**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------- X

DORRELIEN FELIX and MARGALY FELIX, individually, and JONATHAN C. MOORE, as Administrator of the ESTATE OF DAVID FELIX,

Plaintiffs,

- against -

THE CITY OF NEW YORK, a municipal entity; HAROLD CARTER and VINCENTE MATIAS, individually and in their official capacities as New York City Police Detectives; the BRIDGE INC., a domestic not-for-profit organization; and JANE DOE (as of yet unidentified employee of the BRIDGE),

Defendants.

------------------------------------------------------------------------- X

**COMPLAINT**

No. 16-cv-5845

**JURY TRIAL**

     Plaintiff DORRELIEN FELIX and Plaintiff MARGALY FELIX, individually, and Plaintiff JONATHAN C. MOORE, as Administrator of the Estate of David Felix, by their attorneys, Beldock Levine & Hoffman LLP, as and for their Complaint, allege as follows:

<b>PRELIMINARY STATEMENT</b>

    1.    This is a civil rights action brought by the family and the estate of David Felix who was killed by two veteran New York City Police Department detectives on April 25, 2015. David, who suffered from paranoid schizophrenia, suffered a tragic death that is not an anomaly in the City of New York. His death was caused by flagrant violations of David's constitutional rights, and is representative of this City's repeated failure to properly protect and treat its most vulnerable residents: those who are homeless, those who are mentally disabled, and those who come to New York City seeking refuge.

1

2.      With knowledge of David's diagnosis, the two veteran detectives entered David's apartment without a warrant, causing David to jump out of bed in fear and flee from his own home. The detectives pursued David, and shot and killed him in the lobby of his apartment building.

3.      The apartment was run by the Bridge, a non-profit which provides supportive housing to New Yorkers struggling with mental health diagnoses. An employee of the Bridge improperly allowed detectives into the building and into David's apartment, precipitating the events that led to his death.

4.      Mr. Felix's family and estate now seek redress under 42 U.S.C. § 1983 and New York State law for the injuries caused by the brutal and malicious unconstitutional conduct of the detectives involved. They also seek to hold the Bridge accountable for the actions of its employee.

5.      Plaintiffs seek (i) compensatory damages for physical injury, psychological and emotional distress, and financial loss caused by the illegal actions of the defendants; (ii) punitive damages to deter such intentional or reckless deviations from well-settled constitutional law; and (iii) such other and further relief, including costs and attorneys fees, as this Court deems equitable and just.

## JURISDICTION AND VENUE

6.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights and is brought under 42 U.S.C. § 1983.

7.     Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), as this is the judicial district in which the defendant City of New York and defendant the Bridge maintains their principal places of business.

## JURY DEMAND

9.     Plaintiffs demand a trial by jury in this action on each and every one of their claims for which jury trial is legally available.

## THE PARTIES

### Plaintiff

10.     David Felix was 24-years-old Haitian immigrant who, at the time of his death on April 25, 2015, resided at 538 East 6th Street, New York, New York 10009.

11.     Plaintiff DORRELIEN FELIX is the father of David Felix. He is a citizen of Haiti and resides in Port-aux-Prince, Haiti.

12.     Plaintiff MARGALY FELIX is the mother of David Felix. She is a citizen of Haiti and resides in Port-aux-Prince, Haiti.

13.     Plaintiff JONATHAN C. MOORE was appointed by the Surrogate's Court of New York County as the Administrator of Mr. Felix's Estate for purposes of this litigation. He is a citizen of the United States and of the State of New York and resides in New York County.

### Defendants

14.     THE CITY OF NEW YORK (the "City") is a municipal entity created and authorized under the laws of the State of New York.

3

15.     The City is authorized by law to maintain a police department, and does maintain the New York City Police Department ("NYPD") which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers and detectives.

16.     Defendants HAROLD CARTER and VINCENTE MATIAS (also referred to herein as the "Defendant Detectives") are NYPD Police Detectives who unlawfully detained, assaulted, used excessive force, and/or failed to prevent the use of excessive force on Mr. Felix. They are sued in their individual and official capacities as NYPD Police Detectives.

