**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------- X

DORRELIEN FELIX and MARGALY FELIX, individually, and JONATHAN C. MOORE, as Administrator of the ESTATE OF DAVID FELIX,

                                   Plaintiffs,

      - against -

THE CITY OF NEW YORK, a municipal entity; HAROLD CARTER and VINCENTE MATIAS, individually and in their official capacities as New York City Police Detectives; the BRIDGE INC., a domestic not-for-profit organization; and JANE DOE (as of yet unidentified employee of the BRIDGE),

                                   Defendants.

-------------------------------------------------------------------------- X

**FIRST AMENDED**
**COMPLAINT**

No. 16-cv-5845

**JURY TRIAL**

Plaintiff DORRELIEN FELIX and Plaintiff MARGALY FELIX, individually, and Plaintiff JONATHAN C. MOORE, as Administrator of the Estate of David Felix, by their attorneys, Beldock Levine & Hoffman LLP, as and for their Complaint, allege as follows:

### PRELIMINARY STATEMENT

1.       This is a civil rights action brought by the family and the estate of David Felix who was killed by two veteran New York City Police Department detectives on April 25, 2015. Mr. Felix, a 24-year-old Haitian immigrant, who was diagnosed with paranoid schizophrenia, suffered a tragic but wholly unavoidable death that is unfortunately not an anomaly in the City of New York. His death was caused by flagrant violations of his constitutional rights, and is representative of this City's repeated failure to properly protect and treat its most vulnerable residents: those who are homeless, those who are mentally disabled, and those who come to New York City seeking refuge.

1

2.	With knowledge that Mr. Felix's suffered from a mental illness, the two veteran detective defendants entered Mr. Felix's apartment without a warrant, causing Mr. Felix to jump out of bed in fear and flee from his own home. The detectives, who were in plain clothes, pursued Mr. Felix and, after a physical confrontation, shot and killed him in the lobby of his apartment building.

3.	The building that housed Mr. Felix's apartment was run by the BRIDGE, a non-profit which provides supportive housing to New Yorkers struggling with mental health diagnoses. An employee of the BRIDGE improperly allowed detectives into the building and into Mr. Felix's apartment, precipitating the events that led to his death.

4.	Mr. Felix's family and estate now seek redress under 42 U.S.C. § 1983 and New York State law for the injuries caused by the brutal and malicious unconstitutional conduct of the detectives involved. They also seek to hold the BRIDGE accountable for the actions of its employee.

5.	Plaintiffs seek (i) compensatory damages for physical injury, psychological and emotional distress, and financial loss caused by the illegal actions of the defendants; (ii) punitive damages to deter such intentional or reckless deviations from well-settled constitutional law; (iii) injunctive and declaratory relief; and (iv) such other and further relief, including costs and attorneys fees, as this Court deems equitable and just.

## JURISDICTION AND VENUE

6.	Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights and is brought under 42 U.S.C. § 1983.

7.      Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), as this is the judicial district in which the defendant City of New York and defendant the BRIDGE maintain their principal places of business.

**JURY DEMAND**

9.      Plaintiffs demand a trial by jury in this action on each and every one of their claims for which jury trial is legally available.

**THE PARTIES**

**Plaintiff**

10.      David Felix was a 24-year-old Haitian immigrant who, at the time of his death on April 25, 2015, resided at 538 East 6th Street, New York, New York 10009.

11.      Plaintiff DORRELIEN FELIX is the father of David Felix. He is a citizen of Haiti and resides in Port-au-Prince, Haiti.

12.      Plaintiff MARGALY FELIX is the mother of David Felix. She is a citizen of Haiti and resides in Port-au-Prince, Haiti.

13.      Plaintiff JONATHAN C. MOORE was appointed by the Surrogate's Court of New York County as the Administrator of Mr. Felix's Estate for purposes of this litigation. He is a citizen of the United States and of the State of New York and resides in New York County.

**Defendants**

14.      THE CITY OF NEW YORK (the "City") is a municipal entity created and authorized under the laws of the State of New York.

15. The City is authorized by law to maintain a police department, and does maintain the New York City Police Department ("NYPD") which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers and detectives.

16. Defendants HAROLD CARTER and VINCENTE MATIAS (also referred to herein as the "Defendant Detectives") are NYPD Police Detectives who unlawfully detained, assaulted, used excessive force, and/or failed to prevent the use of excessive force on Mr. Felix. They are sued in their individual and official capacities as NYPD Police Detectives.

17. The BRIDGE is a domestic not-for-profit organization, registered to operate in the State of New York. The BRIDGE provides supportive housing and mental health treatment to residents of New York City. In carrying out its duties, the BRIDGE was required to ensure that its personnel were properly trained and that its residents were safe from foreseeable harm.

18. JANE DOE was, at all relevant times, an employee employed by the BRIDGE. She is sued individually and in her capacity as an employee of the BRIDGE.

19. At all times relevant herein, defendants HAROLD CARTER and VINCENTE MATIAS have acted under color of state law in the course and scope of their duties and/or functions as agents, employees, and/or officers of the City and/or the NYPD, and incidental to the lawful pursuit of their duties as agents, employees, and/or officers of the City and/or the NYPD.

