UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 3 0 2018

Dorrelien Felix, Margaly Felix, and Jonathan C. Moore, as Administrator of the Estate of David Felix,

Plaintiffs,

—v—

The City of New York *et al.*,

Defendants.

16-CV-5845 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Plaintiffs Dorrelien Felix and Margaly Felix, individually, and Jonathan C. Moore, as Administrator of the Estate of David Felix, bring this suit against the City of New York ("The City"), New York Police Department ("NYPD") detectives Harold Carter and Vincente Mathias ("Detective Defendants"), the not-for-profit organization the Bridge, Inc., and Jane Doe, an employee of the Bridge. Plaintiffs allege, *inter alia*, that Mr. Felix's April 25, 2015 death was caused by violations of Mr. Felix's Fourth and Fourteenth Amendment rights and by the City's failure to provide protections to which he was entitled under Title II of the Americans with Disabilities Act and the Rehabilitation Act. Before the Court is the City's motion to dismiss the municipal liability and disability discrimination claims in Plaintiffs' amended complaint.

For the reasons stated herein, Defendant the City's motion to dismiss is GRANTED in part and DENIED in part.

## I. Background

The Court begins by reviewing the factual and procedural background leading to this motion to dismiss.

### A.    Facts

The following facts are taken from the First Amended Complaint ("FAC") and documents incorporated into the complaint by reference and assumed to be true for purposes of evaluating the Motion to Dismiss.[1]  *See Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (permitting the court to "consider any written instrument attached to the complaint[ and] statements or documents incorporated into the complaint by reference" in deciding a motion to dismiss).

On April 25, 2015, two NYPD detectives, Harold Carter and Vincente Matias, pursued David Felix, a 24-year-old individual diagnosed with paranoid schizophrenia, from his apartment into the lobby of his supportive living facility.  FAC ¶¶ 2, 10, 17, 57.  In a physical altercation, Detective Carter shot Mr. Felix once in the chest.  FAC ¶ 95.  Mr. Felix died shortly thereafter.  FAC ¶¶ 97–103.

### 1.    Events Leading to the Encounter

The encounter between the NYPD detectives and Mr. Felix was precipitated by the following sequence of events.  The detectives visited the Bridge facility at 538 6th Street in Manhattan for purposes of speaking with Mr. Felix about his alleged involvement in a robbery.  *Id.* ¶¶ 69, 72.  They secured access to the building, and then to Mr. Felix's apartment, by demanding the assistance of a Bridge employee on duty at the facility, Jane Doe.  FAC ¶¶ 77, 79, 81, 84–85.  Ms. Doe informed the detectives that the facility housed individuals with mental illnesses and that Mr. Felix was diagnosed with paranoid schizophrenia.  FAC ¶ 82.

---

[1] Although the City occasionally portrays the facts differently, on a motion to dismiss, the Court cannot credit any of the factual allegations appearing in Defendant's—or Plaintiffs'—memorandum.  *See Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988).

According to the amended complaint, this information should have triggered NYPD procedures for working with "emotionally disturbed persons" like Mr. Felix. FAC ¶ 115. Under these procedures, officers are not supposed to take emotionally disturbed persons into custody "without the specific direction of a supervisor" and are required to "attempt to isolate and contain" such persons "while maintaining a zone of safety until arrival of a patrol supervisor" and other emergency personnel. FAC ¶ 116 (quoting NYPD Patrol Guide). The detectives did not follow these policies.

Instead, after Ms. Doe unsuccessfully attempted to contact a supervisor, they refused to wait and demanded that Ms. Doe escort them to Mr. Felix's apartment and open the door. FAC ¶¶ 83–84. Ms. Doe complied without first announcing to Mr. Felix that the detectives wished to speak with him. FAC ¶¶ 85–86. The detectives did not have a warrant to access Mr. Felix's apartment and did not knock and announce or request entry, nor were exigent circumstances present at the time of their entry. FAC ¶¶ 85, 87. They merely possessed an "I-Card," an NYPD tool that "tracks individuals that officers seek to interview or arrest." FAC ¶¶ 73, 106. According to the amended complaint, I-Cards do not provide a valid basis for entry to residences for the purposes of apprehending suspects. FAC ¶ 110 & n.1 (citing *Crossing the Threshold: An Evaluation of Civilian Complaints of Improper Entries and Searches by the NYPD from January 2010 to October 2015*, CCRB (2015) ("CCRB Report") at 7, http://www.nyc.gov/html/ccrb/downloads/pdf/Crossing-the-Threshold-2010-2015.pdf).

In response to the detectives' entry to his apartment, Mr. Felix, who feared police, panicked and ran down the fire escape. FAC ¶¶ 32, 90, 92. The detectives ran down the stairs to the lobby, where they encountered Mr. Felix. FAC ¶ 92–93. A physical altercation ensued, culminating in the shooting. FAC ¶ 95. The amended complaint contends that this encounter

represented the detectives' deliberately forcing a physical confrontation, using excessive force, and treating Mr. Felix in a "wantonly reckless" manner.  FAC ¶¶ 117–18.

Plaintiffs contend that two alleged customs, policies, or practices caused violations of Mr. Felix's rights, and led to the foregoing encounter: (1) the use of "I-Cards" to gain access to residences and (2) failing to properly handle emotionally disturbed persons.  Plaintiffs further attribute violations of Mr. Felix's rights to the NYPD's failure to properly train officers with respect to both policies and the NYPD's alleged failure to screen officers for their propensity for violence.  Finally, they allege the encounter resulted in violations of Title II of the ADA and the Rehabilitation Act.

### 2.        I- Cards as a Basis for Gaining Access to the Residence

To substantiate its charge that the NYPD has a policy of permitting improper use of I-Cards, FAC ¶ 108, the amended complaint points to three facts.  First, the NYPD Patrol Guide § 208-23 fails to clearly state that I-Cards do not constitute warrants and cannot serve as a legal basis for entry to a residence.  FAC ¶ 109.  Further, a 2015 Civilian Complaint Review Board ("CCRB") report analyzing improper entries and searches over the period in which this incident occurred noted a pattern of improper use of I-Cards as a basis for entry and apprehension.  Specifically, the CCRB Report found that 28 out of 174, or 16 percent, of substantiated CCRB complaints involved the improper use of I-Cards.  FAC ¶¶ 110, 112 & n.2.  Third, in response to this pattern, the CCRB recommended (a) correcting the NYPD Patrol Guide to clearly state that I-Cards were not warrants and (b) clarifying for detectives both the situations in which it was permissible for them to create I-Cards rather than warrants and the need to use warrants to apprehend individuals inside private residences.  FAC ¶ 113a–b.

