USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 3 0 2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Dorrelien Felix *et al.*,

        Plaintiffs,

—v—

The City of New York *et al.*,

        Defendants.

16-CV-5845 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

This litigation concerns the attempted arrest and fatal shooting of David Felix. The two New York Police Department ("NYPD") detectives involved, Defendants Harold Carter and Vincente Matias, now move for partial summary judgment on some claims brought against them under Section 1983, the New York State Constitution, and New York tort law. Specifically, they move for summary judgment on claims related to their conduct preceding the shooting.

For the reasons stated below, Defendants Carter and Matias's partial motion for summary judgment is GRANTED in part and DENIED in part.

**I.    BACKGROUND**

The following facts are drawn from the parties' statements and counter-statements made pursuant to Local Civil Rule 56.1.

On April 25, 2015, Defendants Harold Carter and Vincente Matias, two NYPD detectives, arrived at the Bridge, a residence with programming, treatment, and supervision for individuals suffering from mental illness. Defendant's Counter Statement Pursuant to Rule 56.1 ("Def. Counter 56.1") ¶¶ 8, 11, Dkt. No. 120. They were there to arrest David Felix, a suspect in a robbery and assault, although they did not have an arrest warrant. *Id.* ¶¶ 7, 10. When they

buzzed the front door, they were greeted by Danielle Steeley, an employee of the Bridge. *Id.* ¶¶ 20-22. Defendants Carter and Matias showed her a document with a picture of Felix. *Id.* ¶ 23 Steeley has testified that she believed this document to be an arrest warrant for Felix. *Id.* ¶ 25. She then explained the mission of the Bridge and informed the detectives that Felix was diagnosed with schizophrenia. *Id.* ¶ 26. Steeley buzzed Felix's apartment but he did not respond. *Id.* ¶ 40.

The three of them then went up to Felix's apartment on the sixth floor. *Id.* ¶ 42. On the way, Steeley called her supervisor, Maritza Bryson, and Defendant Carter told Bryson that he and Matias were there to arrest Felix. Plaintiffs' Responses to Defendant's' Rule 56.1 Statement ("Plaintiffs Counter 56.1") ¶ 89. Steeley then knocked on Felix's door, but no one responded. *Id.* ¶¶ 93-94. Steeley then opened the door. *Id.* ¶ 98. At some point, they heard what sounded like a person kicking a screen door. *Id.* ¶ 113. Defendant Matias entered the apartment and discovered that Felix had knocked off a window screen and was fleeing down the fire escape. *Id.* ¶¶ 116-17. Defendant Matias relayed this to Carter, who had also entered the apartment. *Id.* ¶¶ 118-19. Defendant Carter ran down the stairs, followed by Matias. *Id.* ¶¶ 119-20.

Defendant Carter confronted Felix in order to arrest him. *Id.* ¶¶ 126-27. Felix attempted to escape and was grabbed by Carter. *Id.* ¶¶ 128-29. Defendants Carter and Matias became engaged in a physical struggle with Felix as they tried to apprehend him. *Id.* ¶ 131-57. As discussed below, the conduct of Carter, Matias, and Felix during this struggle is disputed. Matias eventually disengaged due to injuries that he sustained. *Id.* ¶¶ 160, 162. Defendant Carter then shot Felix once, fatally wounding him. *Id.* ¶ 175. The circumstances surrounding the shooting are heavily disputed. They are not relevant for the disposition of this motion, though,

2

because Defendants only move for summary judgment on claims for conduct preceding the shooting.

## II. LEGAL STANDARD

Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[I]n making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In seeking summary judgment, the initial "burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994). Where the non-moving party would bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant

3

"demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" to survive summary judgment. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted) (quoting *Celotex Corp.*, 477 U.S. at 323).

## III. DISCUSSION

Plaintiffs, Felix's parents and the administrator of his estate, bring claims under Section 1983 against both Carter and Matias, as well as the City. They also bring Rehabilitation Act and ADA claims against the City, New York State Constitutional claims against Carter and Matias, assault and battery claims against Carter and Matias, intentional infliction of emotional distress claims against Carter and Matias, as well as wrongful death and pain and suffering claims against Carter and Matias. Finally, Plaintiffs also bring a "*respondeat superior*" claim against the City. This motion only concerns: 1) the Section 1983 claims against Carter and Matias on conduct preceding the shooting; 2) the New York State Constitutional claims for conduct preceding the shooting; and 3) the assault, battery, and intentional infliction of emotional distress tort claims against Carter and Matias for conduct preceding the shooting.

