# EXHIBIT 26

```
 1
 2    UNITED STATES DISTRICT COURT
 3    SOUTHERN DISTRICT OF NEW YORK
 4    Civil Action No. 16-cv-5845 (AJN)
 5    ------------------------------------x
 6    DORRELIEN FELIX and MARGALY FELIX,
 7    individually, and JONATHAN C. MOORE, as
 8    Administrator of the Estate of DAVID FELIX,
 9                         Plaintiffs,
10
11         - against -
12
13    THE CITY OF NEW YORK, a municipal entity;
14    HAROLD CARTER and VINCENTE MATIAS,
15    individually and in their official capacities
16    as New York City Police Detectives; the BRIDGE
17    INC., a domestic not-for-profit organization;
18    and JANE DOE (as of yet unidentified employee
19    of the Bridge)
20                         Defendants.
21    ------------------------------------x
22                         August 8, 2019
23                         11:36 a.m.
      (Continued.)
24
25
```

Page 2

C O N T I N U E D:

EXAMINATION BEFORE TRIAL of a Defendant, The City Of New York, By, THERESA TOBIN, pursuant to Notice, held at the offices of BELDOCK LEVINE & HOFFMAN, LLP, 99 Park Avenue, New York, New York 10016 before Mandy Fein, a Notary Public of the State of New York.

Page 3

APPEARANCES:

BELDOCK LEVINE & HOFFMAN, LLP
99 Park Avenue, 26th Floor
New York, New York 10016
   Attorney for Plaintiffs

BY: JONATHAN C. MOORE, ESQ
    LUNA DROUBI, ESQ

NEW YORK CITY LAW DEPARTMENT
100 Church Street, 4th Floor
New York, New York 10007
   Attorney for Defendants

BY: JOSHUA J. LAX, ESQ

ALSO PRESENT
    PETER J. CALLAGHAN
    ROLAND WILEY

Page 4

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reversed to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

* * *

Page 5

TOBIN

THERESA TOBIN, called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY
MR. MOORE:

Q   Good morning, Chief Tobin.
A   Good morning.
Q   My name is Jonathan Moore. We met right before. You are here today in the case of Felix verse the City of New York, and you are testifying on behalf of the New York City Police Department concerning EDP.
    Do you understand that?
A   Yes.
Q   If for any reason you need to take a break, just let me know. If there is a question pending, I'd ask that you finish the answer before you take a break.
A   Sure.
Q   But if you need to take a break, that is perfectly fine. The only other couple of rules that we try to abide by in these depositions is that only one person should speak at a time, which we often don't do

TOBIN

but -- it is human nature. To the extent possible, let me finish the question before you answer.
    Okay?
A   Sure.
Q   I will try not to interrupt you and hopefully you will try not to interrupt me.
A   Sure.
Q   The other thing is, the court reporter is only takes down audible answers. She can't take down nods of the head.
A   Right.
Q   So, all of your answers have to be audible.
    Do you understand that?
A   Yes.
Q   Most people then go uh-huh.
    So, what is your full name for the record?
A   Theresa, T-H-E-R-E-S-A C. Tobin, T-O-B-I-N.
Q   What year were you born?
A   1961.
    MR. MOORE: I am not asking for date

TOBIN

of birth.
Q   1951?
A   '61.
Q   Sorry, I didn't mean to date you.
    Where are you currently employed?
A   The New York City Police Department.
Q   What is your rank?
A   Assistant chief.
Q   That is two stars, right?
A   Correct.
Q   What is your date of appointment to the police department?
A   July 25th, 1983.
Q   So, you're just -- just had your thirty-eighth, thirty-seventh anniversary?
A   Thirty-seventh, yes.
Q   Congratulations.
A   Thank you.
Q   I guess.
    So, what is your present assignment, Chief Tobin?
A   I'm the commanding officer of collaborative policing.
Q   Commanding officer of what?

TOBIN

A   Collaborative policing.
Q   Tell me what collaborative policing is.
A   We work with other City agencies and internally with the NYPD in collaborating on different policies that the NYPD has in terms of victims, in terms of the community, in terms of crime fighting.
Q   Who do you report to?
A   The police commissioner.
Q   So, you are in the police commissioner's office?
A   No, down the hall.
Q   Is there a deputy commissioner or a commissioner for collaborative policing?
A   There was. It has been vacant since the end of January.
Q   Who was that?
A   Suzanne Herman.
Q   She's no longer in the police department?
A   That's correct.
Q   How long have you been the commanding officer of collaborative policing?

