# EXHIBIT 32

# PUTTING TRAINING INTO PRACTICE: A REVIEW OF NYPD'S APPROACH TO HANDLING INTERACTIONS WITH PEOPLE IN MENTAL CRISIS



**NEW YORK CITY DEPARTMENT OF INVESTIGATION**

OFFICE OF THE INSPECTOR GENERAL FOR THE NYPD (OIG-NYPD)

**MARK G. PETERS**
COMMISSIONER

**PHILIP K. EURE**
INSPECTOR GENERAL FOR THE NYPD

## Table of Contents

I.      Executive Summary ............................................................................... 1

II.     Methodology and Scope ...................................................................... 6

III.    What is a Crisis Intervention Team (CIT) Program? ............................. 8

IV.     Introduction of CIT to NYPD .............................................................. 10

V.      Programmatic Deficiencies in NYPD's CIT Model ............................... 12

        A.  NYPD is Not Systematically Assigning CIT-trained Officers to Mental Health
            Crisis Incidents ................................................................... 12

        B.  NYPD is Not Currently Coordinating and Integrating Its CIT Efforts
            Department-wide ................................................................. 14

        C.  NYPD Has Not Adjusted Its Policies to Reflect the Goals of CIT Programs.. .......... 17

        D.  NYPD's Form for Crisis Incidents Will Not Allow for Adequate Data Analysis
            of Its CIT Initiative ............................................................. 23

VI.     Deficiencies in NYPD's CIT Training........................................................ 28

        A.  NYPD Should Consider Training More Officers in CIT.................................... 30

        B.  911 Call Takers Do Not Receive Specialized CIT Training ............................ 31

        C.  Officers Undergoing CIT Training Do Not All Get Exposure to People Living
            With Mental Illness.............................................................. 31

        D.  NYPD Does Not Conduct Any Post-Training Assessment of CIT-Trained
            Officers........................................................................ 32

        E.  NYPD Does Not Provide a Manual or Reference Guide for Officers Undergoing
            CIT Training.................................................................... 33

VII.    Recommendations............................................................................. 34

VIII.   Appendices

**PUTTING TRAINING INTO PRACTICE:**
**A REVIEW OF NYPD'S APPROACH TO HANDLING INTERACTIONS**
**WITH PEOPLE IN MENTAL CRISIS**

## I.    EXECUTIVE SUMMARY

Every day, the New York City Police Department (NYPD) responds to hundreds of calls involving people in mental crisis.[1]  Because these calls present unique challenges and dangers for both officers and the people that they serve, NYPD has recognized that officers would benefit from having additional, specialized training to better equip them to manage these situations.  Since the summer of 2015, NYPD has been working to enhance the training it provides officers in handling these complicated and often volatile encounters by creating and implementing Crisis Intervention Team (CIT) training, part of a nationally-recognized approach to de-escalating encounters between police officers and people in mental crisis.  The New York City Department of Investigation's (DOI) Office of the Inspector General for the NYPD (OIG-NYPD) has been actively investigating NYPD's approach to CIT.

On October 19, 2016, as OIG-NYPD was completing this investigation into NYPD's implementation of CIT, the dangers inherent in these calls were once again highlighted by the fatal officer-involved shooting of Deborah Danner, a 66 year-old African-American woman with a history of schizophrenia.  Of note, the police sergeant who responded to the scene and fired the fatal shots had not yet received the Department's recently implemented CIT training.  This DOI OIG-NYPD investigation, however, does not seek to investigate the specific circumstances of the Danner shooting.  That task will be carried out by NYPD's Internal Affairs Bureau and the Bronx County District Attorney.  Instead, OIG-NYPD's aim in this Report is to provide a systemic assessment of NYPD's implementation of CIT.  OIG-NYPD's findings—most notably NYPD's failure to fully integrate and use this training within the totality of NYPD's everyday policing—are detailed herein.

In 2016, NYPD received approximately 157,000 calls involving people in mental crisis.[2]  While NYPD responds to the overwhelming majority of these types of calls without discharging weapons or causing serious injury, the Danner incident demonstrates the potential for a lethal outcome in such situations.  Nationwide, in 2015, police officers shot and killed 251 people who had exhibited signs of mental illness.  This number represents fully one-quarter of the 991 people

---

[1] NYPD refers to the mentally ill as "Emotionally Disturbed/Distressed Persons" or "EDPs" in their trainings, policies, and descriptions.  However, this Report uses phrases such as "persons in mental crisis," "persons in crisis," or "people living with mental illness" except when citing NYPD policies, procedures, and forms.

[2] NYPD received approximately 143,000 calls in 2014 and 145,000 calls in 2015. According to NYPD's Office of Management Analysis and Planning (OMAP), 125,508 of the 157,000 calls in 2016 were "founded" as "EDP" incidents.

shot to death by police officers in 2015.[3]  The Federal Bureau of Investigation (FBI) also found that in 2015, 1,710 law enforcement officers across the United States were assaulted while "handling persons with mental illness," and two were killed while doing so.[4]  In several cities, the failure to adequately manage police interactions with the mentally ill has resulted in U.S. Department of Justice (DOJ) findings, settlement agreements, and consent decrees in which federal monitors have been installed to oversee court-mandated improvements in the way those cities' police departments police.[5]

Recognizing that NYPD's CIT initiative is still relatively new, DOI's OIG-NYPD found that, thus far, NYPD has implemented the core components of the training aspects of the CIT model in a manner that meets national standards and is very well executed by its trainers.  OIG-NYPD, however, also identified several fundamental programmatic and training flaws in NYPD's CIT initiative.  Most importantly, NYPD does not deploy these specially-trained police officers to incidents involving people in crisis.  There is no organized mechanism to ensure that CIT officers are called to scenes where their training is needed.  The improved training provided by CIT is important, but NYPD, should not place its sole emphasis on training without also integrating a number of other aspects of a fully functional CIT program.  Therefore, NYPD should take clear and immediate steps to ensure that, wherever possible, officers with appropriate training to manage mental health crises are deployed to incidents where a person is suspected of being in crisis—including better institutionalizing CIT principles across the Department's operations and policies.

A year-and-a-half after implementing the new CIT training, NYPD has not begun to effectively deploy CIT training beyond the classroom.  Without any plan for directing CIT-trained officers to situations where they are needed, NYPD is underutilizing the newly-acquired skills of CIT-trained officers.  Moreover, NYPD has not adopted new Patrol Guide provisions and other

---

[3] Kimberly Kindy, Marc Fisher, et. al., *A Year of Reckoning:  Police Fatally Shoot Nearly 1,000,* WASH. POST, December 26, 2015, *available at* http://www.washingtonpost.com/sf/investigative/2015/12/26/a-year-of-reckoning-police-fatally-shoot-nearly-1000/.  (The database can be accessed at https://www.washingtonpost.com/graphics/national/police-shootings/.  A description of the methodology employed in the study is available at https://www.washingtonpost.com/national/how-the-washington-post-is-examining-police-shootings-in-the-united-states/2016/07/07/d9c52238-43ad-11e6-8856-f26de2537a9d_story.html. )

[4] Fed. Bureau of Investigation (FBI), 2015 LAW ENFORCEMENT OFFICERS KILLED AND ASSAULTED, https://ucr.fbi.gov/leoka/2015/officers-feloniously-killed/felonious_topic_page_-2015.

[5] *See e.g.,* U.S. Dep't of Justice, Civil Rights Division (DOJ), *Investigation of the Baltimore City Police Department* (2016); Consent Decree, *United States v. City of Ferguson,* 4:16-cv-000180 (E. D. Mo. 2016); Consent Decree, *United States v. City of Cleveland,* 1:15-cv-01046 (N. D. Ohio 2015); Settlement Agreement, *United States v. City of Albuquerque***,** 1:14-cv-01025 (D. N.M. 2014)**;** Settlement Agreement, *United States v. City of Seattle,* 12**-**cv-1282 (W. D. Wash. 2012); Settlement Agreement**,** *United States v. City of Portland,* 3:12-cv-02265-SI (D. Or. 2012).

procedures aligned with CIT principles. As a result, NYPD is currently asking CIT-trained officers to follow policies that do not include the principles of the specialized training they are receiving.

In sum, DOI's OIG-NYPD investigation yielded the following findings:

➢ **NYPD is not directing CIT-trained officers to incidents involving people in crisis.**

NYPD has yet to devise and implement a system in which it directs CIT-trained officers to mental crisis incidents. In fact, it is presently random whether officers assigned by dispatch to mental crisis incidents are CIT trained. While NYPD has discussed potential changes to its dispatch procedures (as discussed further below), the Department currently has no official plans to build any capacity into its dispatch system to assign CIT-trained officers to mental crisis incidents. As it stands, NYPD handles more than 400 mental crisis calls a day, but there is no capability for dispatchers to direct CIT-trained officers to these incidents.

➢ **NYPD is not currently coordinating its CIT efforts Department-wide.**

While NYPD's Office of Collaborative Policing and the City's Department of Health and Mental Hygiene (DOHMH) designed the Police Department's CIT training, no dedicated official or unit within NYPD has, as its sole responsibility, the management of day-to-day CIT operations. As a result, no one in the Department is specifically accountable for identifying aspects of the CIT initiative to be improved over time, nor is there an identifiable NYPD official to whom police officers and those outside the Department can direct questions, concerns, or suggestions about CIT. This is a critical shortcoming, particularly for a police department of NYPD's size. NYPD needs a designated CIT coordinator to create a deployment plan, oversee the revisions of current policies, and improve data collection and analysis. With the leadership of such an official, or the creation of an overall unit, the Department's current CIT effort can be transformed into a full-scale CIT program that consistently improves the response of officers to people in crisis.

➢ **NYPD has not adjusted its written policies in the Patrol Guide to reflect the CIT training or the goals of a CIT program.**

NYPD's main policy governing how officers should interact with people in crisis does not incorporate either its new CIT training or the overall goals of a CIT program. For example, the relevant Patrol Guide section does not mention either the need to have CIT-trained officers respond to scenes or the use of de-escalation techniques, subject assessment, active listening, or rapport building. Nor does the relevant Patrol Guide section provide officers with guidance on how to potentially use their discretion in crisis incidents. Because NYPD has not integrated CIT

policies into the Patrol Guide, CIT training remains isolated and thus less likely to be used when needed.

> ➢ **NYPD cannot perform adequate data analysis on its CIT initiative or on how officers handle CIT interactions with its current forms involving people in crisis.**

The primary forms that NYPD currently uses to track incidents with people in crisis are inadequate.  For example, they do not contain fields that are specific to CIT, and they collect limited, if any, information about a person's behaviors or the techniques used by the officer to manage the situation.  In addition to a lack of detail on the primary forms, any additional data that do exist about mental health-related encounters are fragmented across numerous Department documents, depending on the individual circumstances of each incident.  Without a more detailed form on crisis incidents in particular, NYPD cannot measure the performance of its officers or ascertain whether its training and procedures are effectively meeting the needs of the public, and in particular, those who suffer from mental illness and come into contact with police officers.

> ➢ **There are several important deficiencies in the content of NYPD's CIT training.**

NYPD's CIT classroom instruction meets the basic standards of CIT trainings nationwide. However, several important aspects of CIT training are still missing.  Most critically, the Department's dispatchers, as well as the 911 call takers who receive emergency calls from the public, are not being trained in CIT.  Other shortcomings in the CIT training include:  (1) the lack of consistent opportunities for officers to interact with people living with mental illnesses in every class whenever practicable; (2) officers trained in CIT do not receive any guide or manual for future reference; and (3) there is no form of assessment to measure skill retention or the overall effectiveness of the training.

Based on these findings, OIG-NYPD makes the following recommendations to NYPD:

1. NYPD should commit to creating timelines for any changes to its CIT initiative within 90 days of the publication of this Report.

2. NYPD should adjust its dispatch procedures to ensure that officers with CIT training are directed to crisis incidents.

3. NYPD should create a dedicated mental health unit, or at the very least appoint a CIT coordinator who holds the rank of chief, in order to manage all aspects of a CIT program.

4. NYPD should revise its Patrol Guide to explicitly authorize CIT-trained officers to use the skills learned in CIT training during crisis situations.

5. NYPD should revise its Patrol Guide to require that CIT-trained officers respond to all crisis incidents whenever possible.

6. NYPD should revise its Patrol Guide to allow all officers to use their discretion to refer individuals to officially approved and vetted outside community resources in appropriate incidents.

7. NYPD should either substantially revise one of its current forms or develop a new permanent form to capture more detailed data on incidents involving persons in crisis.

8. NYPD should analyze data regarding mental crisis incidents.

9. NYPD should consider training more officers in CIT.

10. NYPD should begin training 911 call takers and dispatchers in at least some aspects of CIT.

11. In every CIT training, NYPD should ensure that its officers interact with people living with mental illnesses.

12. Following every CIT training, NYPD should assess the retention of officers' skills.

13. NYPD should provide a manual or reference guide to officers who undergo CIT training.

After the Deborah Danner incident in October 2016, the Department formed a "Chief of Department" working group that, as of the date of the release of this Report, has had two discussions on how to improve NYPD's CIT initiative.[6] NYPD has now indicated to OIG-NYPD that it is considering changes, including the potential appointment of a dedicated coordinator, adjustments to its Patrol Guide policies, and changes to its dispatch procedures. These are important steps. However, 18 months after initiating CIT training, NYPD has not yet provided OIG-NYPD with any specific details or timeline for these considered changes. Given the importance of this issue, the Department must now commit itself to an explicit timeline and a set of specific actions.

---

[6] Since 2015, NYPD has also had an internal working group on the content of the CIT training itself and has been a participant in the Mayor's Task Force on Behavioral Health and the Criminal Justice System.

## II.    METHODOLOGY AND SCOPE

For this investigation, OIG-NYPD interviewed NYPD officials responsible for implementing various aspects of the CIT initiative.  These meetings included high-ranking officials from the Office of Collaborative Policing and the Bureaus of Information Technology, Training, and Patrol Services.  OIG-NYPD also had discussions with officials from the Mayor's Office of Criminal Justice (MOCJ), the City's Department of Health and Mental Hygiene (DOHMH), and the Fire Department of New York-Emergency Medical Dispatch Command's (FDNY-EMS) Training Unit.

OIG-NYPD also conducted a focus group with NYPD patrol officers who have been trained in CIT from:  (1) the 23rd, the 25th, and the 28th precincts (which were the precincts for NYPD's initial CIT pilot program); (2) the Transit and Housing Bureaus; and (3) the Crisis Outreach and Support Unit, which focuses primarily on encounters with homeless New Yorkers (who often have higher rates of mental illness).[7]  OIG-NYPD led a group discussion with these officers to understand their perspectives on the CIT training, how it affected their responses to people displaying signs of mental illness, and how the CIT initiative could be improved.  OIG-NYPD also interviewed mental health advocates, including representatives from the New York City branch of the National Alliance on Mental Illness (NAMI) and Community Access, and attended public forums to hear the perspectives of people living with mental illness regarding both the need for and the development of NYPD's CIT training.

In addition, OIG-NYPD staff attended the full four-day CIT training course at NYPD's Police Academy on four separate occasions over the course of 15 months.[8]  OIG-NYPD investigators spoke to participating officers from NYPD as well as trainers from NYPD and both the John Jay College of Criminal Justice (which helped organize the initial training) and the Center for Urban

[*] NYC Department of Investigation Commissioner Mark G. Peters and Inspector General for the NYPD Philip K. Eure thank the staff of OIG-NYPD for their efforts, persistence, and insight in helping to produce this Report, especially Sandra Musumeci, Deputy Inspector General; Asim Rehman, General Counsel; Daniel Boylan, Director of Investigation; Candace McCoy, Director of Policy Analysis;  Rebecca Engel, Assistant Counsel; Joseph Lipari, Senior Policy Manager; Adrian Amador, Policy Analyst; Andrew Guinan, Special Investigation; John Kim, Special Investigator; Cameron Watkins, Special Investigator; Christopher Tellet, Investigative Attorney; Nicole Napolitano; Senior Policy Manager; Tyler Gibson, Policy Analyst; and Senora Harvey, Clerical Assistant, as well as other current and former staff.   The contributions made by Lesley Brovner, First Deputy Commissioner, Richard Condon, Special Commissioner, and Michael Carroll, Chief of Investigation, are also appreciated.  Our gratitude is also extended to the New York City Police Department and other agencies and organizations noted for their cooperation during the preparation of this Report.

