# EXHIBIT 38

```
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    Case No. 16-cv-5845(AJN)
      - - - - - - - - - - - - - - - - - - - -x
 4
      DORRELIEN FELIX and MARGALY FELIX,
 5    individually, and JONATHAN C. MOORE, as
      Administrator of the Estate of DAVID
 6    FELIX,
                              Plaintiffs,
 7
                -against-
 8
      THE CITY OF NEW YORK, a municipal entity;
 9    HAROLD CARTER and VINCENTE MATIAS,
      individually and in their official
10    capacities as New York City Police
      Detectives; the BRIDGE, Inc., a domestic
11    not-for-profit organization; and JANE DOE
      (as of yet unidentified employee of the
12    Bridge),
                              Defendants.
13    - - - - - - - - - - - - - - - - - - - -x
14                    99 Park Avenue
                      New York, New York
15
                      October 23, 2019
16                    12:48 p.m.
17       DEPOSITION of THE CITY OF NEW YORK,
18    one of the Defendants in the above-
19    entitled action, by JAMES FULTON, held at
20    the above time and place, taken before
21    Arthur Hecht, a Shorthand Reporter and
22    Notary Public of the State of New York,
23    pursuant to the Federal Rules of Civil
24    Procedure, and stipulations between
25    Counsel.
```

Page 2

APPEARANCES:

BELDOCK, LEVINE & HOFFMAN, L.L.P.
Attorneys for Plaintiff
99 Park Avenue
New York, New York 10016
BY: JONATHAN C. MOORE, ESQ.
   -and-
   LUNA DROUBI, ESQ.

GEORGIA PESTANA, ESQ.
CORPORATION COUNSEL, THE CITY OF NEW YORK
100 Church Street
New York, New York 10007
BY: BRIAN FRANCOLLA, ESQ.

ALSO PRESENT: PETER J. CALLAGHAN

* * *

Page 3

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

* * *

Page 4

Fulton

JAMES FULTON, called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY
MR. MOORE:

Q. Good afternoon, Captain Fulton. Can you state your full name for the record and spell your last name?
A. It's James Fulton, F-U-L-T-O-N.
Q. Do you prefer being called Mr. Fulton or Captain Fulton?
A. Mr. Fulton's fine.
Q. Okay.
A. Mr. Fulton's -- captain...
Q. Can you tell us what your current employment is?
A. I'm retired.
Q. Retired. And where are you retired from?
A. NYPD.
Q. When did you retire?
A. May of this year.
Q. Congratulations.

Page 5

Fulton

A. Thank you.
Q. How many years did you do?
A. Approximately 28.
Q. Twenty-eight?
A. Yeah, about that.
Q. And was your retirement voluntary?
A. Yes.
Q. At the time of your retirement, what rank were you?
A. Captain.
Q. Okay. In April of 2015, you were also the rank of captain?
A. Yes.
Q. Okay. When did you -- when were you promoted to captain?
A. I was promoted in 2003.
Q. 2003?
A. Yes.
Q. What's your date of appointment to the police department?
A. 1991.
Q. When?
A. April 30, 1991.

1  Fulton
2  Q. 1991?
3  A. Yes.
4  Q. Okay.
5  A. And captain, October 31st.
6  Q. October --
7  A. 31st, Halloween.
8  Q. All right. In April of 2015,
9  what was your assignment?
10  A. I was the executive officer of
11  the firearms and tactics section.
12  Q. And when did they -- where were
13  your offices?
14  A. Rodmans Neck in the Bronx.
15  Q. How long were you the executive
16  officer there?
17  A. Close to six years.
18  Q. And before you were the
19  executive officer of the firearms and
20  tactics section, what was your assignment?
21  A. Leading up to that, I was in
22  narcotics.
23  Q. How long were you in narcotics?
24  A. Six years.
25  Q. Where, in the Bronx?

