# EXHIBIT 41

**POLICE DEPARTMENT**
**CITY OF NEW YORK**

December 20, 2013

From:     Chairman, Patrol Borough Manhattan North Firearms Discharge Advisory Board

To:       Chairman, Department Firearms Discharge Review Board

SUBJECT:    **FINDINGS AND RECOMMENDATIONS**

1. On Tuesday, September 25, 2012, at approximately 1941 hours , on-duty Detective Edwin Mateo, tax registry #917121, on-duty Police Officer Andrew Kress, tax registry #906592, and on-duty Police Officer Michael Green, tax registry #930265,  assigned to Emergency Services Unit Truck #2, had the occasion to discharge their firearms.

2. On Friday, December 20, 2013 the Patrol Borough Manhattan North Firearms Discharge Advisory Board met and reviewed the facts and circumstances in this case.

3. The findings of the Board are:
   A. ____**X**____ No violation of Department Firearm Guidelines
   B. _____ Violation of Department Firearm Guidelines
   C. _____ Accidental Discharge—No Violation
   D. _____ Accidental Discharge—Violation

4. The Board recommends the following:
   A. ____**X**____ No Corrective action be taken
   B. _____ Member concerned to review laws and instructions RE: Discharge of Firearm
   C. _____ Member concerned to receive additional firearm instruction
   D. _____ Member to receive Tactics instruction
   E. _____ Other (Command Discipline or Charges and Specifications, etc.)

5. BOARD MEMBERS

| RANK | NAME | ASSIGNMENT | COMMAND | SIGNATURE |
|------|------|------------|---------|-----------|
| D.C. | O'Neill | X.O. | PBMN | |
| Insp. | Hurley | Adjutant | PBMN | |
| Capt. | Natale | C.O. | PBMN-IU | |
| Capt. | Weisberg | C.O. | DB | |
| Capt. | Charlson | C.O. | NBMN | |
| Capt. | Perez | X.O. | HBMN | |
| Capt. | Coates | X.O. | TBD3 | |
| Det. | ~~Carmichael~~ AUGUSTINE | Inv. | 24 DET. SQD. | |

DEF 16722

**POLICE DEPARTMENT
CITY OF NEW YORK**

June 13, 2014

From:   Chief of Department

To:     Commanding Officer, Patrol Borough Manhattan North

Subject: **FINDINGS OF DEPARTMENT FIREARMS DISCHARGE REVIEW BOARD**

1.    At 1941 hrs, September 25, 2012, Det. Edwin Mateo, Tax# 917121, assigned to Emergency Service Truck #2, did have occasion to discharge a firearm within your command.

2.    On January 21, 2014, the Department Firearms Discharge Review Board met and reviewed the facts and circumstances in this case. The Board concurs with your findings in this case.

3.    The officer concerned shall be notified without delay. Verification of this notification shall be forwarded to the Board, indicating time and date the officer was notified and the name of the commanding officer who made the notification.

4.    A copy of the Firearms Discharge Review Board's findings shall be placed in the member's command personnel folder.

Philip Banks III
CHIEF OF DEPARTMENT

**POLICE DEPARTMENT
CITY OF NEW YORK**

June 13, 2014

From:     Chief of Department

To:        Commanding Officer, Patrol Borough Manhattan North

Subject: **FINDINGS OF DEPARTMENT FIREARMS DISCHARGE REVIEW BOARD**

1.      At 1941 hrs, September 25, 2012, P.O. Andrew Kress, Tax# 940264, assigned to Emergency Service Truck #2, did have occasion to discharge a firearm within your command.

2.      On January 21, 2014, the Department Firearms Discharge Review Board met and reviewed the facts and circumstances in this case. The Board concurs with your findings in this case.

3.      The officer concerned shall be notified without delay. Verification of this notification shall be forwarded to the Board, indicating time and date the officer was notified and the name of the commanding officer who made the notification.

4.      A copy of the Firearms Discharge Review Board's findings shall be placed in the member's command personnel folder.

Philip Banks III
CHIEF OF DEPARTMENT

DEF 16724

**POLICE DEPARTMENT
CITY OF NEW YORK**

June 13, 2014

From:    Chief of Department

To:      Commanding Officer, Patrol Borough Manhattan North

Subject: **FINDINGS OF DEPARTMENT FIREARMS DISCHARGE REVIEW BOARD**

1.    At 1941 hrs, September 25, 2012, P.O. Michael Green, Tax# 930265, assigned to Emergency Service Truck #2, did have occasion to discharge a firearm within your command.

2.    On January 21, 2014, the Department Firearms Discharge Review Board met and reviewed the facts and circumstances in this case. The Board concurs with your findings in this case.

3.    The officer concerned shall be notified without delay. Verification of this notification shall be forwarded to the Board, indicating time and date the officer was notified and the name of the commanding officer who made the notification.

4.    A copy of the Firearms Discharge Review Board's findings shall be placed in the member's command personnel folder.

Philip Banks III
CHIEF OF DEPARTMENT

## POLICE DEPARTMENT
## CITY OF NEW YORK

December 20, 2013

From:        Chairman, Patrol Borough Manhattan North Firearms Discharge Advisory Board

To:          Chairman, Department Firearms Discharge Review Board

SUBJECT:     FINDINGS AND RECOMMENDATIONS

1. On Tuesday, September 25, 2012, at approximately 1941 hours , on-duty Detective Edwin Mateo, tax registry #917121, on-duty Police Officer Andrew Kress, tax registry #906592, and on-duty Police Officer Michael Green, tax registry #930265, assigned to Emergency Services Unit Truck #2, had the occasion to discharge their firearms.

2. On Friday, December 20, 2013 the Patrol Borough Manhattan North Firearms Discharge Advisory Board met and reviewed the facts and circumstances in this case.

3. The findings of the Board are:
   A. ____X____ No violation of Department Firearm Guidelines
   B. _____ Violation of Department Firearm Guidelines
   C. _____ Accidental Discharge—No Violation
   D. _____ Accidental Discharge—Violation

4. The Board recommends the following:
   A. ____X____ No Corrective action be taken
   B. _____ Member concerned to review laws and instructions RE: Discharge of Firearm
   C. _____ Member concerned to receive additional firearm instruction
   D. _____ Member to receive Tactics instruction
   E. _____ Other (Command Discipline or Charges and Specifications, etc.)

5. BOARD MEMBERS

| RANK | NAME | ASSIGNMENT | COMMAND | SIGNATURE |
|------|------|------------|---------|-----------|
| D.C. | O'Neill | X.O. | PBMN | |
| Insp. | Hurley | Adjutant | PBMN | |
| Capt. | Natale | C.O. | PBMN-IU | |
| Capt. | Weisberg | C.O. | DB | |
| Capt. | Charlson | C.O. | NBMN | |
| Capt. | Perez | X.O. | HBMN | |
| Capt. | Coates | X.O. | TBD3 | |
| Det. | ~~Carmichael~~ AUGUSTINE | Inv. | 24 DET. SQD. | |

DEF 16726

## POLICE DEPARTMENT
## CITY OF NEW YORK

December 16, 2013

From:    Shooting Team Leader, Patrol Borough Manhattan North

To:    Chief of Department

Subject:    **FINAL REPORT OF FIREARMS DISCHARGE FDRB #87s.-12**

## OPENING

On Tuesday September 25, 2012, at approximately 1941 hours, on-duty Detective Edwin Mateo, tax registry #917121, on-duty Police Officer Andrew Kress, tax registry #906592, on-duty Police Officer Michael Green, tax registry #930265, all assigned to Emergency Services Unit Truck #2, and other members of their unit were attempting to deploy a pole camera into 113 Morningside Avenue, Apartment #5D, when they were confronted by Mr. Mohamed Bah, a violent barricaded Emotionally Disturbed Person, wielding an eight (8) inch kitchen knife. Mr. Bah lunged at Detective Mateo and Police Officer Kress with the knife causing injuries to Detective Mateo. Detective Mateo deployed a less lethal Arwen 37 Less Lethal Munitions Launcher and Police Officer Kress deployed an X-26 Taser in an effort to stop the threat and attacks by Mr. Bah. The less than lethal devices were ineffective in stopping the threat posed by Mr. Bah. A third attempt to utilize a less lethal device was made when Sergeant Joseph McCormack, tax registry #919383, assigned to Emergency Services Unit Truck #2, deployed an M-26 Taser with negative results. As a result of the threat of imminent death or serious injury, Detective Mateo, Police Officer Kress, and Police Officer Michael Green discharged their service weapons a total of ten (10) times, striking Mr. Bah several times. Immediate medical aid was rendered by Detective Christopher Zaberto, tax registry #907614, assigned to Emergency Services Unit Truck #2, and Emergency Medical Personnel on the scene. Mohamed Bah was transported to St. Luke's Roosevelt Hospital Center where he succumbed to his injuries and was pronounced at 2016 hours, by Doctor Ralston. Detective Mateo, Police Officer Kress, and Police Officer Green were transported to New York Presbyterian – Weill Cornell Medical Center for treatment of tinnitus and non life threatening trauma related to the knife attacks by Mr. Bah. The details are as follows:

DEF 16727

## NARRATIVE

On Monday, September 24, 2012, Ms. Hawa Bah arrived at John F. Kennedy International Airport from her native country, New Guinea, Africa. Ms. Bah was in New York City with the intention of visiting her son, Mohamed Bah, who resided at 113 Morningside Avenue, Apartment #5D, New York, NY. Ms. Bah was concerned for her son's well being after being informed by family members that his recent behavior was strange and erratic. Upon arriving at the airport, Ms. Bah was met by her brother, Oumar Bah. The pair travelled to 113 Morningside Avenue, to try and speak with Mohamed. When Ms. Bah knocked on the door to apartment #5D, Mohamed answered but refused to allow her to enter. Mohamed appeared unkempt, disheveled, and had an apparently recent injury above his right eye. Mohamed told his mother that he did not want to talk and asked her to come back on the following day. Ms. Bah and her brother left the location and went to spend the night with her sister, Rokia Kaba, who resides at 857 Crotona Park North, Bronx, NY. The following day, Tuesday, September 25, 2012, Ms. Bah along with her niece, Bintou Kaba, travelled to 113 Morningside Avenue where they were met by Alpha Diallo, Mohamed's cousin. Ms. Bah and Mr. Diallo again attempted to speak with Mohamed. Mohamed answered the door for them however he was completely naked and again refused to allow them entry into his home. At approximately 1841 hours upon returning downstairs to the front of 113 Morningside Avenue, Mr. Diallo called 911 at the request of Ms. Bah. Ms. Bah then took the cell phone and reported to the 911 operator that her son had mental issues, was depressed, and was not acting right. Ms. Bah requested the police to respond to assist in obtaining medical treatment for Mohamed. At approximately 1843 hours, Police Officer Brian Stanton, tax registry #949693, and Police Officer Esmeralda Santana, tax registry #942819, assigned to 26th Precinct Sector Adam received a radio assignment of 10-54 EDP with a Psychiatric History. Lieutenant Robert Gallitelli, tax registry #928343, assigned as the 26th Precinct Platoon Commander, along with Police Officer Vincent Johnson, tax registry #948055, also responded to the radio assignment. The lieutenant and the sector both arrived at the scene at the same time. Upon exiting his RMP, Officer Stanton was met by Ms. Bah and Mr. Diallo in front of the building. Ms. Bah explained to Officer Stanton that her son was acting irrationally, but had no history of mental illness or violence. No mention was made of possible weapons. Officer Stanton relayed this information to the other responding officers. They all proceeded to apartment #5D, located on the 5th Floor and next to the stair well entrance. After reaching the 5th Floor, Officer Stanton positioned himself to the right of the door to apartment #5D. Officer Johnson positioned himself to the left side of the doorway. Officer Santana stood opposite the door and to the left next to the stairway railing. Lieutenant Gallitelli was positioned behind Officer Santana. Officer Stanton knocked on the door several times requesting that Mohamed open the door. The door partially opened with Mohamed standing behind it. Only the right side of Mohamed was visible. He was entirely naked with an eight (8) inch kitchen chef knife in his right hand. Mohamed yelled out, "it's not me, it's not me" and "I'm not Mohamed". Initially Officer Stanton and Officer Santana each placed one (1) of their feet in the doorway to block the closing of the door by Mohamed. When Officer Stanton observed the knife in Mohamed's hand, he stepped back and alerted Officer Santana of the large knife. Officer Santana stepped back at which time the door closed shut and the internal lock mechanism was engaged. Officer Stanton and Officer Santana informed the lieutenant of their observation of the knife. Lieutenant Gallitelli notified the radio dispatcher and requested the response of Emergency Services personnel for their assistance regarding a barricaded Emotionally Disturbed

DEF 16728

Person with a knife. Sergeant Joseph McCormack, tax registry #919383, and Detective Raul Gonzalez, tax registry #904057, assigned to ESU Truck #2, along with Detective Christopher Zaberto, tax registry #907614, and Police Officer Michael Green, tax registry #930265, assigned to ESU Truck Boy #2 and Detective Edwin Mateo, tax registry #917121, and Police Officer Andrew Kress, tax registry #906592, assigned to ESU Truck Adam #2, responded to the location. Upon arrival, the ESU personnel established the ESU protocols regarding a barricaded EDP. This included blocking the door peephole and securing the door from being opened by persons inside the apartment. The door's peephole was then punched out to enable a possible view into the apartment. The ESU personnel established an entry stack with Officer Kress as the lead bunker. Officer Kress was holding both a ballistic shield and a X-26 Taser, drawn for possible use. Detective Mateo was next in line with the Arwen (Anti Riot Weapon) Model 37 Munitions Non-Lethal Launcher which deploys a 37 millimeter less lethal projectile. Officer Green was next in line with the Y-Bar. Detective Zaberto was next with a water fire extinguisher. Sergeant McCormack was at the end of the stack with the M-26 Taser prepared for deployment. The door to the apartment was secured against opening from the inside, utilizing a rope tied to the door knob and the opposite stair railing. Several attempts were made to make contact with Mohamed and establish a dialogue. Mohamed was heard making noises on the other side of the doorway. Detective Gonzalez remained on the first floor. Sergeant McCormack requested the response of a Hostage Negotiation Team (HNT) and the Technical Assistance Response Unit (TARU). Lieutenant Gallitelli notified the Patrol Borough Manhattan North Duty Captain, Captain Perry Natale of the barricaded EDP. The City North Manhattan ESU Supervisor, Lieutenant Michael Licitra, tax registry #906642, responded to the location to assess and supervise the ESU personnel. After being informed of the barricaded situation by Detective Gonzalez, Lieutenant Licitra directed Detective Gonzalez to utilize a pole camera via the fourth floor apartment below apartment #5D. The pole camera was deployed from the fire escape with intention of observing the 5th floor apartment through the rear windows. Drapes covering the windows however prevented any possible surveillance. The Hostage Negotiation Team, supervised by Captain Jeffrey Hart, Manhattan Detective Borough, interviewed Ms. Bah regarding her son. They then attempted to establish a dialogue by contacting Mohamed's cell phone. The calls were not answered and went straight to voicemail. An attempt to make an observation through the door peephole failed due to poor visibility in the darkened room. Lieutenant Licitra then determined that a partial breaching of the apartment door was necessary to deploy a pole camera over the top of the door frame to ascertain the position of the Emotionally Disturbed Person. There was no plan or intention to enter into the apartment to engage Mr. Bah. The rope end tied to the stairway railing was freed with Sergeant McCormack now holding the end of rope tight to prevent the door from opening. The rabbet tool was placed into the door frame and the door was partially opened to allow the pole camera to be hoisted above the door into the apartment. The camera showed Mohamed, now wearing a t-shirt and shorts, standing in the center of the room still holding the knife in his right hand. Mohamed then advanced towards the door and from the inside, grabbed the door and violently pulled it completely open into the apartment. Mr. Bah was now in close proximity to the front door and still brandishing the knife, waving it around at Officer Kress and the ESU personnel. Officer Kress advanced approximately two (2) feet into the apartment and while pointing the X-26 Taser at Mohamed, ordered him to drop the knife. Mohamed lunged towards Officer Kress and slashed him with the knife several times in the chest area of the bunker vest causing damage. In response Officer Kress deployed the X-26 Taser which was ineffective against Mohamed.