17.     The BRIDGE is a domestic not-for-profit organization, registered to operate in the State of New York. The BRIDGE provides supportive housing and mental health treatment to residents of New York City. In carrying out its duties, the BRIDGE was required to ensure that its personnel were properly trained and that its residents were safe from foreseeable harm.

18.     JANE DOE was, at all relevant times, an employee employed by the BRIDGE. She is sued individually and in her capacity as an employee of the BRIDGE.

19.     At all times relevant herein, defendants HAROLD CARTER and VINCENTE MATIAS have acted under color of state law in the course and scope of their duties and/or functions as agents, employees, and/or officers of the City and/or the NYPD, and incidental to the lawful pursuit of their duties as agents, employees, and/or officers of the City and/or the NYPD.

20.     At the times relevant herein, defendants HAROLD CARTER and VINCENTE MATIAS violated clearly established rights and standards under the United States Constitution, of which reasonable police officers in their respective circumstances would have known.

## STATEMENT OF FACTS

### David's Arrival in New York and His Diagnosis of Paranoid Schizophrenia

21.     In 2007, at the age of 15, David Felix, a citizen of Haiti, fled from his abusive uncle in Florida to New York City hoping to find a new life.

22.     When he arrived in New York City, he lived in foster homes until the age of 18.

23.     David was diagnosed with paranoid schizophrenia. He was aware of his diagnosis, and struggled for years to obtain proper treatment.

24.     The Diagnostic and Statistical Manual of Mental Disorders ("DSM") defines schizophrenia, paranoid type (commonly known as paranoid schizophrenia) as featuring delusions and hallucinations. Those individuals diagnosed with the disorder have a high rate of suicidal ideations.[1]

25.     In or about 2011, David was arrested for allegedly stealing an iPhone. He was held at Rikers Island for seven (7) months, and then transferred to various immigration detention centers, where he remained for an additional two (2) years.

26.     David's illness was severely exacerbated by his detention.

27.     He developed a serious fear of law enforcement officials and of incarceration.

28.     As a result, he became suicidal.

29.     In one instance, he attempted to swallow a battery resulting in a hospitalization.

30.     David was finally released in or about December 2013 after over two traumatic years of immigration detention.

---

[1] *Schizophrenia*, Diagnostic and Statistical Manual of Mental Disorders, 99–104 (5th ed. 1994).

**David's Arrival at the Bridge**

31.     Upon his release from immigration detention, David attempted to create a better, more stable life for himself.

32.     He moved into a homeless shelter and focused on managing his mental health and stabilizing his life.

33.     His primary goal was obtaining permanent housing and his GED.

34.     He worked with a number of non-profit organizations that focused on supporting homeless youths, particularly those who struggle with mental health issues.

35.     These organizations helped him manage his illness and receive temporary shelter.

36.     One such organization helped David obtain a valid visa allowing him to remain in the United States. He received his most recent authorization on April 2, 2015, days before his death.

37.     He joined a church, began volunteering as an outreach worker, and obtained a job at a Pret a Manger coffee and food store.

38.     He was known as social and vibrant, and had a particular interest in music, running, reading, and learning new languages.

39.     One of the many organizations David worked with referred David to the Bridge, a non-profit that offers mental health housing licensed and funded by the New York State Office of Mental Health and New York City Department of Health and Mental Hygiene.

40.     David began working with the Bridge in or around March 2014.

41.     The Bridge was aware of David's paranoid schizophrenia diagnosis, his suicidal tendencies, and his fear of law enforcement.

42.     On April 8, 2014, David was admitted into the Bridge's Personalized Recovery Oriented Services Program (PROS).

43.     PROS is a recovery-oriented program for individuals with serious mental illness.

44.     The goal of the program is to "integrate rehabilitation services in a way that facilitates the participants' abilities to achieve their independent living goals."

45.     David attended a number of programs and met with mental health professionals almost daily in order to obtain his goal of permanent housing.

46.     On April 29, 2014, David signed a High Risk Safety Plan agreement with the Bridge in which he agreed that he would consistently meet with a therapist once a week, regularly take his medication, and meet with a psychiatrist monthly.

47.     He worked with PROS professionals to achieve his goals.

48.     He attended meetings within the PROS program focusing on career exploration, public benefits, and maintenance of his mental health.