20. At the times relevant herein, defendants HAROLD CARTER and VINCENTE MATIAS violated clearly established rights and standards under the United States Constitution, of which reasonable police officers in their respective circumstances would have known.

4

**COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW**

21.     Plaintiffs served a Notice of Claim upon the City of New York on July 20, 2015, within ninety days of the events giving rise to their claims.

22.     On December 4, 2015, Plaintiff JONATHAN C. MOORE, as Administrator of the Estate of David Felix, appeared for an examination pursuant to section 50-h of the New York General Municipal Law.

23.     On December 4, 2015, Plaintiff DORRELIEN FELIX appeared for an examination pursuant to section 50-h of the New York General Municipal Law.

24.     More than thirty days have elapsed since Plaintiffs served their Notice of Claim and the City has not offered adjustment or payment thereof.

**STATEMENT OF FACTS**

**David's Arrival in New York and His Diagnosis of Paranoid Schizophrenia**

25.     In 2007, at the age of 15, David Felix, a citizen of Haiti, came to New York City hoping to find a new life.

26.     When he arrived in New York City, he lived in foster homes until the age of 18.

27.     Mr. Felix was diagnosed with paranoid schizophrenia. He was aware of his diagnosis, and struggled for years to obtain proper treatment.

28.     The Diagnostic and Statistical Manual of Mental Disorders ("DSM") describes the symptoms of schizophrenia, paranoid type (commonly known as paranoid schizophrenia) as featuring delusions and hallucinations.

29.     Mr. Felix's diagnosis made it difficult for him to maintain a job and interact with strangers.

30.     In or about 2011, Mr. Felix was arrested for allegedly stealing an iPhone. He was held at Rikers Island for seven (7) months, and then transferred to various immigration detention centers, where he remained for an additional two (2) years.

31.     Mr. Felix's illness was severely exacerbated by this detention.

32.     He developed a serious fear of law enforcement officials and of incarceration.

33.     As a result, he became suicidal.

34.     In one instance, he attempted to swallow a battery resulting in a hospitalization.

35.     Mr. Felix was finally released in or about December 2013 after over two years of immigration detention.

**Mr. Felix's Arrival at the Bridge**

36.     Upon his release from immigration detention, Mr. Felix attempted to create a better, more stable life for himself.

37.     He moved into a homeless shelter and focused on managing his mental health and stabilizing his life.

38.     His primary goal was obtaining permanent housing and his GED.

39.     He sought assistance from a number of non-profit organizations that focused on supporting homeless youths, particularly those who struggle with mental health issues.

40.     These organizations helped him manage his illness and provided him with temporary shelter.

41.     One such organization helped Mr. Felix obtain a valid visa allowing him to remain in the United States. He received his most recent authorization on April 2, 2015, days before his death.

42.     Mr. Felix joined a church, began volunteering as an outreach worker, and obtained a job at a Pret a Manger coffee and food store.

43.     He was known as social and vibrant, and had a particular interest in music, running, reading, and learning new languages.

44.     One of the many organizations Mr. Felix worked with referred him to the BRIDGE, a non-profit that offers mental health housing licensed and funded by the New York State Office of Mental Health and New York City Department of Health and Mental Hygiene.

45.     Mr. Felix began working with the BRIDGE in or around March 2014.

46.     The BRIDGE was aware of Mr. Felix's paranoid schizophrenia diagnosis, his suicidal tendencies, and his fear of law enforcement.

47.     On April 8, 2014, Mr. Felix was admitted into the BRIDGE's Personalized Recovery Oriented Services Program (PROS).

48.     PROS is a recovery-oriented program for individuals with serious mental illnesses.

49.     The goal of the program is to "integrate rehabilitation services in a way that facilitates the participants' abilities to achieve their independent living goals."

50.     Mr. Felix attended a number of programs and met with mental health professionals almost daily in order to obtain his goal of permanent housing.

51.     On April 29, 2014, Mr. Felix signed a High Risk Safety Plan agreement with the BRIDGE in which he agreed that he would consistently meet with a therapist once a week, regularly take his medication, and meet with a psychiatrist monthly.

52.     He worked with PROS professionals to achieve his goals.

53.     He attended meetings within the PROS program focusing on career exploration, public benefits, and maintenance of his mental health.

54.     He complied with all of the BRIDGE's objectives, meetings, courses, and therapy sessions.

55.     On October 29, 2014, the BRIDGE provided Mr. Felix with his own apartment.

56.     It was the first time Mr. Felix had a home since his arrival in New York seven years prior.

57.     Mr. Felix was provided with a lease and placed in the BRIDGE's East Village Supportive Housing Unit at 538 East 6th Street.

58.     The building had 20 apartments on six floors, all of which were designated as supportive housing for the BRIDGE's specifically approved clients.

59.     The residence was designated by the BRIDGE as a 24-hour Supervised Community Residence, which included "24-hour staffing, supervised medication, and an emphasis on skills training so that residents can move to more independent housing."