Plaintiffs allege that this policy caused the alleged violations of Mr. Felix's rights because the Defendant Detectives possessed only an I-Card, and not a warrant, and because these alleged policy issues were present when the Detective Defendants entered Mr. Felix's residence.

### 3.    Treatment of Emotionally Disturbed Persons

The amended complaint further alleges that the Detective Defendants' treatment of Mr. Felix was reflective of NYPD's de facto custom, policy, or practice of failing to properly handle emotionally disturbed persons like Mr. Felix.  It identifies these policies by pointing to three pieces of evidence.

First, an Office of the Inspector General for the NYPD ("OIG") report published in 2017 allegedly identified "long-standing deficiencies in the NYPD's handling of response to EDPs— shorthand for "emotionally disturbed persons."  FAC ¶ 123 & n.3 (citing *Putting Training into Practice: A Review of NYPD's Approach to Handling Interactions with People in Mental Crisis* (Jan. 2017) ("OIG Report"),
http://www1.nyc.gov/assets/oignypd/downloads/pdf/Reports/CIT_Report_01192017.pdf).
According to Plaintiffs, this report criticizes the NYPD's lack of an emotionally disturbed persons policy and the NYPD's failure to properly train police officers on handling emotionally disturbed persons prior to summer 2015 beyond offering only a "one-day training" involving "a short, basic lecture on mental illnesses" and four role-playing scenarios.  FAC ¶ 125 (quoting the OIG Report at 10).  Second, the City implemented a Crisis Intervention Team ("CIT") training a few months after Mr. Felix's death, based on months of research and consultations with experts.  FAC ¶ 122; OIG Report at 10.

Finally, the amended complaint alleges that the City was or should have been aware of its officers' pattern of mistreating emotionally disturbed persons, but failed to adequately screen,

train, supervise, or discipline them. FAC ¶ 121. Specifically, the amended complaint contends that officers should have been trained in the use of equipment other than guns to restrain emotionally disturbed persons; evaluation of initial encounters between officers and emotionally disturbed persons; and in emotionally disturbed persons' needs for adequate medical care. FAC ¶ 121.

### 4. ADA Claims

As a final matter, Plaintiffs allege a violation of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act on the grounds that the City failed to reasonably accommodate Mr. Felix's disability and denied to Mr. Felix the benefits of the City's services, programs, and activities by failing to properly train, supervise, and discipline police officers regarding crisis intervention techniques, otherwise providing insufficient resources, and failing to follow established policies and procedures regarding crisis intervention techniques for individuals with mental health disabilities. FAC ¶¶ 150–56.

### B. Procedural History

Plaintiffs filed their Complaint on July 21, 2016. Dkt. No. 1. The nonmunicipal defendants answered Plaintiffs' Complaint on August 12, 2016. *See* Dkt. No. 22. Shortly thereafter, the City sought, and the Court granted, a stay of the litigation pending the conclusion of the NYPD's internal investigation into the events precipitating Mr. Felix's death. Dkt. Nos. 25, 28. That stay remained in place until July 28, 2017, *see* Dkt. No. 44, after which date the Detective Defendants answered Plaintiffs' Complaint, Dkt. No. 49, and the City filed its first Motion to Dismiss, Dkt. No. 50. In conjunction with the foregoing, Defendant the Bridge and the City Defendants filed and responded to crossclaims against one another. *See* Dkt. Nos. 22, 49, 50.

On September 15, 2017, the Plaintiffs filed their first amended complaint. Dkt. No. 56. The Officer Defendants and the Bridge answered the first amended complaint and the City filed a "Renewed Motion to Dismiss." Dkt Nos. 57, 58, 59. That motion to dismiss is the subject of the instant Opinion and Order.

## II.    Legal Standard

The City argues that Plaintiffs' claims against it should be dismissed under Rule 12(b)(6) because Plaintiffs have failed to allege facts necessary to show municipal liability for alleged customs, policies, or practices; training failures; or ADA and Rehabilitation Act violations.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard does not require that the Plaintiffs make "detailed factual allegations," but it "requires more than labels and conclusions." *Twombly*, 550 U.S. at 555.

In determining whether to dismiss a claim under this standard, the Court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 580 F.3d 471, 475 (2d Cir. 2009). In addition to the text of the complaint, the Court may also consider documents attached as exhibits or incorporated by reference thereto. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).

### III. Discussion

This opinion examines (1) Plaintiffs' municipal liability claims against the City under Section 1983 and (2) Plaintiffs' claims against the City under the ADA and Rehabilitation Act.

### A. Plaintiffs' *Monell* Claims Are Dismissed in Part

Plaintiffs bring municipal liability claims against the City under *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978), primarily based on the City's alleged practices of (a) using investigation cards to gain entry to residences, FAC ¶¶ 135–38; (b) subjecting emotionally disturbed persons to brute and excessive force, FAC ¶¶ 135–36, 141–42; and (c) failing to train officers in how to treat emotionally disturbed persons, FAC ¶ 139. *See also* Dkt. No. 66, Pl. Br. at 8–24. To the extent Plaintiffs raised other claims, the Court addresses them in turn. The City contends that Plaintiffs have not successfully stated a claim as to any of these theories.

Evaluating these claims, the Court concludes that Plaintiffs' *Monell* claims alleging (1) a custom, policy, or practice of using investigation cards to gain entry to residences; and (2) a custom, policy, or practice of subjecting emotionally disturbed persons to brute and excessive force must both be DISMISSED. However, the Court declines to dismiss Plaintiffs' *Monell* claim alleging failure to train NYPD officers in how to work with emotionally disturbed persons.

### 1. Standard for *Monell* Liability

The Court first outlines the relevant legal standard. A municipality like the City of New York "may not be held liable in an action under 42 U.S.C. § 1983 solely on the basis of *respondeat superior*." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (citing *Monell*, 436 U.S. at 691). Instead, "to hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official

policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2009) (quotations and citation omitted).

### a. Municipal Policy

"Constitutional deprivations actionable under § 1983 need not be contained in an explicitly adopted rule or regulation." *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992). But "a municipality may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees." *Id.* The "official policy" requirement may be met, inter alia, (1) by alleging a practice so "persistent and widespread," or "permanent and well settled[,] as to constitute a 'custom or usage' with the force of law" and to "imply the constructive knowledge of policymaking officials," *id.* at 870–71 (citing *City of St. Louis v. Praprotnik*, 485 U.S.112, 113 (1988) (plurality)); or (2) by identifying a failure to train or supervise subordinates "amount[ing] to deliberate indifference to the rights of those with whom [the municipality's employees] come into contact," "*City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Whichever theory Plaintiffs offer, "boilerplate assertions of municipal policy are insufficient to state a claim for *Monell* liability." *Bishop v. City of New York,* No. 13-CV-9203 (AJN), 2016 WL 4484245, at *4 (S.D.N.Y. Aug. 18, 2016); *see also Dwares v. City of New York*, 285 F.2d 94, 100 (2d Cr. 1993). Facts supporting the policy's existence must be pled. *Dwares*, 285 F.2d at 100.