### A. Section 1983 Claims

Carter and Matias move for summary judgment on the Section 1983 claims related to their conduct before the shooting. This breaks down into two claims. The first is that Carter and Matias unlawfully entered Felix's apartment. The second is that Carter and Matias used excessive force when they were physically struggling with Felix before the shooting.

Carter and Matias contend that there is no genuine dispute of material fact that their conduct for both claims comported with the Fourth and Fourteenth Amendments. At minimum, they argue there is no genuine dispute of material fact that they are entitled to qualified

4

immunity. The purpose of qualified immunity is to "give government officials breathing room to make reasonable but mistaken judgments." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, [t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]' . . . The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014) (alterations in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate" such that "every 'reasonable official would [have understood] that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alteration in original). Such precedent must come from "controlling authority" or a robust 'consensus of cases of persuasive authority.'" *al-Kidd*, 563 U.S. at 741-42 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). Qualified immunity thus immunizes "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

### 1. Unlawful Entry

Plaintiffs claim that Carter and Matias unlawfully entered Felix's apartment without a warrant in violation of the Fourth and Fourteenth Amendments. Defendants contend that it is undisputed that Steeley gave them consent to enter the apartment. Carter and Matias further argue that given uncertainty in the law regarding the authority of staff at a facility like the Bridge to consent to a search, they are at least entitled to qualified immunity. Finally, they maintain that

Felix's kicking of the screen and escape from the apartment created an exigent circumstance, justifying the entry. If that was all that Plaintiffs allege, these arguments might succeed. But they seek to establish significantly more, namely that Carter and Matias gave Steeley a false impression that they had a valid warrant and used subterfuge to procure her consent. As outlined below, because there is a genuine dispute of material fact as to whether Carter and Matias did so, summary judgment on the unlawful entry claim is denied.

The evidence that Carter and Matias used subterfuge to procure Steeley's consent is as follows: it is undisputed that Carter and Matias went to the Bridge for the purpose of arresting Felix. Def. Counter 56.1 ¶ 10. It is further undisputed that they believed they were going to a private residence, and not a facility where the residents might have a diminished expectation of privacy. *Id.* ¶ 7. Furthermore, it is undisputed that Carter and Matias showed Steeley a document with Felix's picture. *Id.* ¶ 23. Additionally, it is undisputed that, although Steeley did not remember what the officers said when they showed her the paper, Steeley believed that the piece of paper was a valid warrant. *Id.* ¶¶ 23-25. It is also undisputed that when the detectives were attempting to enter the apartment, Carter told Steeley's supervisor, Maritza Bryson, that they were there to arrest Felix. Plaintiffs Counter 56.1 ¶ 89. Video of the encounter between Steeley and the detectives shows that Steeley let the detectives into the building immediately after they showed her the document. Declaration of Luna Droubi, Exh. 12 at 3:20-3:30, Dkt. No. 113-12. Additionally, the video appears to show Carter pointing to some text on the document, when showing it to Steeley. *Id.* The summary judgment record contains only sparse details regarding the actual contents of the document. The principle evidence against the deception theory is Carter and Matias' own testimony. *See* Plaintiffs Counter 56.1 ¶ 66.

Based on this evidence, a reasonable jury could conclude that Carter and Matias deceived Steeley into believing that they had a warrant and that Steeley gave her consent on that basis. Since Carter had told Bryson they were there to arrest Felix, it would be reasonable to find that he and Matias told Steeley the same thing when they showed her the document. Given that Steeley came away from her interaction with the detectives believing that their document was a warrant, it also would be reasonable to infer that Carter and Matias purposely gave her the impression that they had a valid arrest warrant, either by their conduct or by the contents of the document. Based on this evidence, a reasonable jury could conclude that Carter and Matias, more likely than not, intentionally and transparently tricked Steeley into letting them enter the apartment.

Such deception would clearly run afoul of the Fourth Amendment. Consent to a search must be "a product of that individual's free and unconstrained choice, . . . rather than a mere acquiescence in a show of authority." *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018) (quoting *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993)) (alteration in original). When consent is given on the deceptive premise that there is a valid warrant, it necessarily entails acquiescence in the show of authority. There can be little dispute that this doctrine constitutes clearly established law, making qualified immunity inappropriate. In *Bumper v. North Carolina*, the Supreme Court held that consent to a search a dwelling is invalid when officers deceive the occupant into believing that they have a valid warrant. 391 U.S. 543, 546-50 (1968); *see also Iverson*, 897 F.3d at 458-59; *United States v. Sanchez*, 635 F.2d 47, 59 (2d Cir. 1980) (consent to a search requires more than "submission to apparent lawful authority"). As discussed above, a reasonable jury could find that what Carter and Matias did was behavior that "every reasonable official would have understood" to be deceptive. *al-Kidd*, 563 U.S. at 741 (quotation omitted).