TOBIN

A   Since March of 2014.
Q   If you can just briefly, going backwards, from March '14 tell me what your assignments were.
A   They -- that would take a while.
Q   You want to start from the beginning or --
A   I was on patrol. I have worked in various units, investigative patrol.
Q   Let me do it this way.
    How long were you a patrol officer, how many years?
A   Several, like the beginning of my career, worked in various precincts in Queens.
Q   When were you promoted to sergeant, do you know that was?
A   1989.
Q   Did you continue to serve in the patrol function as a sergeant?
A   I did.
Q   How long did you do that in patrol?
A   I was promoted to lieutenant in 1998.
Q   Is it fair to say from 1989 to 1998 you were a sergeant in the patrol division?

Page 10

1      TOBIN
2   A   No. I worked in the press office. I
3   had various assignments.
4   Q   When did you last work in the patrol
5   division?
6   A   2002 as a captain, 2003.
7   Q   So, you became a lieutenant in 1998,
8   correct?
9   A   Yes.
10  Q   What was your assignment upon
11  becoming a lieutenant?
12  A   I worked in the press officer and was
13  editor of the Spring 3100 magazine.
14  Q   What magazine?
15  A   An internal department magazine.
16  Q   What is it called?
17  A   Spring 3100.
18  Q   What does that mean, Spring 3100?
19  A   So, you remember when you used to
20  have like you say Murray Hill 7, so Spring
21  S-P-R was the first if you wanted
22  headquarters, so it got the name Spring 3100
23  is the number people called when they needed
24  police assistance.
25  Q   Good.

Page 11

1      TOBIN
2      And you were promoted to captain at some
3   point?
4   A   I was in September of 2002.
5   Q   What was your assignment upon being
6   promoted to captain?
7   A   Patrol in Manhattan South.
8   Q   How long did you serve in that
9   position?
10  A   I was the XO in the 1st, the 10th and
11  the 13th Precincts and then I was brought into
12  work in personnel.
13  Q   In the personnel division of the
14  police department?
15  A   Correct.
16  Q   When was that?
17  A   I believe it was December or January
18  of 2004.
19  Q   You say you were the XO on the 1st,
20  the 10th and the 13th?
21  A   Precinct, correct.
22  Q   What did you do in the personnel
23  division?
24  A   I was the commanding officer of the
25  staff services section of the personnel

Page 12

1      TOBIN
2   borough.
3   Q   What functions were performed by the
4   staff services section?
5   A   Policy analysis and anything having
6   to do with applicant processing, the medical
7   division, recruitment and civilian employment.
8   Q   How long did you -- how long did
9   you -- how long were you the CO of the staff
10  services section?
11  A   From the time I got there until 2014
12  when I went to collaborative policing.
13  Q   So, just so I understand, from 2004
14  until 2014, you were the CO of the staff
15  services section?
16  A   Correct.
17  Q   The personnel division, correct?
18  A   Yes.
19  Q   Did you ever hold any position in the
20  police academy?
21  A   No.
22  Q   Did you ever hold any position in any
23  training --
24      MR. MOORE: Withdraw that.
25  Q   Did you ever -- were you ever

Page 13

1      TOBIN
2   involved in developing training with respect
3   to any activities in the police department?
4   A   Yes.
5   Q   What was that?
6   A   I worked on the CI, crisis
7   intervention training, team training.
8   Q   CIT training?
9   A   Correct.
10  Q   When did you start doing that?
11  A   In January of 2015, approximately.
12  Q   What did your responsibilities
13  involve in that with regard to that?
14  A   Reviewing other jurisdiction's
15  curriculum, looking at the curriculum that the
16  NYPD had.
17  Q   Anything else?
18  A   Not that I can think of.
19  Q   So, as of January 2015, tell me what
20  your highest level of education was.
21  A   PHD.
22  Q   When did you get your PHD?
23  A   2011.
24  Q   From where?
25  A   State University Of New York at

TOBIN

Albany.
Q What was your PHD in?
A Criminal justice.
Q Do you have any kind of a more particular focus than that or --
A No. That is the name of degree.
Q What did you -- did you do a thesis?
A I did.
Q What was your thesis on?
A Arming off-duty officers.
Q Arming off-duty officers?
A Yes.
Q Did any of your academic studies involve the police department's dealing with, so called, emotionally disturbed persons?
A No.
Q So, in January of 2015 or thereabouts, you said you were assigned to work on developing a CIT training, correct?
A Well, to look at other jurisdictions that had them, that had CIT training.
Q So, you were looking at what other jurisdictions were doing, right?
A Correct.