[7] According to 2016 statistics from the Mayor's Office, 35 percent of clients in New York City's homeless shelters suffer from a serious mental illness.  *See* N.Y.C. OFFICE OF THE MAYOR, THRIVENYC: A MENTAL HEALTH ROADMAP FOR ALL, at 9 (2016), *available at* https://thrivenyc.cityofnewyork.us/wp-content/uploads/2016/03/ThriveNYC.pdf.

[8] OIG-NYPD staff attended NYPD's CIT training in September 2015, December 2015, May 2016, and December 2016.

Community Services (CUCS) (which replaced John Jay College in 2016). OIG-NYPD additionally conducted a careful review of the Police Academy's CIT syllabus and course materials.

OIG-NYPD also examined the CIT programs of nine city police departments that serve large populations, have well-established CIT programs, or have improved police interactions with the mentally ill while under a federal consent decree.[9] Finally, in developing its recommendations for NYPD, OIG-NYPD considered the findings and model policies contained in numerous studies from professional organizations, federal, state, and local government entities, advocacy organizations, and mental health experts.[10]

---

[9] OIG-NYPD examined the CIT programs of police departments in Memphis, Tennessee; Houston, Texas; Los Angeles, California; Washington, D.C.; Phoenix, Arizona; Seattle, Washington; Portland, Oregon; Akron, Ohio; and Atlanta, Georgia.

[10] OIG-NYPD reviewed studies, recommendations, and model CIT programs formulated by numerous entities, including but not limited to, RANDOLPH DUPONT ET AL, THE UNIV. OF MEMPHIS, CRISIS INTERVENTION TEAM: CORE ELEMENTS, *available at* HTTP://CIT.MEMPHIS.EDU/PDF/COREELEMENTS.PDF (2007); THE POLICE EXEC. RESEARCH FORUM, GUIDING PRINCIPLES ON USE OF FORCE, *available at* http://www.policeforum.org/assets/guidingprinciples1.pdf (2016); THE PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING: FINAL REPORT (2016), *available at* http://www.cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf; INT'L ASS'N OF CHIEFS OF POLICE, BUILDING SAFER COMMUNITIES: IMPROVING POLICE RESPONSE TO PERSONS WITH MENTAL ILLNESS (2010), *available at* http://www.theiacp.org/portals/0/pdfs/ImprovingPoliceResponsetoPersonsWithMentalIllnessSummit.pdf; THE COUNCIL OF STATE GOV'TS CRIMINAL JUSTICE, MENTAL HEALTH CONSENSUS PROJECT (2002), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/197103.pdf; MELISSA REULAND ET AL., COUNCIL OF STATE GOV'TS JUSTICE CTR., LAW ENFORCEMENT RESPONSES TO PEOPLE WITH MENTAL ILLNESSES: A GUIDE TO RESEARCH-INFORMED POLICY AND PRACTICE (2009), *available at* https://csgjusticecenter.org/wp-content/uploads/2012/12/le-research.pdf; MELISSA REULAND ET AL., COUNCIL OF STATE GOV'TS JUSTICE CTR. & POLICE EXEC. RESEARCH FORUM, IMPROVING RESPONSES TO PEOPLE WITH MENTAL ILLNESSES (2010), *available at* https://www.bja.gov/Publications/CSG_LE_Tailoring.pdf; MELISSA REULAND, A GUIDE TO IMPLEMENTING POLICE-BASED DIVERSION PROGRAMS FOR PEOPLE WITH MENTAL ILLNESS (2004), *available at* http://www.pacenterofexcellencepitt.edu/documents/Apercent20Guidepercent20topercent20Implementingpercent20Police-Basedpercent20 Diversionpercent20Programs.pdf (2004); N.Y./N.Y.C. MENTAL HEALTH-CRIMINAL JUSTICE PANEL REPORT AND RECOMMENDATIONS (2008), *available at* http://mentalillnesspolicy.org/kendras-law/nyc_nys_mh_crime_rprt_2008.pdf; DISTRICT OF COLUMBIA, OFFICE OF POLICE COMPLAINTS, ENHANCING POLICE RESPONSE TO PEOPLE WITH MENTAL ILLNESS (2006), *available at* http://policecomplaints.dc.gov/node/164642.

### III.     WHAT IS A CRISIS INTERVENTION TEAM (CIT) PROGRAM?

First developed after the fatal shooting of a person in mental crisis by a police officer in Memphis, Tennessee nearly 30 years ago, CIT's ultimate goal is to protect the safety of both police officers and the people they encounter. At the same time, CIT focuses on diverting people in mental crisis away from hospitals and jails, where people living with mental illness are normally placed, even when they have not committed a serious criminal offense. For many years now, CIT programs have been considered a national best practice. As of 2015, 2,633 police departments in localities throughout the U.S. have adopted a CIT model, due to its national acceptance as a best practice.[11] The primary goals of a CIT model are, where appropriate: 1) to improve officer and public safety by reducing the likelihood of use of force against people in crisis, and 2) to reduce unnecessary arrests and incarceration by increasing opportunities for diversion to a range of mental health services.[12] While the specifics of CIT programs may vary from jurisdiction to jurisdiction, the goals remain the same and require both training and the institutionalization of the program into department operations.

The Memphis Model—which the Memphis Police Department (MPD) created along with the National Alliance on Mental Illness—emphasizes that departments train at least 20 to 25 percent of all patrol officers in CIT.[13] CIT training is typically a five-day course of 40 hours. Officers are instructed in modules that emphasize the clinical aspects of varying mental health disorders, their common symptomatic presentations and treatment approaches, and suicide/harm prevention tactics. The training also emphasizes de-escalation strategies through role-playing scenarios involving people in crisis (in clinical or informal settings) in order to increase officers' capacity to successfully resolve encounters.

In addition to training, the integration of a full-scale CIT program into a department involves several other components. Having a dedicated CIT coordinator or unit to manage the day-to-day operations of the program is a core component of CIT programs nationwide. The CIT coordinator's responsibilities include developing and evaluating the program department-wide,

---

[11] THE UNIV. OF MEMPHIS CIT CTR., http://cit.memphis.edu/ (last accessed Oct. 10, 2016). The effectiveness of CIT on reducing arrests and use of force while increasing access to mental health resources has been demonstrated in a number of studies. *See e.g.,* H.J. Steadman, M.W. Deane et al., *Comparing Outcomes of Major Models of Police Responses to Mental Health Emergencies,* 51 PSYCHIATRIC SERVICES 649 (2000); N. Broner, P.K. Lattimore et al., *Effects of Diversion on Adults with Co-occurring Mental Illness and Substance Use: Outcomes from a National Multi-site Study,* 22 BEHAVIORAL SCIENCES AND THE LAW 519 (2004); M.S. Morabito, A.N. Kerr et al., *Crisis Intervention Teams and People with Mental Illness: Exploring the Factors that Influence the Use of Force,* 58 CRIME AND DELINQUENCY 57 (2012); Seattle Police Department, CRISIS INTERVENTION PROGRAM REPORT 2015 (Aug. 2016); Portland Police Bureau, THE EFFECTS OF MANDATORY TRAINING ON USE OF FORCE, ARRESTS, AND HOLDS FOR MENTAL HEALTH (May 2013).

[12] *See* Dupont, *supra* note 10, at 3.

[13] *See id.* at 10.

troubleshooting problems as they arise, communicating with officers, and developing and maintaining relationships with community members with an interest in these issues.

Moreover, a department with a CIT program should create official policies that specifically reflect CIT principles and training.  While these policies can address any number of different issues, their overall goal must be to "provide guidance to officers on how to identify and interact with an individual in crisis," and how to "place greater emphasis on de-escalation techniques and require officers to consider less intrusive alternatives before employing force."[14]

Finally, CIT stresses data collection, evaluation, and research to "help to measure [the program's] impact, continuous outcomes, and efficiency."[15]  The collection of these data can and has been used to measure any number of different elements, from response times to use-of-force rates to dispositions in the field.  A dedicated CIT coordinator, the creation of CIT-related directives, and robust data collection and evaluation are essential aspects of any mental-health policy, and are part of nearly all DOJ consent decrees involving police departments nationwide.

---

[14] Proposed Settlement Agreement*,* *U.S. v. City of Portland*, 3:12-cv-02265-SI, at 41  (D. Or. 2012).

[15] Dupont, *supra* note 10, at 17.

## IV.    INTRODUCTION OF CIT TO NYPD

Until the summer of 2015, NYPD had one basic form of training for police officers on how to handle encounters with people in mental crisis.  Since 2002, both recruits and promoted officers within the Department received a one-day training led by instructors from John Jay College of Criminal Justice.  The earlier form of training involved a short, basic lecture on mental illnesses in the morning and then had a few of the officers engage in a total of four role-playing scenarios in the afternoon, involving schizophrenia, manic-depression, and a suicidal officer.  The officers did not have the opportunity to interact with anyone living with mental illness, nor did they receive any evaluation or testing after the training was complete.  Instead, routine training for patrol officers essentially amounted to an introduction to the basics of mental illnesses and the need for officers to understand the often difficult nature of their interactions with people who might be in the midst of a mental crisis.

By contrast, since 1986, officers from NYPD's elite Emergency Services Unit (ESU) have undergone a full-scale five-day training on mental illnesses.[16]  This training for ESU officers somewhat mirrors the standards of national CIT training, in that it delves much deeper into the signs and symptoms of mood disorders and mental illnesses.  Every officer in ESU has to participate in at least two to three scenarios involving people facing severe mental crises and becomes certified as an Emergency Psychological Technician at the end of the training.

When the proposal to introduce CIT training to patrol officers first surfaced through the Mayor's Task Force on Behavioral Health and the Criminal Justice System in 2015, NYPD partnered with DOHMH to adapt CIT to suit the requirements of a larger, more complex city.[17]  NYPD engaged in an extensive process to develop its CIT training and curriculum, occurring over many months of research and involving consultation with experts, people in need of mental health services, and jurisdictions across the country that already have such programs in place.  NYPD identified several cities, including Los Angeles, Houston, Phoenix, and Atlanta, with existing CIT programs that had successfully improved police responses to people in crisis.

---

[16] NYPD's Emergency Service Unit (ESU) is composed of specialized teams that respond to calls involving barricaded suspects, people in crisis, construction accidents, and other citywide emergencies.  As a result of its focus on emergency situations, ESU's mental health training focuses more than CIT training on the volatile situations that ESU officers may face.

[17] The Mayoral Action for Mental Health, "ThriveNYC," directs both the training of 5,500 NYPD officers in CIT and the development of public health drop-off centers, where officers can transport individuals, when appropriate, as an alternative to either hospitalization or incarceration.  Diversion centers, which have not yet been built, will operate 24 hours a day, seven days a week and will link people in crisis to necessary resources while providing beds for short-term stays.  *See* THRIVENYC: A MENTAL HEALTH ROADMAP FOR ALL, *supra* note 7, at 47.

Since the start of NYPD's CIT training in the summer of 2015, more than 4,700 NYPD officers have completed CIT training, which emphasizes de-escalation, voluntary compliance, active listening, mental health awareness, empathy, and tolerance.  Class sizes are small, with a standard maximum of 30 participants taught by an interdisciplinary staff of clinicians from the Center for Urban Community Services (CUCS), and officer instructors with expertise in mental health conditions who are assigned to the Police Academy.  NYPD plans to provide CIT training to a total of 5,500 officers by early 2017.

## V.    PROGRAMMATIC DEFICIENCIES IN NYPD'S CIT MODEL

Despite several positive elements of NYPD's CIT training, OIG-NYPD's investigation revealed several crucial areas where NYPD has not met the basic programmatic standards of CIT programs nationwide.  Senior representatives from NYPD's Office of Collaborative Policing, the unit responsible for developing the Department's CIT initiative, stated to OIG-NYPD that the primary purpose of CIT training is the training itself.  However, in order to meet the goals of CIT, NYPD's version must include more than training:  CIT comprises an entire program of institutional and interconnected changes that must be implemented within a law enforcement agency in order to be effective and sustainable.  NYPD has said that it is currently discussing addressing several of these deficiencies, but the Department has not, as yet, committed to a timeline for actual implementation.

### A. NYPD IS NOT SYSTEMATICALLY ASSIGNING CIT-TRAINED OFFICERS TO MENTAL HEALTH CRISIS INCIDENTS

Although NYPD has expended significant time and resources towards developing its CIT training, NYPD's broader CIT effort lacks an essential element:  the Department has yet to devise a process by which NYPD communications personnel can direct CIT-trained officers to CIT incidents.  Currently, when 911 call takers receive a call for service involving a person in mental crisis, any available officer can respond, whether the officer is CIT trained or not.  According to NYPD, more than a year-and-a-half into the training, dispatchers still cannot assign CIT-trained officers to crisis calls because they have no way of determining which patrol cars in the field contain CIT-trained officers.  This is highly problematic.  Deploying CIT-trained officers to mental health emergencies is a basic and critical component of the effective implementation of CIT.  The officers best equipped to safely de-escalate and resolve a mental health crisis without using force are specially-trained CIT officers.

In other cities, police departments assign, or at least attempt to deploy, a CIT-trained officer to every crisis call.  For example, in the Seattle Police Department's (SPD) system, 911 dispatchers can look up which officers have specific skills or equipment (i.e., officers equipped with a Taser or rifle, or who speak a specific language or are CIT-certified, etc.).  Through this "Duty Skills Query," 911 dispatchers can identify all officers on patrol with CIT skills.[18] Additionally, SPD's policy sets forth an expectation that if a call involves a person in mental crisis, a CIT-certified officer will be dispatched and will respond, if and when such an officer is available.[19]  For public safety reasons, however, SPD will not "hold" a call to wait for a CIT-trained officer.  911 dispatchers will first broadcast a CIT job, and then wait for a CIT-certified officer to respond.  If no CIT-certified officer is available, any SPD officer will respond.  A recent assessment

---

[18] As of May 14, 2016, 58.2 percent of SPD's patrol officers were CIT-certified.

[19] SEATTLE POLICE DEP'T, POLICE MANUAL § 16.110:  CRISIS INTERVENTION IDENTIFICATION COURSE (Oct. 28, 2014).

by the Seattle Police Monitor found that under this procedure, SPD has been able to get CIT-certified officers to mental crisis incidents approximately 71 percent of the time.[20]

Likewise, at the beginning of each shift in the Los Angeles Police Department (LAPD), officers log in to the Computer Aided Dispatch System, which is used to tell dispatch which officers are on duty and what special skills they have, including CIT training, language skills, domestic violence (DV) expertise, etc. A Radio Trafficking Officer (RTO) can look at those skills and assign officers according to their skill sets. For example, if a domestic violence call requires a Cantonese-speaking police officer, the RTO can identify officers with that language ability and DV expertise in the Computer Aided Dispatch and dispatch an appropriate officer to the job. LAPD is in the process of integrating this model into its existing mental health unit, so that officers who make first contact with people in crisis are CIT-trained, as far as practicable.