1  Fulton
2  A. That was my last assignment, but
3  I was in the Bronx, Queens, Brooklyn
4  North, Brooklyn South.
5  Q. Okay. When you retired, were
6  you still in -- the executive officer of
7  the firearms and tactics section?
8  A. Yes.
9  Q. So explain to us what your
10  duties and responsibilities were as an
11  executive officer for the firearms and
12  tactics section.
13  A. I was in second in command
14  in the -- you know, I usually did four to
15  twelves, and qualifications of the
16  firearms for the members of the service, I
17  oversaw that, and --
18  Q. You oversaw the -- oversaw the
19  qualifications for members of service on
20  the use of weapons?
21  A. On firearms, the firearm
22  qualifications.
23  Q. Okay.
24  A. They're annual, so they would
25  have to come twice a year.

1  Fulton
2  Q. Right.
3  A. And then also recruit training
4  would come up to us for firearms training.
5  Q. Who was your supervisor there?
6  A. My -- Raymond Caroli --
7  Inspector Raymond Caroli -- or chief,
8  sorry Chief Caroli. He was an inspector
9  at the time.
10  Q. Spell the last name.
11  A. Ray Caroli, C-A-R-O-L-I.
12      MR. MOORE: Off the record.
13      [Discussion held off the
14  record.]
15  Q. Anything else you can tell us
16  about your duties and responsibilities as
17  the XO of the firearms and tactics
18  section?
19  A. That's it, I just supervised,
20  you know, lieutenants, sergeants, cops,
21  make sure on a daily basis they were given
22  proper training, firearms training.
23  Q. From time to time, were you
24  asked to conduct an investigation or be a
25  part of an investigation into an officer's

1  Fulton
2  discharge of their weapon?
3  A. Yes.
4  Q. How did that come about?
5  A. The boroughs -- each borough
6  would have -- if there was a shooting
7  within the borough, they were responsible
8  to -- borough, on the borough level to --
9  before it went to the main firearms
10  discharge review board with the, you know,
11  the higher staff, I guess --
12  Q. Right.
13  A. -- the chiefs and stuff, they
14  would have to do an investigation and pass
15  it up -- and -- I guess they'd have to
16  have findings when, you know, the
17  shooting's a good shoot or not a good
18  shoot.
19      So part of it was they would
20  send me, through e-mail, to find out,
21  because we were from tactics, you know,
22  firearms and tactics, to take a look at
23  the situation -- the incident and deem if
24  there's any type of -- you know, how the
25  incident -- was it reasonable and if there

1 Fulton
2 was any, you know, maybe disadvantages or
3 tactics or advantages, tactical advantages
4 or disadvantages, and I must have done
5 over a hundred of them.
6 Q. When you say a hundred, you mean
7 a hundred where you assisted in the
8 overall investigation of somebody's
9 discharge of weapon?
10 A. Well, they would send me the
11 reports and I would have to, you know, do
12 a little -- like on tactics, one of the
13 sections, and I would have to comment on
14 it.
15 And sometimes it would come, you
16 know, you know, when they would do the
17 board, it wasn't like they did a board
18 right after the shooting, sometimes it
19 would be a year later, two years --
20 Q. Yes.
21 A. -- later, so, you know, I'd get
22 the information, they'd say, listen, we're
23 going to do a board on, like, these
24 shootings, from the borough standpoint, we
25 need, you know, a comment, on, you know,

1 Fulton
2 what you can see about tactics, I'd say
3 okay and I'd take a look at it.
4 And at first, I think Inspector
5 Caroli was doing them before I got there,
6 and when I got there, he made that one of
7 my assignments, so -- but I still would go
8 to him, you know, on occasion, you know,
9 and ask him for advice because, you now --
10 Q. Right.
11 A. -- some were a little more, you
12 know, difficult than others, so.
13 Q. So just so I understand, you
14 weren't the person who was actually
15 responsible for conducting the
16 investigation of a discharge of weapon,
17 but you would participate in that
18 process --
19 A. Yeah, it was after the fact, it
20 was like --
21 Q. Let me just finish the --
22 A. Okay.
23 Q. -- question.
24 A. Sorry.
25 Q. -- as part of the -- reviewing