DEF 16729

Detective Mateo then advanced and deployed the Arwen Model 37 Munitions Less Lethal Launcher and discharged two (2) hard plastic less lethal rounds at Mr. Bah which were also ineffective. Mr. Bah then turned and lunged at Detective Mateo with the knife striking him in the left shoulder causing blunt trauma. A struggle ensued involving Det. Kress, Det. Mateo, and Mr. Bah, with Mr. Bah lunging wildly at both Detective Mateo and Officer Kress with the knife. Sergeant McCormack then heard Detective Mateo yell, "He has a knife." Sergeant McCormack advanced into the apartment and reaching over Detective Mateo, deployed the M-26 Taser at Mr. Bah. The taser was ineffective. Lieutenant Licitra then heard one (1) unidentified ESU member state, "he's stabbing me, shoot him." Detective Mateo, Officer Kress and Officer Green discharged their service weapons at Mr. Bah, striking Mr. Bah numerous times. Detective Mateo discharged five (5) rounds from his service weapon, a Glock, 9MM, Model 19. Officer Kress discharged three (3) rounds from his service weapon, a Sig Sauer, 9MM, Model P226. Officer Green discharged two (2) rounds from his service weapon, a Glock, 9MM, Model 19. As a result, Mohamed Bah was struck several times about the torso. Detective Zaberto, a certified paramedic, immediately rendered medical aid to the injured Mr. Bah. Emergency Medical Services personnel responded from the fourth (4th) floor and proceeded to treat Mr. Bah for the gunshot wounds he had sustained. Lieutenant Gallitelli notified Captain Natale of an MOS involved shooting. Captain Natale requested a Level 1 Mobilization for crowd and traffic control. Mohamed Bah was removed to St. Luke's Roosevelt Hospital Center for the treatment of his gunshot wounds. Lieutenant Licitra conducted a firearms check of the ESU personnel. Detective Mateo, Officer Kress and Officer Green informed Lieutenant Licitra that they had each discharged their firearms. An inspection of the three (3) firearms confirmed the recent discharges. Detective Mateo's firearm contained eleven (11) live rounds, one (1) in the chamber and ten (10) in the magazine. Officer Kress' firearm contained thirteen (13) live rounds, one (1) in the chamber and twelve (12) in the magazine. Officer Green's firearm contained fourteen (14) live rounds, one (1) in the chamber and thirteen (13) in the magazine. Captain Matthew Galvin, the Emergency Services Unit Duty Captain responded to the scene and inspected Sergeant McCormack's and Detective Zaberto's firearms which did not reveal any recent discharge. Detective Mateo, Officer Kress and Officer Green were removed to New York Presbyterian – Weill Cornell Medical Center for treatment of tinnitus and non life threatening trauma related to the knife attacks by Mr. Bah. At 2016 hours, Mohamed Bah was pronounced DOA by Dr. Rolston.

## LESS-LETHAL FORCE OPTIONS

Police Officer Kress deployed the X-26 Taser, serial #X00-537448, at the armed subject at a distance of three (3) to seven (7) feet. Although the darts appeared to make contact with the subject the Taser proved ineffective. After the first Taser attempt failed, Detective Mateo deployed the Arwen (Anti Riot Weapon) Model 37 Less Lethal Munitions Launcher which deploys a 37 millimeter less lethal projectile, serial #M65 0394, discharging one (1) less lethal round at the armed subject. The investigation at this time is unable to determine whether the less lethal round actually struck the target subject but he remained unaffected following its deployment. In quick succession with the deployment of the Arwen Model 37 Less Lethal Munitions Launcher, Sergeant McCormack deployed the M-26 Taser, serial #P3-024206, at the

DEF 16730

armed subject at a distance of three (3) to seven (7) feet. Although the darts appeared to make contact with the subject the Taser proved ineffective.

## DISTRICT ATTORNEY

Several conferrals were held with Assistant District Attorney Shannon Lucey and it was determined that the Subject Members of the Service were fully cooperative with the New York County District Attorney's Office and their actions were found to be justified by a grand jury. On Monday, December 2, 2013 Assistant District Attorney Shannon Lucey stated that the investigation conducted by her office was concluded and clearance was given to interview the Subject Members of the Service.

## MOS SUBJECTS

| Name | Rank | Shield | Tax # | Command | Tour |
|------|------|--------|-------|---------|------|
| Edwin Mateo | Det. | 1496 | 917121 | ESS 2 | 1515x2350 |
| Andrew Kress | P.O. | 10841 | 906592 | ESS 2 | 1515x2350 |
| Michael Green | P.O. | 3108 | 930265 | ESS 2 | 1515x2350 |

## MOS SUBJECT STATEMENTS

All member of the service subjects were formally interviewed under the provisions of Patrol Guide procedures 206-13 and 203-08. Detective Kress and Detective Green were represented by Michael Martinez, attorney for the Patrolmen's Benevolent Association. Detective Mateo was represented by James Moschella, attorney for the Detective's Endowment Association, and Detective Frank Ciccone, Welfare Officer Brooklyn South. The interviews were electronically recorded and are on file in the office of the Patrol Borough Manhattan North Investigations Unit.

## Detective Edwin Mateo, tax registry #917121, ESS 2

Detective Mateo stated that on Tuesday, September 25, 2012, he was assigned to Emergency Services Unit Truck #2 with Police Officer Kress as his partner in the "Adam" car. During the course of their third (3rd) platoon tour of duty, they were directed to respond to 113 Morningside Avenue, Apartment #5D, regarding an Emotionally Disturbed Person. Upon their arrival, Det. Mateo and Officer Kress donned their gear and ESU protocols regarding a barricaded EDP were established. While in the front vestibule of the building Det. Mateo and other ESU personnel were encountered by Ms. Bah who informed them that her son was in the apartment naked, not acting like his usual self, and in possession of a knife. An entry stack was assembled at the top of the stairway in front of the apartment door. Det. Mateo, attired in his ballistic helmet, his heavy vest, and in possession of an Arwen Model 37 Less Lethal Munitions Launcher, was directly behind Officer Kress. Det. Mateo was followed by Officer Green and Det. Zaberto, with Sgt. McCormack to the left of Det. Mateo. A rope was tied to the door knob and then attached to the stair railing to ensure that the door would not be opened from inside of

DEF 16731

the apartment. Det. Mateo heard Mr. Bah reciting, from inside the apartment, what he perceived to be some type of prayer while Officer Kress attempted to establish a dialogue with Mr. Bah. However, Officer Kress received no direct response from Mr. Bah. In an attempt to establish a visual of the apartment's interior to ascertain the position of Mr. Bah, the peep hole was removed from the apartment door. Upon observing that the interior was unlit a "chem-light" was inserted therein, however negligible visibility was attained. Other ESU personnel also made an attempt utilizing a pole camera to establish a visual of the interior of the apartment, via the exterior apartment windows located adjacent to the fire escape. However the windows were obscured by black curtains thus yielding negative results. Lt. Licitra, now at the location, then determined as per ESU protocol that a rabbet tool would be utilized to breach the door in order to insert the pole camera into the apartment. The rope securing the door was untied from the stair railing with Sgt. McCormack now holding the untied end of the rope, the door was partially breached with the rabbet tool, and the pole camera was inserted to ascertain the position of Mr. Bah. Lt. Licitra, utilizing the pole camera, obtained a visual of Mr. Bah and relayed to the other ESU personnel that Mr. Bah was behind the door with his left hand extended and his right hand behind his back. Immediately after, the apartment door was violently pulled open by Mr. Bah from inside of the apartment. After Officer Kress advanced forward to the interior of the apartment, followed by Det. Mateo, Mr. Bah raised his hand up and began slashing at Officer Kress' ballistic shield with a large knife. Officer Kress moved to his left and then deployed his X-26 Taser at Mr. Bah attaining minimal, if any, effect. Det. Mateo, approximately three (3) feet away from and directly facing Mr. Bah, who was still in possession of the knife, discharged his Arwen Model 37 Less Lethal Munitions Launcher two (2) times at Mr. Bah. The two (2) discharged rounds from the Arwen Model 37 Less Lethal Munitions Launcher did not have any effect on Mr. Bah who, while grunting incoherently, lunged towards Det. Mateo and slashed the left side of Det. Mateo's medical pouch with the knife. Sgt. McCormack, who was now positioned behind Det. Mateo, deployed his M-26 Taser over Det. Mateo's left shoulder, striking Mr. Bah. However, the lead wires from the deployed M-26 Taser made contact with Det. Mateo causing his body to "lock up" and he then fell backwards onto his left side. Det. Mateo, lying on his left side while positioned in the doorway of the apartment, observed the apartment door swinging in his direction but knowing Officer Kress was still in the apartment, kicked the door open. Mr. Bah again advanced towards Det. Mateo with the knife making contact with Det. Mateo's left arm. In fear for his life, Det. Mateo exclaimed "Shoot, shoot". Det. Mateo, still lying on his left side, with Mr. Bah above him, withdrew his firearm from its holster and using his right hand from a one hand unsupported position discharged approximately five (5) rounds in an upwards angle towards Mr. Bah who was standing. Det. Mateo was unaware if any other firearms were discharged. Mr. Bah fell to the floor and shortly thereafter Det. Mateo observed Det. Zaberto rendering aide to Mr. Bah while he conducted his own self assessment and the other involved ESU personnel checked themselves for injuries. EMT personnel then transported Mr. Bah to an awaiting ambulance that was downstairs at the location. Det. Mateo was instructed to go downstairs and while sitting inside of an ambulance Lt. Licitra took possession of his firearm and subsequently informed him that he had discharged five (5) rounds. Det. Mateo was then removed to New York Presbyterian – Weill Cornell Medical Center, where he was treated for tinnitus and remained overnight for elevated creatine levels. Det. Mateo stated that he was unsure if the rubber bullets discharged from his Arwen Model 37 Less Lethal Munitions Launcher had actually struck Mr. Bah. Det. Mateo additionally stated that at the time in which he discharged his firearm, he felt Mr. Bah was trying to kill him with the knife, placing him in

DEF 16732

fear for his life. Officer Mateo further stated other members of service were not in a crossfire position at the time of his firearms discharge.

**Police Officer Andrew Kress, tax registry #906592, ESS 2**

      Detective Kress stated that on Tuesday, September 25, 2012, while performing his duties at the rank of Police Officer, he was assigned to Emergency Services Unit Truck #2 with Detective Mateo as his partner in the "Adam" car. During the course of their third (3rd) platoon tour of duty, they were directed to respond to 113 Morningside Avenue, Apartment #5D, regarding an Emotionally Disturbed Person. Upon their arrival, Officer Kress and Det. Mateo donned their gear and ESU protocols regarding a barricaded EDP were established. As the other ESU personnel arrived, an entry stack was assembled at the top of the stairway in front of the apartment door wherein Mr. Bah was located. Officer Kress, acting as the lead bunker attired in his ballistic helmet and his heavy vest, possessed a ballistic shield in his left hand, and an X-26 Taser in his right hand. Det. Mateo, who was in possession of an Arwen Model 37 Less Lethal Munitions Launcher, was directly behind Officer Kress. Det. Mateo was followed by Officer Green and Det. Zaberto, with Sgt. McCormack to their rear. A rope was tied to the door knob and then attached to the stair railing to ensure that the door would not be opened from inside of the apartment. Det. Kress attempted several times to establish a dialogue with Mr. Bah who could be heard inside the apartment, but he received no response. In an attempt to establish a visual of the interior of the apartment, to ascertain the positioning of Mr. Bah, the peep hole was removed from the apartment door. Upon observing that the interior was unlit, a "chem-light" was inserted there-in, however negligible visibility was attained. Other ESU personnel also made an attempt utilizing a pole camera to establish a visual of the interior of the apartment, via the exterior apartment windows located adjacent to the fire escape. This attempt was unsuccessful due to the windows being obstructed with curtains, dark in color. After an unsuccessful attempt by Officer Green to manually pick both apartment door locks, it was then determined that a rabbet tool would be utilized to breach the door in order to insert the pole camera into the apartment. The rope securing the door was untied from the stair railing with Sgt. McCormack now holding the untied end of the rope, the door was partially breached with the rabbet tool, and the pole camera was inserted to ascertain the position of Mr. Bah. Immediately after, the apartment door was violently pulled open by Mr. Bah from inside of the apartment. Officer Kress determined that once the door opened, described as the "Fatal Funnel", knowing that he and the other ESU personnel were in such a confined / restricted area, and as per his training, he had to move forward and enter the apartment in order to give the other personnel a chance to also move in behind him. Now inside the apartment, Officer Kress noticed that Mr. Bah was to his left and holding a large knife in his hand and growling incoherently. After Mr. Bah did not comply with several orders given by Officer Kress to drop the knife, Officer Kress, from approximately three (3) to four (4) feet away from Mr. Bah deployed his X-26 Taser. Officer Kress was not sure if the darts from the discharged X-26 Taser struck Mr. Bah, however Mr. Bah then began making slashing motions with the knife, seemingly in an attempt to cut the wires leading from the X-26 Taser. Officer Kress, at the time could not recall if Mr. Bah was attired in anything that may have prevented the X-26 Taser darts from making contact with him. Mr. Bah charged at Officer Kress and started thrusting the knife at him in an overhand downward motion. Officer Kress was able to utilize his ballistic shield to push Mr. Bah away from him. Mr. Bah then charged at Officer Mateo who was positioned slightly inside the doorway of the

DEF 16733

apartment with Officer Green. At this point Officer Kress states he heard someone exclaim, "He's stabbing me". After the apartment door appeared to close for a moment Mr. Bah refocused his attack on Officer Kress, now thrusting the knife in an underhand upward motion and striking the lower abdomen portion of Officer Kress' heavy vest. At the time, Officer Kress states, he did not know if he or his vest was actually being struck because of the amount of force that Mr. Bah was utilizing. In fear of his life Officer Kress, now bladed slightly from Mr. Bah, dropped the X-26 Taser, drew his firearm from its holster, and using his right hand from a one hand unsupported position discharged what he believed were two (2) rounds in a forward direction towards the attacking Mr. Bah who was standing. When Officer Kress discharged his firearm he simultaneously heard other gunshots but did not know who was firing their weapon. With Mr. Bah now lying prone on the floor of the apartment, Officer Kress along with other ESU personnel, proceeded to search the apartment for any other possible occupants. Shortly after determining that no members of service suffered any injuries, including his own self assessment, Officer Kress, along with EMT personnel who were transporting Mr. Bah on a stretcher down the stairs, then went outside and sat down inside of the large ESU truck that was parked at the location. While sitting inside of the truck, it was then that Officer Kress realized his ballistic vest was in fact slashed in the lower abdomen area, and it was at this time Lt. Licitra took possession of his firearm and subsequently informed him that he had discharged three (3) rounds. Officer Kress was then removed to New York Presbyterian – Weill Cornell Medical Center, where he was treated and released for tinnitus. Officer Kress stated that at the time in which he discharged his firearm he felt Mr. Bah was trying to kill him with the knife, placing him in fear for his life. Officer Kress further stated other members of service were not in a crossfire position at the time of his firearms discharge, and at that moment he did not know if any additional forms of less lethal options were deployed.