49.     He complied with all of the Bridge's objectives, meetings, courses, and therapy sessions.

50.     On October 29, 2014, the Bridge provided David with his own apartment.

51.     It was the first time David had a home since his arrival in New York seven years prior.

52.     David was provided with a lease and placed in the Bridge's East Village Supportive Housing Unit at 538 East 6th Street.

53.     The building had 20 apartments on six floors, all of which were designated as supportive housing for the Bridge's specifically approved clients.

54.     The residence was designated by the Bridge as a 24-hour Supervised Community Residence, which included "24-hour staffing, supervised medication, and an emphasis on skills training so that residents can move to more independent housing."[2]

55.     The Bridge designated David as a "high risk" patient.

56.     They were aware he had attempted suicide and had a serious fear of law enforcement.

57.     After David moved into an apartment within the Bridge's East Village Supportive Housing Unit, he developed a weekly routine within the PROS program, attending almost daily meetings.

58.     David attended a number of courses to help him maintain his mental health treatment, handle stress, and work on obtaining employment.

59.     He also attended a GED program five days a week.

60.     On April 16, 2015, David had an in-person meeting with his advisor.

61.     She reported that David was making good progress.

62.     David expressed his goal to complete his high school equivalency in order to go to trade school.

63.     The following week, he continued his progress by attending another week of PROS meetings and attended GED preparation courses.

**David's Death**

64.     In the early afternoon of Saturday, April 25, 2015, Defendants CARTER and MATIAS arrived at 538 East 6th Street in the East Village neighborhood of New York.

65.     Defendants CARTER and MATIAS were both veteran NYPD Detectives

---

[2] *Mental Health Housing*, THE BRIDGE, *available at* http://thebridgeny.org/programs/housing/mental-health-housing.

stationed at the 26th Precinct in the Harlem, New York,

66.     They were looking to speak to David about an allegation that he had stolen a woman's purse.

67.     Upon information and belief, Defendants CARTER and MATIAS did not have a search warrant or an arrest warrant.

68.     Upon information and belief, Defendants CARTER and MATIAS had no knowledge that David was armed or dangerous.

69.     That afternoon, upon information and belief, Defendant JANE DOE was the sole employee on duty to protect the residents of 538 East 6th Street.

70.     In order to gain entry into the building, individuals and guests must ring the bell outside and, via intercom, request and obtain access from staff members stationed in the building's front office.

71.     Upon information and belief, only permitted visitors were able to obtain access.

72.     The building was staffed 24-hours a day due to the needs of its vulnerable tenants.

73.     Upon information and belief, Defendants CARTER and MATIAS rang the building's doorbell, spoke to Defendant JANE DOE through the intercom, and demanded entry into the building.

74.     Defendant JANE DOE, upon information and belief, allowed Defendants CARTER and MATIAS into the building without a warrant.

75.     Defendants CARTER and MATIAS approached Defendant JANE DOE and requested access to David's apartment.

76.     Defendant JANE DOE informed Defendants CARTER and MATIAS that the apartment housed individuals with mental illnesses, and that David was diagnosed with paranoid schizophrenia.

77.     Upon information and belief, Defendant DOE tried, but failed, to reach a supervisor.

78.     Defendants CARTER and MATIAS refused to wait, and demanded that she escort them to David's door.

79.     Rather than declining them access, Defendant JANE DOE complied, escorting the detectives to the sixth floor, and, using her master key, opened the door to David's locked apartment without a warrant or exigent circumstances, allowing Defendants CARTER and MATIAS into David's apartment.

80.     Defendants CARTER and MATIAS entered David's locked apartment without a warrant or exigent circumstances.

81.     David, who was in bed watching television, immediately panicked, jumped out of his bed, yelled "I'm not going," and ran down the fire escape.

82.     Prior to this confrontation initiated solely by the Detective Defendants forcing their way into the apartment, David Felix posed no immediate threat to anyone.

83.     David, who had spent over two years incarcerated for allegedly stealing an iPhone, had a substantiated fear of police and incarceration. David's fear was well documented and known by the BRIDGE.