60.     The BRIDGE designated Mr. Felix as a "high risk" patient.

61.     They were aware he had attempted suicide and had a serious fear of law enforcement.

62.     After Mr. Felix moved into an apartment within the BRIDGE's East Village Supportive Housing Unit, he developed a weekly routine within the PROS program, attending almost daily meetings.

63.     Mr. Felix attended a number of courses to help him maintain his mental health treatment, handle stress, and work on obtaining employment.

64.     He also attended a GED program five days a week.

65.     On April 16, 2015, Mr. Felix had an in-person meeting with his advisor.

66.     She reported that Mr. Felix was making good progress.

67.     Mr. Felix expressed his goal to complete his high school equivalency in order to go to trade school.

68.     The following week, he continued his progress by attending another week of PROS meetings and attended GED preparation courses.

**Mr. Felix's Death**

69.     In the early afternoon of Saturday, April 25, 2015, Defendants CARTER and MATIAS arrived at 538 East 6th Street in the East Village neighborhood of Manhattan.

70.     Upon information and belief, Defendants CARTER and MATIAS were not in NYPD uniforms but were plain clothed.

71.     Defendants CARTER and MATIAS were both veteran NYPD Detectives stationed at the 26th Precinct the Harlem, New York.

72.     They were looking to speak to Mr. Felix about an allegation that he had stolen a woman's purse.

73.     Defendants CARTER and MATIAS did not have a search warrant or an arrest warrant. Instead, they possessed an Investigation Card, also known as an I-Card, which is issued by the NYPD and not by a judge or neutral magistrate.

74.     Upon information and belief, Defendants CARTER and MATIAS had no knowledge that Mr. Felix was armed or dangerous.

75.     That afternoon, upon information and belief, Defendant JANE DOE was the sole employee on duty to protect the residents of 538 East 6th Street.

76. In order to gain entry into the building, individuals and guests must ring the bell outside and, via intercom, request and obtain access from staff members stationed in the building's front office.

77. Upon information and belief, only permitted visitors were able to obtain access.

78. The building was staffed 24-hours a day due to the needs of its vulnerable tenants.

79. Upon information and belief, Defendants CARTER and MATIAS rang the building's doorbell, spoke to Defendant JANE DOE through the intercom, and demanded entry into the building.

80. Defendant JANE DOE, upon information and belief, allowed Defendants CARTER and MATIAS into the building without a warrant.

81. Once inside the building, Defendants CARTER and MATIAS approached Defendant JANE DOE and demanded access to Mr. Felix's apartment.

82. Upon information and belief, Defendant JANE DOE informed Defendants CARTER and MATIAS that the apartment building housed individuals with mental illnesses, and that Mr. Felix was diagnosed with paranoid schizophrenia.

83. Upon information and belief, Defendant DOE tried, but failed, to reach a supervisor.

84. Defendants CARTER and MATIAS refused to wait, and demanded that she escort them to, and open the door to, Mr. Felix's apartment.

85. Rather than declining them access, Defendant JANE DOE complied, escorting the detectives to the sixth floor, and, using her master key, opened the door to Mr. Felix's locked apartment without a warrant or exigent circumstances, allowing Defendants CARTER and MATIAS into Mr. Felix's apartment.

86.     Upon information and belief, Defendant JANE DOE provided Defendants CARTER and MATIAS access to Mr. Felix's apartment without first announcing to Mr. Felix that police officers wanted to speak with him.

87.     Defendants CARTER and MATIAS entered Mr. Felix's locked apartment without a warrant or exigent circumstances, and without knocking first and requesting entry.

88.     Mr. Felix, who was in bed watching television, immediately panicked, jumped out of his bed, yelled "I'm not going," and ran down the fire escape.

89.     Prior to this confrontation initiated solely by the Detective Defendants forcing their way into his apartment, David Felix posed no immediate threat to anyone.

90.     Mr. Felix, who had spent over two years incarcerated for allegedly stealing an iPhone, had a substantiated fear of police and incarceration. Mr. Felix's fear was well documented and known by the BRIDGE.

91.     In fact, the BRIDGE had recognized that Mr. Felix was a "High Risk" client due to a previous suicide attempt while incarcerated at a detention facility.

92.     Upon information and belief, Defendants CARTER and MATIAS ran down the stairs into the lobby of Mr. Felix's apartment building.

93.     Upon information and belief, Mr. Felix unexpectedly encountered the two Detectives in the lobby.

94.     David Felix was unarmed.

95.     A physical altercation ensued and ended with Defendant CARTER shooting Mr. Felix one time in the chest.

96.     Mr. Felix lay supine and bleeding on the floor of the lobby of his own apartment building.

97.    The detectives called for an ambulance, which arrived at approximately 1:50 p.m.

98.    EMS officials attempted to resuscitate Mr. Felix.

99.    Mr. Felix arrived at Mount Sinai Beth Israel Hospital at approximately 2:10 p.m.

100.    He was immediately transported to the Emergency Room.

101.    Doctors continued resuscitating Mr. Felix, noting that Mr. Felix had a "weak pulse for 1-2 minutes."

102.    Upon information and belief, Mr. Felix felt the excruciating pain of a bullet wound to the chest.

103.    After approximately 20 minutes of attempted resuscitation, doctors declared Mr. Felix dead at 2:30 p.m.

**A Custom, Policy, and Practice of Improper Use of I-Cards to Gain Access to Residences**

104.    NYPD officers must possess a valid warrant, based upon probable cause and issued by a judge or magistrate, in order to cross the threshold of a home.