### b. Causation

Plaintiffs next must show that the alleged unconstitutional policy was the "moving force" behind Plaintiffs' injury"—a showing that amounts to proximate cause. *Bishop*, 2016 WL

4484245, at *3 (citing *Cash v. County of Erie*, 654 F.3d 324, 341–42 (2d Cir. 2011)).

Accordingly, municipal actors sued under § 1983 are "responsible for the natural consequences of their actions." *Warner v. Orange Cty. Dep't of Prob.*, 115 F.3d 1068, 1071 (2d Cir. 1996). This responsibility extends to the "reasonably foreseeable conduct" of city employees. *Dodd v. City of Norwich*, 827 F.2d 1, 6 (2d Cir. 1987). So, when "the city is aware that its policy may be unconstitutionally applied by inadequately trained employees but the city consciously chooses not to train them, or [when] the city's official policy . . . is valid, but the city's actual practice is [unconstitutional]," the causation requirement may be met. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125–26 (2d Cir. 2004).

### 2.  Plaintiffs' *Monell* Claims

The Court next examines whether any of Plaintiffs *Monell* claims meet this standard. Plaintiffs focus on three municipal policies they claim were responsible for Mr. Felix's death: customs, policies, or practices of (1) using I-cards to gain access to homes and (2) using brute force against emotionally disturbed persons; and (3) failure to train officers in how to work with emotionally disturbed persons. In their amended complaint, they further appear to raise a failure to train claim with respect to I-Cards, see FAC ¶ 139, and a hiring theory with respect to officers' treatment of emotionally disturbed persons. *See* FAC ¶ 140.

As explained in further detail below, the Court dismisses the last two theories of liability because Plaintiffs appear to abandon them in their papers. As to the fully briefed claims, the Court further concludes that Plaintiffs have not sufficiently alleged that a custom or practice of using I-Cards to gain access to individual homes or a custom or practice of excessive force towards emotionally disturbed persons caused the injuries complained of here. But the Court

finds that Plaintiffs have sufficiently stated a claim for failure to train officers and detectives with respect to the treatment of emotionally disturbed persons.

### a. Failure to Train Officers in Use of I-Cards and Custom or Practice of Inadequate Screening in Hiring

As a preliminary matter, the Court addresses two claims against the City that the parties discuss minimally or not at all: Plaintiffs' apparent theories of failure to train with respect to I-Cards and a custom or practice of inadequate screening in hiring. *See* FAC ¶¶ 139–40.

As to the hiring theory, Defendant argues that this claim should be dismissed on the ground that Plaintiffs have not met the "rigorous standards of culpability and causation" it urges apply to such claims. *See* Dkt. No. 61, Def. Br. at 5–6. Plaintiffs do not address this argument in their papers. Courts "may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." *Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637, 643 (S.D.N.Y. 2008); *see also Romeo & Juliette Laser Hair Removal, Inc. v. Assam I LLC*, No. 08-CV-442 (TPG), 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage . . . a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim."). Accordingly, here, the Court concludes that Plaintiffs' failure to respond to Defendant's motion to dismiss their hiring claims constitutes abandonment, and such claim is hereby DISMISSED.

Neither party discusses the I-Card training theory in any detail. Defendant generically urges dismissal of training claims in its initial memorandum, *see* Def. Br. at 13; and Plaintiffs subsequently pitch their opposition to different theories of liability. It is possible that Plaintiffs intended to fold this theory into their custom-or-practice claim. In any case, because Defendant

clearly styles its motion as a motion to dismiss *all* municipal liability claims, *see id.* at 1–2, 4–16, and because Plaintiff does not defend this theory, the Court deems it waived.[2]

### b.    Plaintiffs Have Not Adequately Alleged a Custom or Practice of Using I-Cards to Gain Access to Individuals' Homes

The Court turns next to the claims fully addressed in the parties' papers.  To support their I-Card theory, Plaintiffs offer two factual allegations: (1) the NYPD Patrol Guide's failure to state that I-Cards do not constitute warrants and (2) the findings of the CCRB report, which documented improper use of I-Cards as a basis for entry and apprehension and recommended changes to NYPD documents and training procedures.  *See* FAC ¶¶ 108–13; CCRB Report at 52–56.

The City counters that the CCRB findings are insufficient to support a conclusion that the NYPD had the alleged custom or practice, Dkt. No. 72, Def. Reply at 1–2, and in any case that Plaintiffs have failed to allege that any City custom or practice with respect to I-Cards caused Plaintiffs' complained-of injury, *id.* at 3.  Because the Court finds that Plaintiffs have not sufficiently alleged causation, it need not address whether Plaintiff's factual allegations are sufficient to plead the existence of a custom or practice.

### i.    Causation

Plaintiffs tell two causal stories.  First, in their opposition, they explain: (1) the NYPD possessed the above-described custom or policy; (2) the Detective Defendants possessed only an I-card; the Detective Defendants (3) improperly represented that the I-Card was a warrant, and (4) secured entry to the building and Mr. Felix's apartment on that basis, which entry (5) caused Mr. Felix to panic and flee and led to the encounter.  The problem with this theory is that it is not

---

[2] Even if this theory had been fully briefed, it suffers from the same failure to allege causation that disposes of Plaintiffs' I-Card custom-or-practice theory, as discussed *infra*.  Accordingly, even if Plaintiffs did not waive the theory, it is not adequately pleaded to survive a motion to dismiss.

actually alleged in the amended complaint, which contains no allegation that the detectives secured access either to the building or to Mr. Felix's apartment *because* they misrepresented their I-Card as a warrant. *Compare* Pl. Br. at 9 *with* FAC ¶¶ 77, 83, 85. Rather, the cited portions of the amended complaint plead only that the Detective Defendants demanded entry to the building, and then to Mr. Felix's apartment, and that the Detective Defendants lacked a warrant or other exigent circumstances to justify their demands. FAC ¶¶ 77, 83, 85.

Plaintiffs' second causal theory suffers from the same flaw. They contend in their opposition that "even if the officers had been granted lawful access to the building," they lacked authority to enter Mr. Felix's room, and it was this entry that proximately caused Mr. Felix's death. Pl. Br. at 9. But this theory still fails to allege that the I-Card was responsible for the alleged unlawful entry of Mr. Felix's room.