7

Additionally, since there is a genuine dispute of material fact on the deception issue, there is a genuine dispute as to whether there were exigent circumstances that justified the entry. The Supreme Court has clearly established that police cannot use the exigent circumstances exception if they "create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 462 (2011); *see also United States v. MacDonald*, 916 F.2d 766, 772 (2d Cir. 1990) (en banc) ("law enforcement agents may not create their own exigencies through illegal conduct") (quotation omitted); *United States v. Segura*, 663 F.2d 411, 415 (2d Cir. 1980). The detectives argue that Felix's flight created an exigent circumstance. But it is undisputed that he was trying to flee only because of the attempted entry into his apartment. If the jury finds that the entry was a result of deception regarding the existence of a warrant, then Defendants would have created their own exigencies through a Fourth Amendment violation. Defendants are not entitled to summary judgment on these claims.

### 2. Excessive Force

In contrast, the Court finds that Carter and Matias are entitled to qualified immunity on the claim that their conduct during the struggle leading up to the shooting was excessive force. Because Plaintiffs only raise two specific, pre-shooting uses of force as potentially unlawful, this holding is in effect limited to those two instances only. This ruling does not, in any way, affect Plaintiffs' claim that the shooting was unlawful. And it does not, for example, preclude future consideration of the pre-shooting conduct in determining the lawfulness of the shooting. Rather, it is restricted to the detectives' liability for these two specific uses of force, standing alone.

First, Plaintiffs allege that Carter slammed Felix's head into the wall while he and Matias were attempting to restrain Felix. Second, they claim that seconds after that incident, Carter

choked Felix by pushing his arm against Felix's neck. It is undisputed that these incidents took place in the entryway of the building, while the detectives were struggling with Felix as he was trying to escape. Def. Counter 56.1 ¶ 62. Plaintiffs argue that these two instances support an excessive force claim, regardless of the shooting. They add that they believe these alleged actions were particularly unreasonable given Carter and Matias' knowledge of Felix's mental illness.

The sole evidence for these allegations is security camera footage that captured the relevant part of the struggle between the detectives and Felix. *See* Dkt. No. 113, Exh. 12. For the slam, the video shows that Carter and Matias had Felix pinned against a wall, Felix's front facing the wall. *See id.* at 10:50-10:52. Felix then attempts to turn around, presumably in an attempt to wriggle free and escape. *Id.* at 10:52-54. As he does so, Carter puts his arm around Felix's neck. *Id.* Then Carter, Felix, and Matias all fall towards the other side of the hall, and Felix hits his head against the wall. *Id.* 10:54-58. One could reasonably interpret the video as showing Carter putting Felix in headlock and purposefully slamming Felix's head against the wall, in reaction to Felix's attempt to escape. It would also be reasonable to interpret the slam as being an unintended byproduct of Felix's attempt to push off the wall he was pinned against, as Carter and Matias attempted to restrain him.

Moments later, the video shows Matias grabbing Felix from behind. *Id.* at 11:00-11:03. Meanwhile Carter pushes his arm down on Felix's chest as both he and Matias attempt to restrain Felix from fleeing. *Id.* at 11:03-11:05. Carter's arm then moves up closer to the neck area. *Id.* 11:05-11:11. It is not clear from the video whether Carter is at this point applying pressure to Felix's chest or his neck. During this period, Felix is waving his arms in an attempt to get Carter off of him.

9

Even viewing the video in the light most favorable to Plaintiffs, Carter and Matias are entitled to qualified immunity. Claims of excessive force during an attempted arrest are evaluated by giving "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Furthermore, courts are required to "evaluate the record from the perspective of a reasonable officer on the scene" making "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (quotations omitted). Evaluating the use of force during arrests is thus a highly contextual undertaking.

In *Tracy*, a police officer attempted to arrest Patrick Tracy, a man who he believed was wanted for a criminal offense. *Id.* at 93. The officer had pulled Tracy over on the side of a road, alone and in bad weather. *Id.* Tracy resisted arrest and the two men became engaged in a physical struggle. *Id.* at 93-94. Tracy alleged that, at one point as they struggled the officer hit him multiple times with a metal flashlight and also jumped on him to prevent him from fleeing. *Id.* Tracy claimed that the officer did this even though Tracy had not attempted to strike him. *Id.* The Second Circuit found that even under Tracy's version of events, the force was objectively reasonable under the Fourth Amendment. *Id.* at 97. On the first *Graham* factor, the court explained that the officer had "ample basis" to believe that Tracy was wanted for a potentially serious criminal offense and that he was "a fugitive seeking to evade capture." *Id.* The court also found that a reasonable officer on the scene would have believed that Tracy's "attempt to