TOBIN

Q What was going on in the police department at that point in January of 2015 with respect to CIT training?
A Advocates of the -- in the field had requested that we consider doing CIT training with the NYPD, within the NYPD.
Q Is that to replace the training with respect to emotionally disturbed persons or something in addition?
A To supplement it.
Q Can you describe for me the difference between the training for ADP's and CIT training, if there is any difference?
A In the crisis intervention team training there is -- it's a much longer course than what officers receive as a matter of course in their training, and it breaks down different mental illnesses, tools that would be helpful in working with people with mental illness, as well as, developmental disabilities and then there is also a portion on self-care for officers.
Q So, is it fair to say that the crisis intervention training didn't change the

TOBIN

policies with respect to emotionally disturbed persons in the police department, it just was implementing a different approach to dealing with it?
A Could you repeat that?
Q Sure.
    Is it fair to say that the CIT training didn't implement a new approach --
    MR. MOORE: Withdrawn.
Q Didn't implement new policies with respect to emotionally disturbed persons, that issue in the police department, it just changed the premise approach to it?
A I think it supplemented what we -- what we had, yeah.
Q Was there any revision of the policy with respect to EDP's at any time when you started working on the CIT training?
A No.
Q Was there anything, any incident, any event in the City that you understood was the motivating force behind the change and approach in working with CIT training?
A No.

TOBIN

Q So, tell me a little bit more about what you were doing with respect to the CIT training.
A So, we visited several cities, and when I say we, I am referring to our partnership with the department of mental health and mental hygiene, DOHMH, and we went to various cities and sat through, say, the Los Angeles Police Department's crisis intervention team training program, which was four days, and we looked at Houston and Arizona, some of the cities in Arizona and Rochester.
Q Rochester, New York?
A Yes. We didn't physically sit through Rochester, but we -- there was a person up there that was instrumental in New York State training.
Q Who was that?
A Dawn Kamen.
Q Dawn Kamen?
A Uh-huh.
Q When you were developing the CIT training, were you working -- at that point

Page 18

1     TOBIN
2  what was the --
3     MR. MOORE:  Withdraw that.
4   Q    When you were first starting to work
5  on the CIT training --
6     MR. MOORE:  Withdraw that.
7   Q    Other than visiting those
8  jurisdictions and learning what they were
9  doing, what else were you doing in terms of
10 your involvement with the work on CIT
11 training?
12  A    We met with professionals in the
13 field, Amy Watson in Chicago, who had written
14 several articles, as well as, Dr. Michael
15 Compton, who had done a lot of work with CIT
16 in Atlanta.
17  Q    What was the first name, Amy?
18  A    Watson.
19  Q    And what was the purpose of meeting
20 with them?
21  A    To see if it -- if they believe
22 through their research that it was a worth
23 while venture.
24  Q    Other than the visiting of the
25 jurisdictions and meeting with other people,

Page 19

1     TOBIN
2  what else were you doing in terms of your
3  duties at this time with regard to CIT
4  training?
5   A    That was it.
6   Q    Was there some recommendation that
7  was made at some point by you or your staff to
8  the police commissioner concerning CIT
9  training?
10  A    Yes.
11  Q    How was that recommendation conveyed,
12 was it in writing, was it orally or what?
13  A    I believe it was the Deputy
14 Commissioner Suzanne Herman had a conversation
15 with Police Commissioner Bill Braden at the
16 time.
17  Q    Did you prepare any written materials
18 for the police -- for the deputy commissioner
19 or for the police commissioner summarizing
20 what you had been doing with respect to CIT
21 training pertaining to any recommendations?
22  A    I didn't, but I believe possibly
23 training did.
24  Q    So, when you say training, you mean
25 the training division of the --

Page 20

1     TOBIN
2   A    Yes.
3   Q    -- New York Police Department, right?
4   A    Yes.
5   Q    At the time, who was the head of the
6  training when you were looking at the CIT
7  stuff?
8   A    I believe it was Benjamin Tucker.
9   Q    So, he was the head of the police
10 academy at the time?
11  A    He was the head of the training
12 borough.
13  Q    Training borough, so that would
14 oversee the police academy?
15  A    Right.
16  Q    So, when you were developing this
17 approach to the CIT training that was
18 ultimately recommended --
19    MR. MOORE:  Withdraw that.
20  Q    You ultimately recommended, you, your
21 group, recommended that the NYPD should get
22 involved in the CIT training, correct?
23  A    Correct.
24  Q    So, in doing that, did you meet with
25 members of the training division?

Page 21

1     TOBIN
2   A    Yes.
3   Q    How often did you meet with them and
4  what was the nature of the interactions?
5   A    We looked at the training that was
6  currently provided to the emergency service
7  unit who gets the very in depth training in
8  terms of working with EDP's and looked at
9  modifying that curriculum for CIT.
10  Q    What else, anything else?
11  A    That was mainly the focus.
12  Q    Was there any change at this point, a
13 recommended change, in the training that
14 officers generally receive with regard to
15 EDP's?
16  A    Not in terms of what they currently
17 receive.  This was to enhance by establishing
18 CIT training.
19  Q    So, in terms of the policy that
20 existed at the time in 2015, with respect to
21 EDP's, I mean, the policy of New York City
22 Police Department, that didn't change what
23 changed was supplementing this with CIT
24 training, correct?
25  A    Correct.