According to personnel in NYPD's Information Technology Bureau (ITB), the City's Intergraph Computer Aided Dispatch (ICAD) system currently lacks the technological capacity to facilitate the identification of patrol officers with special skills such as CIT training. NYPD reported to OIG-NYPD that ICAD was not designed for this function, and such customization would involve considerable costs, time, and testing.[21] Indeed, the ICAD system is central to New York City's emergency communications infrastructure, and any changes to ICAD would require careful planning. To date, the Department has been unable to provide a cost estimate or price range for such upgrades.[22] While the cost-benefit analysis of such a change is solely the province of NYPD, which knows all competing demands, the sheer number of mental health crisis calls in New York City each day, the value in lives saved, and the litigation that could be avoided by having specially-trained officers appropriately deployed should all be factored into any such cost-benefit analysis. The experiences of other jurisdictions suggest that the benefits of a more targeted and integrated police dispatch system may be worth the investment with respect to handling mental crisis calls, although NYPD is best positioned to understand the full scope of its competing budgetary priorities and make an appropriate judgment about such expenditures. Meanwhile, in New York City, NYPD receives, on average, more than 400 mental crisis calls a day—calls that are currently being handled without the ability to dispatch the Department's specially-trained CIT officers to the scene.

---

[20] MERRICK J. BOBB, SEATTLE POLICE MONITOR, FIFTH SYSTEMIC ASSESSMENT: CRISIS INTERVENTION 18 (2016).

[21] ITB personnel indicated that the classification system for many of the Department's 250,000 police vehicles would have to be changed and that such large-scale changes to the highly complex ICAD system, if not done properly, could affect the functionality of other critical ICAD components.

[22] In 2004, the City commenced an overhaul of the existing 911 system which ultimately cost over $2 billion and took over ten years to complete. Unfortunately, despite the fact that CIT programs began emerging nationwide in the 1980s and 1990s, NYPD had not yet begun to implement a CIT initiative at the time of the 911 system overhaul.

As an alternative to making these technical changes to the 911 system, NYPD has recently indicated to OIG-NYPD that the Department is considering implementing a workaround measure to inform dispatchers which patrol cars contain CIT-trained officers, to increase the likelihood that trained officers are sent to mental crisis calls.[23]  While this idea may be an adequate first step in CIT assignment if it is actually implemented, NYPD should establish clear protocols and conduct regular assessments of its effectiveness, in order to ensure that the process is working as intended.  Over the long term, however, both NYPD and the public would probably be better served by a more integrated dispatch system, as exists in other cities such as Seattle and Los Angeles.

## B.  NYPD IS NOT CURRENTLY COORDINATING AND INTEGRATING ITS CIT EFFORTS DEPARTMENT-WIDE

NYPD does not currently coordinate its CIT initiative Department-wide.  It is essential that a department have a dedicated program coordinator to implement and institutionalize CIT throughout the agency's operations.  Under the Memphis Model, a CIT coordinator represents the primary supervisor within the law enforcement agency charged with "assisting, implementing and sustaining" the various facets of the CIT program.[24]  These responsibilities include coordinating CIT training, managing certified officers, liaising with community stakeholders, and organizing CIT performance measurements and evaluation.[25]  Again, while NYPD has recently stated that it may create this position in the future, it has not yet taken any steps to do so.

In New York City, while NYPD's Office of Collaborative Policing and DOHMH designed the CIT training, no person or unit within NYPD is responsible for performing the day-to-day management of CIT operations.  The Office of Collaborative Policing helped to research and design the CIT training, but it also oversees a number of other unrelated initiatives involving crime reduction through the development of partnerships between NYPD and all New York City communities.  Therefore, any decisions made about the assignment of CIT-trained officers and

---

[23] As the idea was explained to OIG-NYPD, this workaround would require that 911 dispatchers receive a list of units with CIT-trained officers in each precinct at the start of each tour.  On December 8, 2016, NYPD issued a directive to all commands stating that all platoon commanders, patrol supervisors, and desk sergeants should be made aware of the officers in their commands who have completed CIT training, and "[w]henever feasible Patrol Supervisors will utilize CIT trained Officers at the scene of EDP jobs."  The directive indicates that each command will receive an updated list of CIT-trained officers each month.  *See* NYPD DIRECTIVE TO COMMANDS ON CIT-TRAINED OFFICERS (Dec. 8, 2016).  However, in order to increase the likelihood that CIT officers consistently arrive on the scene of a mental health crisis in a timely fashion, each command will need to provide information to dispatchers about the CIT-trained officers in each unit.  NYPD has not yet committed itself to implementing such a process.  In addition, given that this workaround would involve 77 commands providing dispatchers with information three times a day (for each shift of officers), it is more prone to human error than a more integrated technological system.

[24] THE UNIV. OF MEMPHIS CIT CTR., CRISIS INTERVENTION TEAM:  LAW ENFORCEMENT COORDINATOR, at 1.

[25] Dupont, *supra* note 10, at 13.

CIT operations, if they are made at all, occur at the precinct or bureau level. Without a CIT coordinator, the Department has no one to synchronize the program across multiple units or to implement any of the broad changes that need to be made. In fact, without a coordinator, there is no comprehensive, integrated CIT program: no one to ensure that 911 is directing CIT-trained officers to every crisis call, no one to consider how to adjust the Department's relevant policies and Patrol Guide provisions on mental health responses, and no one to improve the Department's collection of data and analysis on the large number of crisis incidents that take place in New York City. Without a coordinator, no single point of contact exists where officers and members of the community can direct questions, concerns, or suggestions.

Highlighting this need for internal coordination, while officers in the focus group that OIG-NYPD conducted generally had a very positive view of their CIT training, they also offered a number of ideas on how NYPD's use of CIT could be improved. For example, with respect to training, officers proposed the use of more "props like handcuffs," "annual refresher courses," and "handouts on the mental illnesses they just learned about." Nearly all of the officers in the focus group indicated that they disliked having to bring people in crisis to emergency rooms, since temporary stays at those places did not address the deeper issues of instability, especially among the homeless. Yet currently, NYPD has no dedicated official to whom these officers can offer their input.

To illustrate the need for a single point of contact, community groups such as Community Access, a mental health advocacy organization, reported to OIG-NYPD that while its representatives have communicated with higher-level DOHMH and NYPD officials at quarterly community forums, a "dedicated CIT coordinator" is essential to make this communication more consistent and detailed. For example, in the wake of the Danner shooting incident, staff and members of Community Access reported to OIG-NYPD that there was no effective vehicle for advocacy organizations to get and receive information regarding the incident and to consider possible reforms. In a number of other cities, there are standing committees such as Cleveland, Ohio's "Mental Health Response Advisory Committee (MHRAC)," where a CIT coordinator works with a variety of community members and stakeholders to address issues.[26]

Given the growing number of CIT-trained officers now in the field and the importance of regular consultations with the extensive mental health advocacy community in New York City, it is critical that NYPD prioritize establishing the CIT coordinator position.[27] In fact, the creation of

---

[26] *See e.g.,* CLEVELAND DIVISION OF POLICE, GENERAL POLICE ORDER: CRISIS INTERVENTION TEAM PROGRAM (FINAL DRAFT) (Nov. 26, 2016).

[27] Several recent federal consent decrees that involve the implementation of a CIT program require the hiring of a CIT coordinator. For example, the importance of having a CIT coordinator within CIT programs is addressed in the consent decree with Ferguson, Missouri, which requires that within 180 days of its implementation, the department designate an officer to "better facilitate communication between FPD [the Ferguson Police Department] and

a central CIT coordinator, if not an overall unit, has been instrumental in the formation of nearly all full-scale CIT programs in the U.S., especially in large city police departments.

For example, LAPD, under a 2005 consent decree, explicitly tasked the Mental Evaluation Unit (MEU), housed in the LAPD's Crisis Response Support Section (CRSS), with the responsibility "to develop, improve, and maintain adequate systems for recognition and early intervention of the mentally disordered and the developmentally disabled."[28]  The MEU is comprised of several smaller teams of LAPD officers (and some teams of co-responding mental health counselors) who work together to respond to calls and incidents, track data, provide information to responding officers, and develop long-term intervention strategies for certain cases.  The head of the CRSS, the Mental Illness Project Coordinator, has described how he is responsible for structuring and organizing all of these elements, assessing, and if necessary, improving, how MEU's resources are deployed department-wide.  In the complex and multi-tiered world of mental illness, MEU's Coordination Unit is also responsible for making connections across a number of different entities outside of the department itself—with EMS, the Fire Department, citywide hospitals, diversion centers, and advocacy groups.

The Mental Illness Project Coordinator described how in the past year, MEU had experienced hundreds of interactions with one person who was in nearly constant mental crisis; the Fire Department and numerous mental health agencies were also having repeated encounters with the same person.  Together, these entities met to strategize on finding a solution to this individual's problems and, as a result, greatly reduced his interactions with the police. Through such daily management, the MEU officer in charge also noted that he was responsible for providing "real world" input to the LAPD's Training Bureau, which was not "in touch" with what was actually happening with mental illness "on the ground level."

In smaller cities, such as Seattle, a CIT coordinator, rather than an entire unit, maintains primary responsibility for "examining, reviewing, and making recommendations to ensure the CIT Program is implemented and sustained as a community program."[29]  As another example of the critical role of a CIT point person, Seattle's CIT coordinator engaged in discussions with the city's "Crisis Intervention Committee" (comprised of community advocates, social services, facilities, and hospitals) and then performed a comprehensive data analysis of one particular

---

members of the area mental health community and to increase the effectiveness of the FPD's crisis intervention program."  *See* Consent Decree, *U.S. v. Ferguson*, 4:16-cv-000180, at *46 (E. D. Mo. 2016).  The same timeline for the hiring of a CIT coordinator was also required in the settlement agreement between DOJ and Cleveland, Ohio. *See* Settlement Agreement, *U.S. v. City of Cleveland,* 1:15-cv-01046 (N. D. Ohio 2015).

[28] LAPD and L. A. Cnty. Dep't of Mental Health, Mental Evaluations Unit:  Operations Manual, at 7 (2016).

[29] *See* Memorandum Submitting Consensus Seattle Police Department Crisis Intervention Policy, *U.S. v. City of Seattle*, 12-cv-1282-JLR, at *3 (W. D. Wash. 2014).

county-run diversion facility.  In doing so, after learning that the facility was being under-used by police officers, the coordinator has worked with the county on strategies to address the problem.

Without a CIT unit or coordinator, NYPD has no one designated to perform any of these daily operations to improve the effectiveness of the CIT program—consistently connecting with the community, liaising with outside agencies, making training adjustments, and conducting data analysis.   While NYPD has only recently indicated that it is considering the creation of a coordinator position, the Department has not made a firm commitment or established any timeline for the creation of such a position.  Until this role is established, the ongoing absence of coordination makes it less likely that any additional and significant elements of a comprehensive CIT program will be incorporated in the near term.

### C.   NYPD HAS NOT ADJUSTED ITS POLICIES TO REFLECT THE GOALS OF CIT PROGRAMS

NYPD's current policies and procedures governing how officers should manage scenarios involving people in mental crisis are problematic and need revision.    First, the existing Departmental policies for responding to people in mental crisis, particularly those who have barricaded themselves or otherwise refuse to be taken into custody, contains dense language and are fragmented across three different Patrol Guide sections, making them potentially confusing for officers to follow.  More importantly, and directly relevant to this Report, NYPD's existing policies do not reflect the goals and approach now taught to officers in the new CIT training.   While both the existing policies and the new CIT training share the same goal of resolving crisis incidents as safely as possible, the existing Patrol Guide policies emphasize containment and placing the individual into custody.  By contrast, CIT training places a higher priority on engagement, de-escalation, officer discretion, and alternative dispositions.

NYPD last updated its policies on responding to people in mental crisis—Patrol Guide §216-05, §216-06 and §212-38—in 2013.  Understandably, none of these old policies include any reference to the CIT training currently being provided to officers. Instead, the primary policy, Patrol Guide §216-05, focuses on what it refers to as "Emotionally Disturbed Persons" or "EDPs," which it narrowly defines as, "A person who appears to be mentally ill or temporarily deranged and is conducting himself in a manner which a police officer reasonably believes is likely to result in serious injury to himself or others."[30]  Despite the Patrol Guide definition of an "EDP" as a likely danger to self or others, however, the term "EDP" is also broadly employed in NYPD's CIT training both for potentially dangerous as well as compliant persons in crisis.[31]   This definitional

---

[30] *See* NYPD PATROL GUIDE §216-05, at Appendix A.

[31] It should also be noted that the Patrol Guide policy also uses the term "EDP" for persons in crisis who are "not immediately dangerous" and "unarmed, not violent and willing to leave voluntarily."  *Id.*

incongruency between written policy and NYPD's CIT training has the potential to add further confusion for officers in already complex and dynamic situations.

The following chart sets forth NYPD's current policies on mental health encounters with "EDPs," as compared to what is emphasized in NYPD's CIT training, which mirrors national best practices.[32]

| Policy or Procedure[33] | Current NYPD Policy | Current NYPD CIT Training |
|---|---|---|
| Establish a zone of safety | ✓ | X |
| Assess threat | ✓ | ✓ |
| Take cover | ✓ | X |
| Request additional personnel | ✓ | ✓ |
| Take into custody if non-violent | ✓ | X |
| Isolate and contain | ✓ | X |
| Request supervisor or ESU | ✓ | X |
| Patrol supervisor takes operational command | ✓ | X |

[32] A "✓" in the chart indicates that the stated policy or procedure is included in the policy and/or CIT training, while an "X" indicates that it is not included in the policy and/or CIT training.

[33] Clearly, some of the current NYPD policies—such as the need to isolate and contain or to establish a zone of safety—may be appropriate and necessary for certain interactions with people who are engaged in behavior which is likely to result in serious injury to themselves or others.

| | | |
|---|---|---|
| Avoid provoking subject and take necessary time, establish dialogue | ✓ | ✓ |
| Assign designated shooter | ✓ | x |
| If no immediate threat, no action without authorization of precinct commander, duty captain, or borough commander | ✓ | x |
| De-escalate if possible | x | ✓ |
| Ensure, when possible, CIT-trained officer responds to scene and takes lead | x | ✓ |
| Delineates responsibilities of CIT-trained officer | x | ✓ |
| Information on potential alternative dispositions, referrals, and community resources | x | ✓ |
| Allow officers to use discretion to avoid hospitalization when appropriate | x | ✓ |

As a result of these differences or inconsistencies, as currently worded, NYPD policies put officers who have CIT training in the untenable position of either putting their training into practice or abiding by directives that do not include the practices that they have learned.

In addition to the confusion that these differences in emphasis might create for CIT-trained officers, the current policies also fail to incorporate the priorities of a CIT program in other ways.  First, none of the current policies require or even suggest that a CIT-trained officer attempt to respond to the scene of a crisis incident.  In addition, for non CIT-trained officers and supervisors, the policies do not indicate how and when they should request the assistance of a CIT-trained officer, whenever it is possible.  Finally, the policies do not provide officers with guidance as to what alternative outcomes or services are available or appropriate for non-violent people in mental crisis.

In December 2016, NYPD stated that the Office of Management Analysis and Planning (OMAP) was examining changes to the Patrol Guide.  However, NYPD provided no timeline or specifics on any actual policy changes.