1 Fulton
2 the tactics used, correct?
3 A. Yes, it would be after the fact.
4 It would be, you know, in hindsight, what
5 if -- you know, what do I -- like, you
6 know, like I said, six months, a year
7 later, they'd say this is -- this is the
8 facts, this is a video or whatever we have
9 on it, what do you see.
10 Q. So when you did the
11 investigation -- withdraw that.
12 Were there ever any occasion
13 where you yourself were responsible for
14 the overall investigation that was being
15 done by the firearms discharge review
16 board of a shooting?
17 A. No.
18 Q. Okay. So your involvement in
19 these shooting investigations by members
20 of service was always from the standpoint
21 of what tactics were used, whether they
22 were, you know, looking at the tactics
23 that were used?
24 A. Tactics and also if the shooting
25 seemed reasonable or not.

1 Fulton
2 Q. Seemed --
3 A. Seemed reasonable or not.
4 Q. Okay.
5 A. You know.
6 Q. So you were asked to -- you
7 would be asked to give an opinion as to
8 whether the shooting in a particular case
9 was -- reflected appropriate tactics, is
10 that -- is that correct?
11 A. They wouldn't ask -- they would
12 -- they would say they're going to send me
13 information, and then whatever information
14 I saw, if I saw -- because I was in
15 training, if I saw a tactical advantage
16 that the cops could have used, or a
17 tactical disadvantage that they used, I
18 would comment if I felt it needed to be
19 commented on.
20 Q. Okay. You also said -- I
21 believe you said that you would also be
22 asked to opine as to whether the shooting
23 was reasonable or not, is that correct?
24 A. Most times if it was a good --
25 if it was like a good shoot or a bad

Page 42

```
 1              Fulton
 2      Q.   Did you even know about that?
 3      A.   No.
 4      Q.   In the video we just observed,
 5   did you ever see anything in the hand of
 6   David Felix, any radio, any stick, any gun
 7   or anything?
 8      A.   I don't believe so.
 9      Q.   Okay.  And so for all the time
10   that they were struggling in front of that
11   door there, there was nothing in his
12   hands, correct, as far as you can recall?
13      A.   I didn't see -- yeah, I didn't
14   see anything.
15      Q.   And you never saw him actually
16   slug or punch any of the officers while
17   they were in the front there, correct?
18      A.   I didn't see that, no.
19      Q.   Okay.  Now, you say here and it
20   says here in the tactics section, after it
21   says the incident was reviewed by you
22   regarding tactics, it says the detectives
23   would have been prudent if they requested
24   additional backup personnel due to the
25   violent criminal past and mental history
```

Page 43

```
 1              Fulton
 2   of the perpetrator prior to their
 3   interaction, do you see that?
 4      A.   Yes.
 5      Q.   Is that an opinion you gave to
 6   Lieutenant Hatzoglou, is that an opinion
 7   you gave to him?
 8      A.   Yeah, that's from -- from what I
 9   gleaned from the information, that's what
10   I thought.
11      Q.   What do you mean by that, that
12   they would have been prudent to request
13   additional backup?
14      A.   Well, after -- you know, like I
15   said, after watching the video, their
16   size, they were outsized, you know, and,
17   you know, tactical -- like I said, I do
18   training, so tactical advantage would then
19   to probably, you know -- more people
20   there, you know, would have been prudent.
21      Q.   Well, you mention -- it mentions
22   here the mental history of the
23   perpetrator, so you were aware, were you
24   not, that this incident took place at a
25   facility that treats people with mental
```

Page 44

```
 1              Fulton
 2   health issues, you're aware of that,
 3   right?
 4      A.   I believe so, yes.
 5      Q.   A place called The Bridge,
 6   right?
 7      A.   Yes.
 8      Q.   You've heard of The Bridge
 9   before, right?
10      A.   Not -- I didn't work in
11   Manhattan, but from the incident.
12      Q.   Okay.  But you knew at the time
13   you were asked to review the tactics, that
14   the incident took place at a facility for
15   people who had mental health issues --
16      A.   Yes.
17      Q.   -- correct?
18      A.   Yes.
19      Q.   And you knew that -- were you
20   also advised that Mr. Felix had been
21   diagnosed as a paranoid schizophrenic?
22      A.   I mean, I don't know his
23   official diagnosis.  I know that -- I
24   believe that someone told the detectives
25   that he has, you know, he had a history of
```