### Police Officer Michael Green, tax registry #930265, ESS 2

Detective Green stated that on Tuesday, September 25, 2012, while performing his duties at the rank of Police Officer, he was assigned to Emergency Services Unit Truck #2 with Detective Zaberto as his partner in the "Boy" car. During the course of their third (3rd) platoon tour of duty, they were directed to respond to 113 Morningside Avenue, Apartment #5D, regarding an Emotionally Disturbed Person with a knife. Upon their arrival, and after Officer Green was given a Y-bar, he and Det. Zaberto donned their gear and then made their way to the fifth (5th) floor of the location. An entry stack was assembled at the top of the stairway in front of the apartment door wherein Mr. Bah was located. Officer Kress, acting as the lead bunker was in possession of both a ballistic shield and an X-26 Taser. Det. Mateo, who was in possession of an Arwen Model 37 Less Lethal Munitions Launcher, was behind Officer Kress. Officer Green, in possession of the Y-bar, was directly behind Det. Mateo. Officer Green was followed by Det. Zaberto, with Sgt. McCormack off to their side. A rope was tied to the door knob and then attached to the stair railing to ensure that the door would not be opened from inside of the apartment. Officer Green heard Mr. Bah yelling incoherently from inside the apartment while Officer Kress attempted, to no avail, to establish a dialogue with Mr. Bah. In an attempt to establish a visual of the interior of the apartment, to ascertain the exact location of Mr. Bah, the apartment door's peep hole was removed. However, because of poor lighting, negligible visibility was attained. Officer Green was then instructed by Lt. Licitra to pick the door locks in order to open the apartment door. This would be done not to gain entry into the

apartment but to allow a pole camera to be inserted into the apartment in an attempt to gain a visual of Mr. Bah. Officer Green was successful picking one of the door's locks, however there was a deadbolt on the door that could only be manually unlocked from within the apartment. A hydraulic rabbet tool was then utilized to create a large enough space between the door and its frame allowing the pole camera to be inserted into the apartment. Officer Green noticed that the rope was still tied to the door knob while he deployed the rabbet tool, and that it was still tense. However, he was unsure if the rope was still attached to the stair railing. After deploying the rabbet tool, Officer Green returned to his entry stack position behind Det. Mateo. Immediately after a visual of Mr. Bah inside the apartment was established, the apartment door was violently pulled open from the inside. Officer Kress was then heard yelling several times "Drop the knife" and subsequently the "clicking" noise of a deployed Taser was heard by the side of Officer Green's left ear. Officer Green recalled that at the time Sgt. McCormack was positioned behind him and to his left. Det. Mateo, who was electrically charged from the deployed Taser, then fell backwards and on top of Officer Green causing him to also become electrically charged. Officer Green then fell backwards into the hallway and dropped the Y-bar from his possession. Officer Green then observed the apartment door closing. However, Det. Mateo then rose to his feet and re-entered the apartment followed by Officer Green. Officer Green, now approximately one (1) foot inside the apartment, observed Mr. Bah jabbing a large stainless steel knife in a forward thrusting motion into Officer Kress' lower abdomen area while Officer Kress was holding the ballistic shield upwards in his left hand. Officer Green observed Officer Kress stepping backwards, away from Mr. Bah, while Mr. Bah continued to stab Officer Kress. Officer Green then drew his firearm from its holster and using his right hand from a one hand unsupported position discharged two (2) rounds in a forward direction towards Mr. Bah who was standing. Officer Green simultaneously heard "popping noises similar to fireworks" but was unsure if another MOS had discharged their firearm. Mr. Bah then fell to the ground and Sgt. McCormack directed the ESU personnel to conduct a search of the apartment. After doing so, Det. Zaberto immediately began to render aide to Mr. Bah, who was subsequently transported by Emergency Medical Personnel, via a stretcher, downstairs to an awaiting ambulance. Shortly after assuring that no Members of the Service suffered any injuries, including his own self assessment, Officer Green walked downstairs and sat down inside of the large ESU truck that was parked at the location. While sitting inside of the truck, Captain Galvin took possession of his firearm and informed him that he had discharged two (2) rounds. Officer Green was then removed to New York Presbyterian – Weill Cornell Medical Center, where he was treated and released for tinnitus. Officer Green was unsure if Officer Kress had discharged his X-26 Taser during their encounter with Mr. Bah but did observe an undetermined number of darts from a Taser in the body of Mr. Bah at the time Det. Zaberto was rendering aide. Officer Green stated at the time he discharged his firearm, he saw Officer Kress getting stabbed and was in fear for Officer Kress' life. Officer Green further stated at the time of his firearms discharge other Members of Service were not in a crossfire position, and at that moment he did not know if any additional forms of less lethal options were deployed.

DEF 16735

## MOS WITNESSES

| Name | Rank | Shield | Tax # | Command | Tour |
|------|------|--------|-------|---------|------|
| Robert Gallitelli | Lt. | N/A | 928343 | 26th Pct. | 1445x2330 |
| Michael Licitra | Lt. | N/A | 906642 | ESU | 1400x2235 |
| Joseph McCormack | Sgt. | 4353 | 919383 | ESS 2 | 1503x2400 |
| Christopher Zaberto | Det. | 6414 | 907614 | ESS 2 | 1515x2350 |
| Brian Stanton | P.O. | 11683 | 949693 | 26th Pct. | 1500x2335 |
| Esmeralda Santana | P.O. | 30635 | 942819 | 26th Pct. | 1500x2335 |
| Vincent Johnson | P.O. | 8537 | 948055 | 26th Pct. | 1500x2335 |

## MOS WITNESS STATEMENTS

Member of the service witnesses were formally interviewed under the provisions of Patrol Guide procedures 206-13 and 203-08. Lieutenants Licitra and Gallitelli were represented by Lieutenant Thomas O'Neill, Manhattan North director for the Lieutenant's Benevolent Association. Sergeant Joseph McCormack was represented by Sergeant Joseph Quinn, Transit Bureau Director of the Sergeant's Benevolent Association. Detective Christopher Zaberto was represented by Detective Thomas Driscoll of the Detective's Endowment Association. Police Officers Johnson, Santana, and Stanton, were represented by Police Officer Desmond Stafford, Patrolman's Benevolent Association Manhattan North Trustee. Their statements were electronically recorded and are kept on file at the Patrol Borough Manhattan North Investigations Unit. These statements helped form the basis of the narrative in paragraph #4.

## Lieutenant Robert Gallitelli, tax registry #928343, 26th Precinct

On Tuesday, September 25, 2012, Lieutenant Robert Gallitelli was performing a 1445x2330 tour, assigned as the 26th Precinct Platoon Commander, with Police Officer Vincent Johnson designated as his operator in marked RMP #5622. They were both attired in the uniform of the day. During the tour, Lieutenant Gallitelli and his vehicle operator responded to a radio signal of a 10-54 EDP at 113 Morningside Avenue. They arrived simultaneously with 26th Precinct sector Adam (Police Officer Santana and Police Officer Stanton). Lt. Gallitelli observed six (6) individuals at the location, one (1) of whom identified herself as Mr. Bah's mother. She stated that her son, who was in the apartment acting irrationally, did not have any psychiatric history, was unarmed and lived alone. Upon arriving at apartment #5D, an officer knocked on the door and Mr. Bah partially opened it standing completely naked making unintelligible and incoherent utterances. Officer Stanton initially attempted to engage in a conversation with Mr. Bah and then suddenly stepped back away from the door. Mr. Bah slammed the door shut and locked it. Lt. Gallitelli was informed by P.O. Stanton that Mr. Bah had a large knife in his hand. Lt. Gallitelli immediately established firearms control and requested the response of ESU. Lt. Gallitelli also informed Central that Mr. Bah was barricaded with a knife in his possession. EMS arrived shortly before ESU and was instructed to remain on the floor below, which was the fourth (4th) floor, while ESU attempted to establish a dialogue

DEF 16736

with Mr. Bah. Upon their arrival, ESU personnel directed that all unnecessary personnel leave the 5th floor landing. As ESU was setting up, the Hostage Negotiating Team and the Technical Assistance Response Unit arrived. Officer Santana remained on the 5th floor and Officer Stanton was stationed at the apartment directly below #5D. An additional sector was requested to secure the fire escape and front door. Lt. Gallitelli was not in a position where he could hear any response from Mr. Bah to ESU. Lt. Gallitelli did not observe ESU breach the door or enter the apartment. Lt. Gallitelli heard at least two (2) Tasers being deployed and subsequently heard seven (7) to ten (10) gunshots being fired in quick succession after a small pause. He did not personally observe anyone discharge their firearm and he could not hear any commands being given by ESU personnel, but heard inaudible screaming. Lt. Gallitelli then directed EMS to render medical attention to Mr. Bah.

### Lieutenant Michael Licitra, tax registry #906642, Emergency Services Unit

On Tuesday September 25, 2012 Lieutenant Michael Licitra #906642, performed a 1400x2235 tour of duty, assigned as the ESU Emergency Service City North Supervisor. During his tour he responded to 113 Morningside Avenue regarding a request for ESU that was originally transmitted by the 26th Precinct Platoon Commander over division radio and which was retransmitted over special operations division radio. The original request was made in regards to a barricaded EDP on the fifth (5th) floor of the aforementioned address. The request for Lt. Licitra's response was transmitted over SOD radio. There was no mention of Mr. Bah being armed with a knife during the initial transmission. When he arrived at 113 Morningside Avenue, Lt. Licitra was met and debriefed by Detective Gonzalez, ESU. It was during this debriefing that Lt. Licitra was told that the first responding patrol personnel had in fact observed Mr. Bah in possession of a knife. Lt. Licitra proceeded to suit up in his tactical gear and then entered the location making his way to the fifth (5th) floor. Upon arriving on the fifth (5th) floor, Lt. Licitra met with Sgt. McCormack, Officer Kress, Det. Mateo, Officer Green, and Det. Zaberto. All four (4) personnel on scene were already attired with their tactical helmets, heavy vests and equipped according to ESU protocols. Officer Kress was designated the lead bunker and armed with an X-26 Taser drawn in his hand. Det. Mateo was armed with a Arwen Model 37 Less Lethal Munitions Launcher. Officer Green and Det. Zaberto had other equipment including equipment used to breach a door. Sgt. McCormack was armed with an M-26 Taser. The door had already been roped off according to ESU procedure prior to Lt. Licitra's arrival on the fifth (5th) floor. The peep hole had also been previously removed in an attempt to gain visual intelligence from the apartment. Chemical lights were introduced through the peep hole to provide additional lighting, but were unsuccessful after being deployed. Lt. Licitra and Det. Zaberto went one (1) floor below in an attempt to gain visual intelligence through the three (3) exterior windows utilizing a pole camera. The results were negative because the windows were obstructed by blinds or other covering. Lt. Licitra then returned to the fifth (5th) floor and was informed that Mr. Bah was no longer communicating with on scene personnel. Sgt. McCormack then proceeded to untie the door so that the door could be breached by utilization of a rabbet tool. The door was breached solely to stick the pool camera through the door, not for entry by ESU personnel. The pole camera, which does not record, allowed the ESU personnel to see an image of Mr. Bah in the center of the apartment. Sgt. McCormack did request the Hostage Negotiation Team which was in the process of gathering information from Mr. Bah's mother. The Hostage Negotiation Team which had previously unsuccessfully attempted to contact Mr.

DEF 16737

Bah via telephone made no additional attempts at that time. While another attempt to gain verbal communication with Mr. Bah was being made by members of the ESU team which also met negative results, Mr. Bah grabbed the door in an attempt to open it. After a brief struggle, Mr. Bah successfully opened the door. Mr. Bah was then given verbal commands by Officer Kress to drop the knife. Mr. Bah did not comply with the commands and Officer Kress deployed his X-26 Taser with negative results. Mr. Bah then attacked Officer Kress in a violent matter with a large chef's knife. After Det. Mateo fired a round from his less lethal munitions launcher with negative results, Mr. Bah then proceeded to direct his attack towards Det. Mateo. Sgt. McCormack, who was behind Det. Mateo, reached over Det. Mateo and fired his M-26 Taser with negative results. Mr. Bah continued his attack alternating between Officer Kress and Det. Mateo when an unidentified officer yelled "he's stabbing me, shoot him". At that time, an estimated eight (8) to ten (10) rounds were fired by different ESU personnel. When the discharge ceased, Det. Zaberto, who is a tactical paramedic, began to render aide to Mr. Bah. EMS subsequently arrived at the fifth (5th) floor to render aide to Mr. Bah. Lt. Licitra went back downstairs out of the apartment and conducted a firearms inspection to verify which ESU personnel discharged their weapon. The results of the inspection showed that Det. Mateo (armed with a Glock, 9MM, model 19) had 11 rounds in his firearm, 1 in the chamber, 10 in the magazine. Officer Kress (armed with a Sig Sauer, 9MM, model P226) had 13 rounds in his firearm, 1 in the chamber, 12 in the magazine. Officer Green (armed with a Glock, 9MM ,model 19) had 14 rounds in his firearm, 1 in the chamber, 13 in the magazine. Lt. Licitra did not inspect any other firearms. All remaining weapons were inspected by Captain Galvin with negative results. Lt. Licitra did observe a cut on the uniform shirt of Det. Mateo and knife slashes on Officer Kress' vest. The three (3) ESU personnel who fired their weapons were transported to New York Presbyterian – Weill Cornell Medical Center and one (1) Taser dart was observed lodged in Mr. Bah's chest area. Lt. Licitra described Mr. Bah as a male Black in his late 20's to early 30's, approximately 6' tall, weighing 180 lbs., wearing a white shirt and black pants.

### Sergeant Joseph McCormack, tax registry #919383, ESU, Truck #2

Sergeant Joseph McCormack performed a 1503x2400 tour of duty, assigned as the Truck #2 supervisor in Truck #5511, with Detective Gonzalez. Sgt. McCormack was requested over SOD division radio to respond to 113 Morningside Avenue in regards to a barricaded EDP. Upon arrival, Sgt. McCormack met with Officer Kress and Det. Mateo assigned to the Adam car. Sgt. McCormack, along with Officer Kress and Det. Mateo, suited up with heavy vest and helmets and entered the building. He then met with Lt. Gallitelli, the 26th Precinct Platoon Commander, on the fourth (4th) floor of the location and began to confer about what had transpired. Sgt. McCormack was informed by Lt. Gallitelli that they had an EDP with a knife. Shortly thereafter, the ESU Boy car arrived with Det. Zaberto and Officer Green. The entry stack consisted of Officer Kress with the lead bunker and taser, Det. Mateo with the Arwen Model 37 Less Lethal Munitions Launcher, Officer Green and Det. Zaberto side by side with Sgt. McCormack. They attempted to make contact with Mr. Bah who was inside the apartment but Mr. Bah was speaking incoherently. The door was roped off and tied to the stair railing while the end was held by Sgt. McCormack. The peep hole was removed and used to place chemical light sticks in the apartment since it was dark with no visibility inside. Sgt. McCormack requested the Hostage Negotiation Team and the Technical Assistance Response Unit. Lt.