84.     In fact, the BRIDGE had recognized that David was a "High Risk" due to a previous suicide attempt while incarcerated at a detention facility.

85.     Upon information and belief, Defendants CARTER and MATIAS ran down the stairs into the lobby of David's apartment building.

86.     Upon information and belief, David unexpectedly encountered the two Detectives in the lobby.

87.     David Felix was unarmed.

88.     An altercation ensued and ended with Defendant CARTER shooting David one time in the chest.

89.     David lay supine and bleeding on the floor of the lobby of his own apartment building.

90.     The detectives called for an ambulance, which arrived at approximately 1:50 p.m.

91.     EMS officials attempted to resuscitate David.

92.     David arrived at Mount Sinai Beth Israel Hospital at approximately 2:10 p.m.

93.     He was transported immediately to the Emergency Room.

94.     Doctors continued resuscitating David, noting that David had a "weak pulse for 1-2 minutes."

95.     Upon information and belief, David felt the excruciating pain of a bullet wound to the chest.

96.     After approximately 20 minutes of attempted resuscitation, doctors declared David dead at 2:30 p.m.

### A Custom, Policy, and Practice of Failing to Properly Handle Individuals with Mental Illnesses

97.     On April 25, 2015, Defendants CARTER and MATIAS violated NYPD policies when they encountered David Felix. These violations were a direct result of the City's deliberate indifference to individuals deemed emotionally disturbed persons (also known as an "EDP").

98.     Prior to and at the time of the shooting, David Felix was identified by the Defendant Detectives as a possible EDP. As such, Defendants were required to follow certain rules and regulations of the NYPD, some of which are outlined in the NYPD Patrol Guide and which required Defendants to employ particular methods and to otherwise use reasonable care in their treatment of David Felix.

99.     Despite the foregoing, Defendant Detectives failed to follow the Patrol Guide and other generally accepted standards. Instead, they used excessive force, and were otherwise wantonly reckless in the manner in which they treated David Felix, in complete disregard for the preservation of his life, and in so doing shot and killed him.

100.    For example, Section 216-05 of the NYPD Patrol Guide explicitly states: "Do not attempt to take [emotionally disturbed persons] into custody without the specific direction of a supervisor" and "attempt to isolate and contain [the person] while maintaining a zone of safety until arrival of a patrol supervisor and Emergency Service Unit personnel."

101.    The Defendant Detectives knew of David's diagnosis and failed to follow the Patrol Guide protocol.

102.    Despite this knowledge of David's condition, the Detectives deliberately and intentionally disregarded the directives for dealing with alleged EDPS set out in the Patrol Guide.

103.    As a direct and proximate result of their deliberate disregard of Patrol Guide procedures, David was killed by the Defendant Detectives.

104.    Upon information and belief, the CITY OF NEW YORK was or should have been aware of police officers' past poor treatment of emotionally disturbed persons, yet failed to adequately screen, train, supervise or discipline police officers regarding the mental health care

needs of citizens, including but not limited to the maintenance of firearms control, use of equipment other than guns to restrain persons, evaluation of initial encounters with police controlling situations with emotionally disturbed persons and adequate medical care. Said inaction constitutes deliberate indifference that caused the assault and death of David Felix.

## COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW

105.    Plaintiffs served a Notice of Claim upon the City of New York on July 20, 2015, within ninety days of the events giving rise to their claims.

106.    On December 4, 2015, Plaintiff JONATHAN C. MOORE, as Administrator of the Estate of David Felix, appeared for an examination pursuant to section 50-h of the New York General Municipal Law.

107.    On December 4, 2015, Plaintiff DORRELIEN FELIX appeared for an examination pursuant to section 50 h of the New York General Municipal Law.

108.    More than thirty days have elapsed since Plaintiffs served their Notice of Claim and the City has not offered adjustment or payment thereof.

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – Violations of Fourth and Fourteenth Amendment Rights
### (against Defendants CARTER and MATIAS)

109.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

110.    In committing the acts and omissions complained of herein, Defendants CARTER and MATIAS acted under color of state law to deprive Mr. Felix and the Plaintiffs of certain constitutionally protected rights under the Fourth and Fourteenth Amendments to the United States Constitution, including, but not limited to:

a.    the right to be free from unreasonable search and seizure;

b.    the right to be free from excessive force;

c.    the right to be free from deprivation of life and liberty without due process of law; and

d.    the right to freely associate with one's family and loved ones.