105.    Absent consent, or exigent or emergency circumstances, an officer's warrantless entry into a residence is presumptively unreasonable and violates the Fourth Amendment of the U.S. Constitution.

106.    An Identification Card (also known as "I-Card") is an internal NYPD tool that tracks individuals that officers seek to interview or arrest.

107.    An I-Card is not a warrant and does not provide officers with any legal authority to enter an apartment to question or arrest someone.

108.    It is a custom, policy, and/or practice of the City to permit police officers and detectives to improperly use I-Cards to unlawfully and unconstitutionally gain access to an individual's home or residence.

109.    In fact, the NYPD Patrol Guide § 208-23 describes the use of I-Cards, but does not clearly state that an investigation card does not constitute a warrant or that it is unlawful for the NYPD member of service to use the I-Card to gain entry into a residence.

110.    In a 2015 Civilian Complaint Review Board ("CCRB") Report analyzing improper entries and searches by the NYPD from January 2010 to October 2015, the CCRB identified a trend in CCRB complaints, finding that, in a number of cases, the NYPD officers were improperly using I-Cards to gain access to individual's homes: "Investigation cards (commonly known as I-cards) are present in numerous substantiated cases, suggesting that they are being improperly used by investigatory commands to gain entry into homes to search and apprehend the subject of the investigation card."[1]

111.    In the Report, the CCRB analyzed 1,759 complaints corresponding to 2,465 allegations of unlawful entries and searches of a premises between January 2010 to October 2015.

112.    The CCRB identified 28 out of 174 (16%) cases of substantiated CCRB complaints in which the NYPD used I-Cards to unlawfully and unconstitutionally gain access into a home.[2]

113.    The CCRB recommended the following:

---

[1] *Crossing the Threshold: An Evaluation of Civilian Complaints of Improper Entries and Searches by the NYPD from January 2010 to October 2015*, CCRB (2015) at 7, *available at* http://www.nyc.gov/html/ccrb/downloads/pdf/Crossing-the-Threshold-2010-2015.pdf

[2] *Id.* at 54.

a. The NYPD Patrol Guide, Police Student's Guide, and other training material should explicitly state, and officers should be retrained, that investigation cards are not warrants. Further, investigation cards carry with them no authority to enter homes; and

b. The NYPD should clarify the situations where it is permissible for officers to create an investigation card for an individual instead of obtaining an arrest warrant, with an emphasis on the need for warrants if officers want to apprehend an individual inside a private residence.

**A Custom, Policy, and Practice of Failing to Properly Handle Individuals with Mental Illnesses**

114. On April 25, 2015, Defendants CARTER and MATIAS violated existing NYPD policies when they encountered David Felix. These violations were a direct result of the Individual Defendants' and the City's deliberate indifference to individuals deemed emotionally disturbed persons (hereinafter, "EDP" or "EDPs").

115. Prior to and at the time of the shooting, David Felix was identified by the Defendant Detectives as a possible EDP. As such, Defendants were required to follow certain rules and regulations of the NYPD, some of which are outlined in the NYPD Patrol Guide and which required Defendants to employ particular methods and to otherwise use reasonable care in their treatment of David Felix.

116. For example, Section 216-05 of the NYPD Patrol Guide explicitly states: "Do not attempt to take [emotionally disturbed persons] into custody without the specific direction of a supervisor" and "attempt to isolate and contain [the person] while maintaining a zone of safety until arrival of a patrol supervisor and Emergency Service Unit personnel."

14

117. Despite the foregoing, Defendant Detectives failed to follow the Patrol Guide and other generally accepted standards. Instead, they forced a physical confrontation, used excessive force, and were otherwise wantonly reckless in the manner in which they treated David Felix, in complete disregard for the preservation of his life, and, in so doing, shot and killed him.

118. The Defendant Detectives knew of Mr. Felix's diagnosis and failed to follow the Patrol Guide protocol.

119. Despite this knowledge of Mr. Felix's condition, the Detectives deliberately and intentionally disregarded the directives for dealing with alleged EDPs set out in the Patrol Guide.

120. As a direct and proximate result of their deliberate disregard of Patrol Guide procedures, Mr. Felix was killed by the Defendant Detectives.

121. Upon information and belief, the CITY OF NEW YORK was or should have been aware of police officers' past poor treatment of emotionally disturbed persons, yet failed to adequately screen, train, supervise, or discipline police officers regarding the mental health care needs of citizens including, but not limited to, the use of equipment other than guns to restrain persons, evaluation of initial encounters with police controlling situations with emotionally disturbed persons and adequate medical care. Said inaction constitutes deliberate indifference that caused the assault and death of David Felix.

122. The NYPD has acknowledged the failures of its *de facto* EDP policy by implementing a Crisis Intervention Team (CIT) beginning in the summer of 2015, just a few months after Mr. Felix's death.