As a final matter, Plaintiffs might have alleged that the fact that the officers possessed only an I-Card, and no other lawful basis for entering Mr. Felix's property, means that their decision to enter must have been caused by the unlawful I-Card custom. Because Plaintiffs did not plead sufficient factual allegations from which the Court could infer this causal pathway occurred, the Court need not address whether it is sufficiently plausible to pass muster at this stage.

### c. Plaintiffs Have Not Adequately Alleged a Custom, Policy, or Practice of Subjecting Emotionally Disturbed Persons to Brute and Excessive Force

To make out a custom, policy, or practice claim with respect to the NYPD's treatment of emotionally disturbed persons, Plaintiffs point to information in the OIG report and a series of lawsuits and incidents cited in the amended complaint. They contend these factual allegations are sufficient to plead (1) that the NYPD had a pattern of misconduct with respect to treatment of

13

emotionally disturbed persons and (2) that high-ranking officials had knowledge of that pattern. The Court disagrees.

The OIG Report constitutes a review of the NYPD's efforts to enhance officer training with respect to treatment of emotionally disturbed persons. OIG Report at 1. It focuses on a new four-day Crisis Intervention Team ("CIT") training program, which "first surfaced through the Mayor's Task Force on Behavioral Health and the Criminal Justice System in 2015," and was implemented in June 2015 "after "many months of research and involving consultation with experts." *Id.* at 10, 28. According to the Report, such changes were necessary because of the large volume of calls the NYPD responds to concerning individuals in mental crisis: "[w]hile NYPD responds to the overwhelming majority of these types of calls without discharging weapons or causing serious injury, [high-profile incidents] demonstrate[ ] the potential for a lethal outcome in some situations." *Id.* at 1.

Plaintiffs contend that the OIG Report supports their claims both because it identifies "long-standing deficiencies in the NYPD's handling of responses to EDPs," or emotionally disturbed persons, FAC ¶ 123; and because the NYPD's decision to implement the changes discussed in the OIG Report constituted its acknowledgment of the failures of its preexisting policies, FAC ¶ 122. Although the OIG Report was published in January 2017, Plaintiffs note that it reflects changes made in the summer of 2015, and research and planning necessary to implement those changes prior to that date. FAC ¶¶ 122–23. Plaintiffs further argue that the civil rights complaints cited in their papers indicate the existence of a pattern of NPYD officers' mistreatment of emotionally disturbed persons and that policymakers' awareness of the problem dates even earlier. *See* FAC ¶ 142 (citing 10 cases dating between 1984 and 2017 involving police officers' alleged wrongful killings of individuals with mental disabilities).

Defendants argue that dismissal of this claim is warranted for several reasons: (1) Mr. Felix should not be considered an emotionally disturbed person; (2) Plaintiffs may not rely on records like the OIG Report for purposes of sufficiently pleading the existence at the time of Mr. Felix's death of a *de facto* policy of subjecting emotionally disturbed persons to brute and excessive force because the OIG Report was published subsequent to his encounter with the police officers; and (3) neither the OIG Report nor the civil rights complaints Plaintiffs cite are sufficient to demonstrate a "persistent and widespread" practice as required to state this *Monell* theory. Taking Plaintiffs' allegations as true, and drawing all inferences in their favor, the Court rejects the first two arguments. However, the Court concludes that the OIG Report and the civil rights complaints, standing alone, are insufficient to plead deliberate indifference with respect to the NYPD's treatment of emotionally disturbed individuals.

### i.   Applicability of Emotionally Disturbed Persons Policy

As a preliminary matter, Defendant contends that Mr. Felix was not an emotionally disturbed person, or at minimum that his status as an emotionally disturbed person was not apparent to the officers. Under the obligation to take all well-pleaded facts as true at the motion to dismiss phase, the Court disagrees.

According to Defendant, an emotionally disturbed person is a "person who appears to be mentally ill or temporarily deranged and is conducting himself in a manner which a police officer reasonably believes is likely to result in serious injury to himself or others." Def. Reply at 5 (citing OIG Report at 42). Defendant points out that Mr. Felix's behavior did not conform to this description and that, indeed, Mr. Felix's progress in successfully handling his mental illness suggested the opposite. *Id.* It construes his behavior in response to the detectives' entry to his apartment as reflecting someone who did not want to be arrested, not temporary derangement or similar. *Id.* at 6.

15

Taking the allegations in the amended complaint as true and drawing all inferences in Plaintiffs' favor, the Court rejects this argument. The fact that Mr. Felix was making progress in successfully handling his mental illness does not mean that he would not qualify as an emotionally disturbed person in the context of triggers for that mental illness, including the presence of law enforcement figures, whom he allegedly feared. *See* FAC ¶ 31–32. Further, Plaintiffs plead that Ms. Doe's statement to the detectives placed them on notice of the fact that Mr. Felix was a "possible" emotionally disturbed person, and appear to infer that the NYPD Patrol Guide's policies attach in that instance. FAC ¶ 115.

Although the NYPD Patrol Guide does not precisely clarify its applicability to this situation, at the motion to dismiss stage, the Court finds it reasonable to infer that individuals should be treated as emotionally disturbed persons when officers are informed of a suspect's mental illness prior to encountering that individual. In this case, that inference is supported by Plaintiff's allegation that Mr. Felix "panicked," FAC ¶ 88, a reaction consistent with his acting pursuant to his mental illness.

*Estate of Jaquez v. City of New York*, cited by the Defendants to urge dismissal, does not support a contrary conclusion. In *Jaquez*, the court rejected the plaintiff's claim that his treatment reflected a pattern or practice of constitutional violations of emotionally disturbed persons' rights in part because the plaintiff had not alleged that the NYPD officers were informed that the decedent was an emotionally disturbed person on the 911 call or on their arrival at the scene. No. 10-CV-2881 (KBF), 2014 WL 2696567, at *5–6 (S.D.N.Y. June 9, 2014). Contrary to Defendant's framing, the *Jaquez* conclusion indicates that informing officers of a mental illness *could* identify an individual as an emotionally disturbed person—as was alleged to have occurred here.

### ii.  Reliance on OIG Report

Defendants next argue that Plaintiffs' reliance on the OIG Report is inappropriate given its publication date. The Court, however, finds the OIG Report adequately reflects the City's notice of problems that occurred prior to its publication.