10

flee or flight back" posed a "real and imminent" threat to "officer safety." *Id.* Finally, Tracy was "actively resist[ing] arrest, thus necessitating a forceful response." *Id.*

In this case, a reasonable officer could have concluded that even an intentional head slam and chokehold were reasonable under the circumstances. First, Felix was wanted for serious offenses, robbery and assault. Second, as the video shows, Felix and the two detectives were evenly matched in a physical struggle. Like in *Tracy*, the "attempt to flee or fight back posed a potentially serious and imminent risk to [officer] safety." *Id.* Finally, there is no question that Felix was resisting arrest. The detectives could logically reason that their previous attempts to subdue Felix were inadequate "thus necessitating a forceful response." *Id.* A reasonable officer could believe that even an intentional head slam and chokehold were necessary and were roughly comparable to the force used in *Tracy*. *See also Pesola v. City of New York*, No. 15-cv-1917, 2017 U.S. Dist. LEXIS 140967, at *8-*9 (S.D.N.Y. Aug. 31, 2017) (officer was entitled to qualified immunity when alleged chokehold was used to subdue suspect resisting arrest); *Torres v. Dennis*, No. 10-cv-0803, 2013 U.S. Dist. LEXIS 83421, at *11-*13 (E.D.N.Y. June 13, 2013) (officer entitled to qualified immunity when he punched and struck resisting arrestee on the head with a flashlight). At the very least, even resolving all reasonable inferences in favor of the Plaintiffs, it cannot be said that "every 'reasonable official would [have understood] that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alteration in original). Qualified immunity is appropriate for these claims.

### 3. Failure to Intervene

Defendants also move for summary judgment on the failure to intervene claims against Carter and Matias for conduct before the shooting and against Matias for not preventing the shooting. The claims premised on unlawful entry fail because both detectives are alleged to be

direct participants, making "the failure to intervene theory of liability inapplicable." *See Cuellar v. Love*, No. 11-cv-3632, 2014 U.S. Dist. LEXIS 51622, at *23 (S.D.N.Y. Apr. 11, 2014). Moreover, because the Court grants summary judgment on the pre-shooting excessive force claims, it must grant summary judgment on any failure to intervene claims based on that conduct.

The Court also grants summary judgment on the failure to intervene claim against Matias for not preventing the shooting. In order to succeed on a failure to intervene theory, there must "have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). It is undisputed that by the time of the shooting, Matias was on the verge of losing consciousness, due to injuries sustained during the struggle with Felix. Plaintiffs Counter 56.1 ¶ 158. It is further undisputed that there was blood coming down his head and that he was bending over. *Id.* ¶¶ 159, 161. Furthermore, it is undisputed that a minute or two after the shooting, Steeley saw Matias leaning against a window and asked him if he was ok. *Id.* ¶ 179. Given the state of Matias's injuries at the time of the shooting, no reasonable jury could find that he had a realistic chance to intervene.

### B. New York State Constitution Claims

Plaintiffs also bring claims under the New York State Constitution. However, on summary judgment, they only defend their claims under Article I, Section 12, which is the New York equivalent of the Fourth Amendment. This claim is related to the alleged unlawful entry, and Defendants contend that it is duplicative. While the standard for liability under the Fourth Amendment and the New York Constitution are the same, there is a *respondeat superior* remedy under the New York State Constitution that is significantly broader than that under Section 1983.

See *Brown v. State*, 674 N.E.2d 1129, 1139-42, 1142 (N.Y. 1996). Summary judgment is therefore denied.

### C. New York Tort Law Claims

Additionally, Plaintiffs bring claims of assault, battery, and intentional infliction of emotional distress. The finding of qualified immunity on the excessive force claims requires a grant of summary judgment on assault and battery as well. See *Papineau v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006) (recognizing that New York law grants police defendants a qualified immunity defense on state-law claims). Plaintiffs do not contest summary judgment on the intentional infliction of emotional distress claim.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED with respect to the excessive force claims, the failure to intervene claims, the New York State constitutional claims arising under Article I, Section 6, and the New York tort law claims, to the extent that all of these claims relate solely to conduct preceding the shooting. Defendants' motion is DENIED with respect to the unlawful entry claims and the New York State constitutional claims arising under Article I, Section 12.

Because discovery is still proceeding on claims against the City, a Case Management Conference will be scheduled by a separate order.

This resolves Dkt. No. 100.

Dated: September 30, 2019
New York, New York

_____
ALISON J. NATHAN
United States District Judge

13