**Page 22**

1 TOBIN
2 MR. LAX: The witness has a
3 clarification she wants to make in response to
4 the last question.
5  A  So, this was in responding to 911
6 calls.
7  Q  When you say this was, what do you
8 mean?
9  A  The CIT training, when officers on
10 patrol were responding to 911 calls
11 regarding --
12  Q  Does -- does -- go ahead.
13  A  Regarding emotionally disturbed
14 persons.
15  Q  Did the CIT training only focus on
16 responding to 911 calls?
17  A  It was to supplement the training the
18 officers get when responding to 911 calls and
19 pick-up jobs.
20  Q  Is that still the case, the CIT
21 crisis intervention teams are only activated
22 in response to 911 calls?
23     MR. LAX: Objection. You can answer.
24  A  You are saying teams, this is people
25 on patrol.

**Page 23**

1 TOBIN
2  Q  I am just trying to understand your
3 clarification.
4  A  Uh-huh.
5     MR. MOORE: Maybe you can read her
6 clarification back to me.
7     (The record was read back by the
8 reporter.)
9     Thank you.
10  Q  What --
11     MR. MOORE: Withdraw that.
12  Q  Was there a retraining of all patrol
13 officers concerning the CIT training at some
14 point?
15  A  No.
16  Q  Has that ever been done since you
17 implemented CIT training?
18  A  We are in the process of training
19 officers, which has continued. The class size
20 for CIT training is thirty at a max, so we've
21 increased it from one tour to three tours per
22 week.
23  Q  Do you do the training at the police
24 academy?
25  A  Correct, yes.

**Page 24**

1 TOBIN
2  Q  You are not talking about recruit
3 training, you are talking in service training
4 for officers around the force, right?
5  A  Yes.
6  Q  In control training?
7  A  In Operational command.
8  Q  Okay, when you say operational
9 command, what do you mean?
10  A  Housing and transit as well.
11  Q  Would that include anticrime units?
12  A  Yes.
13  Q  Would it include officers or
14 individuals assigned to the detective
15 division?
16  A  No.
17  Q  So, is there -- at -- currently the
18 CIT training is not being given to members of
19 the detective division, correct?
20  A  Correct.
21  Q  And it hasn't been, since -- that has
22 been the case since January 2015, it hasn't
23 been given to them, correct?
24  A  Correct.
25  Q  Did you ever in your time in the

**Page 25**

1 TOBIN
2 police department work on developing
3 curriculum for how the police department
4 should respond to EDP's?
5  A  No.
6  Q  Did you ever teach any courses in the
7 company or either for recruits or in-service
8 with regard to how the -- how police officers
9 should respond to EDP's?
10  A  No.
11  Q  Whose currently the head of the
12 police academy?
13  A  Theresa Shoretel is the assistant
14 chief in charge of the training borough and
15 Frederick Glover is the commanding officer of
16 the police academy.
17  Q  So Theresa Shoretel is the deputy
18 commissioner for training?
19  A  No. She's the chief of training.
20  Q  Chief of training, I get the titles
21 all mixed up.
22  A  No, it was -- it was -- they moved it
23 from a civilian position to a bureau. There
24 is no deputy commissioner, which Benjamin
25 Tucker was in 2014.

Page 26

1  TOBIN
2  Q  What is Theresa Shoretel's rank?
3  A  She's a bureau chief.
4  Q  She's a three star?
5  A  Three star, yep.
6  Q  I am going to hand you some patrol
7  guide provisions.
8      MR. MOORE: Can you mark this as
9  Tobin Deposition Exhibit Number 1 and this as
10 Tobin Deposition Number 2.
11     (Documents marked as Tobin Exhibits 1
12 and 2 for Identification, as of this date.)
13 Q  Let's look at Tobin Exhibit Number 2
14 first. To your knowledge, is this the current
15 patrol guide provisions with respect to
16 mentally ill or emotionally disturbed persons?
17     (Exhibit handed to witness.)
18 A  I think it's actually -- yes, it is.
19 Q  We are talking about Exhibit Number
20 2, right?
21 A  Yes.
22 Q  Dated 11/28/18, correct?
23 A  Correct.
24 Q  Look at Tobin Exhibit Number 1. This
25 is a patrol guide provision for the same