In contrast, nearly every other jurisdiction OIG-NYPD examined revised its departmental policies to include definitions and procedures related to their CIT trainings and programs when they were created.  These policies often begin with an overall statement of values explaining the priorities of a CIT program and objectives when encountering volatile situations.  For example, the Portland Police Bureau (PPB) describes the goal of such encounters as follows:

> To de-escalate situations safely for all individuals involved when reasonable, practical, and consistent with established safety priorities and to attempt to resolve such incidents in as constructive and humane a manner as possible.  Members are expected to recognize behavior that is characteristic of mental illness or crisis and particularly that which is potentially destructive and/or dangerous, so as to respond in ways that promote safety.[34]

The policies of other police departments typically direct how CIT officers should be dispatched to the scene of crisis events whenever possible and then detail the appropriate procedures a CIT-trained officer should follow.  These procedures vary by jurisdiction, but overall, the policies stress that these officers should be assigned to incidents involving people in mental crisis, that they should attempt de-escalation, and that they are trusted to potentially exercise

---

[34] PPB, Directives Manual §0850.20:  Mental crisis Response.  The Akron Police Department (APD), MPDC, SPD, PHXPD, LAPD, and MPD all also use CIT-related language to describe procedures for mental health response.

discretion during each encounter.[35]  The policies also often describe how both dispatchers and non CIT-trained officers should respond to crisis incidents.  In Seattle, for example, the policy requires that officers make "every reasonable effort" to request the assistance of CIT-trained officers, that communications dispatch at least one CIT-trained officer, and that if one is not available, that non CIT-trained officers shall be dispatched, and a CIT-trained officer "shall respond as soon as possible."[36]

In some departments, CIT policies also provide additional information  for all officers, whether CIT-trained or not,  on alternative dispositions from the criminal justice system, such as when and how to refer people to a "mental health agency," "crisis hotline," "service agency," or "halfway house," or how to "consult with mental health or medical professionals," and in the process, divert people from the criminal justice system when appropriate – one of the major goals of comprehensive CIT programs.[37]

While New York City does not yet have diversion centers, other community mental health resources do exist where individuals who have not committed crimes might be directed, as an alternative to protective custody or hospitalization.  In the focus group that OIG-NYPD conducted with CIT-trained NYPD officers, some officers reported that when a request for additional support (such as ESU) has not already been made, they occasionally use their discretion to avoid transporting the person to an emergency room.  Current NYPD Patrol Guide policy, however, does not openly provide for such an option.  NYPD's Patrol Guide §216-05 only vaguely states in its "Additional Data" section, "Refer persons who voluntarily seek psychiatric treatment to proper facility," but it does not give any context or guidelines for making such a decision.[38]  NYPD should adjust its policies to direct officers on when and how to use their discretion to refer people to these resources.[39]   Fortunately, NYPD has now started to provide officers with memo book inserts that include contact information for mental health organizations at its CIT trainings, but it

---

[35] The Los Angeles Police Department (LAPD), Metropolitan Police Department (MPDC), Seattle Police Department (SPD), Phoenix Police Department (PHXPD), Portland Police Department (PPB), and Memphis Police Department (MPD) all provide officers with instructions concerning discretion and de-escalation in resolving an array of mental health emergencies.  In the Monitoring Team's first semi-annual report about the Cleveland Police Department (CPD), the department was likewise required to revise its policies, to mandate that CIT officers be dispatched to all calls involving an individual in crisis, to reflect that CIT responses may be necessary even where the person in mental crisis has committed a crime, and to indicate that officers should have the discretion to direct individuals to health care rather than the judicial system.  CLEVELAND POLICE MONITORING TEAM, FIRST SEMIANNUAL REPORT, at 41 (2016), *available at*  http://static1.squarespace.com/static/5651f9b5e4b08f0af890bd13/t/57505d172eeb81e389277c4d/ 1464884005703/First+Semiannual+Report—2016 -06-02--FOR+RELEASE.pdf.

[36] *See* SPD, CRISIS INTERVENTION, § 16.110-POL-5(1)-(2), at Appendix B.

[37] *See e.g.,* SPD, CRISIS INTERVENTION, § 16.110-Pol-5 (4); PHXD, INDIVIDUALS WITH MENTAL OR PHYSICAL DISABILITIES, OPERATIONS ORDER 4.15(H); LAPD, DEPARTMENT MANUAL VOLUME IV (revised By Special Order No. 6, 2016).

[38] NYPD PATROL GUIDE §216-05, *supra* note 30, at 4.

[39] DOI routinely investigates not-for-profits that do business with the City and/or provide services at the City's behest.  These investigations demonstrate the importance of careful vetting of such organizations and, to the extent that NYPD chooses to rely upon these referrals, such vetting would take on the highest level of importance.

should begin to provide these lists for all of its officers, and reference how and when to use them in the Patrol Guide itself.[40]

---

### The Use of Officer Discretion:
### The Los Angeles Police Department (LAPD) Policy

     LAPD's "Contact with Persons Suffering from a Mental Illness" policy states that "the goal of the Department is to provide a humane, cooperative, compassionate and effective law enforcement response to persons within our community who are afflicted with mental illness. The Department seeks to reduce the potential for violence during police contacts involving people suffering from mental illness while simultaneously assessing the mental health services available to assist."[41]  While LAPD has a number of different sub-units within its MEU, the department's policies do not focus on the detention of individuals in every circumstance.[42] Instead, LAPD allows patrol officers to determine what the appropriate disposition to calls should be by answering a few basic questions for every case, such as:

- Are there indicators of mental illness?

- If so, is the subject a danger to self, others, or gravely disabled?

- Does probable cause exist to involuntarily detain and transport the subject to a mental health facility?

     If officers find insufficient probable cause, LAPD advises them to provide the person and/or their family with referral resources, such as the Los Angeles County Department of Mental Health ACCESS line or the LAPD MEU 911 Checklist.  Barring certain exceptions, officers are also instructed to transport the person in mental crisis to the place where he or she was originally detained, if that person is being released without being booked or cited.[43]

---

[40] Until recently, NYPD was not consistently providing officers with a full list community resources even at its CIT trainings.  This was despite the fact that other NYPD programs were disseminating local community resource information in other contexts.  For example, through its current neighborhood policing pilot program, Neighborhood Coordinating Officers (NCOs) are given "Services and Resource Guides" that include contact information for mental health resources, both citywide and in particular neighborhoods.   By providing officers with a list of resources for exercising their discretion to address mental health crises that clearly do not warrant jail or hospitalization, NYPD can enable officers to serve individuals more effectively.

[41] LAPD and L.A Cnty. Dep't of Mental Health, Mental Evaluation Unit (MEU):  Operations Manual, at 9.

[42] All LAPD officers undergo 40 hours of CIT training, with specialized units receiving additional training.

[43] LAPD and L.A. Cnty. Dep't of Mental Health, *supra* note 41, at 24.

NYPD's reluctance until December 2016 to consider creating a new official policy regarding CIT or to adjust current policy reflects NYPD's failure to recognize that the benefits of CIT cannot be fully realized with an isolated training program.  Instead, CIT should be designed to produce a cultural shift within the police department that leads to better and safer police interactions with people in mental crisis.  Not only are the overall goals of a CIT program absent from the Patrol Guide, NYPD is also effectively training a subset of patrol officers in CIT without providing any policy guidance on how they can and should use the CIT training and methods when responding to calls for service.  Moreover, the lack of Patrol Guide policies on CIT leave non CIT-trained officers and patrol supervisors with little guidance on how to request, support, or manage CIT-trained officers in crisis scenarios.

The policies and procedures that govern a CIT initiative are essential to creating operational and cultural change in a police department—especially a department as large and complex as NYPD—because those measures provide written guidance to officers on the actions to be taken during critical mental health encounters.  Written policies are also essential in holding officers, supervisors, and the Department as a whole accountable to the public that they serve.

### D.  NYPD'S FORM FOR CRISIS INCIDENTS WILL NOT ALLOW FOR ADEQUATE DATA ANALYSIS OF ITS CIT INITIATIVE

Given the number of calls and incidents involving NYPD officers coming into contact with people in crisis every day, comprehensive data tracking and analysis emerge as equally critical aspects of an effective CIT program.  Encounters with these vulnerable populations are sensitive and prone to rapid escalation, requiring stringent measures to monitor officer performance and assure the quality of training designed to teach officers to mitigate the risks posed by these often-volatile incidents.  In particular, robust data collection and analysis can assist NYPD in achieving a number of short and long-term goals:  measuring officer performance, identifying people with a greater likelihood of repeated contact with CIT-trained officers, allowing the Department to respond to the changing environments of the mental health issues most present, and continuously improving the quality of both its CIT training and the operational aspects of a full-fledged CIT program.

In order to comprehensively evaluate a CIT program, a police department must consistently collect detailed data on each encounter between a CIT-trained officer and a person in mental crisis.  Currently, however, NYPD does not systematically collect such detailed data that would allow for a meaningful analysis.

Instead, NYPD relies primarily on its "AIDED card" database to track encounters with people in mental crisis.  An AIDED card is prepared for any assignment in which a subject receives medical treatment but is not arrested, and it is not specific to people experiencing mental crises.

The AIDED card contains only the person's basic pedigree information (name, sex, race, age), the incident location, and check boxes to indicate whether the subject was an "EDP," whether there was any "prior history" for the "EDP," and the "EDP's" actions (i.e., "attempted physical harm to self," "attempted physical harm to others.")[44]  In addition, when ESU arrives on a scene, it uses its own separate form to track each of its assignments.  ESU's form also includes a checkbox to indicate whether the person was an "EDP," as well as whether the person was barricaded, what equipment was used, whether the person was transported to the hospital, and again, a brief narrative section.[45]  This form is also only completed in the minority of incidents when ESU actually arrives at the scene.  Neither form contains any fields that are specific to CIT techniques, and they collect limited, if any, information about the person's behaviors or de-escalation techniques used by the officer.  These two forms, therefore, provide little trackable information about the details of each encounter.

In addition to a lack of detail on its primary forms, any additional information that does exist on these encounters is fragmented across numerous Department documents, depending on the particular circumstances of each incident.  The forms officers complete may include, for example, the Unusual Occurrence Report, the Medical Treatment of Prisoner Form, the Criminal Complaint Report, the Arrest Report, and the new Use of Force report known as the Threat, Resistance or Injury (TRI) Incident Worksheet.[46]  As a result, while NYPD may have the ability to cull some CIT-related information on crisis incidents from its various forms, without a unified form, these data are inconsistent and varied.  For example, while there were approximately 157,000 crisis calls made to NYPD in 2016, only 19,328 corresponding AIDED cards were generated.  This discrepancy may stem from a variety of circumstances, such as the number of crisis calls that did not result in medical attention.  But the difference may also partly arise from the fact that AIDED cards are not filled out when a person is arrested.[47]  In short, AIDED cards are not a reliable proxy for tracking data on mental crisis encounters.

Other police departments have introduced far more useful forms to gather data on encounters between their officers and people in crisis.  For example, LAPD requires officers to complete a report specific to each crisis encounter.  The form tracks information such as pedigree information, known mental history, behaviors and symptoms exhibited by the person, incident disposition, and a narrative section.  The information is then stored in a confidential database,

---

[44] *See* NYPD, NYPD Aided Report Worksheet, at Appendix C.

[45] *See* NYPD, NYPD Emergency Service Unit, ESD2 Form, at Appendix D.

[46] NYPD has traditionally maintained all of these myriad forms in various distinct and isolated databases, complicating the process of analyzing data from a single incident across different reports.  The Department is in the process of merging these databases onto a unified platform called FORMS which should increase NYPD's capacity to analyze and compare data across different forms.

[47] In an interview with OIG-NYPD staff, personnel from NYPD's Office of Management, Analysis and Planning (OMAP) indicated that officers sometimes will not fill out the AIDED form even when medical transport is made.

separate from the database used to track criminal subjects.[48] These forms not only effectively track data, but also allow LAPD officers to learn the background of people in the community who have had repeated encounters with the police because of their mental illness by accessing this information at LAPD's "triage desk."[49]

Likewise, the Seattle Police Department uses a contact report unique to mental health encounters.[50] This report tracks numerous details of each incident, including the nature of the crisis, behaviors and weapons displayed by the person, techniques, equipment, or force used by the officer, injuries sustained by the officer and the individual, and the incident outcome.[51] The form additionally includes a narrative section to allow the officer to fully document the incident.[52]

Like these departments, NYPD should either substantially revise one of its current forms or adopt a separate, unified tracking form designed to capture specific data about mental crisis encounters. The form need not be overly burdensome but should elicit certain basic information, including, at a minimum, whether the officer is CIT trained, the type of mental crisis encountered, techniques used by the officer, what if any force was used, and the encounter's outcome. In doing so, NYPD can begin to collect and evaluate detailed information regarding a subject's actions and presentation, as well as the officer's response.

For instance, analyzing data from a specialized mental crisis form could help NYPD measure the extent to which CIT-specific de-escalation and active listening techniques, as opposed to force, are being used during encounters with people in mental crisis. This practice would then allow NYPD to monitor officer compliance with CIT procedures, as well as assist officers in developing their CIT skills by providing them with detailed assessments of prior incidents. Likewise, these data could reveal a need to bolster training in certain techniques, thereby enhancing the effectiveness of CIT training overall and improving long-term outcomes beyond any one particular encounter. Finally, by tracking information related to the subject's behaviors and known mental health or substance abuse conditions, NYPD could more easily identify emerging trends in both law enforcement practices and in the most prevalent medical

---

[48] *See* LAPD, MENTAL EVALUATION REPORT FORM.

[49] LAPD's "triage desk" takes calls from patrol officers seeking assistance for managing situations involving people with mental illnesses. A triage officer consults the MEU database to determine whether a person has a history of police contact and provides advice accordingly.

[50] SPD, POLICE MANUAL § 16.110: CRISIS INTERVENTION (effective Oct. 28, 2014).

[51] *See* SPD, MENTAL HEALTH CRISIS CONTACT FORM, at Appendix E.

[52] *Id.*

conditions present in the city's current environment.[53]  Of course, any such database collecting data on mentally ill individuals would need to incorporate appropriate privacy protections.

In other police departments using CIT, relevant forms allow for this sort of programmatic analysis.  For example, a breakdown of data by the LAPD in 2015 revealed that an indication of mental illness existed in 14 of the 38 individuals that were shot by officers that year.[54]  Data from SPD, by contrast, showed a very low number of CIT incidents where force was used against armed individuals and revealed a high rate of successful de-escalation by CIT officers.[55]  PPB, meanwhile, tracked how many people who had encounters with CIT-trained officers were re-arrested, re-incarcerated, or completed chemical dependency treatment.[56]  The Phoenix Police Department reported that it tracked CIT incident dispositions and detected an increase in the number of people transported to diversion centers as opposed to hospitals.  This led to an increase in the delivery of more personalized mental health services, and allowed officers to return to patrol more rapidly.  In short, tracking CIT-related metrics can help measure the impact of the CIT program and indicate where additional resources and attention are necessary.

NYPD has emphasized to OIG-NYPD that it has partnered with the Mayor's Office of Criminal Justice and the City College of New York's Institute for State and Local Governance to begin considering how to track data and evaluate officers' use of NYPD's CIT training.  As part of its work, MOCJ is creating a more detailed form, with the aim of comparing the behavior of officers who have been CIT-trained versus those who have not.  MOCJ's form, however, will be temporary, as part of the mayoral initiative, and will not be fully incorporated into NYPD's data analysis.  Therefore, while MOCJ's efforts may prove valuable in the short term, without a permanent, more detailed form to track a variety of data related to every CIT encounter, NYPD

---

[53] In addition to the CIT training currently being implemented, NYPD and DOHMH have also begun to develop and deploy "co-response" teams to respond to the most serious incidents involving people in mental crisis.  The co-response model pairs a trained mental health clinician with CIT-trained police officers to provide a field response for situations involving a mental crisis.  The theory underlying the approach is that the dual presence of a clinician and law enforcement personnel is preferable to just the police, so that police officers can manage any safety concerns on the scene while the mental health professional can focus on delivering more acute psychiatric care.  Currently, ten CIT-trained NYPD officers are assigned to co-response teams, along with one lieutenant and a supervisor.  DOHMH has nine clinicians (seven line staff, one supervisor, and a director) participating in the co-response unit.  A critical component of co-response approach is tracking repeated emergency responses to the same person in mental crisis.  Co-response teams are designed to conduct both on-scene crisis response as well as follow-up visits to ensure that people who become the focus of repeated mental crisis responses have access to the resources they need.  This method is only feasible and effective when law enforcement agencies accurately track crisis response data, with appropriate privacy protections, further underscoring the importance of adequate data collection and analysis.  OIG-NYPD may evaluate NYPD's co-response model in the future in order to assess the program's effectiveness.