Page 45

```
 1              Fulton
 2   mental illness.
 3      Q.   Right, and do you know what the
 4   history was, do you know that it was
 5   paranoid schizophrenia?
 6      A.   I didn't know the official -- I
 7   don't recall.  I don't recall.  I might
 8   have known it at the time, I don't recall,
 9   maybe.
10      Q.   Were you aware as to whether
11   there was a suggestion that he had not
12   been taking his medication?
13      A.   I don't recall that.
14      Q.   So in this situation, was it
15   your opinion that given the violent nature
16   of what they were looking for him for and
17   given his mental history prior to the
18   intersection, that these detectives should
19   have called a supervisor or called ESU
20   before going up there, was that your
21   opinion?
22      A.   No, I said it's prudent, it
23   would have been prudent if they did that.
24   It would have been -- it have been
25   prudent.
```

Page 62

1 Fulton
2 [Whereupon, at this time, the
3 reporter marked as Fulton Exhibit 1
4 the above-mentioned memo from the
5 chief of department to the police
6 commissioner for identification.]
7 Q. All right, let me hand you
8 what's been marked Fulton deposition
9 Exhibit number 1. The document you looked
10 at before was the -- Tobin 5 was the final
11 report for the firearms discharge review
12 board in the confines of the 9th Precinct
13 -- the document you looked at before,
14 which was Tobin Exhibit number 5, was from
15 the commanding officer of the patrol
16 borough of Manhattan South investigations
17 unit to the chief of department, correct?
18 A. That's from chief of department
19 to --
20 Q. No, this one here, this one
21 here.
22 A. This one?
23 Q. Yes.
24 A. This is from Manhattan South
25 investigations unit --

Page 63

1 Fulton
2 Q. Right.
3 A. -- to chief of department, yes.
4 Q. Okay. Now, the document I just
5 handed you which is Fulton Exhibit number
6 1 is a memo from the chief of department
7 to the police commissioner, correct?
8 A. Yes.
9 Q. Concerning the same matter,
10 right?
11 A. It is the same, yes.
12 Q. Yes. And there's a section in
13 here, if you look on page, I guess it's
14 page five, which is Bates stamped number
15 Defendant 2015, where the tactics,
16 assessment of tactics and procedure
17 appears, correct?
18 A. Yes.
19 Q. And that's similar to the one
20 that you made in the earlier document,
21 right?
22 A. It looks like what I said, but
23 that's not -- I didn't do this.
24 Q. No, I understand, but it's
25 repeating your --

Page 64

1 Fulton
2 A. It looks like it's repeating --
3 Q. Yes.
4 A. -- it's similar to what I wrote.
5 Q. And the recommendation, the
6 findings and recommendation -- well,
7 there's a finding of no violation of
8 department firearms policy, correct?
9 A. No violation firearms --
10 Q. And the recommendation was
11 retraining of Detective Carter, or
12 retraining of tactics --
13 A. Yes.
14 Q. -- correct?
15 A. Yes.
16 Q. And that's signed by Carlos
17 Gomez who's chief of department and it's
18 approved by chief of Jim O'Neill, correct?
19 A. That's what it says, yes.
20 Q. So that means the commissioner
21 of the police department signed off on
22 this investigation, right?
23 A. He approved it.
24 Q. Yes. Do you know if there was
25 ever any retraining provided to either

Page 65

1 Fulton
2 Carter or Matias?
3 A. I don't know, no.
4 Q. Well, look at page, on Tobin
5 Exhibit number 5, look at page six.
6 A. This one?
7 MR. FRANCOLLA: Yes.
8 Q. On subsection seven, where it
9 says Detective Carter attended the tactics
10 review session on April 26, 2016, do you
11 see that?
12 A. Okay.
13 Q. Would that have been retraining
14 for Detective Carter?
15 A. I -- yes, the tactics review
16 section is done at the range.
17 Q. At the range, right?
18 A. Yes, but I don't -- I don't
19 recall him coming, I don't -- me
20 personally, I don't remember seeing him or
21 doing, you know, this date or anything.
22 Q. As far as you understand, that
23 would reflect the fact that Carter was --
24 did get retraining on tactics on April 26,
25 2016, correct?