DEF 16738

Licitra, ESU, arrived on scene. Sgt. McCormack directed the patrol units to the apartment directly beneath Mr. Bah's apartment to see the floor plan. The pole camera was requested to the fourth (4th) floor apartment. Lt. Licitra attempted to see into the fifth (5th) floor windows but was met with negative results. The fifth (5th) floor windows were completely blacked out. With no visual into the apartment, the door was breached enough to create a small void in order to utilize the pole camera. Sgt. McCormack loosened the rope from the door in order for the breach to occur but continued to hold it firmly. The image on the camera receiver was very dark and sketchy. As they were viewing the receiver Mr. Bah violently thrust the door open with a knife in his hand. Mr. Bah's violent pull of the door caused Sgt. McCormack to lose control of the rope. Officer Kress discharged his X-26 Taser with negative results. Det. Mateo then discharged the Arwen Model 37 Less Lethal Munitions Launcher one (1) time and was also met with negative results. Sgt. McCormack heard one of his officers state "He's got a knife, he's stabbing me, shoot him." Sgt. McCormack could not see if Mr. Bah was actually armed but his body movement suggested that he was fighting with the officers. Sgt. McCormack identified a small target, placed the dot on the upper torso of a white shirt and depressed the trigger to his M-26 Taser. This also produced negative results. At that point three (3) officers discharged their firearms and struck Mr. Bah several times. The shots were fired rapidly and in quick succession after the Tasers and less lethal device was utilized. Sgt. McCormack observed barbs from the Taser in Mr. Bah's neck and chest area, the barb in the chest dislodged. He does not know which barbs came from which Taser. Sgt. McCormack verified that his Taser and Officer Kress' Taser were tested prior to use as per protocol.

### Detective Christopher Zaberto, tax registry #907614, ESU Truck 2

Detective Christopher Zaberto Tax #907614 Shield #6414 assigned to ESU Truck 2, Boy Car in RMP #5591, with Police Officer Michael Green, performed a 1515x2350 tour of duty. Det. Zaberto was directed by SOD radio to respond to 113 Morningside Avenue regarding an EDP. The initial job came over as an EDP, then as a barricaded EDP with a knife. Upon their arrival they were briefed by Det. Gonzalez, of ESU Truck 2, who was already on the scene. Det. Zaberto met with a woman who identified herself as Mr. Bah's mother who stated that her son does not have any medical history, but has been acting irrationally lately. Det. Zaberto and his partner both entered into the building with equipment donned and proceeded to the fifth (5th) floor of the location. They then met with ESU Sgt. McCormack, Officer Kress and Det. Mateo. Officer Kress had the ballistic bunker shield against the door to restrict Mr. Bah's view through the peep hole, and tried to initiate verbal contact with Mr. Bah. Det. Zaberto observed Det. Mateo equipped with an Arwen Model 37 Less Lethal Munitions Launcher which is a less lethal weapon that projects rubber ballistic bullets. Det. Zaberto also observed a rope with one end tied around the door knob and the other end tied around a banister to prevent Mr. Bah from opening the apartment door. The ESU team members were waiting for intelligence that was being gathered by other units on the scene in order to plan their next move. The peep hole to the apartment door had already been removed and blocked with the ballistic bunker shield by Officer Kress in order to restrict Mr. Bah's view through the peep hole. A chemical light was deployed into the peep hole so that ESU can see into the apartment but it had proved unsuccessful. Det. Zaberto was in control of the rabbet tool and did not breach the door at that time. Det. Zaberto was able to gain access to the apartment directly below Mr. Bah's and went through the fire escape to deploy the pole camera but was unable to see anything because the apartment window

DEF 16739

shades were drawn. The pole camera was then deployed through a crack in the door where the rabbet tool had been used to pry it open. Lt. Licitra from ESU was maneuvering the camera around while Det. Zaberto was viewing the monitor. This also proved unsuccessful because Mr. Bah moved the camera prohibiting ESU from seeing anything inside of the apartment. The monitor was given to Lt. Licitra and Det. Zaberto returned back to his position on the entry team. The door of the apartment then flew open and Officer Kress entered into the apartment with ballistic bunker shield and Taser in hand. Det. Zaberto heard repeated commands to drop the knife and observed Officer Kress deploy the Taser with negative results. Sgt. McCormack then deployed his Taser with negative results. Det. Zaberto could not make out if the Arwen Model 37 Less Lethal Munitions Launcher was deployed. At that point Mr. Bah was still being ordered to drop the knife but was non-compliant. Officer Kress, while backing up, dropped his Taser and Mr. Bah started stabbing at Officer Kress under his bunker with the knife he had in his hand. Officer Kress discharged more than one (1) round from his 9mm Sig Sauer firearm and Officer Green also discharged his 9mm Glock 19. Mr. Bah suffered bullet wounds from the shooting and fell to the floor. At that time Det. Zaberto checked with Det. Mateo, Officer Green, and Officer Kress to see if anyone was stabbed with negative results, everyone reported they were okay. Det. Zaberto checked on Mr. Bah and saw that he was still alive and conscious but incapacitated. The knife he had previously held was lying on the floor about one (1) foot from his body. While administering aid to Mr. Bah, Det. Zaberto observed two barbs lodged in Mr. Bah. One was in his neck and the other on his left torso area. Det. Zaberto and EMS, already on the scene, rendered advance care to Mr. Bah and removed him to Saint Lukes Hospital.

## Police Officer Brian Stanton, tax registry #949693, 26th Precinct

Police Officer Brian Stanton performed a 1500x2335 tour of duty, assigned to 26th Precinct sector Adam, with his partner Police Officer Esmeralda Santana, in RMP #3344. At approximately 1843 hours they responded to a radio run of a signal 10-54 EDP located at 113 Morningside Avenue. Officer Stanton and his partner were the first sector to arrive on the scene along with Lieutenant Gallitelli, the 26th Precinct Platoon Commander, and his operator, Officer Johnson. Upon arrival, Officer Stanton was approached by approximately three (3) to four (4) of Mr. Bah's family members. One woman who identified herself as Mr. Bah's mother stated her son had been acting irrational all day but was not violent and did not possess any weapons. Officer Stanton, Officer Santana, Lt. Gallitelli and his operator, Officer Johnson then began to ascend the stairs to apartment #5D. Officer Stanton knocked on the door and the door swung partially open. Officer Stanton observed Mr. Bah completely naked with his body bladed to him. Officer Stanton began a dialog with Mr. Bah in an attempt to assess the situation. Officer Stanton asked Mr. Bah if he had any clothing to put on. Mr. Bah replied incoherently "not me, you." Mr. Bah abruptly attempted to close the door on the officers. At that point Mr. Bah turned his body and Officer Stanton saw a large knife in his right hand pointed outward. The knife was as large as a butcher's knife. Officer Stanton and Officer Santana attempted to stop him from closing the door but Officer Stanton pulled back his foot and pushed his partner back. The door then slammed and was locked. Officer Stanton then advised everyone that Mr. Bah possessed a large knife. Lt. Gallitelli called for ESU via division radio. Officer Stanton then heard Mr. Bah muttering what appeared to be a prayer. Upon ESU's arrival, Officer Stanton went downstairs in an attempt to secure the keys for the roof from the building's superintendant. Officer Stanton did not re-enter the building. While in front of the location, the officer heard sounds consistent with

DEF 16740

gun shots. At that point, Officer Stanton assisted in establishing the outer perimeter of the crime scene.

## Police Officer Esmeralda Santana, tax registry #942819, 26th Precinct

Police Officer Esmeralda Santana performed a 1500x2335 tour duty assigned to 26th Precinct sector Adam with her partner Police Officer Brian Stanton, in RMP #3344. At approximately 1843 hours they responded to a radio run directing them to a signal 10-54 EDP located at 113 Morningside Avenue. Officer Santana and her partner arrived at the scene at the same time as Lieutenant Gallitelli and his operator, Officer Vincent Johnson. At the location Officer Santana was met by an individual who identified herself as the caller and further informed Officer Santana that her son was acting irrationally. The female did not indicate that her son was armed. Officer Santana began ascending the stairs to apartment #5D with Officer Stanton in the lead, followed by Officer Johnson, then herself and Lt. Gallitelli. Officer Santana could not see the male inside of the apartment but when the door opened she had a partial view of him and observed that he was naked. Officer Stanton attempted to engage the male in conversation, and the male's statements lead her to conclude that he was emotionally disturbed. The male attempted to close the door and Officer Santana attempted to use her foot to prevent him from doing so, however upon hearing Officer Stanton state that the male had a knife, she removed her foot from the door, allowing it to close. Lt. Gallitelli immediately requested that the Emergency Services Unit respond to the location, informing the dispatcher that Mr. Bah had a knife. When ESU arrived, Officer Santana was on the fifth (5th) floor landing, but was at the opposite end of the hall. She observed members of ESU tie the door knob with a rope to secure it, and observed them attempt to engage Mr. Bah in conversation through the closed door. She observed ESU use a hydraulic machine to breach the door. She heard a physical confrontation ensue and a Taser being deployed. After the deployment of the Taser she heard numerous gunshots in quick succession.

## Police Officer Vincent Johnson, tax registry #948055, 26th Precinct

Police Officer Vincent Johnson performed a 1500x2335 tour duty assigned as Lieutenant Gallitelli's operator in RMP #5622. During their tour they received a radio run of a 10-54 EDP at 113 Morningside Avenue. Upon arriving at the scene, he observed Sector Adam, Police Officer Santana and Police Officer Stanton, who had arrived at the location at approximately the same time. Upon their arrival they were met by a women (who was later identified as Hawa Bah DOB 8/24/1958) who claimed to be the mother of Mr. Bah (later identified as Mohammed Bah DOB 9/28/1983). She stated that her son was upstairs alone and acting erratic, but that he was not violent. She further stated that she could use their help. Officer Johnson entered 113 Morningside Avenue along with Lt. Gallitelli, Officer Santana, and Officer Stanton to further investigate. Upon entering the building, they proceeded to apartment #5D, were Officer Stanton knocked on the door. Suddenly, the door rapidly opened half way, with Mr. Bah standing behind the half opened door with his body bladed. Officer Stanton asked Mr. Bah if he could put on some clothes and if he needed any assistance. At that point Officer Johnson heard Mr. Bah mumble something to the effect of "not me, it wasn't me". Officer Stanton had his foot in the front door frame attempting to prevent Mr. Bah from closing the door. Suddenly, Officer Stanton quickly removed his foot from the door frame and backed away from

DEF 16741

the door simultaneously stating "he has a knife". All of the officers backed up to a safe distance and told Lt. Gallitelli that Mr. Bah had a knife. Upon hearing that information, Lt. Gallitelli called Central to notify Emergency Service Unit, and to have them respond to the location for assistance. Soon after the door was closed, Officer Johnson heard Mr. Bah apparently praying to God. Approximately five (5) to ten (10) minute later, three (3) ESU members arrived, one (1) Sergeant and two (2) Officers. The ESU members tied rope to the door handle and secured the loose end to the adjacent stair rail banister. Officer Johnson backed down the stairs, and was assigned to a post outside of the building to secure the location. While outside, the driver from one of the ESU trucks told him to bring a camera up to the ESU members within the building. Upon receiving the camera, he headed up to the fourth (4th) floor landing, gave it to an officer from ESU and was assigned to secure the apartment directly under Mr. Bah's apartment on the fourth (4th) floor. While in the apartment he guarded the fire escape to make sure that Mr. Bah did not attempt to escape by using the fire escape. Officer Johnson stated that he heard approximately five (5) quick shots come from upstairs.

## CIVILIAN WITNESS - INTERVIEWS

Interviews with civilian witnesses to the incident were conducted by members of the Detective Bureau and were recorded on Complaint Follow-Up Informationals (DD5's). A canvass of the area was conducted by members of the Detective Bureau and Internal Affairs Bureau. The aggregate content of the interviews helped form the basis of the narrative in paragraph #4.

**Civilian Witness #1,** a female, black, ear-witness, known to the Department, stated that she heard banging on a door upstairs and then gunshots. The witness stated he was a nice guy and would help her with groceries/packages.

**Civilian Witness #2,** a female, Hispanic, ear-witness, known to this Department, stated she heard an argument followed by gunshots at which point she ran to the rear of her apartment. The witness stated she doesn't know the aided and has lived in the building for five (5) years.

**Civilian Witness #3,** a male, black, ear witness, known to this Department, stated UMOS utilized his fire escape to try and view the aided's apartment with a camera but the blinds were down. The witness further stated that UMOS attempted to call the aided via telephone but no one answered. The witness heard a door open, a scuffle and then gunshots. Witness stated he doesn't like the police but feels they did everything they could.

**Civilian Witness #4,** a female, black, ear witness, known to this Department, stated she heard a series of gunshots. The witness does not know the aided and only spoke to him in passing.

**Civilian Witness #5,** a male, black, ear witness, known to this Department, stated he just heard a lot of commotion and just knew the aided as a neighbor.

DEF 16742

**Civilian Witness #6,** a female, black, ear witness, known to this Department, stated she heard a lot of commotion. According to the witness, the aided was a nice guy and didn't bother anybody.

## CIVILIAN SUBJECTS

Mohamed Bah       113 Morningside Avenue #5D    DOB: 09/28/83
                          Manhattan, NY                   NYSID: 00340662H

## CIVILIAN SUBJECT - INTERVIEW

Mr. Mohamed Bah succumbed to his injuries and was pronounced dead at 2016 hours, and therefore was not interviewed.

## SUBJECT'S HISTORY

A Real Time Crime Center search of Mr. Mohamed Bah did not produce a criminal history. One (1) non-criminal NYSID # 00340662H was listed for a New York City Taxi and Limousine Commission application and a New York Department of State-Licensing Division application. He has several vehicle traffic infractions noted regarding vehicle accidents and moving violations. There are no previous aided events on file for Mr. Bah.

## DISCREPANCIES AND CLARIFICATIONS

At the date and time of incident Detective Andrew Kress and Detective Michael Green were performing their official duties at the rank of Police Officer. They currently hold the rank of Detective.

## SUBJECT M.O.S. INFORMATION

### Detective Edwin Mateo

| | |
|---|---|
| Shield #: | 1496 |
| Tax #: | 917121 |
| Appointed NYPD: | July 18, 1996 |
| Assigned to ESS 2: | July 29, 2005 |
| Duty & Uniform Status: | On Duty, in uniform |
| Physical Conditions: | The lighting conditions were good |
| Personal Information: | Male/Hispanic, 43 years old, Right-handed. |
| Firearms Re-qualification: | Cycle #13-01, attended 03/29/2013 |
| Tactics Review Session: | March 29, 2013 |
| 2 Day Advanced Tactical: | Yes |

DEF 16743

| | |
|---|---|
| OC Spray Equipped: | Yes |
| Previous Shootings: | No |
| Body Armor Equipped: | Yes |
| Disciplinary Monitoring: | None |

- Detective Mateo was armed with his on-duty service weapon, Glock, 9mm, model #GLC19, serial #PHV405. This weapon holds a maximum of sixteen (16) rounds.
- At the time of the discharge, Detective Mateo had no other firearms in his possession.
- The firearm was found to contain ten (10) live rounds in the magazine and one (1) live round in the chamber.
- Detective Mateo discharged five (5) rounds from his weapon, one-hand unsupported.
- At the time of the firearms discharge, the distance between Detective Mateo and the subject was within close proximity.
- The lighting conditions in the apartment were good (supplied from hallway after apartment door was opened).
- The Firearms Analysis Section examined Detective Mateo's firearm. The firearm is functioning within normal parameters. A copy of the report is attached for reference.
- Copies of Detective Mateo's Central Personnel Index and Departmental Recognition Record are attached.
- Detective Mateo did indicate, by initials, his position on a sketch made of the location. A copy of the sketch is attached to this report.
- Detective Mateo prepared a Firearms Discharge/Assault Report. A copy of the report is attached for reference.