111.    Defendants CARTER and MATIAS personally violated these constitutional rights, or failed to intervene to prevent the violations of these rights even though they had the ability and opportunity to do so.

112.    As a direct and proximate result of being deprived of these constitutional rights, Plaintiffs suffered the injuries and damages set forth above.

113.    The unlawful conduct of Defendants CARTER and MATIAS was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 – Violations of Fourth and Fourteenth Amendment Rights
### (against the CITY OF NEW YORK)

114.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

115.    The unconstitutional conduct of Defendants CARTER and MATIAS was directly and proximately caused by *de facto* policies, practices, and/or customs devised, implemented, enforced, encouraged and sanctioned by the City whereby written policies are ignored in practice in favor of *de facto* policies.

116.    Defendant CITY OF NEW YORK developed and maintained customs, policies and practices exhibiting deliberate indifference to the constitutional rights of its citizens, which caused the violations of David Felix's rights.

117.    It is a custom, policy, and/or practice of the City to conduct inadequate screening in the hiring of police officers for their propensity for violence and bias against and insensitivity toward emotionally disturbed persons, to certain religious practices which may be different then their own.

118.    The CITY OF NEW YORK developed and maintained a culture of indifference with respect to emotionally disturbed individuals, and have created a *de facto* NYPD policy of brute force. This culture of indifference has existed for years, including, but not limited to, the following examples:

      a.   1984: *Bumpers v. New York City Transit Authority et al.*: When Housing Authority Officials asked for NYPD assistance with the eviction of a 66-year-old African American women they knew was mentally disturbed, officers broke in, ultimately shooting and killing Ms. Bumpers.

      b.   2001: *Kerman v. City of New York et al.*: NYPD officers forcibly entered Mr. Kerman's apartment without a warrant and, knowing he was mentally disabled, slammed the door against Mr. Kerman's forehead, then forcibly restrained him.

      c.   2004: *Estate of Busch v. City of New York et al.*: Six NYPD officers responded to a call regarding a mentally disturbed 29-year-old man with a hammer, and shot him twelve times, killing him instantly.

      d.   2007: *Khiel Choppin*: The mother of a mentally disabled man called 911 seeking assistance to help transport her son to a psychiatric hospital. Choppin was shot and killed by NYPD officers after he attempted to escape by climbing out of his window and holding a hairbrush under his shirt. He was unarmed.

      e.   2008: *Negron v. City of New York et al.*: When officers responded to a mother's request for help with her son Iman Morales, who suffered from schizoaffective disorder and had barricaded himself into his apartment, the officers chose to use a Taser when Morales was standing on a ledge, causing him to fall off the ledge to his death.

    f.   2012: *Francis v. City of New York et al.*: On March 15, 2012, Shereese Francis, an unarmed 29 year-old woman, was killed in her own home by NYPD officers summoned by her family to transport her to the hospital for psychiatric evaluation and care. The officers needlessly antagonized Shereese, chased her, and tackled her onto a bed, pressed their weight on her until she suffered cardiac arrest, and then prevented her from receiving appropriate, timely medical care.

    g.   2012: *Bah v. City of New York*:  Mohamed Bah's mother called for an ambulance for her son. Rather than an ambulance, police officers arrived and, despite his refusal and his mother's objections, confronted Bah. The officers refused his mother's request to let her try and calm him down (as recommended by the NYPD guidelines). After determining Bah was an EDP, NYPD officers with police shields, Tasers, and other weapons surrounded the apartment and forced open Bah's front door. The officers used a Taser against Bah, fired bean bags at him, and ultimately shot and killed him.

119.    As a direct and proximate result of the foregoing acts, omissions, systemic deficiencies and the City's deliberate indifference, David Felix's constitutional rights were violated, because of which he which he suffered substantial damages at an amount to be determined at trial.