123. In a January 2017 Report by the New York City Department of Investigation, Office of the Inspector General for the NYPD (OIG-NYPD), the OIG-NYPD identified long-standing deficiencies in the NYPD's handling of responses to EDPs.[3]

124. The Report criticized the NYPD's lack of an EDP policy[4] and the failure to properly train police officers on how to handle responding to individuals with mental disabilities prior to the summer of 2015.

125. The Report described the training prior to the summer of 2015, which was in existence at the time of Mr. Felix's death:

> Until the summer of 2015, NYPD had one basic form of training for police officers on how to handle encounters with people in mental crisis. Since 2002, both recruits and promoted officers within the Department received a one-day training led by instructors from John Jay College of Criminal Justice. The earlier form of training involved a short, basic lecture on mental illnesses in the morning and then had a few of the officers engage in a total of four role-playing scenarios in the afternoon, involving schizophrenia, manic-depression, and a suicidal officer.[5]

126. The Report also identified certain changes implemented by the NYPD since the summer of 2015: "[s]ince the summer of 2015, NYPD has been working to enhance the training it provides officers in handling these complicated and often volatile encounters by creating and implementing Crisis Intervention Team (CIT) training." *Id.*

---

[3] *Putting Training Into Practice: A Review of NYPD's Approach to Handling Interactions with People in Mental Crisis* (Jan. 2017), *available at* http://www1.nyc.gov/assets/oignypd/downloads/pdf/Reports/CIT_Report_01192017.pdf.

[4] The Report also identifies that, in several cities, "the failure to adequately manage police interactions with the mentally ill has resulted in U.S. Department of Justice (DOJ) findings, settlement agreements, and consent decrees in which federal monitors have been installed to oversee court-mandated improvements in the way those cities' police departments police." *Id.* at 2.

[5] *Id.* at 10.

127.    However, since its implementation in the summer of 2015, the NYPD's new policy remains flawed. The Report criticizes the "NYPD's failure to fully integrate and use [the CIT] training within the totality of NYPD's everyday policing." *Id.* at 1.

128.    These failures include failing to create a department-wide CIT system, failing to adjust or amend the Patrol Guide or create a written policy to reflect the goals and approach of the new CIT training programs, and existing deficiencies in the current CIT trainings. *Id.* at 14, 17, 28.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983 – Violations of Fourth and Fourteenth Amendment Rights**
**(against Defendants CARTER and MATIAS)**

129.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

130.    In committing the acts and omissions complained of herein, Defendants CARTER and MATIAS acted under color of state law to deprive Mr. Felix and the Plaintiffs of certain constitutionally protected rights under the Fourth and Fourteenth Amendments to the United States Constitution, including, but not limited to:

    a.    the right to be free from unreasonable search and seizure;

    b.    the right to be free from excessive force;

    c.    the right to be free from deprivation of life and liberty without due process of law; and

    d.    the right to freely associate with one's family and loved ones.

131.    Defendants CARTER and MATIAS personally violated these constitutional rights, or failed to intervene to prevent the violations of these rights even though they had the ability and opportunity to do so.

132.    As a direct and proximate result of being deprived of these constitutional rights,

Plaintiffs suffered the injuries and damages set forth above.

133. The unlawful conduct of Defendants CARTER and MATIAS was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

### SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 – Violations of Fourth and Fourteenth Amendment Rights
### (against the CITY OF NEW YORK)

134. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

135. The unconstitutional conduct of Defendants CARTER and MATIAS was directly and proximately caused by *de facto* policies, practices, and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City whereby written policies are ignored in practice in favor of *de facto* policies.

136. Defendant CITY OF NEW YORK developed and maintained customs, policies and practices exhibiting deliberate indifference to the constitutional rights of its citizens, which caused the violations of David Felix's rights.

137. It is a custom, policy, and/or practice of the City to improperly use I-Cards to unlawfully and unconstitutionally gain access to an individual's home.

138. The CITY OF NEW YORK has developed and maintained a culture of indifference with respect to unlawful entries into premises and residences through the use of I-Cards.

139. The CITY OF NEW YORK has failed to properly train NYPD officers that I-Cards do not constitute warrants and cannot be used to enter into premises or residences.

140.    It is also a custom, policy, and/or practice of the CITY OF NEW YORK to conduct inadequate screening in the hiring of police officers for their propensity for violence and bias against and insensitivity toward emotionally disturbed persons.

141.    The CITY OF NEW YORK developed and maintained a culture of indifference with respect to emotionally disturbed individuals, and have created a *de facto* NYPD policy of brute and excessive force which, in many instances, have led to death.