Plaintiffs may adequately plead the existence of de facto customs or policies based on governmental reports documenting constitutional deficiencies or misconduct. *See, e.g.*, *Bektic-Marrero v. Goldberg*, 850 F. Supp. 418, 430–31 (S.D.N.Y. 2012) (Department of Justice ("DOJ") CRIPA investigation of county jail documenting constitutionally deficient medical care); *Kucharczyk v. Westchester County*, 95 F. Supp. 3d 529, 544 (S.D.N.Y. 2015) (DOJ report identifying widespread practice); *Graham v. County of Erie*, No. 11-CV-605S, 2012 WL 1980609, at *5–6 (W.D.N.Y. May 31, 2012) (DOJ findings letter identifying "several similar situations" of constitutionally deficient medical care); *United States v. Erie County*, 724 F. Supp. 2d 357, 360 (W.D.N.Y. 2010) (relying on same findings letter); *Flores v. Nieva*, No. 14-cv-7960 (KPF), 2017 WL 899942, at *6 (S.D.N.Y. Mar. 6, 2017) (United States Attorney's Office report finding pattern and practice of constitutional violations).

That a report was published after the subject incident does not prevent plaintiffs from relying on it—provided plaintiffs plead other allegations from which the court may infer high-level policymakers' acquiescence. For example, in *Bektic-Marrero*, the court permitted plaintiffs to rely on a later-published report when high-ranking officials had been advised of the report's preliminary findings in advance of the conduct giving rise to plaintiff's claim. 850 F. Supp. at 431. In contrast, the courts in *Boddie v. City of New York* and *Dixon v. City of New York* rejected the plaintiffs' attempts to rely on reports published six months and four years, respectively, after their claims had accrued—when there does not appear to be any indication that officials had earlier notice of their contents. No. 15-CV-4275 (GHW), 2016 WL 1466555, at *1, 3 (S.D.N.Y.

Apr. 13, 2016); No. 14-CV-4930 (PGG), 2017 U.S. Dist. LEXIS 119042, at *30–31 (S.D.N.Y. July 27, 2017).

Here, Plaintiffs offer sufficient factual allegations to substantiate policymakers' awareness of the NYPD's deficient policies. Namely, the OIG Report was an internal document rather than a document developed by an outside agency. It discusses extensive research and planning leading up to the institution of CIT training in the summer of 2015. Plaintiffs thus rely on the report not for the notice it provided on its date of publication, but for the inference it supports that high-level policymakers were aware of the alleged deficiencies at the time of Mr. Felix's death. Def. Br. at 11 (citing OIG Report at 10). The Court finds that inference reasonable, and concludes that the Plaintiffs have sufficiently alleged that NYPD policymakers were aware of the concerns leading to the institution of that training at the time of its officers' late April encounter with Mr. Felix.

### iii.       Persistent Practice of Subjecting Emotionally Disturbed Persons to Brute and Excessive Force

However, Plaintiffs have not sufficiently alleged that the NYPD's practice of subjecting emotionally disturbed persons to brute and excessive force was "so persistent and widespread," or "permanent and well settled[,] as to constitute a 'custom or usage' with the force of law." *Sorlucco*, 971 F.2d at 870. To make this showing, Plaintiffs point only to the findings in the OIG Report and the 10 civil rights complaints referenced in their amended complaint. Defendants contend that these allegations are insufficient because they are too few in number to plausibly state that the City has a widespread or well-settled custom. Def. Br. at 7–8.

The problem for Plaintiffs, in the Court's view, is somewhat different. Though Plaintiffs labor to make the OIG Report relevant to their de facto practice claim, the bulk of the Report concerns the City's progress in implementing a new training policy and, to a lesser extent,

18

reasons it elected to do so. To the extent the Report discusses incidents of brute and excessive force towards individuals with mental illness, the report represents such incidents as few in number, and the NYPD's response to "the overwhelming majority" as occurring without leading to a discharge of weapons or serious injury—in short, documenting few instances of brute or excessive force. OIG Report at 1–2. While it is certainly possible that the NYPD had a de facto custom of excessive force, the limited discussion in the OIG Report is not enough to substantiate its existence, even at the motion to dismiss stage. This situation makes this case similar to *Delorbe-Bell v. City of New York*, in which the district court rejected the plaintiff's reliance on a different OIG Report not because it was published after the complained-of incident, nor because such a report cannot support a custom, policy, or practice claim, but because it concluded that the OIG Report did not sufficiently allege deliberate indifference. No. 15-CV-2344 (LGS), 2016 WL 1451581, at *3–4 (S.D.N.Y. Apr. 12, 2016) (describing the OIG Report's characterizations of the relevant excessive force problems as "notably modest" in number).

With such a limited foundation, the Court does not find that Plaintiff's citation to 10 civil rights complaints over the course of 30 years sufficiently moves the plausibility needle in their favor. Although "[a]n obvious need may be demonstrated through proof of repeated civil rights violations," *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995), courts typically rely on more than the allegations in this case to find a claim sufficiently stated. *See, e.g.*, *An v. City of New York*, No. 16-CV-5381 (LGS), 2017 WL 2376576, at *4 (S.D.N.Y. June 1, 2017) (relying not just on "numerous lawsuits," but also on "news reports, complaints to the CCRB . . . and the CCRB's decision to prepare [a] report"). *But see Osterhoudt v. City of New York*, No. 10-CV-3173 (RJD), 2012 WL 4481927, at *1 (citing *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (finding the plaintiff's citation of "a number of complaints alleging that the NYPD conducted

mass arrests at demonstrations and in crowd control situations plausibly alleg[ed] a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis").

### d. Plaintiffs Have Sufficiently Alleged Failure to Train and Supervise Officers on How to Properly Treat Emotionally Disturbed Persons

To make out a failure to train or supervise theory, the Second Circuit has outlined three requirements. First, "the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (quoting *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992)). Next, "the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." *Id.* And finally, "the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of citizen's constitutional rights." *Id.* Failure to train municipal police officers on the use of deadly force constitutes an example of such a policy. *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989). In this case, the Court concludes these elements are sufficiently alleged.

Courts have rejected failure to train claims as conclusory when they fail to "identify any specific policies, regulations, or deficiencies in training," or to "allege a series of other incidents." *Valdiviezo v. City of New York*, 15-CV-3902 (AJN), 2017 WL 1191528, at *4 (S.D.N.Y. Mar. 29, 2017); *see also Simms v. City of New York*, 480 F. App'x 627, 631 n.4 (2d Cir. 2012) (summary order). Further, courts have cautioned that deliberate indifference is a high standard: "A training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir.