Page 27

1  TOBIN
2  subject matter dated on August 1, 2013,
3  correct?
4      (Exhibit handed to witness.)
5  A  Correct.
6  Q  To your knowledge, is this the patrol
7  guide provision with respect to mentally ill
8  or emotionally disturbed persons that was in
9  effect in April of 2015?
10 A  Yes.
11     MR. MOORE: Please mark this as
12 Number 3.
13     (Document marked as Tobin Exhibit 3 for
14 Identification, as of this date.)
15 Q  I am handing you what has been marked
16 as Tobin Exhibit Number 3.
17     Can you identify this document?
18     (Exhibit handed to witness.)
19 A  This is patrol guide procedure in
20 effect as of January 1st of 2000.
21 Q  Do you know how the policy, the
22 police department policy, with respect to
23 mentally ill or mentally disturbed persons
24 changed from January 2000 to August 2013?
25 A  Well, it should be -- it appears that

Page 28

1  TOBIN
2  the reports have changed to less lethal
3  request -- there are two different reports.
4  It appears that one of them is no longer
5  utilized in the 2013 procedure.
6  Q  Which one is that?
7  A  It looks like the taser/stun device
8  report is now called the use of conducted
9  energy device, CED.
10 Q  Is that the only change you can see?
11 A  I haven't gone line-by-line.
12 Q  Let me ask you before you -- you
13 agree with me that the numbered paragraphs of
14 the patrol guide are the same as it was in
15 2000 to 2013, right?
16 A  They have -- they both have, I
17 believe, thirty-two steps.
18 Q  Right.
19 A  Whether they are the same or changed,
20 I don't know.
21 Q  We won't go through each one, but so
22 at least there were thirty-two paragraphs in
23 the old policy and thirty-two numbered
24 paragraphs in the new policy, correct?
25 A  Correct.

Page 29

1  TOBIN
2  Q  What appears to have been changed is
3  the language has been either added or removed
4  from the section that begins additional data,
5  correct?
6  A  Right.
7  Q  But the current policy -- not the
8  current policy, the policy that would have
9  been in effect in January -- in April of 2015
10 would be contained in Tobin Exhibit Number 1,
11 correct?
12 A  That's correct.
13 Q  So, in the period of time from 2000
14 until 2013, the policy with respect to how
15 officers should deal with people who have
16 mentally ill or emotional problems the policy
17 hasn't changed, right?
18 A  Since when?
19 Q  Between 2000 to 2013, there was no
20 change in the policy, I am not talking about
21 how it was implemented, I am talking about
22 whether the policy set forth in the patrol
23 guide had changed?
24 A  It had to. If there is two different
25 patrol guides, one is revised.

8 (Pages 26 - 29)

Page 30

1  TOBIN
2  Q  The one is revised with respect to
3  about the policy contained and the number of
4  paragraphs hasn't changed, correct?
5  A  I haven't gone through them, so, but
6  there had to be some change in policy if we
7  have a new patrol guide revision.
8  Q  Well, is it fair -- well, you can
9  have a new patrol guide that has additional
10 materials at the end of the numbered
11 paragraphs but still the number of paragraphs
12 would be the same?
13 A  Which appears to be the case here,
14 but it doesn't mean the policy hasn't changed
15 if there is more information and additional
16 data.
17 Q  The new information may be generic
18 described as policy it had changed in that
19 respect, right?
20 A  Say that again, please.
21 Q  So, what you are suggesting is that
22 to the extent there is additional information
23 contained in the 2013 policy as compared to
24 the 2000 policy, those additional changes you
25 would describe as a change in policy, correct?

Page 31

1  TOBIN
2  A  Correct.
3  Q  So, between 2000 and 2015, can you
4  tell me if you know how the training provided
5  to police officers has changed, if at all,
6  with regard to mentally or emotionally
7  disturbed persons?
8  A  I think the change that took place
9  between 2000 and 2013 had to do with the stun
10 gun, that appears to be the difference in the
11 policy.
12 Q  Or the -- what do they call it
13 conductive?
14 A  Energy device, CED.
15 Q  So, other than with respect to the
16 use of the stun gun, can you tell me whether
17 the training with respect to the stun gun can
18 you tell me whether in any other respect the
19 training with respect to EDP's has changed
20 from 2000 to 2015 that you are aware of?
21 A  Not to my knowledge, but I'm not in
22 training.
23    MR. MOORE:  Let's take a short break.
24    (RECESS)
25 Q  So, Chief Tobin, can you tell me if