[54] LAPD, Use of Force Year-End Review Exec. Summary (2015), *available at* http://assets.lapdonline.org/assets/pdf/UOFpercent20Executivepercent20Summary.pdf.

[55] Bobb, *supra* note 20, at 12.

[56] PPB Behavioral Health Unit, Key Performance Measures (2015).

cannot truly ascertain whether its CIT training is effectively meeting the needs of the community. Likewise, the collection of data from NYPD's CIT operations would enable external oversight entities as well as community stakeholders to assess the ongoing impact of the CIT program going forward.

### VI.    DEFICIENCIES IN NYPD'S CIT TRAINING

Since NYPD first introduced its CIT training in June 2015, staff from OIG-NYPD have observed the course on four separate occasions—during the pilot phase in September 2015, after its Department-wide expansion four months later in December 2015, a year following its establishment, in May 2016, and most recently, in December 2016. The box below describes OIG-NYPD's observations.

---

#### *NYPD's CIT Course: Lectures, Scenarios, and Officer Safety*

At present, NYPD's CIT instruction consists of 32 hours over four days. The entire first day and the mornings of the second, third, and fourth days are reserved for lectures on communications techniques and a variety of mental illnesses, including their symptoms, common treatment approaches, and their prevalence within the general public. The afternoons are dedicated to attendee participation in scenario-based exercises with professional actors.[57]

The first day of training is devoted to outlining effective communication tactics, the importance of officer safety and mental health stability while on the job, and a weapons handling presentation. Depending on the availability of volunteers, certain classes on the first day also engage with panels of individuals who have interacted with NYPD while experiencing a mental crisis. Direct interaction is commonly used in CIT programs to increase officer understanding and empathy for people living with mental health conditions.

On the second day of CIT training, the lecture portion of the presentation focuses on further defining the issue of mental health through the lens of people suffering from various types of mental illness. The lecture explores the long-term effects of deinstitutionalization in New York, the high rates of illnesses like depression in the general population, and the vulnerable state in which many people with psychological diagnoses live. Specific emphasis is placed on the greater likelihood of people with mental illnesses remaining incarcerated for longer than more stable offenders due to penalties received for behavioral violations, as well as their increased rates of crime victimization. The instructors also refute many prevalent myths about people with mental health difficulties and in doing so, attempt to reduce the associated stigma. Psychosis, mood, and social anxiety disorders are also defined in detail.

From the second day onward, officers participate in scenarios that draw upon the lessons discussed during the morning lectures and are based on real-life incidents that NYPD officers have encountered. For example, one exercise involves a scenario in which two officers were

---

[57] At thirty-two hours, NYPD's current CIT training is eight hours short of the Memphis Model's forty hours. Forty hours is also required by all of the recent DOJ consent decrees that address CIT training.

assigned to a domestic incident involving a non-compliant person who refused to take his prescribed medication and was actively hallucinating.  While one family member attempted to calm the affected relative, another phoned the authorities.  Officers were required to use skills gained from the CIT training, including active listening and the delivery of clear, concise directions, to remove an angry family member from the scene and gain voluntary compliance in transporting the hallucinating person to a hospital without using force.[58]  Finally, a post-scenario review of the officers' actions takes place, intended to reinforce the material covered.

The lecture on the third day covers personality disorders, Post-Traumatic Stress Disorder (PTSD), and suicide, while on the fourth day, instructors concentrate on the psychological vulnerabilities that may arise during adolescence and old age.  Conditions including autism and dementia are discussed at length, as are the proper communication approaches to be used by officers when encountering people who might not be capable of immediately understanding law enforcement commands.  Officers watch videos about how to structure such difficult interactions, with narration offered by fellow officers and caretakers to underscore the most effective ways to calm people in crisis.  The training also focuses on the stress encountered by officers on the job, the importance of their own mental health, and the resources that are available through NYPD for officers having a difficult time.

Over the period that OIG-NYPD staff attended the CIT training sessions, NYPD instituted a number of changes.  These changes included shortened presentations which used less technical scientific language and more time spent reviewing age-specific conditions like dementia and anti-social behavior in adolescence.  The updated training also incorporated an expanded number of scenarios and an increased emphasis on the effects of mental illness on officers in their daily lives, as well as the services that are available to lend them support.

These changes underscored the willingness of NYPD, through the training's developers, to enhance its content and presentation to improve its skill sets of officers.  Overall, OIG-NYPD found the training to be both well developed and very effectively presented.  Likewise, in the focus group that OIG-NYPD organized with officers who had attended the CIT training, nearly all expressed satisfaction with the training.

Overall, the focus group participants indicated that because of the CIT training, they felt greater confidence in identifying mental health conditions and employing proper techniques to manage people in crisis through means that would avoid using force when possible.  For example, officers stated that the training gave "a different perspective on how to talk to an EDP . . . how

---

[58] Almost every scenario that OIG-NYPD observed ended with the officer taking the person in mental crisis into protective custody.  This is consistent with current official NYPD policy under Patrol Guide §216-05, with respect to people whom officers believe will cause serious injuries to themselves or others.

to scale down your reaction and show compassion." Officers also reported that they "gained more perspective" and learned how to "step back," "practice active listening," and "bring them [people in crisis] down, to communicate more in depth than [the officer] was used to." In both basic content and presentation, NYPD's CIT instruction appears to meet the standards of CIT trainings nationwide.

OIG-NYPD, however, identified five areas where the training could nonetheless be improved, not necessarily in content, but in approach, to move the Department beyond its pre-CIT training: the training of more officers, dispatcher training, officer interaction with individuals living with mental illness, the development of a training manual or pamphlet, and the assessment of officers' retention of CIT skills learned in training.

## A. NYPD SHOULD CONSIDER TRAINING MORE OFFICERS IN CIT

The percentage of officers to be CIT trained in a particular jurisdiction emerges as an important issue to be considered. While the original Memphis Model suggested that 20 to 25 percent of patrol officers should be CIT-trained, other departments around the country have recently sought to train more uniformed members. For example, Seattle has trained nearly 60 percent of its patrol officers in CIT, and a 2012 DOJ consent decree with Albuquerque set an initial goal for the city to train 40 percent of field officers in CIT.[59] NYPD has committed to training a total of 5,500 officers in CIT. This number is exactly 25 percent of NYPD's approximately 22,000 patrol officers.

The geographic distribution of CIT-trained officers is just as important as the overall percentage of patrol officers who are CIT trained. The appropriate number of CIT-trained officers (patrol officers and sergeants) for each precinct will vary based on the average number of mental health crisis calls each precinct receives. Therefore, NYPD should continually monitor and assess the volume of CIT calls and response times in each precinct to determine whether the overall number of CIT-trained officers and supervisors is appropriate.

---

[59] Bobb, *supra* note 20, at 12; Settlement Agreement, *U.S. v. the City of Albuquerque*, 1:14-cv-01025 (D. N.M. 2014). Other cities have reported higher rates of CIT-trained officers, including Houston at 50 percent and San Antonio at 92 percent. Dana Goldstein, *Therapists in Blue,* THE MARSHALL PROJECT, Dec. 2, 2014, https://www.themarshallproject.org/2014/12/02/therapists-in-blue#.DHHuINPcA.

### B.  911 CALL TAKERS DO NOT RECEIVE SPECIALIZED CIT TRAINING

NYPD should expand the trainings to include 911 call takers and dispatchers who receive and process emergency calls from the public.  While NYPD is best placed to assess the number of hours and specific aspects of CIT that will suit the capacities and needs of its call takers and dispatchers, the Department's ability to assess accurately and quickly the needs of callers and ensure the public receipt of prompt care is diminished if call takers and dispatchers do not have any CIT training.  The amount of training that 911 call takers and dispatchers receive varies across the country:  in Memphis, emergency call operators receive the same 40 hours of CIT training as police officers; Houston uses a three-day course for call takers and dispatchers; and Los Angeles provides eight hours of training to its communications personnel.

A look at successful CIT programs around the country demonstrates that exposing dispatchers and call takers to CIT training is essential to the implementation of a successful CIT program.[60]  Communications personnel serve at the front line of responding to public requests for assistance.  Active listening skills and the ability to recognize the signs and symptoms of a variety of mental health disorders can allow operators to help de-escalate situations.  In addition, even though Emergency Management Services (EMS) is also patched into these 911 calls, communications personnel can aid in providing incident-specific information to responding officers, while also assisting them in formulating a tactical plan for engaging subjects prior to the police arriving on the scene.

Currently, the training materials that NYPD call takers and dispatchers receive about mental illnesses and those in mental crisis are too limited.  Traditionally, the standard 45-day course that NYPD dispatchers and call takers undergo prior to handling calls incorporates only two hours of material related to people in crisis, coupled with a limited number of practice scenarios addressing that content.  NYPD has stated that it anticipates training 911 call takers and dispatchers to better vet calls and transmit information and will start providing officers with a one-day "Mental Health First Aid" training that is run by DOHMH.  But the Department has no timeline or written plan to start any such training, and it has maintained that it does not intend to provide call takers or dispatchers with any aspects of the CIT training itself.

### C.  OFFICERS UNDERGOING CIT TRAINING DO NOT ALL GET EXPOSURE TO PEOPLE LIVING WITH MENTAL ILLNESS

Another shortcoming of NYPD's CIT training is the inconsistent exposure of officers to people living with mental illnesses.  Such interactions are not available to every class of officers completing NYPD's CIT training. OIG-NYPD attended NYPD's CIT training on four separate

---

[60] Dupont, *supra* note 10, at 12 and 15.

occasions.  In September 2015, the training included a panel of individuals who have used mental health services and had prior police interactions. However, in December 2015,  the officers instead viewed a video recording of such a panel.  In May 2016, there was no panel at all, and in December 2016, an in-person panel returned.  Trainers informed OIG-NYPD that after the first few trainings, the volunteer panelists were unable to attend every weekly CIT training session due to the expense and difficulty of obtaining regular transportation to the training location.

Interaction with individuals who have diagnosed conditions and have had contact, negative or positive, with NYPD during vulnerable periods is a critical aspect of CIT training, serving as a powerful tool to sensitize officers about the need for them to be empathetic and tolerant.  Officers in OIG-NYPD's focus group made comments such as "I used to think that they are all crazy.  Now I understand the differences," and "now I understand how they are feeling, what they are going through."  While PowerPoint slides and scenarios can contribute to this understanding, CIT trainings emphasize that interaction with people living with mental illness can best contribute to this understanding.  NYPD should therefore make a concerted effort to expand the pool of volunteer panel members to ensure their regular availability or provide transportation or a small stipend for volunteer panelists to address this challenge.[61]  Alternatively, or in addition, NYPD should consider a strategy that has been employed in a number of other cities—having officers visit mental health clinics or hospitals in order to interact with patients and providers.  In Memphis, Los Angeles, and Washington, D.C., this is a standard component of CIT training.

### D.  NYPD DOES NOT CONDUCT ANY POST-TRAINING ASSESSMENT OF CIT-TRAINED OFFICERS

Finally, NYPD's CIT training course incorporates no internal assessment of its effectiveness.  NYPD offers neither an exam at the end of the training, nor an exposure evaluation requiring officers to apply their new skills in staged scenarios, which would measure officers' understanding and application of the training materials.  At present, the only assessment of NYPD's CIT training is an officer satisfaction survey given at the conclusion of the course.  The Department does not use any analytical tools to assess which aspects of the training material could be improved, what concepts officers struggle with, or which course components could be streamlined or eliminated.  Given that NYPD uses a formalized curriculum, the Department should develop a data source from which assessments about the effectiveness of particular course elements can be made.  Jurisdictions across the nation have adopted such efforts as standard practice.  Currently, both the State of Georgia and Washington, D.C., require all officers who attend the CIT training to take and pass a written examination at the end of the modules to receive certification in the material.  In Los Angeles, each officer goes through an individualized

---

[61] According to NYPD, the Department currently provides panel members with gift cards and is discussing how to provide transportation options.

assessment of three scenarios in which they use the skills learned. When officers make mistakes during the assessment, the trainers perform remediation in order to make sure the officers understand their errors. NYPD should conduct a comprehensive assessment of all newly-trained CIT officers, given the complicated nature of CIT training and the conditions which it covers, even if the Department does not plan on certifying its officers in CIT.

### E. NYPD DOES NOT PROVIDE A MANUAL OR REFERENCE GUIDE FOR OFFICERS UNDERGOING CIT TRAINING

CIT-trained officers who participated in the OIG-NYPD focus group cited a desire to receive a post-instruction reference guide, such as a manual or memo book insert.[62] ESU officers currently receive a reference guide after their Emergency Psychological Technician Training and it could prove just as helpful for CIT-trained officers, in order to facilitate officers' ability to retain skills and knowledge over time. Only on the first occasion when OIG-NYPD attended NYPD's CIT training did the trainers provide copies of slide presentations to course attendees for note-taking and reference. Distributing a handbook discussing the themes and content of the lecture materials, resources for officers to recommend to the public, and effective tactics to defuse difficult situations would enhance knowledge retention for officers. Such a manual or guide would need to be updated as the CIT training, policies, and associated resources develop further.

---

[62] NYPD currently provides training participants with a three-page document that summarizes communication and active listening skills with people in crisis but does not address any specific mental health conditions. NYPD has stated that it is currently discussing providing a manual as well, but it has no specifics or timeline for doing so.

## VII.    RECOMMENDATIONS

In order to address the sheer number of calls and encounters between NYPD officers and people in crisis—approximately 157,000 per year, or more than 400 each day—NYPD needs to go beyond the present CIT training.  CIT is a program with a number of different elements: training, assignment, coordination, and policies.  When all of these elements work together, CIT can fundamentally change and improve the way that officers respond to a crisis incident at any given time.

Accordingly, OIG-NYPD makes the following recommendations so that NYPD can best move forward to create a viable CIT program in the near future.

**NYPD Should Set Firm Internal Timelines for the Implementation of All Changes to its CIT Initiative**

1. **NYPD should commit to creating timelines for any changes to its CIT initiative within 90 days of the publication of this Report.**  NYPD has informed OIG-NYPD that it agrees with the majority of the recommendations in this Report.  While NYPD has acknowledged the need for these changes, the Department should now commit to enacting these reforms by setting firm deadlines with definitive dates of expected completion.  OIG-NYPD understands that some reforms may take longer than others.  While the development or substantial revision of one of NYPD's data collection forms may take a significant amount of time, the provision of a reference guide to officers at CIT trainings should take much less.

**NYPD Should Ensure that, When Available, a CIT-Trained Officer Responds to Every Mental Crisis**

2. **NYPD should adjust its dispatch procedures to ensure that officers with CIT training are directed to crisis incidents.**  NYPD should make the necessary changes to its dispatch procedures so that when a call regarding a mental crisis comes in, a CIT-trained officer is assigned to the scene, whenever possible.  This will increase the likelihood that the first officer who responds to the location has the appropriate skills and knowledge learned in CIT training and can successfully de-escalate the situation rather than use force.