17 (Pages 62 - 65)

Page 66

1  Fulton
2  A. That's what it says, yeah.
3  Q. Okay. And when we talk about
4  the policy of isolation -- isolate and
5  contain, one of the other aspects of the
6  policy is that if necessary, you want to
7  call ESU or call a bus, right?
8  A. Uh-hum.
9  Q. That's part of the protocol when
10 dealing with EDPs?
11      MR. FRANCOLLA: Objection.
12 A. I mean, they call a bus for
13 EDPs.
14 Q. Yes.
15 A. For my knowledge.
16 Q. A bus referring to an ESU
17 vehicle or ambulance?
18 A. No, a bus is usually an
19 ambulance.
20 Q. Okay.
21 A. EMS.
22 Q. So what is the policy, to call
23 ESU or just call an ambulance?
24      MR. FRANCOLLA: Objection.
25 Q. If you know.

Page 67

1  Fulton
2  A. For what type of person?
3  Q. For an EDP.
4  A. You know, I got 28 years on, and
5  1991, you can see from that EDP, this one
6  you gave me, is 2013, so there's been
7  updates and numerous updates, you know,
8  you know, you know, I don't think every
9  EDP, unless they changed it, every EDP is
10 ESU, because --
11 Q. Every EDP is what?
12 A. Every EDP needs to request of
13 ESU, I think it depends on the nature of
14 the violence or maybe nowadays they call
15 ESU for every EDP they show up at, I don't
16 know.
17 Q. But in terms of calling for
18 assistance, you would call a supervisor
19 who would direct other officers
20 to respond?
21 A. Again, assistance when, when you
22 call an 85? You're just screaming on the
23 radio.
24 Q. No, I'm talking about before
25 they went in that building. Your judgment

Page 68

1  Fulton
2  was that it would have been prudent for
3  them --
4  A. Well, they could have called --
5  sometimes some guys call for just a radio
6  car to back me up, you know, let me get a
7  car over here for a nonemergency.
8  Q. Okay. Just so we understand
9  what we're talking about, it was your
10 opinion that the detectives -- it would
11 have been prudent for the detectives to
12 have requested additional backup personnel
13 prior to the interaction, right?
14 A. Yes.
15 Q. So that was before they even got
16 into contact with Mr. Felix, correct?
17 A. Yes, yes.
18 Q. Okay.
19 A. But like I say, I don't know
20 what type of, you know, backup -- there's
21 -- you know, you're saying the super --
22 they should have called the supervisor,
23 you know, they could have -- some guys,
24 like I said, they, you know, just call a
25 backup, an RMP, you know, not a --

Page 69

1  Fulton
2  Q. So what is that, a 1085, a 1013?
3  A. 1085, not emergency.
4  Q. Okay.
5  A. And they call and show up,
6  they're, like, hey, we're going in, you
7  know, so you know, we're going in to grab
8  this guy, can you just back up, you know,
9  go in the rear --
10 Q. Right.
11 A. -- because if he jumps out the
12 back or something, okay, you know.
13 Q. Exactly. And that was your
14 judgment that it would have been prudent
15 to do that was based on the violent
16 criminal past and mental history of Mr.
17 Felix, correct?
18 A. And the information I got and
19 also the video, I base that on, so I
20 looked at the video, I looked at the
21 information they gave me, the 49, and
22 that's what I wrote, that statement.
23 Q. But you're, just to be clear,
24 you say the detectives would have been
25 prudent to request additional backup