## Detective Andrew Kress

| | |
|---|---|
| Shield #: | 7663 |
| Tax #: | 906592 |
| Appointed NYPD: | February 28, 1994 |
| Assigned to ESS 2: | June 2, 2011 |
| Duty & Uniform Status: | On Duty, in uniform |
| Physical Conditions: | The lighting conditions were good |
| Personal Information: | Male/White, 45 years old, Right-handed. |
| Firearms Re-qualification: | Cycle #13-02, attended 10/11/2013 |
| Tactics Review Session: | March 29, 2013 |
| 2 Day Advanced Tactical: | Yes |
| OC Spray Equipped: | Yes |
| Previous Shootings: | No |
| Body Armor Equipped: | Yes |
| Disciplinary Monitoring: | None |

- Detective Kress was armed with his on-duty service weapon, Sig Sauer, 9mm, model #P226, serial #U501251. This weapon holds a maximum of sixteen (16) rounds.
- At the time of the discharge, Detective Kress had no other firearms in his possession.

DEF 16744

- The firearm was found to contain twelve (12) live rounds in the magazine and one (1) live round in the chamber.
- Detective Kress discharged three (3) rounds from his weapon, one-hand unsupported.
- At the time of the firearms discharge, the distance between Detective Kress and the subject was within close proximity.
- The lighting conditions in the apartment were good (supplied from hallway after apartment door was opened).
- The Firearms Analysis Section examined Detective Kress' firearm. The firearm is functioning within normal parameters. A copy of the report is attached for reference.
- Copies of Detective Kress' Central Personnel Index and Departmental Recognition Record are attached.
- Detective Kress did indicate, by initials, his position on a sketch made of the location. A copy of the sketch is attached to this report.
- Detective Kress prepared a Firearms Discharge/Assault Report. A copy of the report is attached for reference.

### Detective Michael Green

| | |
|---|---|
| Shield #: | 7649 |
| Tax #: | 930265 |
| Appointed NYPD: | July 1, 2002 |
| Assigned to ESS 2: | June 2, 2011 |
| Duty & Uniform Status: | On Duty, in uniform |
| Physical Conditions: | The lighting conditions were good |
| Personal Information: | Male/White, 34 years old, Right-handed. |
| Firearms Re-qualification: | Cycle #13-02, attended 10/14/2013 |
| Tactics Review Session: | Scheduled to attend 12/20/2013 |
| 2 Day Advanced Tactical: | Yes |
| OC Spray Equipped: | Yes |
| Previous Shootings: | No |
| Body Armor Equipped: | Yes |
| Disciplinary Monitoring: | None |

- Detective Green was armed with his on-duty service weapon, Glock, 9mm, model #GLC19, serial #DWW887. This weapon holds a maximum of sixteen (16) rounds.
- At the time of the discharge, Detective Green had no other firearms in his possession.
- The firearm was found to contain thirteen (13) live rounds in the magazine and one (1) live round in the chamber.
- Detective Green discharged two (2) rounds from his weapon, one-hand unsupported.
- At the time of the firearms discharge, the distance between Detective Mateo and the subject was within close proximity.
- The lighting conditions in the apartment were good (supplied from hallway after apartment door was opened).
- The Firearms Analysis Section examined Detective Green's firearm. The firearm is functioning within normal parameters. A copy of the report is attached for reference.

DEF 16745

- Copies of Detective Green's Central Personnel Index and Departmental Recognition Record are attached.
- Detective Green did indicate, by initials, his position on a sketch made of the location. A copy of the sketch is attached to this report.
- Detective Mateo prepared a Firearms Discharge/Assault Report. A copy of the report is attached for reference.

## PHYSICAL EVIDENCE

Detective Gilford, Crime Scene Unit, responded and processed the following items under Crime Scene Run #12-756:

1) Photographs of the scene
2) Diagram of the scene
3) Service weapons (3)
4) Physical Evidence:
   - A. Ten (10) Discharged Shell Casings
   - B. One (1) Fired Bullet
   - C. One (1) Large knife approximately 10" in length
   - D. One (1) Sig Sauer, 9mm, semi-automatic pistol, model #P226, serial #U501251
   - E. One (1) Glock, 9mm, semi-automatic pistol, model #19, serial #DWW887
   - F. One (1) Glock, 9mm, semi-automatic pistol, model #19, serial # PHV405
   - G. One (1) Less than lethal projectile
   - H. Two (2) spent Taser cartridges, serial #REVC310089PC4X9 and #REVC31008982X9

## TACTICAL ANALYSIS

A conferral was conducted with Inspector Raymond Caroli, the Commanding Officer of the Firearms and Tactics Section, regarding the circumstances of this incident and the tactics utilized. It is apparent that the Emergency Service Unit members on scene initially secured the apartment door and attempted to establish visual access to the aided via a pole camera mounted outside the apartment. This attempt was mitigated by the curtains covering the windows. An attempt is made to establish some verbal communication with the aided and that also proves unsuccessful. A decision is then made by ESU Lieutenant Michael Licitra to partially breach the front door to introduce a pole camera so visual contact can be established. This partial breaching allows or prompts the aided to pull open the door and subsequently attack ESU members with a knife. ESU members have at the ready and deploy conducted energy devices and an impact munitions device which both prove to have minimal effect. The aided then raises his knife and charges at the officers and repeatedly stabs at and hits at least two ESU Officers on their person. The officers appeared to have avoided serious injury due to their heavy protected vests taking the brunt of the impact. These officers then utilized their service pistol to end the attack.

DEF 16746

Tactical issues: If it was clearly established that the aided was alone inside the apartment, which may have been uncertain at the time, a tactical consideration of maintaining full control of the apartment door by not performing the partial breach and rather awaiting further ESU personnel to include ranking executive level members may have been a viable option. This would have allowed the possibility to establish a more formalized tactical plan and further attempts to establish verbal contact with the aided. It should also be noted that there is a considerable tactical advantage of having visual access on a barricaded subject and the strong assumption in this incident is that the ESU members on scene felt that they could have secured the door enough to allow a partial breaching in order to gain this advantage.

## MEDICAL INFORMATION

Detective Mateo was taken to New York Presbyterian – Weill Cornell Medical Center and treated and released for a puncture wound to his left arm, left shoulder and arm strain, right elbow strain, and tinnitus by Dr. Dua.

Police Officer Kress was taken to New York Presbyterian – Weill Cornell Medical Center and treated and released for tinnitus by Dr. Anthony.

Police Officer Green was taken to New York Presbyterian – Weill Cornell Medical Center and treated and released for tinnitus by Dr. Cordwell.

Mr. Mohamed Bah sustained several gunshot wounds during the incident. However, Mr. Bah was pronounced dead at 2016 hours by Dr. Ralston at Saint Luke's Roosevelt Medical Center.

## RADIO RUN INFORMATION

A copy of SPRINT job #T11575 is attached. Recordings of the radio transmissions and calls to 911 were obtained from the Central Communications Division. The recordings are on file at the office of the Patrol Borough Manhattan North Investigations Unit. These recordings were reviewed and found to be consistent with the subject and witness accounts. The transmissions contain the standard requests for emergency medical service, additional assistance, emergency services, supervisory personnel, along with crime scene notifications.

## RECOMMENDATION

The investigation into this matter is complete. Detective Edwin Mateo discharged five (5) rounds, Police Officer Andrew Kress discharged three (3) rounds, and Police Officer Michael Green discharged two (2) rounds from their authorized service weapons, at an armed Emotionally Disturbed Person, that had just violently lunged and slashed at Detective Mateo and Officer Kress' vest with a large kitchen knife, and who was advancing to continue his assault.

DEF 16747

Police Officer Kress deployed the X-26 Taser and Sergeant Joseph McCormack deployed the M-26 Taser, independently, one (1) time each at different times at the subject; however, neither Taser attempt was successful in restraining the Emotionally Disturbed Person. Detective Mateo deployed the Arwen Model 37 Less Lethal Munitions Launcher and discharged two (2) hard plastic less-lethal rounds at the subject which proved to be ineffective at stopping the subject's attacks. Unable to tactically retreat and confronted by the use of deadly physical force against them, three (3) officers discharged a total of ten (10) rounds to stop the subject from continuing his deadly knife attacks against Uniformed Members of the Service. The referenced investigation has concluded that the firearm discharges by the aforementioned Members of the Service were both lawful under Article 35 of the New York State Penal Law and within Department Guidelines. It is recommended that this firearms discharge event be classified as: **NO VIOLATION OF DEPARTMENT GUIDELINES. NO CORRECTIVE ACTION TAKEN.**

Perry Natale
Captain

**DISTRIBUTION**
Chief of Department (DIRECT)
Chief of Department (THROUGH CHANNELS)
Chief of Department's Investigation Review Section, Firearms Discharge Review Board
Deputy Commissioner, Strategic Initiatives
Deputy Commissioner, Training
Deputy Commissioner, Public Information
Deputy Commissioner, Personnel
Chief of Patrol
Chief of Detectives
Chief of Internal Affairs Bureau
Commanding Officer, Patrol Borough Manhattan North
Commanding Officer, Special Operations Division
Executive Officer, Patrol Borough Manhattan North
Commanding Officer, Emergency Services Unit
Commanding Officer, Detective Borough Manhattan
Commanding Officer, Firearms and Tactics Section
Commanding Officer, 26th Precinct
Commanding Officer, SOD Investigations Unit
File

DEF 16748

## FIRST ENDORSEMENT

Commanding Officer, Patrol Borough Manhattan North to Chief of Department. The Patrol Borough Manhattan North Firearms Advisory Board convened on December 20, 2013 and reviewed the circumstances involving the actions of Detective Andrew Kress, Tax # 906592, Detective Edwin Mateo, Tax # 917121, and Detective Michael Green, Tax # 930265, regarding their firearms discharge event that occurred on September 25, 2012. The Board was chaired by Deputy Chief Brian H. O'Neill, Executive Officer, Patrol Borough Manhattan North. The findings of the Board were as follows: **NO VIOLATION OF DEPARTMENT GUIDELINES. NO CORRECTIVE ACTION.** I concur with the findings of the board.

James A. Secreto
Assistant Chief

**POLICE DEPARTMENT**
**CITY OF NEW YORK**

September 25, 2012

From:     Shooting Team Leader, Patrol Borough Manhattan North

To:       Chief of Department

Subject:  **FIREARMS DISCHARGE BY THREE (3) ON-DUTY MEMBERS OF THE SERVICE, AT AN ARMED VIOLENT EMOTIONALLY DISTURBED PERSON, RESULTING IN THE   DEATH OF ONE (1) VIOLENT EMOTIONALLY DISTURBED PERSON WITHIN THE CONFINES OF THE 26TH PRECINCT, INVESTIGATED UNDER IAB LOG #12-50993**

1.   <u>**OPENING**</u>

On Tuesday, September 25, 2012, at approximately 1941 hours, on-duty Detective Edwin Mateo, tax registry #917121, and on-duty Police Officer Andrew Kress, tax registry #906592, both assigned to Emergency Services Unit Truck #2, and other members of their unit were attempting to deploy a pole camera into 113 Morningside Avenue, Apartment #5D, when they were confronted by Mr. Mohamed Bah, a violent barricaded Emotionally Disturbed Person, wielding an eight (8) inch kitchen knife. Mr. Bah lunged at Detective Mateo and Police Officer Kress with the knife causing injuries to Detective Mateo. Detective Mateo deployed a less lethal Arwen 37 Munitions Projectile weapon and Police Officer Kress deployed an X-26 Taser in an effort to stop the threat and attacks by Mr. Bah. The less than lethal devices were ineffective in stopping the threat posed by Mr. Bah. A third attempt to utilize a less lethal device was made when Sergeant Joseph McCormack, tax registry #919383, assigned to Emergency Services Unit Truck #2, deployed an M-26 Taser with negative results. As a result of the threat of imminent death or serious injury, Detective Mateo, Officer Kress and Police Officer Michael Green, tax registry #930265, also assigned to Emergency Services Truck #2, discharged their service weapons a total of ten (10) times, striking Mr. Bah several times. Immediate medical aid was rendered by Detective Christopher Zaberto, tax registry 907614, assigned to Emergency Services Unit Truck #2, and Emergency Medical Personnel on the scene. Mohamed Bah was transported to St. Luke's Roosevelt Hospital Center where he succumbed to his injuries and was pronounced at 2016 hours, by Doctor Ralston. Detective Mateo, Police Officer Kress and Police Officer Green were transported to New York Presbyterian – Weill Cornell Medical Center for treatment of tinnitus and non life threatening trauma related to the knife attacks by Mr. Bah. The details are as follows:

1

DEF 16750

2. **INVESTIGATED BY**

   This incident was investigated by Captain Eric Pagan, Patrol Borough Manhattan North Shooting Team Leader, under the supervision of Inspector Michael J. Harrington, Patrol Borough Manhattan North, under the overall direction of Assistant Chief William T. Morris, Commanding Officer, Patrol Borough Manhattan North.

3. **PERSONS INVOLVED**

### MOS SUBJECT

| Name | Rank | Shield | Tax | Command | Tour |
|------|------|--------|-----|---------|------|
| Andrew Kress | P.O. | 10841 | 940264 | ESS 2 | 1515x2350 |
| Edwin Mateo | Det. | 1496 | 917121 | ESS 2 | 1515x2350 |
| Michael Green | P.O. | 3108 | 930265 | ESS 2 | 1515x2350 |

### MOS WITNESSES

| Name | Rank | Shield | Tax | Command | Tour |
|------|------|--------|-----|---------|------|
| Robert Gallitelli | Lt. | N/A | 928343 | 26th Pct | 1500x2335 |
| Michael Licitra | Lt. | N/A | 906642 | ESS 2 | 1400x2235 |
| Joseph McCormack | Sgt. | 4353 | 919383 | ESS 2 | 1503x2400 |
| Christopher Zaberto | Det. | 6414 | 907614 | ESU | 1515x2350 |
| Vincent Johnson | P.O. | 8537 | 948055 | 26th Pct | 1500x2335 |
| Esmeralda Santana | P.O. | 30635 | 942819 | 26th Pct | 1500x2335 |
| Brian Stanton | P.O. | 11683 | 949693 | 26th Pct | 1500x2335 |

### CIVILIAN SUBJECT

| Name | Address | DOB | NYSID |
|------|---------|-----|-------|
| Mohamed Bah | 113 Morning Side Drive, apt #5D, N.Y. N.Y.10027 | 09/23/83 | 00340662H |

### CIVILIAN WITNESS

   Civilian witnesses were interviewed by members of the Detective Bureau and the Internal Affairs Bureau. These statements are contained in Complaint Follow-up Informationals (DD5's), and support the narrative in paragraph #4. Their identities are known to the Department.