120.    As a result of the foregoing, Plaintiffs suffered the injuries and damages alleged herein.

### THIRD CAUSE OF ACTION
### Title II of the ADA and the Rehabilitation Act
### (against the CITY OF NEW YORK)

121.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

122.    Defendants discriminated against David Felix by reason of his mental health disability, denying him the benefits of the services, programs, and activities to which he was entitled as a person with a mental health disability, including, but not limited to, the right to be free of discriminatory or disparate treatment by virtue of his mental disability, and to due process

of the law. As a result, David Felix suffered harm in violation of his rights under the laws and

Constitution of the United States, 42 U.S.C. § 12132 and 29 U.S.C. § 794.

123.    Defendant CITY OF NEW YORK has failed to comply with the mandates of 42

U.S.C. § 12132 and 29 U.S.C. § 794 in the following areas:

     a.    The failure to properly train, supervise, and discipline police officers and detectives regarding crisis intervention techniques for individuals who exhibit the signs and symptoms of mental disabilities;

     b.    The failure to provide adequate training and resources for crisis intervention teams of police officers and detectives and others to respond to emergencies involving persons with mental health disabilities;

     c.    The failure of police officers and detectives to follow established policies, procedures, directives, and instructions regarding crisis intervention techniques for individuals who exhibit the signs and symptoms of mental health disabilities.

124.    By all these actions, Defendants have deprived Plaintiffs of rights secured by the

United States Constitution, 42 U.S.C. § 12132 and 29 U.S.C. § 794.

## FOURTH CAUSE OF ACTION
### Violations of New York State Constitution
### (against CARTER and MATIAS)

125.    Plaintiffs reallege and incorporate by reference the allegations set forth in the

foregoing paragraphs as if fully set forth herein.

126.    CARTER and MATIAS subjected Plaintiffs to the foregoing acts and omissions

without due process of law, thereby depriving the Plaintiffs of rights, privileges, and immunities

guaranteed by Article 1, § 6 and 12 of the New York State Constitution, including, without

limitation, the right to due process and the right to be free from unreasonable searches and

seizures.

127.    As a direct and proximate result of Defendants' deprivations of Mr. Felix's and

Plaintiffs' rights, privileges, and immunities guaranteed by the New York State Constitution,

Mr. Felix and Plaintiffs suffered the injuries and damages set forth above.

### FIFTH CAUSE OF ACTION
**Assault and Battery**
**(against Defendants CARTER and MATIAS)**

128.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

129.    Defendants CARTER and MATIAS, without just cause, wilfully and maliciously used physical force against Mr. Felix, causing his death.

130.    Defendants CARTER and MATIAS committed the foregoing acts intentionally, wilfully, and with malicious disregard for Mr. Felix's rights, and are therefore liable for punitive damages.

### SIXTH CAUSE OF ACTION
**Intentional Infliction of Emotional Distress**
**(against the Individual Defendants)**

131.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

132.    Defendants CARTER and MATIAS, through the foregoing acts, did commit extreme and outrageous conduct and thereby intentionally, and/or recklessly caused Plaintiffs to experience severe mental and emotional distress, pain, suffering, and damage to name and reputation.

133.    Defendant JANE DOE through the foregoing acts, did commit extreme and outrageous conduct and thereby intentionally, and/or recklessly caused Plaintiffs to experience

severe mental and emotional distress, pain, suffering, and damage to name and reputation.

134.   All of these acts were performed without any negligence on the part of Plaintiffs and were the proximate cause of injuries to Plaintiffs.

135.   Defendants committed the foregoing acts intentionally, willfully, and with malicious disregard for Plaintiffs' rights and are therefore liable for punitive damages.

### SEVENTH CAUSE OF ACTION
**Negligence/ Premises Liability**
**(against JANE DOE and the BRIDGE)**

136.   Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

137.   Defendant the BRIDGE maintained control over the egress and ingress into the building.

138.   Defendant the BRIDGE was aware of the needs of the tenants it housed, and the added security on account of the tenants to which they catered.