142.    The *de facto* policy and the culture of indifference have existed for years, including, but not limited to, the following examples:

   a.   1984: *Bumpers v. New York City Transit Authority et al.*: When Housing Authority Officials asked for NYPD assistance with the eviction of a 66-year-old African American women they knew was mentally disturbed, officers broke in, ultimately shooting and killing Ms. Bumpers.

   b.   2001: *Kerman v. City of New York et al.*: NYPD officers forcibly entered Mr. Kerman's apartment without a warrant and, knowing he was mentally disabled, slammed the door against Mr. Kerman's forehead, then forcibly restrained him.

   c.   2004: *Estate of Busch v. City of New York et al.*: Six NYPD officers responded to a call regarding a mentally disturbed 29-year-old man with a hammer, and shot him twelve times, killing him instantly.

   d.   2007: *Khiel Choppin*: The mother of a mentally disabled man called 911 seeking assistance to help transport her son to a psychiatric hospital. Mr. Choppin was shot and killed by NYPD officers after he attempted to escape by climbing out of his window and holding a hairbrush under his shirt. He was unarmed.

   e.   2008: *Negron v. City of New York et al.*: When officers responded to a mother's request for help with her son Iman Morales, who suffered from schizoaffective disorder and had barricaded himself into his apartment, the officers chose to use a Taser when Morales was standing on a ledge, causing him to fall off the ledge to his death.

f.  2012: *Francis v. City of New York et al.*: On March 15, 2012, Shereese Francis, an unarmed 29 year-old woman, was killed in her own home by NYPD officers summoned by her family to transport her to the hospital for psychiatric evaluation and care. The officers needlessly antagonized Ms. Francis, chased her, and tackled her onto a bed, pressed their weight on her until she suffered cardiac arrest, and then prevented her from receiving appropriate, timely medical care.

g.  2012: *Bah v. City of New York*: Mohamed Bah's mother called for an ambulance for her son after he began acting strangely, informing the dispatcher that he had mental health issues. Rather than an ambulance, police officers arrived and, despite his refusal and his mother's objections, confronted Mr. Bah. The officers refused his mother's request to let her try and calm him down. NYPD officers with police shields, Tasers, and other weapons surrounded the apartment and forced open Mr. Bah's front door. The officers used a Taser against Mr. Bah, fired bean bags at him, and ultimately shot and killed him.

h.  2016: *Deborah Danner*: Ms. Danner was a 66-year-old African-American woman with a history of schizophrenia who was killed by the NYPD on October 18, 2016. The NYPD responded to a call that a woman had been acting erratically in an apartment building. When they arrived. Ms. Danner was holding kitchen scissors. The officer then allege that she picked up a wooden bat. Sergeant Hugh Barry shot Ms. Danner twice, killing her. In response, NYPD Police Commissioner James P. O'Neill stated that "we've established procedures and protocols for handling emotionally disturbed people. That's to keep everybody safe, that's to keep the cops safe, the community safe and the person that we're dealing with safe." He added, "it looks like some of those procedures weren't followed."[6]

i.  2016: *Conrad v. City of New York*: NYPD officers were summoned to a Food Emporium after a customer, Garry Conrad, had been reported acting erratically. After Mr. Conrad was escorted out of the store, officers approached Mr. Conrad and, rather than de-escalating the situation, caused further escalation. The officers shot Mr. Conrad seven times after he allegedly brandished a knife.

---

[6] Mark Berman, *'We failed,' New York police commissioner says of sergeant fatally shooting 'emotionally disturbed' woman*, Wash. Post, Oct. 19, 2016, *available at* https://www.washingtonpost.com/news/post-nation/wp/2016/10/19/new-york-police-sergeant-fatally-shoots-emotionally-disturbed-woman-in-the-bronx/?utm_term=.8f8bd26bfda9.

j. September 6, 2017: *Miguel Richards*: NYPD officers responded to a request from a Bronx landlord to check on a tenant. The officers found Mr. Richards in his room standing in a corner with a knife—and what was later discovered to be a toy gun—in his hand. For approximately 15 minutes, officers screamed at him, instructing him to put his knife down. Mr. Richards did not move or make a sound. During the exchange, one officer suggested that the officers close the door and allow the Emergency Service Unit officers, who were downstairs, to handle the situation. Instead, the officers escalated the situation by bursting in and firing 16 shots at Mr. Richards, killing him instantly.

143. As a direct and proximate result of the foregoing acts, omissions, systemic deficiencies and the City's deliberate indifference, David Felix's constitutional rights were violated, because of which he which he suffered substantial damages at an amount to be determined at trial.

144. As a result of the foregoing, Plaintiffs suffered the injuries and damages alleged herein.

### THIRD CAUSE OF ACTION
**Title II of the ADA and the Rehabilitation Act**
**(against the CITY OF NEW YORK)**

145. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

146. The NYPD is a federally-funded program of the City.

147. David Felix was a disabled person by virtue of a mental impairment that substantially limited one or more of his major life activities, including, but not limited to, his ability to maintain employment and to interact with strangers, and was regarded as such by the Defendant Detectives after speaking to Defendant JANE DOE.

148. The involvement of NYPD officers such as that made by the Defendant Detectives to Mr. Felix's home on April 25, 2015 is a program and activity of NYPD and the CITY OF NEW YORK.

149.     On April 25, 2015, David Felix met the essential eligibility requirements for the receipt of NYPD services.

150.     The NYPD had a procedure in place at the time David was killed for dealing with individuals known to be EDPs. This procedure is set forth in Section 216-05 of the NYPD Patrol Guide.