2007) (quoting *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 27 (1st Cir. 2005)). The alleged inadequacy "must reflect a deliberate choice among various alternatives, rather than negligence or bureaucratic inaction." *Id.*

Despite this high standard, courts in this district have found inadequate training with respect to individuals with mental illness to sufficiently state a claim for failure to train or supervise. For example, in *Chamberlain v. City of White Plains*, the court found that the inclusion of a section entitled "Mentally/Emotionally Disturbed Persons" in the police department's employee manual evidenced officials' knowledge to a moral certainty that encounters with emotionally disturbed persons would occur. 986 F. Supp. 363, 393 (S.D.N.Y. 2013). Moreover, "given the extreme volatility of such individuals and the need for caution when dealing with them to prevent unnecessary escalation, it is plausible that interactions with emotionally disturbed persons present officers with difficult choices of the sort that training will make less difficult, and that a highly predictable consequences of officers making the wrong choices would be the deprivation of a citizen's constitutional rights." *Id.* (quotation marks omitted).

Roughly the same conclusions are warranted here. The OIG Report and Plaintiffs' cited civil rights complaints make clear that leading up to the encounter with Mr. Felix, NYPD officers regularly responded to individuals with mental illness in the field. OIG Report at 1–2. The same cases indicate that there is some history of employees mishandling such situations. More importantly, the Report notes that adequate training opportunities, including CIT, would make these situations easier for police officers to manage. *See, e.g., id.* at 1 (discussing the fact that an officer responsible for the officer-involved shooting of a schizophrenic woman had *not* received the Department's CIT training); *id.* at 2–3 (discussing the ways in which further

improvements to the City's CIT training program will "improve[ ] the response of officers to people in crisis). Finally, Plaintiffs allege a specific training deficiency—the failure to incorporate CIT or similar training practices—later pinpointed by the NYPD itself.

Against these claims, Defendant questions whether the OIG Report or the civil rights complaints cited by Plaintiffs provide sufficient factual allegations to plead their entitlement to relief. The Court addresses, but ultimately rejects, each objection.

### i.      Use of the OIG Report

To counter Plaintiffs' failure to train or supervise claim, Defendant reiterates its arguments that an OIG Report published after Mr. Felix's death cannot substantiate Plaintiffs' claims, and further cites three district court cases that rejected parallel failure to train claims based on a different OIG report concerning use of excessive force. In *Delorbe-Bell*, for example, the court noted that while that report concluded that NYPD's training sessions spent insufficient time on de-escalation, it also emphasized that the NYPD's time spent on "'use-of-force scenario based training' [was] 'roughly on par' with the national average." 2016 WL 1451581, at *1, 4. *Dixon* and *Boddie* reached similar conclusions. *Dixon*, 2017 U.S. Dist. LEXIS 119042, at *33–35; *Boddie*, 2016 WL 1466555, at *4–5. *Boddie* further emphasized the logic behind imposing a high bar before finding a training program deficient: in light of the risk of "punish[ing the City] with unexpected liability when it seeks to improve itself," courts should exercise caution before finding that a "report recommending improvements to an existing training program—in other words, an acknowledgment that the existing training program is something less than perfect— give[s] rise to a plausible inference of deliberate indifference on the part of the City." *Id.* at *5.

The Court has already explained why it does not view the timing of the OIG Report as determinative in this case, in which Plaintiffs have sufficiently pled that the City was on notice

of training deficiencies when they began research and planning for the changes discussed in the Report. *See supra*. This sufficiently distinguishes the present case from the notice issues described in the cases cited by Defendant.

Further, the OIG Report Plaintiffs cite is meaningfully different from the OIG Report rejected in the above-described cases. While that Report described NYPD training as "on par" with the national average, the OIG Report cited here provides an allegation that the NYPD training practices in place at the time of Mr. Felix's death fell below that standard. The difference stems in part from the fact that this OIG Report is geared mostly toward describing deficiencies in the NYPD's training model as it existed in the period from 2015–2017, after the NYPD had begun to implement CIT training procedures. This Report, in other words, documents problems with the NYPD's training program *after* it had already improved upon the system in place when Mr. Felix died.

According to the Report, the NYPD's *new* model constitutes a nationally accepted "best practice." OIG Report at 8. The Report contrasts this model with the minimal training predating it: "a one-day training . . . involv[ing] a short, basic lecture on mental illnesses in the morning" and then having "a few officers engage in four role-playing scenarios in the afternoon." OIG Report at 10. This description clearly supports the allegation that the NYPD's prior training model prior fell below national standards for training with respect to emotionally disturbed persons. The Report contrasts this training not only with the training implemented in the summer of 2015 or the further improvements it envisions, but also with training given to NYPD's Emergency Services Unit, which has "mirror[ed] the standards of national CIT training" since 1986. *Id.* In short, the Court finds that the amended complaint's reliance on this

OIG Report avoids the concerns courts in this circuit have identified with respect to other reports. The allegations are sufficient to avoid dismissal at this stage.

### ii.     Use of the Civil Rights Complaints

Defendant further argues that Plaintiffs' "citation to eight lawsuits filed over the last thirty years and two other instances in the press," provides scant evidence of a training or supervision failure. Def. Br. at 9. They point out that the cases cited did not culminate in findings of unconstitutional activity; and that in the absence of a past pattern of unconstitutional activity, the City was not on notice of the issue in this case. *Id.* at 9 & n.4. And they contend that the circumstances of the cases varied enough to fail to provide a consistent pattern, particularly when compared to the volume of emotionally disturbed persons calls NYPD officers responded to in the same period. *Id.* at 10–11.

As this Court has previously observed, there is no requirement that complaints result in a formal finding of misconduct for such complaints to support findings of failure to supervise or failure to train. *See Manigault v. City of New York*, No. 11-CV-4307 (AJN), 2012 WL 13049173, at *8–9 (S.D.N.Y. Apr. 19, 2012) (citing *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986)). Rather, the question at this stage is whether Plaintiffs have plausibly supported the existence of a training deficiency and the City's awareness of the same. The Court disagrees with Defendant that the complaints Plaintiffs cite are too dissimilar to notify the City that its procedures for training officers to respond to or work with emotionally disturbed persons were deficient. Even if the precise factual circumstances of these cases vary, ranging from eviction enforcement to emergency response situations, *see* FAC ¶ 142, Plaintiffs' allegation that the cases illustrate NYPD officers' repeated failures to respond to emotionally disturbed persons is at least a plausible one.