Page 32

1  TOBIN
2  you know back in 1992 or 1994 what the
3  training was that police officers received
4  with respect to EDP's?
5  A  I know it was given to recruit
6  training.  I think it was also given to people
7  promoted during that time.
8  Q  When you say --
9  A  In collaboration with John Jay, I
10 think they got a day of training with them.
11 Q  When you say people promoted, you
12 mean --
13 A  Going from police officer to sergeant
14 and I'm not sure it was sergeant to
15 lieutenant.
16 Q  What about going from police officer
17 to detective division?
18 A  No.
19 Q  Do you know what the extent of the
20 training was in the academy at that time with
21 respect to EDP's, and let's talk about, was it
22 a half day, a class, was it a whole day?
23 A  That I don't know.  I mean, that is
24 very specific with training.  I think it was
25 also a thread through various topics, so let's

Page 33

1  TOBIN
2  say police communications and it would be
3  communicating with X, Y and Z, which would
4  have included emotionally disturbed.
5  Q  After leaving the academy in the
6  middle '90's, when would an officer who wasn't
7  promoted have received any kind of additional
8  training with respect to EDP's?
9  A  After the mid-'90's?
10 Q  Yes.
11 A  If they were part of CIT training,
12 I'm not sure.  There may have been a component
13 of command level training in which officers
14 received roll call training or in tact
15 training.  I don't know what the subject of
16 those were.
17 Q  CIT training didn't begin until 2015,
18 right?
19 A  That's correct.
20 Q  So, from the mid-'90's until 2015 for
21 an officer who wasn't promoted or an officer
22 who was promoted into the detective division,
23 there would have been no additional training
24 on EDP's, correct?
25 A  No.  I don't know that because we

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400

Page 34

1          TOBIN
2   have -- there was in tact training and I don't
3   know what those topics covered from the
4   mid-'90's through 2015.
5   Q    Are you generally aware that in
6   tact -- in tact is like in-service training,
7   right?
8   A    Correct.
9   Q    Are you generally aware that EDP's
10  was a subject matter covered by in tact
11  training?
12  A    I'm not sure.
13  Q    So, you have no knowledge one way or
14  the other as you sit here today, correct?
15  A    Correct.
16       MR. MOORE:  Why don't you mark this
17  as Exhibit 4.
18       (Document marked as Tobin Exhibit 4 for
19  Identification, as of this date.)
20  Q    I handed you what has been marked as
21  Tobin Exhibit 4.
22       Can you identify this document?
23       (Exhibit handed to witness.)
24  A    It's entitled Putting Training Into
25  Practice A Review Of NYPD's Approach To

Page 35

1          TOBIN
2   Handling Interactions With People In Mental
3   Crisis.
4   Q    Have you seen this document before?
5   A    I have.
6   Q    When is the last time you looked at
7   it?
8   A    Probably when it came out in 2017.
9   Q    Did you look at it in preparation for
10  today's deposition by any chance?
11  A    I did not.
12  Q    If you turn to the first page of this
13  document, which is -- I guess it is not Bates
14  stamped, but it was attached to the summary
15  judgment motion?
16       MS. DROUBI:  And the complaint.
17  Q    And the complaint too great.
18       If you look at Page 1, you see on the
19  bottom of the page it lists -- it refers to some
20  statistics in the number of EDP calls the
21  department receives every year?
22  A    Yes.
23  Q    I know you may not know exactly what
24  the numbers are, but is that generally
25  accurate as far as you understand?

Page 36

1          TOBIN
2   A    For this time period?
3   Q    Yes.
4   A    Yes, and I believe that it has
5   significantly increased.
6   Q    So, when you say significantly
7   increased, what do you mean?
8   A    I think the last number that was
9   given, I don't know -- for 2018 might be as
10  high as a hundred and eighty-one thousand
11  calls.
12  Q    In terms of just the perspective,
13  what percentage of police officer's work
14  generally would be involved with people in
15  mental crisis?
16  A    I think it's less then four percent.
17  Q    How much?
18  A    Less then four.
19  Q    Less then four percent?
20  A    Of calls.
21  Q    Of calls, right.  But still a hundred
22  and eighty thousand calls is a large number,
23  correct?
24  A    It is, but I think we respond to four
25  million and the hundred and eighty-one

Page 37

1          TOBIN
2   thousand doesn't mean that those were calls
3   that officers respond to.  I'm not sure, but I
4   know that of the calls received at 911 for
5   this job classification, it's less then four
6   percent or just about four percent.
7   Q    Is there -- are those statistics
8   available somewhere?
9   A    I just know because I asked
10  communications for them.
11  Q    Setting aside the number of calls, do
12  you know how many encounters officers engage
13  in on a yearly basis that involve emotionally
14  disturbed persons?
15  A    Off the top of my head, I don't.
16  Q    So, other than the CIT training, has
17  there been any revision that you know of in
18  the policy with respect to how police officers
19  are to respond to EDP's as we sit here today?
20  A    I believe so.  There was a new
21  revision that came out to the patrol guide.
22  Q    In 2018?
23  A    Yes.
24  Q    How has that changed?
25  A    Without going through the thirty-two