**NYPD Should Start Coordinating its CIT Efforts Department-Wide**

3. **NYPD should create a dedicated mental health unit, or at the very least appoint a CIT coordinator who holds the rank of chief, in order to manage all aspects of a CIT program.** This unit or person, once in place, should actively solicit input and suggestions from officers, the public, the mental health community, and other criminal justice bodies through the creation of a working group or stakeholder committee. At the same time, this unit or individual should move forward with all of the crucial missing aspects of NYPD's current CIT effort. In particular, this role requires the capacity to plan, implement, and improve the Department's CIT training, policies, and data collection and analysis. With the leadership of such a unit or official, NYPD can maximize the opportunities that a full CIT program presents and can more effectively improve the response of officers to people in crisis.

**NYPD Should Adjust its Patrol Guide to Reflect the Purpose and Goals of a CIT Program**

4. **NYPD should revise its Patrol Guide to explicitly authorize CIT-trained officers to use the skills learned in CIT training during crisis situations.** The NYPD Patrol Guide needs to provide guidance to officers by referencing the use of CIT skills such as subject assessment, active listening, rapport building, and de-escalation, all of which have been shown to reduce the likelihood that force is used during crisis incidents.

5. **NYPD should revise its Patrol Guide to require that CIT-trained officers respond to all crisis incidents whenever possible.** NYPD should adjust the Patrol Guide to prioritize the arrival of a CIT-trained officer to all crisis scenes. In particular, the Patrol Guide should require the dispatch of CIT-trained officers to all crisis scenes whenever it is possible, and should also provide guidance to non CIT-trained officers and supervisors on how and when they should request the assistance of these officers.

6. **NYPD should revise its Patrol Guide to allow all officers to use their discretion to refer individuals to officially approved and vetted outside community resources in appropriate incidents.** The Patrol Guide procedures currently in place focus on having officers ultimately resolve incidents by placing the person in mental crisis into custody. The current policy does not direct officers to use their discretion to consider options other than hospitals, when appropriate. The policy should provide officers with guidance on when the use of discretion is appropriate and how to use community resources when people in crisis are not considered a threat to themselves or others.

## NYPD Should Collect and Analyze More Detailed Data about Incidents Involving Persons in Crisis

7. **NYPD should either substantially revise one of its current forms or develop a new permanent form to capture more useful data on incidents involving persons in crisis.** This new incident form need not be burdensome to complete, but it should collect information such as the type of mental crisis that the officer believes is being encountered, the techniques employed by the officer, what if any force was used, and the resolution of the encounter. NYPD should require officers to complete the form for all mental health crisis incidents.

8. **NYPD should analyze data regarding mental crisis incidents.** In order to be able to better respond to mental crisis incidents, NYPD needs to analyze data on the deployment of offices, and then the nature, frequency, and disposition of incidents. This analysis should be done in order to measure the extent to which CIT skills and policies are being used and followed by officers, to assess the need to revise the content of the Department's CIT curriculum and policies, and to identify the most prevalent mental health conditions currently present in the City.

## NYPD Should Train 911 Call Takers and Dispatchers in CIT and Update Its CIT Training to Address Deficiencies in Its Content and Presentation

9. **NYPD should consider training more officers in CIT.** While NYPD has set an initial goal of training 5,500 officers (25 percent of its patrol division) in CIT, the Department should consider training more officers in CIT as it monitors the rates of mental health crisis calls and response times in each precinct. Better collection and analysis of CIT data (*see* Recommendation #8), will allow the Department to continually reassess the CIT staffing needs of each precinct and make appropriate adjustments where necessary.

10. **NYPD should begin training 911 call takers and dispatchers in at least some aspects of CIT.** 911 call takers and dispatchers need to be provided with some of the skills that are emphasized in CIT trainings, such as active listening and the ability to recognize the signs and symptoms of a variety of mental health disorders. These call takers and dispatchers should obtain these skills through targeted CIT training in order to ensure that the appropriate information also becomes available to responding officers.

11. **In every CIT training, NYPD should ensure that its officers interact with people living with mental illnesses.** Interaction with individuals who have diagnosed mental health conditions and have had contact with NYPD in the past is a critical way that CIT training teaches officers to be empathetic and tolerant towards people living with mental

illnesses. This interaction cannot be an irregular component of CIT trainings but should be required, and should take place at the Police Academy, at hospitals, or at mental health clinics.

12. **In every CIT training, NYPD should assess the retention of officers' skills.** To ensure that its officers are actually retaining the skills emphasized in their CIT training, NYPD should provide either a formal test or a scenario evaluation. This form of assessment can be used by the CIT coordinator in order to develop data about the content and effectiveness of the Department's CIT training.

13. **NYPD should provide a manual or reference guide to officers who undergo CIT training.** To facilitate retention of the knowledge and skills gained in CIT training, NYPD should provide a post-instruction manual or reference guide to officers for them to review or consult when needed.

---

*Please contact us at*:

**Office of the Inspector General for the New York City Police Department**
New York City Department of Investigation
80 Maiden Lane
New York, NY 10038
Telephone: (212) 806-5200
www.nyc.gov/oignypd

For general inquiries, please email inquiry@oignypd.nyc.gov

For OIG-NYPD's Press Office, please call (212) 806-5225 or email press@oignypd.nyc.gov

For OIG-NYPD's Outreach Unit, please call (212) 806-5200 or email outreach@oignypd.nyc.gov

# APPENDICES

# APPENDIX A

**NYPD Patrol Guide §216-05: Mentally Ill or Emotionally Disturbed Persons**

# **MENTALLY ILL OR EMOTIONALLY DISTURBED PERSONS**

## DATE EFFECTIVE: 09-28-07

## PURPOSE

To safeguard a mentally ill or emotionally disturbed person who does not voluntarily seek medical assistance.

## SCOPE

The primary duty of all members of the service is to preserve human life. The safety of ALL persons involved is paramount in cases involving emotionally disturbed persons. If such person is dangerous to himself or others, necessary force may be used to prevent serious physical injury or death. Physical force will be used ONLY to the extent necessary to restrain the subject until delivered to a hospital or detention facility. Deadly physical force will be used ONLY as a last resort to protect the life of the uniformed member of the service assigned or any other person present. If the emotionally disturbed person is armed or violent, no attempt will be made to take the EDP into custody without the specific direction of a supervisor unless there is an immediate threat of physical harm to the EDP or others are present. If an EDP is not immediately dangerous, the person should be contained until assistance arrives. If the EDP is unarmed, not violent and willing to leave voluntarily, a uniformed member of the service may take such person into custody. When there is time to negotiate, all the time necessary to ensure the safety of all individuals will be used.

## DEFINITIONS

EMOTIONALLY DISTURBED PERSON (EDP) - A person who appears to be mentally ill or temporarily deranged and is conducting himself in a manner which a police officer reasonably believes is likely to result in serious injury to himself or others.

ZONE OF SAFETY - The distance to be maintained between the EDP and the responding member(s) of the service. This distance should be greater than the effective range of the weapon (other than a firearm), and it may vary with each situation (e.g., type of weapon possessed, condition of EDP, surrounding area, etc.). A minimum distance of twenty (20) feet is recommended. An attempt will be made to maintain the "zone of safety" if the EDP does not remain stationary.

## PROCEDURE

When a uniformed member of the service reasonably believes that a person who is apparently mentally ill or emotionally disturbed, must be taken into protective custody because the person is conducting himself in a manner likely to result in a serious injury to himself or others:

UNIFORMED MEMBER OF THE SERVICE

1. Upon arrival at scene, assess situation as to threat of immediate serious physical injury to EDP, other persons present, or members of the service. Take cover, utilize protective shield if available and request additional personnel, if necessary.

    a. If emotionally disturbed person's actions constitute immediate threat of serious physical injury or death to himself or others:

        (1) Take reasonable measures to terminate or prevent such behavior. Deadly physical force will be used only as a last resort to protect the life of persons or officers present.

    NOTE: Damaging of property would not necessarily constitute an immediate threat of serious physical injury or death.

    b. If EDP is unarmed, not violent and is willing to leave voluntarily:

        (1) EDP may be taken into custody without the specific direction of a supervisor.

    c. In all other cases, if EDP's actions do not constitute an immediate threat of serious physical injury or death to himself or others:

        (1) Attempt to isolate and contain the EDP while maintaining a zone of safety until arrival of patrol supervisor and Emergency Service Unit personnel.

        (2) Do not attempt to take EDP into custody without the specific direction of a supervisor.

2. Request ambulance, if one has not already been dispatched.

    a. Ascertain if patrol supervisor is responding, and, if not, request response.

    NOTE: Communications Section will automatically direct the patrol supervisor and Emergency Service Unit to respond to scene in such cases. Patrol supervisors' vehicles are equipped with non-lethal devices to assist in the containment and control of EDP's, and will be used at the supervisor's direction, if necessary.

3. Establish police lines.

4. Take EDP into custody if EDP is unarmed, not violent and willing to leave voluntarily.

PATROL SUPERVISOR

5. Verify that Emergency Service Unit is responding, if required.

    a. Cancel response of Emergency Service Unit if services not required.

6. Direct uniformed members of the service to take EDP into custody if unarmed, not violent, and willing to leave voluntarily.

    NOTE: When aided is safeguarded and restrained comply with steps 25 to 32 inclusive.

WHEN AIDED IS ISOLATED/CONTAINED BUT WILL NOT LEAVE VOLUNTARILY:

PATROL SUPERVISOR

7. Establish firearms control.

    a. Direct members concerned not to use their firearms or use any other deadly physical force unless their lives or the life of another is in imminent danger.

8. Deploy protective devices (shields, etc.).

    a. Employ non-lethal devices to ensure the safety of all present (see "ADDITIONAL DATA" statement).

9. Comply with provisions of PG 212-38, "Hostage/Barricaded Person(s)," where appropriate.

10. Establish police lines if not already done.

11. Request response of hostage negotiation team and coordinator through Communications Section.

12. Notify desk officer that hostage negotiation team and coordinator have been notified and request response of precinct commander/duty captain.

13. Request Emergency Service Unit on scene to have supervisor respond.

14. If necessary, request assistance of:

    a. Interpreter, if language barrier

    b. Subject's family or friends

    c. Local clergyman

    d. Prominent local citizen

    e. Any public or private agency deemed appropriate for possible assistance.

    NOTE: The highest ranking uniformed police supervisor at the scene is in command and will coordinate police operations. If the mentally ill or EDP is contained and is believed to be armed or violent but due to containment poses no immediate threat of danger to any person, no additional action will be taken without the authorization of the commanding officer or duty captain at the scene.

EMERGENCY SERVICE UNIT SUPERVISOR

15. Report to and confer with ranking patrol supervisor on scene.

    a. If there is no patrol supervisor present, request response forthwith, and perform duties of patrol supervisor pending his/her arrival.

    NOTE: The presence of a supervisor from any other police agency does not preclude the required response of the patrol supervisor.

16. Evaluate the need and ensure that sufficient Emergency Service Unit personnel and equipment are present at the scene to deal with the situation.

17. Verify that hostage negotiation team and coordinator are responding, when necessary.

18. Devise plans and tactics to deal with the situation, after conferral with ranking patrol supervisor on scene.

DESK OFFICER

19. Verify that precinct commander/duty captain has been notified and is responding.

20. Notify Operations Unit and patrol borough command of facts.

COMMANDING OFFICER/DUTY CAPTAIN

21. Assume command, including firearms control.

22. Confer with ranking Emergency Service Unit supervisor on scene and develop plans and tactics to be utilized.

23. Direct whatever further action is necessary, including use of negotiators.

[IO 20/08] 24. Direct use of alternate means of restraint, if appropriate, according to circumstances.

WHEN PERSON HAS BEEN RESTRAINED:

UNIFORMED MEMBER OF THE SERVICE

25. Remove property that is dangerous to life or will aid escape.

26. Have person removed to hospital in ambulance.

    a. Restraining equipment including handcuffs may be used if patient is violent, resists, or upon direction of a physician examiner.

    b. If unable to transport with reasonable restraint, ambulance attendant or doctor will request special ambulance.

    c. When possible, a female patient being transported should be accompanied by another female or by an adult member of her immediate family.

27. Ride in body of ambulance with patient.

    a. At least two (2) uniformed members of the service will safeguard if more than one (1) patient is being transported.

    NOTE: If an ambulance is NOT available and the situation warrants, transport the EDP to the hospital by RMP if able to do so with reasonable restraint, at the direction of a supervisor. UNDER NO CIRCUMSTANCES WILL AN EDP BE TRANSPORTED TO A POLICE FACILITY.

28. Inform examining physician, upon arrival at hospital, of use of non-lethal restraining devices, if applicable.

29. Safeguard patient at hospital until examined by psychiatrist.

    a. When entering psychiatric ward of hospital, unload revolver at Firearm Safety Station, if available (see PG 216-07, "Firearms Safety Stations At Psychiatric Wards And Admitting Areas").

30. Inform psychiatrist of circumstances which brought patient into police custody:

    a. Inform relieving uniformed member of circumstances if safeguarding extends beyond expiration of tour.

    b. Relieving uniformed member will inform psychiatrist of details.

31. Enter details in ACTIVITY LOG (PD112-145) and prepare AIDED REPORT WORKSHEET (PD304-152b).

    a. Indicate on AIDED REPORT WORKSHEET, name of psychiatrist.

32. Deliver AIDED REPORT WORKSHEET to desk officer.

## ADDITIONAL DATA

Refer persons who voluntarily seek psychiatric treatment to proper facility.

Prior to interviewing a patient confined to a facility of the NYC Health and Hospitals Corporation, a uniformed member of the service must obtain permission from the hospital administrator who will ascertain if the patient is mentally competent to give a statement.

Upon receipt of a request from a qualified psychiatrist, or from a director of a general hospital or his/her designee, uniformed members of the service shall take into custody and transport an apparently mentally ill or emotionally disturbed person from a facility licensed or operated by the NYS Office of Mental Health which does not have an inpatient psychiatric service, or from a general hospital which does not have an inpatient psychiatric service, to a hospital approved under Section 9.39 of the Mental Hygiene Law.

Uniformed members of the service will also comply with this procedure upon direction of the Commissioner of Mental Health, Mental Retardation and Alcoholism Services or his/her designee.

[IO 20/08] USE OF NON-LETHAL DEVICES TO ASSIST IN RESTRAINING EMOTIONALLY DISTURBED PERSONS

Authorized uniformed members of the service may use a conducted energy device (CED) to assist in restraining emotionally disturbed persons, if necessary.

Emergency Service Unit personnel will obtain the permission of the Emergency Service Unit supervisor prior to utilizing a CED, except in emergencies.

Authorized members of the service will be guided by Interim Order 20, series 2008, "Use of

Conducted Energy Devices (CED)", when a CED has been utilized.

LESS LETHAL/RESCUE EQUIPMENT USE REPORT (PD 320-151) will be prepared whenever a less lethal restraining device or rescue equipment is used by a uniformed member of the service in the performance of duty.

The Commanding Officer, Investigation Review Section, will collate statistical information recorded on the REPORTS, and will forward a monthly report to the Office of the Chief of Department by the seventh (7th) business day of each month.

## RELATED PROCEDURES

Aided Cases - General Procedure (PG 216-01)

Mental Health Removal Orders (PG 216-06)

Unusual Occurrence Reports (PG 212-09)

Investigation Of Carjackings (PG 207-32)

Unlawful Evictions (PG 214-12)

Hostage/Barricaded Person(s) (PG 212-38)

## FORMS AND REPORTS

ACTIVITY LOG (PD112-145)

AIDED REPORT WORKSHEET (PD304-152b)

NON-LETHAL RESTRAINING DEVICE/RESCUE EQUIPMENT REPORT (PD320-150)

TASER/STUN DEVICE REPORT (PD304-150)

UNUSUAL OCCURRENCE REPORT (PD370-152)

# APPENDIX B

**Seattle Police Department Manual §16.110: Crisis Intervention**

## SEATTLE POLICE DEPARTMENT MANUAL

# 16.110 - CRISIS INTERVENTION

Effective Date: 10/28/2014

16.110-POL-1  Crisis Intervention Committee (CIC)

16.110-POL-2  CIT Coordinator

16.110-POL-3  CIT-Certified Officers

16.110-POL-4  Crisis Response Team (CRT)

16.110-POL-5  Responding to Subjects in Behavioral Crisis

16.110 – POL

This policy applies to the Department's response to subjects in behavioral crisis. This includes people diagnosed with mental illness, as well as people suffering from substance abuse and personal crises. (For fuller definition, see 16.110-POL-5.9.) The Seattle Police Department recognizes the need to bring community resources together for the purpose of safety and to assist and resolve behavioral crisis issues. The Department further recognizes that many people suffer crises, and that only a small percentage has committed crimes or qualifies for an involuntary evaluation. Persons suffering crises will be treated with dignity and will be given access to the same law enforcement, government and community service provided to all citizens.