### CIVILIAN VICTIM

   Not Applicable

2

DEF 16751

4.    **NARRATIVE**

On Monday, September 24, 2012, Ms. Hawa Bah arrived at John F. Kennedy International Airport from her native country, New Guinea, Africa. Ms. Bah was in New York City with the intention of visiting her son, Mohamed Bah, who resided at 113 Morningside Avenue, apartment #5D, New York, NY. Ms. Bah was concerned for her son's well being after being informed by family members that his recent behavior was strange and erratic. Upon arriving at the airport, Ms. Bah was met by her brother, Oumar Bah. The pair travelled to 113 Morningside Avenue, to try and speak with Mohamed. When Ms. Bah knocked on the door to apartment #5D, Mohamed answered but refused to allow them to enter. Mohamed appeared unkempt, disheveled and had an apparently recent injury above his right eye. Mohamed told his mother that he did not want to talk and asked her to come back on the following day to talk. Ms. Bah and her brother left the location and went to spend the night with her sister, Rokia Kaba, who resides at 857 Crotona Park North, Bronx, NY. The following day, Tuesday, September 25, 2012, Ms. Bah along with her niece, Bintou Kaba, travelled to 113 Morningside Avenue where they were met by Alpha Diallo, Mohamed's cousin. Ms. Bah and Mr. Diallo again attempted to speak with Mohamed. Mohamed answered the door for them however he was completely naked and again refused to allow them entry into his home. At approximately 1841 hours upon returning downstairs to the front of 113 Morningside Avenue, Mr. Diallo called 911 at the request of Ms. Bah. Ms. Bah then took the cell phone and reported to the 911 operator that her son had mental issues, was depressed and was not acting right. Ms. Bah requested the police to respond to assist in obtaining medical treatment for Mohamed. At approximately 1843 hours, Police Officer Brian Stanton, tax registry #949693, and Police Officer Esmeralda Santana, tax registry #942819, assigned to 26th Precinct Sector Adam, received a radio assignment of 10-54 EDP with a Psychiatric History. Lieutenant Robert Gallitelli, tax registry #928343, assigned as the 26th Precinct Platoon Commander, along with Police Officer Vincent Johnson, tax registry #948055, also responded to the radio assignment. The lieutenant and the sector both arrived at the scene at the same time. Upon exiting his RMP, Officer Stanton was met by Ms. Bah and Mr. Diallo in front of the building. Ms. Bah explained to Officer Stanton that her son was acting irrationally, but had no history of mental illness or violence. No mention was made of possible weapons. Officer Stanton relayed this information to the other responding officers. They all proceeded to apartment #5D, located on the 5th Floor and next to the stair well entrance. After reaching the 5th Floor, Officer Stanton positioned himself to the right of the door to apartment #5D. Officer Johnson positioned himself to the left side of the doorway. Officer Santana stood opposite the door and to the left next to the hallway railing. Lieutenant Gallitelli was positioned behind Officer Santana. Officer Stanton knocked on the door several times requesting Mohamed open the door. The door partially opened with Mohamed standing behind it. Only the right side of Mohamed was visible. He was entirely naked; in Mohamed's right hand was an eight (8) inch kitchen chef knife. Mohamed yelled out, "it's not me, it's not me" and "I'm not Mohamed." Initially, Officer Stanton and Officer Santana placed one (1) of their feet in the doorway to block the closing of the door by Mohamed. When Officer Stanton observed the knife in Mohamed's hand, he stepped back and alerted Officer Santana of the large knife. Officer Santana stepped back at which time the door closed shut and the internal lock mechanism was engaged. Officer Stanton and Officer Santana informed the lieutenant of their observation of the knife. Lieutenant Gallitelli notified the radio dispatcher and requested the response of Emergency Services personnel for their assistance regarding a barricaded Emotionally Disturbed Person with a knife. Sergeant Joseph McCormack, tax registry #919383, and Detective Raul Gonzalez, tax registry #904057, assigned to ESU Truck #2, along with Detective Christopher Zaberto, tax registry

DEF 16752

907614, and Police Officer Michael Green, tax registry #930265, assigned to ESU Truck Adam #2 and Detective Edwin Mateo, tax registry 917121, and Police Office Andrew Kress, tax registry #906592, assigned to ESU Truck Boy #2, responded to the location. Upon arrival, the ESU personnel established the ESU protocols regarding a barricaded EDP. This included blocking the door peephole and securing the door from being opened by persons inside the apartment. The door's peephole was then punched out to enable a possible view into the apartment. The ESU personnel established an entry stack with Officer Kress as the lead bunker. Officer Kress was holding both a ballistic in one and a X-26 Taser in the other, drawn for possible use. Detective Mateo was next in line with the Arwen (Anti Riot Weapon) Model 37 Munitions Non-Lethal Launcher which deploys a 37 millimeter less lethal projectile. Officer Green was next in line with the Y-Bar. Detective Zaberto was next with a water fire extinguisher. Sergeant McCormack was at the end of the stack with the M-26 Taser prepared for deployment. The door to the apartment was secured against opening from the inside, utilizing a rope tied to the door knob and the opposite hall railing. Several attempts were made to make contact with Mohamed and establish a dialogue by ESU personnel. Mohamed was heard making noises on the other side of the doorway. Detective Gonzalez remained on the first floor. Sergeant McCormack requested the response of a Hostage Negotiation Team (HNT) and the Technical Assistance Response Unit (TARU). Lieutenant Gallitelli notified the Patrol Borough Manhattan North Duty Captain, Captain Perry Natale of the barricaded EDP. The City North Manhattan ESU Supervisor, Lieutenant Michael Licitra, tax registry #906642, responded to the location to assess and supervise the ESU personnel. After being informed of the barricaded situation by Detective Gonzalez, Lieutenant Licitra directed Detective Gonzalez to utilize a pole camera via the fourth floor apartment below apartment #5D. The pole camera was deployed from the fire escape with the intention of observing the 5th floor apartment through the rear windows. Drapes covering the windows however prevented any possible surveillance. The Hostage Negotiation Team, supervised by Captain Jeffrey Hart, Detective Borough Manhattan, interviewed Ms. Bah regarding her son. They then attempted to establish a dialogue by contacting Mohamed's cell phone. The calls were not answered and went straight to voicemail. An attempt to make an observation through the door peephole failed due to poor visibility in the darkened room. Lieutenant Licitra then determined that a partial breaching of the apartment door was necessary to deploy a pole camera over the top of the door frame to ascertain the position of the Emotionally Disturbed Person. There was no plan or intention to enter into the apartment and engage the EDP. The rope end tied to the hallway railing was freed with Sergeant McCormack now holding the end of rope tight to prevent the door from opening. The rabbet tool was placed into the door frame and the door was partially opened to allow the pole camera to be hoisted above the door into the apartment. The camera showed Mohamed, now wearing a t-shirt and shorts, standing in the center of the room still holding the knife in his right hand. Mohamed then advanced towards the door and from the inside, grabbed the door and violently pulled it completely open into the apartment. The EDP was now in close proximity to the front door and still brandishing the knife, waving it around at Officer Kress and the other ESU personnel. Officer Kress advanced approximately two (2) feet into the apartment and pointing the X-26 Taser at Mohamed, ordering him to drop the knife. Mohamed lunged towards Officer Kress and slashed him with the knife several times in the chest area of the bunker vest causing damage. In response, Officer Kress deployed the X-26 Taser which was ineffective against Mohamed. Detective Mateo then advanced and deployed the Arwen Model 37 Munitions Weapon and discharged one (1) hard plastic less lethal round at the EDP which was also ineffective. The EDP then turned and lunged at Detective Mateo with the knife striking him in the left shoulder causing blunt trauma. A struggle ensued involving all three (3) with the EDP lunging wildly at

4

DEF 16753

both Detective Mateo and Officer Kress with the knife. Sergeant McCormack then heard Detective Mateo yell, "He has a knife." Sergeant McCormack advanced into the apartment and reaching over Detective Mateo, deployed the M-26 Taser at the EDP. The taser was ineffective. Lieutenant Licitra then heard one (1) of the members of ESU (unidentified) state, "he's stabbing me." "Shoot him." Detective Mateo, Officer Kress and Officer Green discharged their service weapons at the EDP, striking the EDP numerous times. Detective Mateo discharged five (5) rounds from his service weapon, a Glock, 9MM, Model 19. Officer Kress discharged three (3) rounds from his service weapon, a Sig Sauer, 9MM, Model P226. Officer Green discharged two (2) rounds from his service weapon, a Glock, 9MM, Model 19. As result, Mohamed Bah was struck several times about the torso. Detective Zaberto, a certified paramedic, immediately rendered medical aid to the injured EDP. Emergency Medical Services personnel responded from the fourth floor and proceeded to treat the aided EDP for the gunshot wounds he had sustained. Lieutenant Gallitelli notified Captain Natale of an MOS involved shooting. Captain Natale requested a Level 1 Mobilization for crowd and traffic control. Mohamed Bah was removed to St. Luke's Roosevelt Hospital Center for the treatment of his gunshot wounds. Lieutenant Licitra and Lieutenant Gallitelli conducted firearms checks of the ESU personnel. Detective Mateo, Officer Kress and Officer Green informed Lieutenant Licitra that they had each discharged their firearms. An inspection of the three (3) firearms confirmed the recent discharges. Detective Mateo's firearm contained eleven (11) live rounds, one (1) in the chamber and ten (10) in the magazine. Officer Kress contained thirteen (13) live rounds, one (1) in the chamber and twelve (12) in the magazine. Officer Green's firearm contained fourteen (14) live rounds, one (1) in the chamber and thirteen (13) in the magazine. Captain Matthew Galvin, the Emergency Services Unit Duty Captain responded to the scene and inspected Sergeant McCormack's firearm and Detective Zaberto's firearm which did not reveal any recent discharge. Detective Mateo, Officer Kress and Officer Green were removed to New York Presbyterian – Weill Cornell Medical Center for treatment of tinnitus and non life threatening trauma related to the knife attacks by Mr. Bah. At 2016 hours, Mohamed Bah was pronounced DOA by Dr. Rolston.

### 4a.     <u>**LESS-LETHAL FORCE OPTIONS**</u>

Police Officer Kress deployed the X-26 Taser, serial #X00-537448, at the armed subject at a distance of three (3) to seven (7) feet. Although the darts appeared to make contact with the subject the Taser proved ineffective. After the first Taser attempt failed, Detective Mateo deployed the Arwen (Anti Riot Weapon) Model 37 Munitions Non-Lethal Launcher which deploys a 37 millimeter less lethal projectile, serial #M65 0394, discharging one (1) less lethal round at the armed subject. The investigation at this time is unable to determine whether the less lethal round actually struck the target subject but he remained unaffected following its deployment. In quick succession with the deployment of the Arwin Munitions weapon, Sergeant McCormack deployed the M-26 Taser, serial #P3-024206, at the armed subject at a distance of three (3) to seven (7) feet. Although the darts appeared to make contact with the subject the Taser proved ineffective.

DEF 16754

5. **DETECTIVES**

Numerous members of the Detective Bureau, along with members of the Internal Affairs Bureau, responded and assisted in this investigation. Detective Van Heemstede Obe, 26th Precinct Detective Squad, has been assigned the case under case #12-026-935.

6. **INVESTIGATIONS UNIT**

Members of the Patrol Borough Manhattan North Investigation Unit responded and assisted in this investigation.

7. **DISTRICT ATTORNEY**

Assistant District Attorney Shannon Lucey, New York County District Attorney's Office, was contacted and responded to the 26th Precinct station house and participated in interviewing civilian witnesses.

8. **MOS STATEMENT - SUBJECT**

Detective Mateo, Police Officer Kress and Police Officer Green were not interviewed as per a request from Assistant District Attorney Shannon Lucey.

9. **MOS STATEMENT – WITNESS**

Member of the service witnesses were formally interviewed under the provisions of Patrol Guide procedures 206-13 and 203-08. Lieutenants Licitra and Gallitelli were represented by Lieutenant Thomas O'Neill, Manhattan North director for the Lieutenant's Benevolent Association. Sergeant Joseph McCormack was represented by Sergeant Joseph Quinn, Transit Bureau Director of the Sergeant's Benevolent Association. Detective Christopher Zaberto was represented by Detective Thomas Driscoll of the Detective's Endowment Association. Police Officers Johnson, Santana, and Stanton, were represented by Police Officer Desmond Stafford, Patrolman's Benevolent Association Manhattan North Trustee. Their statements were electronically recorded and are kept on file at the Patrol Borough Manhattan North Investigations Unit. These statements helped form the basis of the narrative in paragraph #4.

**Lieutenant Robert Gallitelli, tax registry #928343, 26th Precinct**

On Tuesday, September 25, 2012, Lieutenant Robert Gallitelli was performing a 1445x2330 tour of duty, assigned as the 26th Precinct Platoon Commander, with Police Officer Vincent Johnson designated as his operator in marked RMP #5622. They were both attired in the uniform of the day. During the tour, Lieutenant Gallitelli and his vehicle operator responded to a radio signal of a 10-54 EDP at 113 Morningside Avenue. They arrived simultaneously with 26th Precinct sector Adam (Police Officer Santana and Police Officer Stanton). Lieutenant

6

DEF 16755

Gallitelli observed six (6) individuals at the location, one (1) of whom identified herself as the EDP's mother. She stated that her son, who was in the apartment acting irrationally, did not have any psychiatric history, was unarmed and lived alone. Upon arriving at apartment #5D, an officer knocked on the door and the EDP partially opened it standing completely naked making unintelligible and incoherent utterances. Officer Stanton initially attempted to engage in a conversation with the EDP and then suddenly stepped back away from the door. The EDP slammed the door shut and locked it. Lieutenant Gallitelli was informed by Officer Stanton that the EDP had a large knife in his hand. Lieutenant Gallitelli immediately established firearms control and requested the response of ESU. Lieutenant Gallitelli also informed central that the EDP was barricaded with a knife in his possession. EMS arrived shortly before ESU and was instructed to remain on the floor below, which was the fourth floor, while ESU attempted to establish a dialogue with the EDP. Upon their arrival, ESU personnel directed that all unnecessary personnel leave the 5th floor landing. As ESU was setting up, the Hostage Negotiating Team and TARU arrived. Officer Santana remained on the 5th floor and Officer Stanton was stationed at the apartment directly below #5D. An additional sector was requested to secure the fire escape and front door. Lieutenant Gallitelli was not in a position where he could hear any response from the EDP to ESU. Lieutenant Gallitelli did not observe ESU breach the door or enter the apartment. Lieutenant Gallitelli heard at least two (2) Tasers being deployed and subsequently heard seven (7) to ten (10) gunshots being fired in quick succession after a small pause. He did not personally observe anyone discharge their firearm and he could not hear any commands being given by ESU personnel, but heard inaudible screaming. Lieutenant Gallitelli then directed EMS to render medical attention to the EDP.