139.   As a result, Defendant the BRIDGE, either individually or by and through its agents, servants, and/or employees acted with less than reasonable care and is therefore liable for the negligent, careless acts and/or omissions, including:

    a.   Improperly operating, managing, and maintaining its premises at 538 East 6th Street, New York, NY 10009;

    b.   Improperly or negligent training its employees with respect to securing the facility which housed individuals with substantial mental health needs;

    c.   Improperly training its employees on proper policy or procedure for entry of unknown persons, including law enforcement agents;

    d.   Negligently creating dangerous circumstances by improperly securing the property;

    e.   Failing to provide a secure housing facility for "high risk" individuals housed on the property; and

f.   Failing to otherwise exercise due care with respect to the matters alleged herein.

140.   Defendant JANE DOE through the foregoing acts, negligently failed to use due care in the performance of her duties in that she failed to perform her duties with the degree of care that a reasonably prudent and careful person would have used under similar circumstances.

141.   All of these acts were performed without any negligence on the part of Plaintiffs and were the proximate cause of injuries to Plaintiffs.

142.   As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

**EIGHTH CAUSE OF ACTION**
**Negligent Infliction of Emotional Distress**
**(against JANE DOE and the BRIDGE)**

143.   Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

144.   Defendant DOE, as an employee tasked with protecting residents of a supportive housing building, owed Plaintiffs a duty of care.

145.   By reason of the foregoing, defendants are liable to Plaintiff DORRELIEN FELIX and Plaintiff MARGALY FELIX, in their individual capacities, for the negligent infliction of emotional distress.

146.   As a result, Plaintiffs suffered emotional distress.

147.   As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

## NINTH CAUSE OF ACTION
### Negligent Hiring, Training, and Discipline
### (against the BRIDGE)

148.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

149.     Defendant the BRIDGE owed a duty of care to David Felix to prevent the conduct alleged, because under the same or similar circumstances, a reasonable prudent, and careful person should have anticipated that injury to Mr. Felix or to those in a like situation would likely result from the foregoing conduct.

150.     Defendant the BRIDGE, failing to adequately train its employees or employ enough staff to secure the entrance, negligently failed to use due care in the performance of its duties in that they failed to perform their duties with the degree of care that a reasonably prudent and careful non-profit would have used under similar circumstances.

151.     The BRIDGE knew or should have known through the exercise of reasonable diligence that the individuals it employed needed to be adequately trained when securing a facility for the mentally disabled. The BRIDGE's negligence in screening, hiring, training, disciplining, and retaining its employees, including Defendant JANE DOE, proximately caused Plaintiffs' injuries.

152.     As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

## TENTH CAUSE OF ACTION
### Wrongful Death
### (against the Individual Defendants, the CITY OF NEW YORK, and the BRIDGE)

153.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

21

154.    The acts of the Defendants, alleged herein, wrongfully caused the death of David Felix.

155.    By reason of the foregoing, Plaintiffs DORRELIEN FELIX and MARGALY FELIX, the statutory distributees of Mr. Felix's estate sustained pecuniary and non-economic loss resulting from the loss of love, comfort, society, attention, services, and support of Mr. Felix. Defendants are liable for the wrongful death of Mr. Felix.

156.    As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

157.    As a consequence, Plaintiffs have suffered damages in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
### *Respondeat Superior*

158.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

159.    At all relevant times, Defendants CARTER and MATIAS were employees of the City and were acting within the scope of their employment.

160.    The CITY OF NEW YORK is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of Defendants CARTER and MATIAS set forth herein.

161.    At all relevant times, Defendant JANE DOE was employed by the BRIDGE and was acting within the scope of her employment.

162.    The BRIDGE is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of defendant JANE DOE.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiffs demand the following relief against the defendants, jointly and severally:

     (a)    compensatory damages in an amount just and reasonable and in conformity with the evidence at trial;

     (b)    punitive damages against the individual defendants;

     (c)    attorneys fees;

     (d)    the costs and disbursements of this action;

     (e)    interest; and

     (f)    such other and further relief as this Court deems just and proper.

Dated: New York, New York
       July 21, 2016

                             BELDOCK LEVINE & HOFFMAN LLP

                             By:   /s/                     
                                 Jonathan C. Moore, Esq.
                                 Luna Droubi, Esq.
                             99 Park Avenue, PH/26th Floor
                             New York, New York 10016
                             (212) 490-0400

                             *Attorneys for Plaintiffs*