151.     The actions of the Defendant Detectives were not in compliance with the services set forth by the NYPD in Patrol Guide § 216-05 for individuals "who appear[] to be mentally ill or temporarily deranged" where the individual is acting "in a manner which a police officer reasonably believes his likely to result in serious injury" to the individual or others.

152.     Pursuant to the Patrol Guide, the officers were required to "assess situation as to threat of immediate serious physical injury to EDP, other persons present, or members of service. Take cover, utilize protective shield if available and request additional personnel, if necessary."

153.     Instead, the Defendant Detectives entered Mr. Felix's apartment without a warrant with full knowledge that Mr. Felix had been diagnosed with paranoid schizophrenia.

154.     David Felix was discriminated against and deprived of equal access to and the benefits of police services because of his disability, because the officers who pursued, restrained, and killed him on April 25, 2015 failed to reasonably accommodate his disability by needlessly confronting him, by rushing their encounter with him, by not waiting for a supervisor or other more highly trained officer to arrive at the scene before entering his apartment, by escalating the situation, and by using deadly force instead of other readily-available techniques for de-escalating the situation.

155.     Defendants discriminated against David Felix by reason of his mental health disability, denying him the benefits of the services, programs, and activities to which he was

entitled as a person with a mental health disability, including, but not limited to, the right to be free of discriminatory or disparate treatment by virtue of his mental disability, and to due process of the law. As a result, David Felix suffered harm in violation of his rights under the laws and Constitution of the United States, 42 U.S.C. § 12132 and 29 U.S.C. § 794.

156. Defendant CITY OF NEW YORK has failed to comply with the mandates of 42 U.S.C. § 12132 and 29 U.S.C. § 794 in the following areas:

    a. The failure to properly train, supervise, and discipline police officers and detectives regarding crisis intervention techniques for individuals who exhibit the signs and symptoms of mental disabilities;

    b. The failure to provide adequate training and resources for police officers and detectives and others who encounter persons with mental health disabilities;

    c. The failure of police officers and detectives to follow established policies, procedures, directives, and instructions regarding crisis intervention techniques for individuals who exhibit the signs and symptoms of mental health disabilities.

157. By all these actions, Defendants have deprived Plaintiffs of rights secured by the United States Constitution, 42 U.S.C. § 12132 and 29 U.S.C. § 794.

**FOURTH CAUSE OF ACTION**
**Violations of New York State Constitution**
**(against CARTER and MATIAS)**

158. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

159. CARTER and MATIAS subjected Plaintiffs to the foregoing acts and omissions without due process of law, thereby depriving the Plaintiffs of rights, privileges, and immunities guaranteed by Article 1, § 6 and 12 of the New York State Constitution, including, without limitation, the right to due process and the right to be free from unreasonable searches and seizures.

160.     As a direct and proximate result of Defendants' deprivations of Mr. Felix's and Plaintiffs' rights, privileges, and immunities guaranteed by the New York State Constitution, Mr. Felix and Plaintiffs suffered the injuries and damages set forth above.

### FIFTH CAUSE OF ACTION
**Assault and Battery**
**(against Defendants CARTER and MATIAS)**

161.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

162.     Defendants CARTER and MATIAS, without just cause, wilfully and maliciously used physical force against Mr. Felix, causing his death.

163.     Defendants CARTER and MATIAS committed the foregoing acts intentionally, wilfully, and with malicious disregard for Mr. Felix's rights, and are therefore liable for punitive damages.

### SIXTH CAUSE OF ACTION
**Intentional Infliction of Emotional Distress**
**(against the Individual Defendants)**

164.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

165.     Defendants CARTER and MATIAS, through the foregoing acts, did commit extreme and outrageous conduct and thereby intentionally, and/or recklessly caused Plaintiffs to experience severe mental and emotional distress, pain, suffering, and damage to name and reputation.

166.     Defendant JANE DOE through the foregoing acts, did commit extreme and outrageous conduct and thereby intentionally, and/or recklessly caused Plaintiffs to experience severe mental and emotional distress, pain, suffering, and damage to name and reputation.

167. All of these acts were performed without any negligence on the part of Plaintiffs and were the proximate cause of injuries to Plaintiffs.

168. Defendants committed the foregoing acts intentionally, willfully, and with malicious disregard for Plaintiffs' rights and are therefore liable for punitive damages.

<u>**SEVENTH CAUSE OF ACTION**</u>
**Negligence/ Premises Liability**
**(against JANE DOE and the BRIDGE)**

169. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

170. Defendant the BRIDGE maintained control over the egress and ingress into the building.

171. Defendant the BRIDGE was aware of the needs of the tenants it housed, and the added security on account of the tenants to which they catered.

172. As a result, Defendant the BRIDGE, either individually or by and through its agents, servants, and/or employees acted with less than reasonable care and is therefore liable for the negligent, careless acts and/or omissions, including:

    a. Improperly operating, managing, and maintaining its premises at 538 East 6th Street, New York, NY 10009;

    b. Improperly or negligent training its employees with respect to securing the facility which housed individuals with substantial mental health needs;

    Improperly training its employees on proper policy or procedure for entry of unknown persons, including law enforcement agents;

    c. Negligently creating dangerous circumstances by improperly securing the property;

    d. Failing to provide a secure housing facility for "high risk" individuals housed on the property; and

    e. Failing to otherwise exercise due care with respect to the matters alleged

herein.