As other courts confronted with a pattern of lawsuits *and* corroborating reports have found, the Court concludes that Plaintiffs have adequately pled deliberately indifferent emotionally disturbed persons training policies. For example, the court in *White v. City of New York* found that a DOJ findings letter, together with a pattern of complaints, sufficed to render plausible Plaintiffs' allegation that "poor training, inexperience, and inadequate supervision" resulted in "a practice of using excessive force against inmates in deliberate indifference" of their rights. No. 13-CV-7421 (KPF), 2015 WL 4601121, at *8 (S.D.N.Y. July 31, 2015).

Finally, Plaintiffs adequately allege causation at the motion to dismiss stage. Taking their allegations as true, the Court finds it reasonable to infer that police officers who had received sufficient training in de-escalation, crisis intervention, or other mental health management techniques would not have instigated entry into Mr. Felix's apartment or pursued him, and therefore would have avoided the harms alleged here.

### B. The Court Declines to Bifurcate the Surviving *Monell* Claims

Defendants next argue that Plaintiffs' surviving *Monell* claims should be bifurcated from the claims against the individual defendants.

Under Rule 42 of the Federal Rules of Civil Procedure, a district court has the discretion to order separate trials "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). "[W]hether to bifurcate a trial into liability and damages phases is a matter within the sound discretion of the trial court." *Getty Petroleum Corp. v. Island Transp. Corp.*, 862 F.2d 10, 15 (2d Cir. 1988). Defendant is correct that courts in this circuit often "favor bifurcating *Monell* clams," and may do so "even when the individual defendants may assert a defense of qualified immunity such that a finding in their favor does not necessarily dispose of

the *Monell* claim." *Brown v. City of New York*, No. 13-CV-6912 (TPG), 2016 WL 616396, at *2 (S.D.N.Y. Feb. 16, 2016).

But the Court does not find these arguments persuasive as to bifurcating discovery at this stage of this case. As one court in this circuit has observed, "[a]n early bifurcation deprives the Court of flexibility to account of developments in discovery and to consider the potential efficiencies and evidentiary difficulties presented by a joint trial." *Alli v. Steward-Bowden*, No. 11-CV-4952 (PKC), 2013 WL 5229995, at *1 (S.D.N.Y. Sept. 17, 2013). While it is possible judicial efficiency will be served by conducting separate trials in this case, prior to any requests for *Monell* discovery and prior to the individual defendants' raising of any qualified immunity defense, the Court is not declined to bifurcate the claims. *See McCoy v. City of New York*, No. 07-CV-4143 (JRD) (JO), 2008 WL 3884388, at *2 (E.D.N.Y. Aug. 13, 2008) (finding bifurcation inappropriate largely because individual officers had asserted a qualified immunity defense).

As appropriate, Defendant may request that the Court approve staged discovery or may renew its motion for bifurcation at a later date. *See Roper v. City of New York*, No. 15-cv-8899 (PAE) (GWG), 2017 WL 462270, at *2 (S.D.N.Y. Jan. 25, 2017) (discussing stay of *Monell* discovery as alternative to bifurcation);

### C.    Plaintiffs' ADA Claims Are Not Dismissed

Plaintiffs finally allege a violation of Title II of the Americans with Disabilities Act ("ADA") and the Section 504 of the Rehabilitation Act on the grounds that the City failed to reasonably accommodate Mr. Felix's disability and denied to Mr. Felix the benefits of the City's services, programs, and activities by (a) failing to properly train, supervise, and discipline police officers regarding crisis intervention techniques; (b) otherwise providing insufficient resources;

and (c) failing to follow established policies and procedures regarding crisis intervention techniques for individuals with mental health disabilities. FAC ¶¶ 150–56.

To plead a violation of Title II of the ADA, a plaintiff must allege that "she is a qualified individual with a disability; (2) that she was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (2d Cir. 2009) (brackets and quotation omitted). To bring a claim under the Rehabilitation Act requires essentially the same showing; "the same factual allegations generally will support both ADA and Rehabilitation Act Claims." *Id.* at 42 n.1 (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)). As a general matter, qualified individuals under these statutes may base discrimination claims on a claim of intentional discrimination (or disparate treatment); disparate impact; or failure to make a reasonable accommodation. *Fulton*, 591 F.3d at 43. In the policing context, courts typically treat Title II claims under either the wrongful arrest or failure to reasonably accommodate umbrellas. *See Ryan v. Vt. State Police*, 667 F. Supp. 2d 378, 386 (D. Vt. 2009); *Valanzuolo v. City of New Haven*, 972 F. Supp. 2d 263, 274 (D. Conn. 2013). Here, only the latter is relevant.

Defendants move for dismissal based primarily on the argument that Plaintiffs have not sufficiently stated claims under Title II or the Rehabilitation Act because they have not set forth "allegations of animus or ill will due to a person or persons with a disability," or have not sufficiently alleged deliberate indifference. Def. Br. at 19; Def. Reply at 10. They further appear to suggest that Mr. Felix either is not disabled or is not covered by the relevant policies. The Court rejects both objections.

### 1. Applicability of ADA and Rehabilitation Act to Mr. Felix

As a preliminary matter, Defendant appears to argue that Plaintiffs have not sufficiently alleged that Mr. Felix was a qualified individual for purposes of the ADA or Rehabilitation Act. Specifically, the City contends that "plaintiffs admit that Mr. Felix was not behaving in an emotionally disturbed manner . . . but was merely behaving as a fleeing felon." Def. Br. at 20; Def. Reply at 10. Insofar as Defendant intends to argue that Mr. Felix's status as an "emotionally disturbed" individual dictates whether his ADA and Rehabilitation Act claims survive, this contention is baseless. Even construing Defendant's argument as an argument that Mr. Felix was not a qualified individual, at this stage, such argument fails.

The ADA and the Rehabilitation Act apply to any "qualified individual." Under Title II of the ADA, which governs programs or activities provided by a public entity, a qualified individual is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Further, an individual has a disability for purposes of any part of the ADA if she has "a physical or mental impairment that substantially limits one or more major life activities," or a "record of such impairment." 42 U.S.C. § 12102(1)(A) & (B). Plaintiffs plead that Mr. Felix constitutes a qualified individual because his schizophrenia constituted a "mental impairment that substantially limited one or more of his major life activities, including, but not limited to, his ability to maintain employment and interact with strangers." FAC ¶ 147.