1 TOBIN
2 steps, I think it mostly had to do with
3 technology, now that we all have the smart
4 phones.
5 Q Body one cameras?
6 A Body one cameras, that type of
7 information.
8 Q So, can you just summarize, for me
9 without referring to the documents, Chief
10 Tobin, how officers are trained with respect
11 to dealing with EDP's, what general principals
12 are supposed to apply?
13 A When they encounter someone who is a
14 danger to themself or others, they should
15 isolate and contain, and request a patrol
16 supervisor, and an emergency service unit.
17 Q Anything else, any other general
18 principals that you can think of?
19 A Just ensure their safety and the
20 person's safety as much as possible.
21 Q Is it important for officers to
22 develop as much information as they can about
23 the incident from the beginning?
24 A When they're responding to a 911
25 call?

1 TOBIN
2 Q Well, when they're responding to
3 somebody who may present with emotional
4 issues?
5 A Yes.
6 Q I mean, that's just basic good police
7 work?
8 A Common sense, yeah.
9 Q I know it is kind of a simple
10 question.
11 A Okay.
12 Q Are you aware of the facts of this
13 case?
14 A Somewhat.
15 Q You're aware, are you not, that two
16 detectives, Detective Matias and Detective
17 Carter in April of 2015 went to a location in
18 the East Village to try to arrest the
19 plaintiff, David Felix, right?
20 A Yes.
21 Q Do you know what information they had
22 in their possession before they went there?
23 A I believe that they knew he was
24 wanted for, I believe, a robbery.
25 Q Right. And were you aware that they

1 TOBIN
2 also knew that he had engaged in an act of
3 violence against the person he had robbed at
4 least twice before they responded to the
5 scene?
6 MR. LAX: Objection. You can answer,
7 if you understand.
8 A That was part of the robbery, that he
9 forcibly took someone's property and that he
10 was violent.
11 Q He physically harmed them?
12 A Yes.
13 Q You were aware of that too, right?
14 A Yes.
15 Q And were you aware that the -- do you
16 understand in this case that these officers
17 responded to a facility called The Bridge?
18 A Yes.
19 Q Are you aware that The Bridge is a
20 facility that houses a residential facility
21 for people with mental health issues?
22 A Yes.
23 Q Are you aware that when they
24 responded to that facility and were buzzed in
25 they talked to a security person at the desk

1 TOBIN
2 there and that person gave them some
3 information about Mr. Felix, are you aware of
4 that?
5 A I believe the information they gave
6 was that they didn't know whether he was home
7 or not.
8 Q Do you recall that -- do you
9 understand in this case that the person who
10 works at The Bridge indicated to these
11 officers that he had a diagnosis as a paranoid
12 schizophrenic?
13 A They were told that?
14 Q Yes.
15 A Okay.
16 Q Do you know that?
17 A Not for a fact, but okay.
18 Q Were you aware that they advised --
19 that the person who worked for The Bridge had
20 advised these officers that he took a
21 medication called Abilify?
22 MR. LAX: Objection. You can answer.
23 A I believe it is one of the officer's
24 testimony.
25 Q Yeah.

TOBIN
A   Okay, yeah.
Q   So, you are aware of that fact too, correct?
A   Yes.
Q   Were you aware that the officers were shown a log which would have indicated whether Mr. Felix had taken his medication?
    MR. LAX: Objection. You can answer.
A   I don't recall seeing that, no.
Q   So, based upon your -- on your understanding of the NYPD's policies and practices with respect to EDP's, what should the officers have done in this circumstance who they were on -- they were looking for somebody who had committed a violent felony, had assaulted somebody, they come to a facility that's a residential facility for people with mental health issues, they learn that he was -- he had a diagnosis as a paranoid schizophrenic and they learned he was on a medication called Abilify, and they had made efforts to contact him, and they were unsuccessful, so they didn't really know if he was there or not, what should they have done

TOBIN
in that circumstance?
    MR. LAX: Objection. You can answer.
A   Pursue whether he was at the location.
Q   I am sorry.
A   Pursue whether he was at the location.
Q   So, what -- should there have been anything they should have done considering what they learned about his mental health condition?
A   No.
Q   Why not?
A   Because they didn't know whether he was there and whether that condition was being manifested.
Q   Well, they knew what the diagnosis was, they knew he was taking a medication and arguably they knew he hadn't taken his medication because he hadn't been there for two days, so under those circumstances, shouldn't they have been required to call a supervisor and call a bus?
    MR. LAX: Objection. You can answer.