Seattle Police officers are instructed to consider the crises that subjects may be experiencing during all encounters. Officers must recognize that subjects may require law enforcement assistance and access to community mental health and substance abuse resources. The ideal resolution for a crisis incident is that the subject is connected with resources that can provide long-term stabilizing support.

Officers are trusted to use their best judgment during behavioral crisis incidents, and the Department recognizes that individual officers will apply their unique set of education, training and experience when handling crisis intervention. The Department acknowledges that officers are not mental health professionals. Officers are not expected to diagnose a subject with a mental illness, nor are they expected to counsel a distraught subject into composure. When officers need to engage with a subject in behavioral crisis, the Department's expectation is that they will attempt to de-escalate the situation, when feasible and reasonable. The purpose of de-escalation is to provide the opportunity to refer the subject to the appropriate services. This expectation does not restrict an officer's discretion to make an arrest when probable cause exists, nor are officers expected to attempt de-escalation when faced with an imminent safety risk that requires immediate response. An officer's use of de-escalation as a reasonable alternative will be judged by the standard of objective reasonableness, from the perspective of a reasonable officer's perceptions at the time of the incident.

The intent of this policy is to provide all officers with resources to deal with subjects who are in behavioral crisis. The CIT (Crisis Intervention Team) program has three distinct components: officers who have undergone basic CIT training; officers who have undergone advanced CIT training (hereafter referred to as "CIT-Certified officers"); and a squad of officers, the Crisis Response Team (CRT), dedicated to following-up on criminal investigations where mental illness is suspected, crisis events, and people who have been identified as being a risk to themselves or others. CRT and CIT-Certified officers are available as a resource, and officers shall make every reasonable effort to request their assistance as appropriate. As described below, communications will be trained to and will dispatch at least one CIT-Certified officer to each call that appears to involve a subject in behavioral crisis and CIT-Certified officers will take primary at the scene of crisis events. After the event has been stabilized, the CRT will engage follow-up.

### 16.110-POL-1  Crisis Intervention Committee (CIC)

#### 1. CIC is a Community and Regional Partnership

The purpose of the CIC is to build an effective regional crisis incident response built upon best practices, innovation and experience. The CIC works in cooperation with the Department to make sure that crisis intervention training and policies are consistent with legal standards, best practices and community expectations. The intent is to include representatives of entities that can assist the Department in achieving the

purpose of the CIC. These entities will come from several categories: city and county government (including law enforcement agencies and line patrol officers), mental health professionals and advocates, academia, and others deemed appropriate.

## 2. CIC Works Collaboratively With the Department to Advise on Crisis Intervention Training and Policies

The CIC has five specific tasks:

- Evaluate SPD's overall CIT program, study national models, and make recommendations on whether SPD should modify the structure and design of its crisis intervention program
- Develop a checklist of resources available to refer individuals in crisis
- Review and validate the Department's CIT training
- Develop policy and procedures for the disposition or voluntary referral of individuals to jails, receiving facilities and local mental health and/or social service agencies that clearly describe the roles and responsibilities of those entities and of the SPD CIT-Certified officers in the process
- Enhance community connections with advocates and social service professionals, as well as provide for a seamless system of care for persons in crisis

## 16.110-POL-2 CIT Coordinator

### 1. CIT Coordinator Oversees the CIT Program, to Include the CRT Unit

The CIT Coordinator, appointed by the Chief, provides command-level oversight for the CRT Program, both the CIT Unit and the CIT-Certified officers. The CIT Coordinator serves many roles with an emphasis on examining, reviewing, and making recommendations to ensure the CIT Program is implemented and sustained as a community program. The CIT Coordinator furthermore serves as a community liaison representing and primary point of contact for the Program, both for law enforcement and other community partnerships to the residents of Seattle. Leadership, planning and problem-solving skills are essential attributes for the CIT Coordinator. The Department will work in conjunction with the CIC to develop the job description for the CIT Coordinator and will post the job description on the Department's website.

## 16.110-POL-3 CIT-Certified Officers

### 1. CIT-Certified Officers Undergo Specific Training

All SPD officers will receive basic training on crisis intervention. To be considered "CIT-Certified," officers are required to successfully pass a 40-hour initial comprehensive CIT training and eight hours of annual CIT-specific in-service training thereafter.

### 2. CIT-Certified Officers Will Take the Lead, When Appropriate, In Interacting With Subjects in Behavioral Crisis

See 16.110-POL-5.2.

### 3. The Department Will Ensure That CIT-Certified Officers Are Available on All Shifts

## 16.110-POL-4 Crisis Response Team (CRT)

### 1. CRT is a Unit of the Patrol Operations Bureau

The CRT Unit is distinct from officers who are CIT-Certified and assigned to other units. (See 16.110-POL-3 CIT-Certified Officers.)

### 2. CRT has Follow-Up Responsibility for Incidents Involving Subjects in Crisis

CRT follows-up on cases involving behavioral crisis through intervention at the lowest-level, least-intrusive intercept point, in order to prevent and reduce harm. CRT works to gain a subject's behavioral self-control through engagement with treatment.

#### a. CRT Utilizes an Intercept Continuum

1. Harmless symptomatic behavior

- Non-criminal: Provide contact information for obtaining services/treatment
- Criminal: Verbal warning

2. Indication of mental-health needs

- Non-criminal: Refer to appropriate service partner for outreach

- Criminal: Document crime, warn

3. Indication of urgent mental-health needs
    - Non-criminal: Contact subject's case manager, CRT outreach, transport to voluntary services
    - Criminal: Document crime, warn

4. Imminent risk of serious harm to self, others or property
    - Non-criminal: Emergent detention, involuntary transport to hospital
    - Criminal: Request charges through Mental Health Court or refer to CSC

5. Escalation of harmful symptomatic behavior
    - Non-criminal: Coordinate with DMHPs, commit for involuntary treatment
    - Criminal: Arrest and booking with referral to Mental Health Court

6. Escalated risk of serious harm to others, resistant to all other interventions
    - Non-criminal: Coordinate with DMHPs, commit for involuntary treatment
    - Criminal: Arrest and booking

**b. CRT Utilizes a Descending Scale of Urgency When Prioritizing Cases**

1. Imminent risk of serious harm

    - Subject is out of custody or possible release following serious incident, danger to public or victims.

2. Pattern of escalation

    - Subject has been involved in a series of incidents indicating decompensation or decline in behavioral self-control, which constitutes an increased risk of serious harm to self or others.

3. High utilization of police resources

    - Subject has made or been the reason for frequent, unfounded calls which unreasonably exploit patrol resources.

4. Request from officers or service provider

    - A patrol officer or service provider requests CIT assistance for problem-solving.

**16.110-POL-5  Responding to Subjects in Behavioral Crisis**

**1.  Officer Shall Make Every Reasonable Effort to Request the Assistance of CIT-Certified Officers, as Appropriate**

**2.  Communications Shall Dispatch at Least One CIT-Certified Officer to Each Call That Appears to Involve a Subject in Behavioral Crisis**

If circumstances dictate that there is not a CIT-Certified officer available to respond to a call that appears to involve a subject in behavioral crisis, non-CIT- Certified officers shall be dispatched and a CIT-Certified officer shall respond as soon as possible.

CIT-Certified officers will take the lead, when appropriate, in interacting with subjects in behavioral crisis.  If a sergeant or above has assumed responsibility for the scene, he or she will seek the input of CIT-Certified officers on strategies for resolving the crisis event when it is reasonable and practical to do so.

**a.  A Sergeant and at Least Two Officers Shall Respond to Each High-Risk Suicide Call**
A high-risk suicide call is one where the likelihood of suicide is imminent, and the subject may be armed with a weapon or may be barricaded.
If, during the course of an incident, an officer determines that a subject meets the above criteria, he or she shall advise dispatch and request a sergeant and back-up.

**3. Officers May Call the Crisis Clinic to Connect with the On-Duty Designated Mental Health Professional (DMHP) During any Incident Involving a Subject in Behavioral Crisis**

The Crisis Clinic is the resource through which officers can be referred to the available resources that are located throughout the region.

Officers may call the Crisis Clinic for an on-site evaluation by the on-duty designated mental health professional (DMHP).

- When communicating with a DMHP, the **officer:**

  - **Calls** (206) 263-9202 Monday through Friday, 0830 hours to 2230 hours

  - **Calls** (206) 461-3210 ext. 1 outside of the above hours

- If the incident requires immediate action, officers may take the subject into protective custody and arrange for a transport to the nearest appropriate hospital. See 16.110–PRO–2 Involuntary Mental Health Evaluation.

**a. Officers Are Encouraged to Call the Crisis Clinic When Contacting Subjects Who Are in a Behavioral Crisis but Are Not Going to Be Referred for Involuntary Mental Health Evaluation or Criminal Charges**

See 16.110–TSK–2 Contacting Subjects Who are in a Behavioral Crisis but are Not Going to Be Referred for Involuntary Mental Health Evaluation or Criminal Charges.

**4. Officers May Refer Eligible Subjects with Mental Illness and/or Substance Use Disorders to the Crisis Solutions Center (CSC)**

See 16.110–PRO–4 Referring a Subject to CSC. Voluntary referrals may take place:

- As part of an officer's community caretaking function, or
- During a *Terry* stop, or
- When an officer has probable cause to believe that an individual has committed one of the following **eligible criminal offenses:**

  - Alcohol in a Park
  - Criminal Possession of Marijuana (>28 grams by an adult)
  - Criminal Trespass I and II
  - Disorderly Conduct
  - DWLS 3
  - Drug Traffic Loitering
  - Failure to Obey
  - False Reporting
  - Misuse of the 911 System
  - NVOL
  - Obstructing a Public Officer
  - Possession of a Fraudulent Driver License
  - Property Damage/Malicious Mischief
  - Prostitution
  - Prostitution Loitering
  - Theft 3
  - Theft of Rental Property
  - Unlawful Bus Conduct
  - Unlawful Issuance of Bank Checks
  - Use of Drug Paraphernalia
  - VUCSA: Possession of Legend Drugs (Prescription Drugs without Proper Prescription)
  - VUCSA: Simple Possession of Cocaine < 1 gram
  - VUCSA: Simple Possession of Heroin < 1 gram
  - VUCSA: Simple Possession of Methamphetamine < 1 gram

**a. Certain Subjects are not Eligible for CSC Referral**

Individuals who meet at least one of the following criteria are not eligible for

CSC referral:

- Suffer from an acute mental health crisis which meets the criteria for a mental health evaluation under RCW 71.05.153
- Require medical treatment
- Have an active and extraditable criminal warrant

- Violent offender status in the past ten years
- Sex offender status in the past ten years
- Juveniles (under 18)

**b. Officers Shall Notify Potential Crime Victim(s) of the Diversion Option**

Officers shall consider any strong opposition presented by the potential crime victim(s) when determining whether to make the referral. This does not negate officer discretion.

**c. Officers Shall Inform Subjects that Referral is Voluntary**

**5. Officers May Facilitate Voluntary Mental Health Hospitalizations**

Officers shall document officer-facilitated voluntary mental health hospitalization. See 16.110–TSK–1 Voluntary Mental Health Hospitalization.

**6. Officers May Facilitate Involuntary Mental Health Evaluations**

See 16.110– PRO–2 Referring a Subject for an Involuntary Mental Health Evaluation.

**7. Officers Shall Complete the *Emergent Evaluation Card* When Referring a Subject in Behavioral Crisis to a Hospital, Whether for Voluntary or Involuntary Evaluation**

**8. Officers May Take a Subject into Custody Based on a Written or Verbal Order From a DMHP**

See 16.110–PRO–3 Taking a Subject into Custody by Order of a DMHP. When a DMHP is unable to accompany officers, officers shall make an independent determination as to whether to order an involuntary mental health evaluation.

**9. Officers Shall Document All Contacts With Subjects Who are in Behavioral Crisis, are Suspects in a Crime, and/or are Detained for a Mental Health Evaluation**

For the purposes of this policy, a behavioral health crisis is defined as an episode of mental and/or emotional distress in a person that is creating significant or repeated disturbance and is considered disruptive by the community, friends, family or the person themselves.

Officers will use a General Offense (GO) report for all hospitalizations – voluntary and involuntary - which is routed to CRT.

For other behavioral crisis calls or contacts, officers will document the contact by using either a GO report or a Street Check.

**10. There Are Five Options for Resolving Behavioral Crisis-Related Misdemeanor Property Crimes**

- Investigate and release with routing to CRT for follow-up
- Referral to the Crisis Solutions Center (See 16.110-POL-5.4 and 16.110-PRO-4  Referring a Subject to CSC.)
- Investigate and release with a request for charges through Seattle Municipal Mental Health Court (MHC)
- Jail booking with MHC flag
- Investigate and detain for a mental health evaluation, with a request for charges through Seattle Municipal Mental Health Court (MHC)

**11. When an Officer has Made the Decision to Book a Felony Suspect into Jail, the Suspect Shall Not Be Diverted for a Mental Health Evaluation**

- Exceptions must be screened by the CRT sergeant.
- If the jail refuses to accept a suspect due to a behavioral crisis, officers shall have the suspect sent to the Harborview Medical Center (HMC).  See 16.110–PRO–1 When Jail Staff Decline to Accept a Suspect in Behavioral Crisis for Booking.

**12. CRT Triages Cases for Follow-Up**

See 16.110-POL-4.2.b.

**13. SPD Collects and Analyzes Data**

The Department's intent with collecting data is two-fold:

- To collect data based on the capabilities of existing and future software, and
- To evaluate the overall CIT progra

a. **There Are Five Components That Are Analyzed to Answer Key Questions**

- Communication procedure
  - Ensure that communications procedures are effective in appropriately identifying people in behavioral crisis.

- CIT-Certified officers
  - Ensure that CIT-Certified officers are effective in responding to incidents involving people in behavioral crisis.

- CRT Unit
  - Ensure that the CRT Unit is effective in terms of improving efficiency of police response to and the resolution of incidents involving people in behavioral crisis.
    - Are subjects getting the services they need?
    - Are call volume and patrol workload being reduced?

- CIT curriculum
  - Ensure that the CIT curriculum is delivering in terms of its intended goals and learning outcomes.