## Police Officer Brian Stanton, tax registry #949693, 26th Precinct

Police Officer Brian Stanton performed a 1500x2335 tour of duty, assigned to 26th Precinct sector Adam, with his partner Police Officer Esmeralda Santana, in RMP #3344. At approximately 1843 hours they responded to a radio run of a signal 10-54 EDP located at 113 Morningside Avenue. Officer Stanton and his partner were the first sector to arrive on the scene along with Lieutenant Gallitelli, the 26th Precinct Platoon Commander, and his operator, Officer Johnson. Upon arrival, Officer Stanton was approached by approximately three (3) to four (4) of the EDP's family members. One woman who identified herself as the EDP's mother stated her son had been acting irrational all day but was not violent and did not possess any weapons. Officer Stanton, Officer Santana, Lieutenant Gallitelli and his operator, Officer Johnson then began to ascend the stairs to apartment #5D. Officer Stanton knocked on the door and the door swung partially open. Officer Stanton observed the EDP completely naked with his body bladed to him. Officer Stanton began a dialog with the EDP in an attempt to assess the situation. Officer Stanton asked the EDP if he had any clothing to put on. The EDP replied incoherently "not me, you." The EDP abruptly attempted to close the door on the officers. At that point the EDP turned his body and Officer Stanton saw a large knife in his right hand pointed outward. The knife was as large as a butcher's knife. Officer Stanton and Officer Santana attempted to stop him but Officer Stanton pulled back his foot and pushed his partner back. The door then slammed and was locked. Officer Stanton then advised everyone that the EDP possessed a large knife. Lieutenant Gallitelli called for ESU via division radio. Officer Stanton then heard the EDP muttering in what appeared to be a prayer. Upon ESU's arrival, Officer Stanton went downstairs in an attempt to secure the keys for the roof from the building's superintendant. Officer Stanton did not re-enter the building. While in front of the location, Officer Stanton

DEF 16756

heard sounds consistent with gun shots. At that point, Officer Stanton assisted in establishing the outer perimeter of the crime scene.

## Police Officer Esmeralda Santana, tax registry #942819, 26th Precinct

Police Officer Esmeralda Santana performed a 1500x2335 tour of duty assigned to 26th Precinct sector Adam, with her partner Police Officer Brian Stanton, in RMP #3344. At approximately 1843 hours they responded to a radio run directing them to a signal 10-54 EDP located at 113 Morningside Avenue. Officer Santana and her partner arrived at the scene at the same time as Lieutenant Gallitelli and his operator, Officer Vincent Johnson. At the location Officer Santana was met by an individual who identified herself as the caller and further informed Officer Santana that her son was acting irrationally. The female did not indicate that her son was armed. Officer Santana began ascending the stairs to apartment #5D with Officer Stanton in the lead, followed by Officer Johnson, then herself and Lieutenant Gallitelli. Officer Santana could not see the male inside of the apartment but when the door opened she had a partial view of him and observed that he was naked. Officer Stanton attempted to engage the male in conversation, and the male's statements lead her to conclude that he was emotionally disturbed. The male attempted to close the door and Officer Santana attempted to use her foot to prevent him from doing so, however upon hearing Officer Stanton state that the male had a knife, she removed her foot from the door, allowing it to close. Lieutenant Gallitelli immediately requested the Emergency Services Unit to the location, informing the dispatcher that the EDP had a knife. When ESU arrived, Officer Santana was on the 5th floor landing, but was at the opposite end of the hall. She observed members of ESU tie the door knob with a rope to secure it, and observed them attempt to engage the EDP in conversation through the closed door. She observed ESU use a hydraulic machine to breach the door. She heard a physical confrontation ensue and a Taser being deployed. After the deployment of the Taser she heard numerous gunshots in quick succession.

## Police Officer Vincent Johnson, Tax #948055, 26th Precinct

Police Officer Vincent Johnson performed a 1500x2335 tour of duty, assigned as Lieutenant Gallitelli's operator, in RMP #5622. During their tour they received a radio run of a 10-54(EDP) at 113 Morningside Avenue. Upon arriving at the scene, he observed sector Adam, with Police Officer Santana and Police Officer Stanton, who had arrived at the location at approximately the same time. Upon their arrival they were met by a women (who was later identified as Hawa Bah, DOB 8/24/1958) who claimed to be the mother of the EDP (later identified as Mohammed Bha, DOB 9/28/1983). She stated that her son was upstairs alone and acting erratic, but that he was not violent. She further stated that she could use their help. Officer Johnson entered 113 Morningside Avenue along with Lieutenant Gallitelli, Officer Santana and Officer Stanton to further investigate. Upon entering the building, they proceeded to apartment #5D, where Officer Stanton knocked on the door. Suddenly, the door opened half way rapidly, with the EDP standing behind the half opened door with his body bladed. Officer Stanton asked the EDP if he could put on some clothes and if he needed any assistance. At that point Officer Johnson heard the EDP mumble something to the effect of "not me, it wasn't me." Officer Stanton had his foot in the front door frame attempting to prevent the EDP from closing the door. Suddenly, Officer Stanton quickly removed his foot from the door frame and backed away from the door simultaneously stating "he has a knife." All of the officers backed up to a safe distance and told Lieutenant Gallitelli that the EDP had a knife. Upon hearing that

8

DEF 16757

information, Lieutenant Gallitelli called Central to notify Emergency Service Unit, and to have them respond to the location for assistance. Soon after the door was closed, Officer Johnson heard the EDP apparently praying to God. Approximately five (5) to ten (10) minute later, three (3) ESU members arrived, one (1) Sergeant and two (2) Officers. The ESU members tied rope to the door handle and secured the loose end to the adjacent stair rail banister. Officer Johnson backed down the stairs, and was assigned to a post outside of the building to secure the location. While outside, the driver from one (1) of the ESU trucks told him to bring a camera up to the ESU members within the building. Upon receiving the camera, he headed up to the (4th) fourth floor landing, gave it to an officer from ESU and was assigned to secure the apartment directly under the EDP's apartment on the (4th) fourth floor. While in the apartment he guarded the fire escape to make sure that the EDP did not attempt to escape using the fire escape. Officer Johnson stated that he heard approximately (5) five quick shots come from upstairs.

## Lieutenant Michael Licitra, tax registry #906642, Emergency Services Unit

On Tuesday, September 25, 2012, Lieutenant Michael Licitra, tax registry #906642, performed a 1400x2235 tour of duty, assigned as the ESU Emergency Service City North Supervisor. During his tour he responded to 113 Morningside Avenue for a request for ESU that was originally transmitted by the 26th Precinct Platoon Commander over division radio and which was retransmitted over special operations division radio. The original request was made in regards to a barricaded EDP on the 5th floor of the aforementioned address. The request for Lieutenant Licitra's response was transmitted over SOD radio. There was no mention of the EDP being armed with a knife during the initial transmission. When he arrived at 113 Morningside Avenue, Lieutenant Licitra was met and debriefed by Detective Gonzalez, ESU. It was during this debriefing that Lieutenant Licitra was told that the first responding patrol personnel had in fact observed the EDP in possession of a knife. Lieutenant Licitra proceeded to suit up in his tactical gear and then entered the location making his way to the 5th floor. Upon arriving on the 5th floor, Lieutenant Licitra met with Sgt. McCormack, Police Officer Kress, Detective Mateo, Police Officer Green, and Detective Zaberto. All four (4) personnel on scene were already attired with their tactical helmets, heavy vests and equipped according to ESU protocols. Police Officer Kress was designated the lead bunker and armed with an X-26 Taser drawn in his hand. Detective Mateo was armed with a less lethal munitions launcher. Police Officer Green and Detective Zaberto had other equipment including equipment used to breach a door. Sergeant McCormack was armed with an M-26 Taser. The door had already been roped off according to ESU procedure prior to Lieutenant Licitra's arrival on the 5th floor. The peep hole had also been previously removed in order to attempt to gain visual intelligence from the apartment. Chemical lights were introduced through the peep hole to provide additional lighting, but were unsuccessful after being deployed. Lieutenant Licitra and Detective Zaberto went one (1) floor below in an attempt to gain visual intelligence through the three (3) exterior windows utilizing a pole camera. The results were negative because the windows were obstructed by blinds or other covering. Lieutenant Licitra then returned to the 5th floor and was informed that the EDP was no longer communicating with on scene personnel. Sergeant McCormack then proceeded to untie the door so that the door could be breached by utilization of a rabbet tool. The door was breached solely to stick the pool camera through the door, not for entry by ESU personnel. The pole camera, which does not record, allowed the ESU personnel to see an image of the EDP in the center of the apartment. Sergeant McCormack did request the Hostage Negotiation Team which was in the process of gathering information from the EDP's mother. The Hostage Negotiation Team, which had previously unsuccessfully attempted to contact the

9

DEF 16758

EDP via telephone, made no additional attempts at that time. While another attempt to gain verbal communication with the EDP was being made by members of the ESU team which also met negative results, the EDP grabbed the door in an attempt to open it. After a brief struggle, the EDP successfully opened the door. The EDP was then given verbal commands by Officer Kress to drop the knife. The EDP did not comply with the commands and Officer Kress deployed his X-26 Taser with negative results. The EDP then attacked Officer Kress in a violent manner with a large chef's knife. After Detective Mateo fired a round from his less lethal munitions launcher with negative results, the EDP then proceeded to direct his attack towards Detective Mateo. Sergeant McCormack, who was behind Detective Mateo, reached over Detective Mateo and fired his M-26 Taser with negative results. The EDP continued his attack alternating between Officer Kress and Detective Mateo when an unidentified officer yelled "he's stabbing me, shoot him." At that time, an estimated eight (8) to ten (10) rounds were fired by different officers. When the discharge ceased, Detective Zaberto, who is a tactical paramedic, began to render aide to the EDP. EMS subsequently arrived at the 5th floor to treat the EDP. Lieutenant Licitra, went back downstairs out of the apartment and conducted a firearms inspection to verify which ESU personnel discharged their weapon. The results of the inspection showed that Detective Mateo (armed with a Glock, 9MM, model 19) had 11 rounds in his firearm, 1 in the chamber, 10 in the magazine. Police Officer Kress (armed with a Sig Sauer, 9MM, model P226) had 13 rounds in his firearm, 1 in the chamber, 12 in the magazine. Police Officer Green (armed with a Glock, 9MM, model 19) had 14 rounds in his firearm, 1 in the chamber, 13 in the magazine. Lieutenant Licitra did not inspect any other firearms. All remaining weapons were inspected by Captain Galvin with negative results. Lieutenant Licitra did observe a cut on the uniform shirt of Detective Mateo and knife slashes on Officer Kress' vest. The three (3) ESU personnel who fired their weapons were transported to New York Presbyterian – Weill Cornell Medical Center and one (1) Taser dart was observed lodged in the EDP's chest area. Lieutenant Licitra describe the EDP as a male Black in his late 20's to early 30's, approximately 6' tall weighing 180 lbs., wearing a white shirt and black pants.

### Sergeant Joseph McCormack, tax registry #919383, ESU, #2 Truck

Sergeant Joseph McCormack performed a 1503x2400 tour of duty, assigned as the Truck #2 supervisor in Truck #5511, with Detective Gonzalez. Sergeant McCormack was requested over SOD division radio to respond to 113 Morningside Avenue in regards to a barricaded EDP. Upon arrival, Sergeant McCormack met with Officer Kress and Detective Mateo assigned to the Adam car. Sergeant McCormack, along with Officer Kress and Detective Mateo, suited up with heavy vest and helmets and entered the building. He then met with Lieutenant Gallitelli, the 26th Precinct Platoon Commander, on the 4th floor of the location and began to confer about what had transpired. Sergeant McCormack was informed by Lieutenant Gallitelli that they had an EDP with a knife. Shortly thereafter, the ESU Boy car arrived with Detective Zaberto and Officer Green. The stack consisted of Officer Kress with the lead bunker and taser, Detective Mateo with the Arwen less lethal munitions launcher, Officer Green and Officer Zaberto side by side with Sergeant McCormack. They attempted to make contact with the EDP who was inside the apartment but the EDP was speaking incoherently. The door was roped off and tied to the banister while the end was held by Sergeant McCormack. The peep hole was removed and used to place chemical light sticks in the apartment since it was dark with no visibility inside. Sergeant McCormack requested the Hostage Negotiation Team and TARU. Lieutenant Licita, ESU, arrived on the scene. Sergeant McCormack directed the patrol units to attempt to gain entry to the apartment directly beneath the EDP's apartment to see the floor plan.

10

DEF 16759

The pole camera was requested to the 4th floor apartment. Lieutenant Licitra attempted to see into the 5th floor windows but was met with negative results. The 5th floor windows were completely blacked out. With no visual into the apartment, the door was breached enough to create a small void in order to utilize the pole camera. Sergeant McCormack loosened the rope from the door in order for the breach to occur but continued to hold it firmly. The image on the camera receiver was very dark and sketchy. As they were viewing the receiver, the EDP violently thrust the door open with a knife in his hand. The EDP's violent pull of the door caused Sergeant McCormack to lose control of the rope. Officer Kress discharged his X-26 Taser with negative results. Detective Mateo then discharged the Arwen device one (1) time and was also met with negative results. Sergeant McCormack heard one (1) of his officers state "he's got a knife, he's stabbing me, shoot him." Sergeant McCormack could not see if the EDP was actually armed but his body movement suggested that he was fighting with the officers. Sergeant McCormack identified a small target, placed the dot on the upper torso of a white shirt and depressed the trigger to his M-26 Taser. This also produced negative results. At that point three (3) officers discharged their firearms and struck the EDP several times. The shots were fired rapidly and in quick succession after the Tasers and less lethal devices were utilized. Sergeant McCormack observed barbs from the Taser in the EDP's neck and chest area, the barb in the chest dislodged. He does not know which barbs came from which Taser. Sergeant McCormack verified that his Taser and Officer Kress' Taser were tested prior to use as per protocol.

### Detective Christopher Zaberto, tax registry #907614, ESU Truck 2

Detective Christopher Zaberto, tax registry #907614, shield #6414, assigned to ESU Truck #2, Boy Car in RMP #5591, with Police Officer Michael Green, performed a 1515x2350 tour of duty. Detective Zaberto was directed by SOD radio to respond to 113 Morningside Avenue regarding an EDP. The initial job came over as an EDP, then as a barricaded EDP with a knife. Upon their arrival they were briefed by Detective Gonzalez, of Truck #2, who was already on the scene. Detective Zaberto met with a woman who identified herself as the EDP's mother and stated that her son does not have any medical history, but has been acting irrationally lately. Detective Zaberto and his partner both entered into the building with equipment donned and proceeded to the fifth floor of the location. They then met with ESU Sergeant McCormick, Police Officer Andy Kress and Detective Mateo. Police Officer Kress had the Ballistic Bunker against the door to restrict the EDP's view through the peep hole, and tried to initiate verbal contact with the EDP. Detective Zaberto observed Detective Mateo equipped with an Arwen which is a less lethal weapon that projects rubber ballistic bullets. Detective Zaberto also observed a rope with one end tied around the door knob and the other end tied around a banister to prevent the EDP from opening the apartment door. The ESU team members were waiting for intelligence that was being gathered by other units on the scene in order to plan their next move. The peep hole to the apartment door had already been removed and blocked with a bunker by Police Officer Kress to restrict the EDP's view through the peep hole. A chemical light was deployed into the peep hole so that ESU can see into the apartment but it had proved unsuccessful. Detective Zaberto was in control of the rabbet tool and did not breach the door at that time. Detective Zaberto was able to gain access to the apartment directly below the EDP's apartment and went through the fire escape to deploy the pole camera but was unable to see anything because the apartment window shades were drawn. The pole camera was then deployed through a crack in the door where the rabbet tool had been used to pry it open. Lieutenant Licitra from ESU was maneuvering the camera around while Detective Zaberto was

DEF 16760

viewing the monitor. This also proved unsuccessful because the EDP moved the camera prohibiting ESU from seeing anything inside of the apartment. The monitor was given to Lieutenant Licitra and Detective Zaberto returned back to his position on the entry team. The door of the apartment then flew open and Police Officer Kress entered into the apartment with Bunker and taser in hand. Detective Zaberto heard repeated commands to drop the knife and observed Police Officer Kress deploy the Taser with negative results. Sergeant McCormick then deployed his Taser with negative results. Detective Zaberto could not make out if the less than lethal weapon Arwen was deployed. At that point the EDP was still being ordered to drop the knife but was non-compliant. Police Officer Kress, while backing up dropped his Taser and the EDP started stabbing at Police Officer Kress under his bunker with the knife in his hand. Police Officer Kress discharged more than one (1) round from his 9mm Sig Sauer firearm and Police Officer Green also discharged his 9mm Glock 19. The EDP suffered bullet wounds from the shooting and fell to the ground. At that time Detective Zaberto checked with Detective Mateo, Police Officer Green, and Police Officer Kress to see if anyone was stabbed with negative results, everyone reported they were okay. Detective Zaberto checked on the EDP and saw that he was still alive and conscious but incapacitated with the knife he had previously held lying on the floor about one foot from his body. While administering aid to the EDP Detective Zaberto observed two barbs lodged in the EDP. One was in his neck and the other on his left torso area. Detective Zaberto and EMS already on the scene rendered advance care to the EDP and removed him to Saint Lukes Hospital.