173.    Defendant JANE DOE through the foregoing acts, negligently failed to use due care in the performance of her duties in that she failed to perform her duties with the degree of care that a reasonably prudent and careful person would have used under similar circumstances.

174.    All of these acts were performed without any negligence on the part of Plaintiffs and were the proximate cause of injuries to Plaintiffs.

175.    As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

### EIGHTH CAUSE OF ACTION
**Negligent Infliction of Emotional Distress**
**(against JANE DOE and the BRIDGE)**

176.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

177.    Defendant DOE, as an employee tasked with protecting residents of a supportive housing building, owed David Felix a duty of care.

178.    By reason of the foregoing, defendants are liable to Plaintiff DORRELIEN FELIX and Plaintiff MARGALY FELIX, in their individual capacities, for the negligent infliction of emotional distress.

179.    As a result, Plaintiffs suffered emotional distress.

180.    As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

### NINTH CAUSE OF ACTION
**Negligent Hiring, Training, and Discipline**
**(against the BRIDGE)**

181.    Plaintiffs reallege and incorporate by reference the allegations set forth in the

26

foregoing paragraphs as if fully set forth herein.

182.    Defendant the BRIDGE owed a duty of care to David Felix to prevent the conduct alleged, because under the same or similar circumstances, a reasonable prudent, and careful person should have anticipated that injury to Mr. Felix or to those in a like situation would likely result from the foregoing conduct.

183.    Defendant the BRIDGE, failing to adequately train its employees or employ enough staff to secure the entrance, negligently failed to use due care in the performance of its duties in that they failed to perform their duties with the degree of care that a reasonably prudent and careful non-profit would have used under similar circumstances.

184.    The BRIDGE knew or should have known through the exercise of reasonable diligence that the individuals it employed needed to be adequately trained when securing a facility for the mentally disabled. The BRIDGE's negligence in screening, hiring, training, disciplining, and retaining its employees, including Defendant JANE DOE, proximately caused Plaintiffs' injuries.

185.    As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.


### TENTH CAUSE OF ACTION
**Wrongful Death**
**(against the Individual Defendants and the BRIDGE)**

186.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

187.    The acts of the Defendants, alleged herein, wrongfully caused the death of David Felix.

188.    By reason of the foregoing, Plaintiffs DORRELIEN FELIX and MARGALY

FELIX, the statutory distributees of Mr. Felix's estate sustained pecuniary and non-economic loss resulting from the loss of love, comfort, society, attention, services, and support of Mr. Felix. Defendants are liable for the wrongful death of Mr. Felix.

189.     As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

190.     As a consequence, Plaintiffs have suffered damages in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
### Pain and Suffering
### (against the Individual Defendants)

191.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

192.     Upon information and belief, Mr. Felix was conscious for approximately thirty minutes after being shot.

193.     The acts of the Defendants CARTER and MATIAS, alleged herein, wrongfully caused Mr. Felix to suffered severe physical injuries, excruciating pain, mental anguish and awareness of impending death.

194.     As a direct and proximate result of the Individual Defendants' unlawful conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
### *Respondeat Superior*

195.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

196.     At all relevant times, Defendants CARTER and MATIAS were employees of the City and were acting within the scope of their employment.

197.    The CITY OF NEW YORK is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of Defendants CARTER and MATIAS set forth herein.

198.    At all relevant times, Defendant JANE DOE was employed by the BRIDGE and was acting within the scope of her employment.

199.    The BRIDGE is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of defendant JANE DOE.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiffs demand the following relief against the defendants, jointly and severally:

(a)    compensatory damages in an amount just and reasonable and in conformity with the evidence at trial;

(b)    punitive damages against the individual defendants;

(c)    issue a declaratory judgment that the NYPD's EDP policy challenged herein violates the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, the New York State Constitution;

(d)    issue a declaratory judgment that the NYPD's use of I-Cards to illegally gain entry into individual's homes violates the Fourth and Fourteenth Amendments of the United States Constitution, the New York State Constitution;

(e)    Issue an order for the following injunctive relief:

i.    enjoining the NYPD from continuing its policy, practice and/or custom of warrantless entries into residences through the use of I-Cards;

ii.    requiring the City to institute and implement improved policies and programs with respect to training, supervision, and discipline related to the treatment of emotionally disturbed persons;

(f)    attorneys' fees;

(g)    the costs and disbursements of this action;

(h)    interest; and

(i)     such other and further relief as this Court deems just and proper.

Dated: New York, New York
        September 15, 2017

                        BELDOCK LEVINE & HOFFMAN LLP


                        By: ___/s/_____
                            Jonathan C. Moore, Esq.
                            Luna Droubi, Esq.
                        99 Park Avenue, PH/26th Floor
                        New York, New York 10016
                        (212) 490-0400

                        *Attorneys for Plaintiffs*