Defendant's suggestion that Mr. Felix was not behaving in an emotionally disturbed manner and that he did not appear to be a threat to himself or others, even if accurate or creditable at this stage, does not contradict Plaintiffs' well-pled allegation that Mr. Felix was entitled to the ADA and Rehabilitation Act's protections. To the contrary, the regulations implementing the ADA explicitly acknowledge schizophrenia as an impairment that "it should easily be concluded . . . will, at minimum, substantially impair" the major life activity of "brain function." 29 C.F.R. § 35.108(d)(2)(iii)(K). Nor does Defendant contest whether police investigative services are covered under Title II. *See Williams v. City of New York*, 121 F. Supp. 3d 354, 368 (S.D.N.Y. 2015) ("The only reasonable interpretation of Title II is that law enforcement officers who are acting in an investigative or custodial capacity are performing 'services, programs, or activities' within the scope of Title II."). Accordingly, at this stage, the Court finds that Plaintiffs have sufficiently alleged that Mr. Felix was a qualified individual with a disability.

## 2. Failure to Allege Animus or Deliberate Indifference

Defendant further argues that Plaintiffs have not sufficiently stated claims under Title II or the Rehabilitation Act because they have not set forth "allegations of animus or ill will due to a person or persons with a disability." Def. Br. at 19. The Court rejects this argument in full.

To find that a Plaintiff has sufficiently pled a claim against the City based on Title II or the Rehabilitation Act, the Second Circuit does "not require personal animosity or ill will." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009).[3] Plaintiffs need only

---

[3] The Court assumes, with the parties, that "discriminatory animus" represents a more onerous standard than "intentional discrimination," but notes that some of the parties' apparent disagreement may stem from courts' imprecise use of such terms. *See* Aziz Z. Huq, *Judging Discriminatory Intent*, 103 CORNELL L. REV. (forthcoming 2018) (manuscript at 24–39), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3033169 (contrasting animus-based concepts of intent with less weighty standards). This may explain why Defendant can find examples of courts using the language of "animus" to describe the general intentional discrimination standards applicable under the Civil Rights Act of 1991, when the Second Circuit elsewhere distinguishes the two concepts. *Compare* Def. Br. at

plead intentional discrimination, which "may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy or custom." *Id.* (alterations and quotation omitted).

Defendants reach the contrary conclusion by misapplying the standard the Second Circuit articulated in *Garcia v. SUNY Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 112 (2d Cir 2001). *Garcia* held that "discriminatory animus or ill will based on the plaintiff's disability" is required in order to subject *states and state entities* to liability in a manner consistent with state sovereign immunity and Congress's enforcement authority under Section 5 of the Fourteenth Amendment. *Id.* (emphasis added). Its concerns are not pertinent to a suit against municipal and private entities. To the extent other courts in this circuit have applied *Garcia* to claims for municipal liability, *see, e.g., Sneed v. City of N.Y. Dep't of Parks & Rec.*, No. 10-CV-299 (WHP), 2011 U.S. Dist. LEXIS 157810, at *7 (S.D.N.Y. Sept. 30, 2011); *Lara-Grimaldi v. County of Putnam*, No. 17-CV-622 (KMK) 2018 WL 1626348, at *21 (S.D.N.Y. Mar. 29, 2018), the Court declines to follow them. The other cases Defendant cites as referring to "discriminatory animus" appear to use the term to generally capture discriminatory motive. *See, e.g., Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) (summary order) (discussing the mixed motives standard).

In their Reply, Defendant next argues that Plaintiffs' amended complaint fails to sufficiently allege deliberate indifference by reiterating its arguments with respect to the allegations that it had a custom, policy, or practice of failing to properly treat emotionally disturbed persons. *See* Def. Reply at 10. The Court disagrees and finds that deliberate indifference is sufficiently alleged at this stage.

---

19 (citing *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) and *Smith v. Reg'l Plan Assn*, No. 10-CV-5857 (BSJ), 2011 U.S. Dist. LEXIS 117712, at *15 (S.D.N.Y. Oct. 7, 2011)) *with Loeffler*, 582 F.3d at 275.

To plead deliberate indifference in an ADA or Rehabilitation Act case, Plaintiffs may allege "deliberate choice, rather than negligence or bureaucratic inaction" or that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Loeffler*, 582 F.3d at 275–76 (Rehabilitation Act); *see also Stamm v. N.Y.C. Transit Auth.*, No. 04-CV-2163 (SLT), 2013 WL 244793, at *4 (E.D.N.Y. Jan. 22, 2013) (applying a similar standard to an ADA Title II case).

Here, Plaintiffs contend that they have adequately alleged that the City was deliberately indifferent to a risk of discrimination against persons with disabilities in policing: namely, failure to accommodate individuals with mental disabilities including schizophrenia.

For many of the same reasons discussed above with respect to Plaintiffs' failure to train claim, the Court finds Plaintiffs have met this standard. The City is obligated to accommodate individuals with disabilities in the operation of its police department, including delaying, where safety concerns permit, approaching individuals in the middle of mental health crises. *See Morales v. City of New York*, No. 13-CV-7667 (RJS), 2016 WL 4718189, at *7 (S.D.N.Y. Sept. 7, 2016); *Taylor v. Schaffer*, No. 14-CV-123 (JGM), 2015 WL 541058, at *8 (D. Vt. Feb. 10, 2015). And courts in this circuit have found that plaintiffs provided sufficient evidence of deliberate indifference when they could point to training deficiencies of which municipal entities were aware and which existed with respect to populations police would necessarily encounter as they did their duties. *See, e.g.*, *Williams*, 121 F. Supp. 3d at 374–75 (noting that even "putting aside" a report documenting training issues, "it would be preposterous to believe that given the diversity of the population of the City of New York, the NYPD did not know full well that its officers would encounter persons with hearing impairments in connection with protecting and

defending the City and that some of those people would need accommodation in order to interact with the police"). These showings have sufficiently been made here, where Plaintiffs have plausibly alleged that the City failed to train officers with respect to the treatment of individuals with mental illness, including but not limited to implementing Crisis Intervention Training, backup calls, and similar policies.

## IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The motion to dismiss is granted with respect to Plaintiffs' *Monell* claims alleging failure to screen, failure to train officers in the use of I-Cards, a custom or practice of misusing I-Cards, and a custom or practice of engaging in excessive force with respect to emotionally disturbed persons. Accordingly, all such claims are hereby DISMISSED.

However, the motion to dismiss is denied with respect to Plaintiffs' *Monell* claims alleging failure to train officers in the treatment of emotionally disturbed persons. The motion to dismiss is also denied with respect to Plaintiffs' ADA and Rehabilitation Act claims. As a final matter, at this stage, the Court declines to bifurcate any of the surviving claims from one another.

Discovery remains ongoing with respect to the individual defendants. *See* Dkt. No. 92. With respect to claims against the City, the Court will issue an Order scheduling a Case Management Conference under separate cover.

This resolves Dkt. Nos. 59 and 67.

Dated: September 20, 2018
New York, New York

ALISON J. NATHAN
United States District Judge