TOBIN
A   No.
Q   Why not?
A   Because they had not located him to see if his diagnosis was evident.
Q   But they didn't know whether he was in the apartment or not?
A   Right.
Q   So, but they then were able to get the building to let them in the apartment, correct?
    MR. LAX: Objection.
Q   Were you aware of that fact?
    MR. LAX: Objection.
A   I think it was a statement of the officers that they did.
Q   Yeah, so with that, in your judgment in terms of dealing with somebody who has emotional, mental health issues, was that a proper police practice to go into the apartment not knowing whether he was there or not?
    MR. LAX: Objection. You can answer.
A   Yes.
Q   That was proper?

TOBIN
A   Yes.
Q   At what point would the procedures with respect to dealing with an emotional disturbed person have been triggered in this circumstance?
A   If they had seen the person they were looking for displaying behavior that would have been harmful to himself or others.
Q   So, if they knew he was in the apartment and they knew that he had this condition and he was taking medication, he had engaged in some violent felonies just a couple of days earlier, is it your testimony that the NYPD policy and practice under the current -- the then current NYPD practice, it would have been okay for them to go into his apartment?
A   Correct.
Q   Even though going into the apartment might have triggered some unusual conduct on his part?
    MR. LAX: Objection. You can answer.
A   I don't know if they would have known that without entering the apartment. They didn't even know if he was there, is my

Page 46

1 TOBIN
2 understanding.
3  Q   Right, but the question is, it is
4 really judgment, I guess I'm asking you as a
5 matter of policy and practice to make a
6 judgment about whether the officers acted
7 properly by going into his apartment knowing
8 what they knew about him, not knowing whether
9 he was there or not, but if he was there that
10 might have provoked a dramatic and fatal
11 confrontation right at the spot, it is your
12 testimony that would be proper?
13       MR. LAX: Objection. You can answer.
14  A   Yes.
15  Q   Do you know that the officers or were
16 investigated by the police department for this
17 shooting that occurred?
18  A   Do I know that the police
19 department --
20       MR. MOORE: Withdraw that. Withdraw
21 that.
22  Q   You know at some point shortly after
23 they went into his apartment and they
24 confronted him down in the lobby that
25 Mr. Felix was shot and killed by one of the

Page 47

1 TOBIN
2 officers, correct?
3  A   Yes.
4  Q   Are you aware that an investigation
5 was done of that shooting?
6  A   I'm aware that we investigate every
7 police shooting, so I'm assuming, yes.
8  Q   Do you know whether as a result of
9 that investigation the officers were ordered
10 to be retrained?
11  A   I don't.
12  Q   Can you think of any reason why they
13 would be asked -- they would be ordered to be
14 retrained?
15       MR. LAX: Objection. You can answer.
16  A   I don't.
17  Q   So, as a matter of policy and
18 practice from the perspective of the police
19 department, and you are speaking for the
20 police department now, it is your testimony
21 that knowing those facts that I laid out, that
22 Mr. Felix had engaged in a robbery and a
23 violent assault of somebody just a couple of
24 days earlier, that he was living in a mental
25 health facility, that he was -- that they knew

Page 48

1 TOBIN
2 he had a diagnosis as a paranoid schizophrenic
3 and they knew he was taking a medication to
4 treat that, and they may or may not have
5 known, it is unclear, but they certainly saw
6 the book showing whether he had taken his
7 medication or not, under that set of
8 circumstances, you are saying it was proper
9 for the officers to go ahead and break into
10 the apartment and not wait for a sergeant or
11 ESU to come to the scene?
12       MR. LAX: Objection. You can answer.
13  A   Okay. Can I just pause here. I'm
14 not understanding what the objections are and
15 then answer.
16       MR. LAX: Sorry, I am objecting to
17 form, but you still have to answer.
18  Q   Unless he directs you not to answer,
19 you have to go ahead and answer.
20       MR. LAX: Sorry about that.
21  Q   I should have explained that to you
22 too, so I apologize.
23  A   I am not sure the facts as you are
24 laying them out are true.
25  Q   In that set of facts, though, are you

Page 49

1 TOBIN
2 saying --
3  A   I don't think they broke into the
4 apartment, is my understanding, but they went
5 up to his room.
6  Q   Change it to they were able to get
7 into his apartment. Under that set of facts,
8 you are saying based upon your understanding
9 of the policy and practice of the police
10 department, it was proper for them to have
11 done that and not have called a supervisor or
12 called ESU?
13  A   Correct.
14  Q   That is based on what?
15  A   Our current policy.
16  Q   Your understanding of the policy and
17 practice?
18  A   Correct.
19       MR. MOORE: Let me take a short
20 break.
21       (RECESS)
22    Please mark this.
23       (Document marked as Tobin Exhibit 5 for
24 Identification, as of this date.)
25  Q   Chief, I am handing you what has been

13 (Pages 46 - 49)