- SPD culture
  - Determine how each aspect of the CIT program is viewed within the SPD culture.
    - Training
    - Response
    - Follow-up

**16.110–PRO–1 When Jail Staff Decline to Accept a Suspect in Behavioral Crisis for Booking**

**Officer**

1. **Attempts** to book subject into jail
   a. If jail **declines** subject, **transports** subject to HMC
2. **Screens** the incident with a sergeant to determine if there will be a police hold

**Sergeant**

3. **Screens** the disposition with CRT sergeant, via Communications
4. **Decides** if there will be a police hold
   a. If there will be a police hold,
   **determines** whether to assign hospital guard (See 11.030 – Guarding Detainees at a Hospital)

**Officer**

5. **Completes** *Emergent Evaluation Card*
   a. **Indicates** that there is a police hold, if applicable
   b. Through Communications, **calls** the appropriate hospital to explain the circumstances behind the police hold, if applicable
   c. **Gives** the *Emergent Evaluation Card* to the ambulance driver/social worker
6. **Completes** a General Offense report
   a. **Lists** "Crisis" in the offenses block, in addition to any offenses that were committed
   b. **Describes** the circumstances of the incident and the disposition of the subject

**Communications**

7. **Dispatches** officer to retrieve the subject, if Harborview calls to notify that a subject on police hold is about to be released

**Officer/Secondary Officer**

    8. **Transports** subject to jail

**16.110–PRO–2 Referring a Subject for an Involuntary Mental Health Evaluation**

**Officer**

    1. **Determines** that the subject may be eligible for evaluation

    2. **Requests** that Communications call the Crisis Clinic, if time allows, or **calls** the Crisis Clinic directly at (206) 461-3210

    3. **Determines** (with or without the assistance of a DMHP) that the subject meets the involuntary mental health evaluation criteria, per RCW 71.05.153(2): Emergent Detention of Persons with Mental Disorders

    4. **Screens** the incident with a sergeant, either at the scene or telephonically

**Sergeant**

    5. **Reviews** the incident and **advises** the officer whether to order the evaluation

**Officer**

    6. **Takes** the subject into protective custody

    7. **Arranges** for the subject to be transported via ambulance or patrol car to the closest appropriate hospital

    8. **Completes** the *Emergent Evaluation Card*

    9. **Provides** the *Emergent Evaluation Card* to the ambulance driver or hospital social worker

    10. **Completes** a General Offense report with the emergent evaluation template

        a. **Lists** "Crisis" in the offenses block, in addition to any offenses that were committed

        b. **Describes** the circumstances of the incident and the disposition of the subject

        c. **Includes** witness information

**Sergeant**

    11. **Approves** GO report

**Data Center**

    12. Immediately **transcribes** GO report

    13. If the hospital requests a copy of the GO report, **faxes** the report to the hospital

**16.110–PRO–3 Taking a Subject into Custody by Order of a Designated Mental Health Professional (DMHP)**

**Communications**

    1. **Receives** request from a DMHP for officers to assist with field evaluation, an emergent detention, or service of a court order

    2. **Dispatches** two officers to the call

        a. **Dispatches** at least one CIT-Certified officer, if one is available

**Officers**

    3. Upon the request of the DMHP, **take** the subject into protective custody

4. **Screen** the incident with a sergeant before taking the subject into custody or entering if:
- The subject is likely to resist custody,
- The subject is barricaded,
- The subject has a history of violence or weapons, or
- Forced entry is necessary

**Sergeant**

5. If necessary, **consults** with the CRT sergeant or a CIT-Certified sergeant via Communications

**Officers**

6. **Arrange** for the subject to be transported via ambulance or patrol car to the closest appropriate hospital, or the hospital requested by the DMHP

7. **Complete** the *Emergent Evaluation Card*

8. **Provide** the *Emergent Evaluation Card* to the ambulance driver or hospital social worker

9. **Complete** a General Offense report with the emergent evaluation template
    a. **List** "Crisis" in the offenses block, in addition to any offenses that were committed
    b. **Describe** the circumstances of the incident and the disposition of the subject
    c. **Include** witness information

**Sergeant**

10. **Approves** GO report

**Data Center**

11. Immediately **transcribes** GO report

12. If the hospital requests a copy of the GO report, **faxes** the report to the hospital

## 16.110–PRO–4 Referring a Subject to CSC

**Officer**

1. **Conducts** a complete investigation

    a. **Checks** subject's name through WACIC and FORS for excluding factors:

- Warrants
- Violent offense conviction within the past 10 years
- Sex offender status within the past 10 years
- Juvenile (Under 18)

    b. **Assesses** subject's imminent danger of serious harm to self, others, or property; or grave disability

    c. **Identifies** elements of crime, if any

2. **Determines** that the subject is appropriate for CSC referral (See 16.110-POL-5.4a)

3. **Notifies** potential crime victim(s) of the diversion option

    a. **Considers** any objection to diversion

4. **Asks** the subject if he or she is interested in being referred to CSC

    a. **Emphasizes** that referral is voluntary

b. If the subject does not want to be referred and arrest is possible, **considers** making the arrest

5. **Screens** incident with sergeant (either in-person or telephonically, unless this Manual requires an in-person screening {i.e., Type II force}) if:

a. The subject was **handcuffed**

b. The officer will be **transporting** the subject to CSC

c. There was a use of reportable **force**

d. The officer is **unsure** as to if the subject meets the intake criteria

e. The officer will be **diverting** the subject to CSC instead of KCJ

6. **Advises** Communications to contact the CSC, or **contacts** the CSC via phone (682-2371) to screen for availability

7. **Arranges** for transport to CSC, either in a patrol car or the Mobile Crisis Team (MCT) vehicle

a. If the subject is being referred to CSC instead of jail, it is preferable, but not necessary, for an officer to make the transport

8. **Completes** a GO report

a. **Documents** the incident, including witnesses and victims

b. **Describes** elements of crime, if applicable

c. **Confirms** that no disqualifying criteria exist

d. **Selects** "CSC Diversion" from the "Arrest Disposition" box in GO suspect linkage, if applicable
- Subjects diverted to CSC will be listed as "arrested" in the entity section of the GO report

**CSC Staff**

9. **Completes** the "Arrest Referral Tracking Sheet" and "Notice of Diversion to CSC," if applicable

a. If the referring officer requested notification, **contacts** the referring officer as soon as they are able to advise if the individual declined services and will be leaving the facility or has already left the facility

b. If an individual who was subject to arrest declines services, **contacts** the appropriate prosecuting attorney

**16.110–TSK–1 Voluntary Mental Health Hospitalization**

When facilitating a voluntary mental health hospitalization, the **officer:**

1. **Receives** request from a subject for voluntary mental health hospitalization

2. **Arranges** for the subject to be transported via ambulance to the closest appropriate hospital

3. **Completes** the *Emergent Evaluation Card*

4. **Provides** the *Emergent Evaluation Card* to the ambulance driver

5. **Completes** a General Offense report

    a. **Lists** "Crisis" in the offenses block

    b. **Describes** the circumstances of the incident and the disposition of the subject

    c. **Routes** GO report to CRT

**16.110–TSK–2 Contacting Subjects Who are in a Behavioral Crisis but are not Going to be Referred to the Crisis Solutions Center, for Involuntary Mental Health Evaluation or Criminal Charges**

When contacting subjects who are in a behavioral crisis but are not going to be referred for involuntary mental health evaluation or criminal charges, the **officer** (at his or her discretion):

1. **Contacts** the Crisis Clinic Supervisor at (206) 461-3210 ext. 1

2. **Obtains** case management history, as applicable

3. **Obtains** contact information for the case manager, as applicable

4. **Contacts** the case manager (or after-hours staff) to advise of police contact

5. **Completes** a General Offense Report, routed to CRT. (All behavioral crisis contacts must be documented consistent with 16.110-POL-5.9.)

---

Site Disclaimer: The Seattle Police Department's website was developed to provide general information. Data contained at this location is generally not reviewed for legal sufficiency. SPD documents displayed are for reference purposes only. Their completeness or currency are not guaranteed. Links or references to other information or organizations are for reference only and do not constitute an endorsement.

© Copyright 1995-2015 City of Seattle

**APPENDIX C**

**NYPD's AIDED Card**



# AIDED REPORT WORKSHEET

PD 304-152b (Rev. 11-98)

| PCT. | Aided # |
|---|---|

Jurisdiction Code ___ ___  Card No. ___ of ___

| Date of Occ. | Time of Occ. | Sex | Race | Age | Date of Birth |
|---|---|---|---|---|---|

| Surname | First Name | M.I. |
|---|---|---|

| Address | Apt. No. | City | State | ZIP |
|---|---|---|---|---|

Aided Homeless? ☐ Yes ☐ No

Telephone: Home: ( )    Work: ( )

Place of Occ.: ☐ in front of ☐ opposite ☐ inside of ☐ subway at

☐ Subway Line: _____    Is Aided victim of a crime? ☐ Yes ☐ No

☐ Sick/Injured Person
☐ Sick/Injured MOS on Duty
☐ Abused/Abandoned/ Neglected Child/etc.

☐ Emotionally Disturbed
☐ Runaway Child
☐ Bicycle Involved (Explain in Details)

☐ Lost Person
☐ Unconscious
☐ Deceased
☐ Other (Explain in Details)

Medical Aid was:  refused ☐    ACR/PCR #

Removed To: ☐ Hospital ☐ Morgue ☐ N/A (which?)_____

Treated by _____    Admission #: if unidentified and hospitalized

**Notification:** Required if Aided is admitted or dies

| Name | Relationship |
|---|---|
| Address | Phone |

| If Notification Was Made: | Time | Date | Made by (Name/Tax #) |
|---|---|---|---|

Children or Dependent Adults Uncared for? ☐ Yes ☐ No  (If Yes: indicate their disposition under Details on the reverse of this card.)

City Involved? ☐ Yes ☐ No  If Yes, Dept. or Agency Involved

NOTE: If City may be involved, enter in Details: If M.O.S. witnessed incident and M.O.S. who examined scene, roadway/sidewalk condition and any contributing factors.

**Notifications** to: ☐ Harbor Unit ☐ Missing Persons Squad
☐ _____Pct. Youth Officer ☐ Emergency Service Unit

Additional Reports prepared: (e.g., **Domestic Incident Report**, etc.)

Complaint No._____ Pct._____

Exposure Report #_____

**If EDP: Prior History?** ☐ Yes ☐ No ☐ Unk.  **Actions of EDP (Check all that apply):**

☐ Attempted physical harm to self    ☐ Physically threatened others    ☐ Unable to care for self
☐ Attempted physical harm to others    ☐ Verbally threatened others    ☐ Other (specify)
☐ Placed self in dangerous situation    ☐ Spoke of harming self or others

**If CPR** administered (by MOS):
Mouth to Mouth ☐ Yes ☐ No
Aided resuscitated ☐ Yes ☐ No

**O.C. Spray Used:** ☐ Yes ☐ No    If used, list in the Details section the rank, name, and tax registry number of each MOS who discharged spray.

**Details (for all Aided Cases):** Give nature of any injury or illness. When CPR is administered by non-ESU MOS, identify MOS administering and list protective equipment used (e.g. mask, gloves, etc.).

| Reported By: | Rank | Name (Type or Print) | Tax # | Command | Signature |
|---|---|---|---|---|---|
| Reviewed By: | Rank | Signature | Tax # | Command | |

PD 304-152b rear.pmd     1     9/5/2007, 1:28 PM

**APPENDIX D**

**NYPD's ESU Form**



**Main Menu**  |  📷 **(Log-out)**

## ESD2 Form

**Date of Report**
04/28/2016 📅

**Emergency Service Squad**
E6
*Check for proper ESS Number*

**Case Number**

**Job Number**

**Stat Tracking Code**

**E.S.U. Classification**
1 ———————— AIDED CASES ————————

**ESU Crew Count**
2

**Time Received**

**Time Assignment Completed**

**Total Assignment Time**

**Call Originated From:**
☑ C.U  ☐ DIV  ☐ Pick UP  ☐ DIV Assign  ☐ Land Line  ☐ Other

**Rank/Name of PCT. Reporting Officer**

**PCT/REC**

Other:

| Designation | | | Special Vechicle# | | |
|---|---|---|---|---|---|
| TK-1 | > | | BearCat | > | |
| Vehicle # | < | | Vehicle # | < | |

**Harbor Launch**
Launch # 3
Launch # 4
Launch # 5
Launch # 8
For multiple selections, hold down the <Ctrl> key while clicking the desired selections.

**Aviation Unit**
15
16
18
19
For multiple selections, hold down the <Ctrl> key while clicking the desired selections.

**Conditions:**

| | | | | | |
|---|---|---|---|---|---|
| ☐ 10-13 | ☐ Perp Search | ☐ DOA Removal | ☐ Impalement | ☐ Water/Boat Incident | ☐ 10-44 Susp Pkge |
| ☐ Person W/Gun | ☐ Evid Search | ☐ Safeguard Weapon | ☐ Building Collapse | ☐ Subway-Rail | ☐ Fire-Explosion |
| ☐ EDP | ☐ Warrant | ☐ 10-53 PIN | ☐ Const Accident | ☐ Elevator/Escalator | ☐ Precautionary |
| ☐ Jumper | ☐ Asst MOS | ☐ 10-53 | ☐ Machine Accident | ☐ Gain Entry | ☐ Dangerous Condition |
| ☐ Barricade Perp | ☐ Asst Other Agency | ☐ 10-54 AIDED | ☐ Aircraft Incident | ☐ Animal Cond | ☐ Other |

Dec 16 2009 11:42am  P001/004    Fax:

Other: [                    ]

[ **Save** ]          [ **Save & Next --->** ]

Powered by NYPD/v9.0.0.0
Copyright © 2016, NYPD/ All rights reserved

Dec 16 2009 11:42am  P002/004          Fax:

# APPENDIX E

# Seattle's Crisis Contact Form

TT_VERSION 1.0

### CRISIS TEMPLATE

NOTE:
    Include corresponding Entity with this template.
    Relate report to your CAD call (CP) using the EVENT button.

OFFICER/INCIDENT INFORMATION:
☐ DICV                                          CIT Certified? [▼]
☐ BODYCAM                          Supervisor responded to scene: [▼]

Certified Crisis Intervention Officer:
    ☐ Requested        ☐ Dispatched        ☐ Arrived

CONTACTED NAME:
Last: [_____]            Served in the Military?:
First: [_____]                    [____▼]

NATURE OF CRISIS (Check all that apply):
    ☐ Biologically Induced (Schizophrenia / Depression / Anxiety)
    ☐ Medically Induced (Traumatic Brain Injury / UTI)
    ☐ Chemically Induced (Crack / Meth / PCP / Heroin)
    ☐ Excited Delirium
    ☐ Unknown

BEHAVIORS (Check all that apply):
☐ Neglect of Self Care                ☐ Disorganized speech / communication
☐ Disorientation / Confusion          ☐ Disorderly / disruptive behavior
☐ Unusually frightened or scared      ☐ Belligerent/uncooperative, angry
☐ Hopeless / Depressed                ☐ Bizarre, unusual behavior
☐ Suicide behaviors, threat/attempt   ☐ Mania
☐ Out of touch with reality           ☐ Hallucinations / Delusions
☐ Other   [_____]

THREATS / VIOLENCE / WEAPONS:
Did subject use / brandish a weapon?      [_____▼]
Type of weapon (check all that apply)
☐ Knife      ☐ Gun      ☐ Other (Specify) [_____]
Did subject threaten violence toward another person?  [_____▼]
If so, to whom? [_____]

INCIDENT INJURIES:
Were there any injuries during the incident?  [ ▼ ]
If yes, please describe:

[                                                        ]

TECHNIQUES USED:
☐ VERBALIZATION          ☐ HANDCUFFS          ☐ REPORTABLE FORCE USED

DISPOSITION  (Check all that apply)
☐ Unable to Contact
☐ Chronic Complaint
☐ Social Service / Alcohol and Drug / Treatment Referral
☐ Resources Offered / Declined
☐ MCT (Mobile Crisis Team)
☐ GRAT (Geriatric Regional Assessement Team)
☐ Shelter
☐ No Action Possible / Necessary
☐ Case Manager / MH Agency Notified
☐ DMHP / Referral
☐ Crisis Clinic
☐ Emergent Detention / ITA          Hospital: [                    ]
☐ Voluntary Committal              Hospital: [                    ]
☐ Arrested
        If no arrest, chargeable offense?  [ ▼ ]

NARRATIVE:
[                                                        ]