10.   **CIVILIAN SUBJECT - INTERVIEW**

Mr. Mohamed Bah succumbed to his injuries and was pronounced dead at 2016 hours, and therefore was not interviewed.

11.   **CIVILIAN WITNESS - INTERVIEW**

Interviews with civilian witnesses to the incident were conducted by members of the Detective Bureau and were recorded on Complaint Follow-Up Informationals (DD5's). A canvass of the area was conducted by members of the Detective Bureau and Internal Affairs Bureau. The aggregate content of the interviews helped form the basis of the narrative in paragraph #4.

**Civilian Witness #1,** a female, black, ear-witness, known to the Department, stated that she heard banging on a door upstairs and then gunshots. The witness stated he was a nice guy and would help her with groceries/packages.

**Civilian Witness #2,** a female, Hispanic, ear-witness, known to this Department, stated she heard an argument followed by gunshots at which point she ran to the rear of her apartment. The witness stated she doesn't know the aided and has lived in the building for five (5) years.

**Civilian Witness #3,** a male, black, ear witness, known to this Department, stated UMOS utilized his fire escape to try and view the aided's apartment with a camera but the blinds were down. The witness further stated that UMOS attempted to call the aided via

DEF 16761

telephone but no one answered. The witness heard a door open, a scuffle and then gunshots. Witness stated he doesn't like the police but feels they did everything they could.

**Civilian Witness #4,** a female, black, ear witness, known to this Department, stated she heard a series of gunshots. The witness does not know the aided and only spoke to him in passing.

**Civilian Witness #5** a male, black, ear witness, known to this Department, s stated he just heard a lot of commotion and just knew the aided as a neighbor.

**Civilian Witness #6** a female, black, ear witness, known to this Department, stated she heard a lot of commotion. According to the witness, the aided was a nice guy and didn't bother anybody.

12.     **EMOTIONALLY DISTURBED PERSON HISTORY**

A Real Time Crime Center search of Mr. Mohamed Bah did not produce a criminal history. One (1) non-criminal NYSID # 00340662H was listed for a New York City Taxi and Limousine Commission application and a New York Department of State-Licensing Division application. He has several vehicle traffic infractions noted regarding vehicle accidents and moving violations. There are no previous aided events on file for Mr. Bah.

13.     **MOS DESCRIPTION**

Police Officer Andrew Kress is a male, white, forty-four (44) years old. He was wearing his Department authorized bullet-resistant vest and was attired in the uniform of the day. He was in possession of one (1) firearm, his authorized service weapon, at the time of the incident. Also in his possession at the time of the incident was a model X-26 Taser.

Detective Edwin Mateo is a male, Hispanic, forty-two (42) years old. He was wearing his Department authorized bullet-resistant vest and was attired in the uniform of the day. He was in possession of one (1) firearm, his authorized service weapon, at the time of the incident. Also in his possession at the time of the incident was an Arwen 37 Munitions Projectile weapon.

Police Officer Michael Green is a male, white, thirty-three (33) years old. He was wearing his Department authorized bullet-resistant vest and was attired in the uniform of the day. He was in possession of one (1) firearm, his authorized service weapon, at the time of the incident.

14.     **MOS FIREARM INFORMATION**

Detective Mateo's authorized service weapon, a Glock, 9mm, semi-automatic pistol, model #19, serial #PHV405, was secured and inspected by Lieutenant Michael Licitra, tax registry #906642, the ESU City Wide Supervisor. It was found to contain one (1) round in the

13

DEF 16762

chamber and ten (10) rounds in the magazine of authorized Department-issued ammunition. Lieutenant Licitra determined there was indicium of recent discharge.

Officer Kress's authorized service weapon, a Sig Sauer, 9mm, semi-automatic pistol, model #P226, serial #U501251, was secured and inspected by Lieutenant Michael Licitra, tax registry #906642, the ESU City Wide Supervisor. It was found to contain one (1) round in the chamber and twelve (12) rounds in the magazine of authorized Department-issued ammunition. Lieutenant Licitra determined there was indicium of recent discharge.

Officer Green's authorized service weapon, a Glock, 9mm, semi-automatic pistol, model #19, serial #DWW887US, was secured and inspected by Lieutenant Michael Licitra, tax registry #906642, the ESU City Wide Supervisor. It was found to contain one (1) round in the chamber and thirteen (13) rounds in the magazine of authorized Department-issued ammunition. Lieutenant Licitra determined there was indicium of recent discharge.

Sergeant Arthur Beal, Patrol Borough Manhattan North Investigations Unit, verified Detective Mateo, Officer Kress and Officer Green's firearms against their force record.

15. **MOS HISTORICAL DATA**

Detective Mateo was appointed to the Department on July 18, 1996 and assigned to Emergency Service Unit on February 19, 2001. He last attended the annual pistol range qualification cycle on March 03, 2012. Detective Mateo has no previous firearms discharges.

Police Officer Kress was appointed to the Department on February 28, 1994 and assigned to Emergency Service Unit on October 10, 2010. He last attended the annual pistol range qualification cycle on April 18, 2012. Officer Kress has no previous firearms discharges.

Police Officer Green was appointed to the Department on July 01, 2002 and assigned to Emergency Service Unit on June 02, 2011. He last attended the annual pistol range qualification cycle on March 21, 2012. Officer Green has no previous firearms discharges.

16. **CRIME SCENE UNIT**

A.  Crime Scene Unit was notified and responded.

B.  Crime Scene Run #12-756.

C.  Recovered, ten (10) 9mm spent shell casings, one (1) fired bullet, one (1) less then lethal projectile, one (1) Sig Sauer, 9mm, semi-automatic pistol, model #P226, serial #U501251, one (1) Glock, 9mm, semi-automatic pistol, model #19, serial #DWW887, one (1) Glock, 9mm, semi-automatic pistol, model #19, serial # PHV405, two (2) spent Taser cartridge, Serial #REVC31008PC4X9 & #REVC31008982X9, and one (1) large knife approximately 10" in length.

DEF 16763

D.     Detective Gilford, CSU, is assigned the case.

17.     **EMERGENCY SERVICES UNIT**

       Members of the Emergency Services Unit not involved in the firearms discharge were on scene and assisted in the evidence search and recovery.

18.     **BALLISTICS**

       Detective Mateo, Police Officer Kress and Police Officer Green's firearms were delivered to the Firearms Analysis Section, for examination/testing, by members of the Patrol Borough Manhattan North Investigations Unit.

19.     **TRAUMA UNIT**

       All members of the service involved in this incident were apprised of the availability of counseling services offered by the Department and outside the Department. However, all involved members of the service declined at this time.

20.     **BOROUGH ASSIGNMENT**

       Detective Mateo, Police Officer Kress and Police Officer Green will be temporarily assigned to their parent command, as per the relevant Patrol Guide procedure.

21.     **COMMUNITY AFFAIRS**

       Deputy Inspector Ehrenberg, Commanding Officer, 26th Precinct, along with Lieutenant Norville, PBMN Community Affairs, contacted numerous prominent community leaders and clergy in order to advise them of the incident and survey the community for unrest. As of the writing of this report, no community unrest was found.

22.     **REPORTS PREPARED**

| | |
|---|---|
| Firearms Discharge/Assault Report | # 2012-026-0004-01A/02A/03A |
| UF 61 | # 2012-026-03464 |
| Aided | # 2012-26-779/780/781 |

22a.     **EVIDENCE VOUCHERED**

Voucher Numbers

| | |
|---|---|
| Glock, 9MM, model 19 | # 6000003139 |
| Glock, 9MM, model 19 | # 6000003141 |

15

DEF 16764

```
Sig Sauer, 9MM, model P226          # 6000003142
Less then lethal projectile         # 6000003143
Fired bullet                        # 6000003144
```

23.     **MEDICAL INFORMATION**

Detective Mateo was taken to New York Presbyterian – Weill Cornell Medical Center and treated and released for a puncture wound to his left arm, left shoulder and arm strain, right elbow strain, and tinnitus by Dr. Dua.

Police Officer Kress was taken to New York Presbyterian – Weill Cornell Medical Center and treated and released for tinnitus by Dr. Anthony.

Police Officer Green was taken to New York Presbyterian – Weill Cornell Medical Center and treated and released for tinnitus by Dr. Cordwell.

Mr. Mohamed Bha sustained several gunshot wounds during the incident. However, Mr. Bha was pronounced dead at 2016 hours by Dr. Ralston at Saint Luke's Roosevelt Medical Center.

24.     **RADIO RUN INFORMATION**

A copy of SPRINT job #T11575 has been reviewed and attached to this report.

25.     **MISCELANEOUS**

The breathalyzer exam of Detective Mateo, Officer Kress and Officer Green was administered by Deputy Inspector Sheehan, Commanding Officer, IAB Group #11, at New York Presbyterian – Weill Cornell Medical Center. All Officers were found to be fit for duty and passed the test.

Detective Vincent Matias, tax registry #901930, and Detective Robert Shannon, tax registry #894937, assigned to the 26th Precinct Detective Squad, conducted an evidence search of the crime scene and surrounding buildings during daylight hours. The detectives, escorted by Security Officer Robert Silver under the direction of Security Director Eugene Green, searched the 5th story roof landing and 6th, 7th, and 8th floors of 133 Morningside Avenue, a Board of Education Building with negative results. The detectives, still accompanied by Mr. Silver, also searched the Harlem Health Center located at 388 W. 125th Street with negative results.

26.     **THE FOLLOWING WERE PRESENT**

Chief Joseph J. Esposito              Chief of Department
Assistant Chief William T. Morris     C.O., Patrol Borough Manhattan North
Assistant Chief Harry Wedin           C.O., Special Operations Division

16

DEF 16765

| | |
|---|---|
| Deputy Chief Joseph R. Riley | X.O., Patrol Borough Manhattan North |
| Deputy Chief Walter Salowski | C.O., Detective Borough Manhattan |
| Deputy Chief Denis M. McCarthy | City Wide Duty Chief |
| Deputy Chief James G. Molloy | C.O., Emergency Service Unit |
| Inspector Harrington | PBMN Operations Commander |
| Inspector Capul | PBMN Special Projects |
| Inspector Colon | C.O., Community Affairs Division |
| Inspector Mekeel | C.O., Real Time Crime Center |
| Inspector Collamusi | C.O., Investigative Review Division |
| Inspector Caroli | C.O., Firearms and Tactics Section |
| Deputy Inspector Stephenson | PBMN Duty Inspector |
| Deputy Inspector Benoit | C.O., Crime Scene Unit |
| Deputy Inspector Sheehan | C.O., IAB, Group #11 |
| Deputy Inspector Barton | C.O., IAB, Group #21 |
| Deputy Inspector McSorley | C.O., Manhattan North Det. Ops. |
| Captain Hart | Detective Borough Manhattan |
| Captain Ventrella | C.O., PBMN Task Force |
| Captain Natale | PBMN Duty Captain |
| Captain Gazis | C.O., Office of Prof. Dev. |
| Captain Aramboles | Emergency Service Unit |
| Captain Galvin | Emergency Service Unit |
| Captain Mugan | X.O., Crime Scene Unit |
| Lieutenant Norville | PBMN Community Affairs |
| Lieutenant Whyte | DCPI |
| Lieutenant Corbett | Chief of Department's Office |
| Lieutenant Melendez | C.O., 26th Detective Squad |
| Sergeant Wright | Chief of Patrol's Office |
| Sergeant Cararcas | Operations Divison |

27. **THE FOLLOWING WERE NOTIFIED**

| | |
|---|---|
| Police Officer Ruane | INRU |
| Police Officer Van Schuyler | Operations, FDRB #87s.12 |
| Police Officer Richards | PBMN Wheel |
| Detective Cooke | IAB, Log #12-50993 |

28. **RECOMMENDATION**

The preliminary investigation into this incident is concluded. Detective Edwin Mateo discharged five (5) rounds, Police Officer Andrew Kress discharged three (3) rounds, and Police Officer Michael Green discharged two (2) rounds from their authorized service weapons, at an armed Emotionally Disturbed Person, that had just violently lunged and slashed at Detective Mateo's and Officer Kress's vests with a large kitchen knife and who was advancing to continue his assault. Police Officer Kress deployed the X-26 Taser and Sergeant Joseph McCormack deployed the M-26 Taser, independently, one (1) time each at different times at the subject; however, neither Taser attempt was successful in restraining the

17

DEF 16766

Emotionally Disturbed Person. Detective Mateo deployed the Arwen Munitions weapon discharging one (1) hard plastic less lethal round at the subject which also proved to be ineffective. Unable to tactically retreat and confronted by the use of lethal force against them, three (3) officers discharged a total of ten (10) rounds to terminate the threat. A final determination will be made at the conclusion of a follow-up investigation, which will include a formal interview of Detective Mateo, Police Officer Kress and Police Officer Green, as well as a review of any relevant information not currently available at the time of this report.

Eric Pagan
Captain

**DISTRIBUTION**
Chief of Department (DIRECT)
Chief of Department (THROUGH CHANNELS)
Chief of Department's Investigation Review Section, Firearms Discharge Review Board
Deputy Commissioner, Strategic Initiatives
Deputy Commissioner, Training
Deputy Commissioner, Public Information
Deputy Commissioner, Personnel
Chief of Patrol
Chief of Detectives
Chief of Internal Affairs Bureau
Commanding Officer, Patrol Borough Manhattan North
Commanding Officer, Special Operations Division
Executive Officer, Patrol Borough Manhattan North
Commanding Officer, Emergency Services Unit
Commanding Officer, Detective Borough Manhattan
Commanding Officer, Firearms and Tactics Section
Commanding Officer, 26th Precinct
Commanding Officer, SOD Investigations Unit
File

DEF 16767