UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/13/2020
```

Dorrelien Felix, *et al.*,

                Plaintiffs,

      –v–

City of New York, *et al.*,

                Defendants.

16-cv-5845 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

This litigation concerns the attempted arrest and fatal shooting of David Felix. Felix's parents and estate sued the two New York Police Department detectives involved in the incident and the City of New York, asserting claims under 42 U.S.C. § 1983, federal disability discrimination statutes, and New York law. The Plaintiffs contend that the City is liable for the detectives' alleged violations of Felix's constitutional rights because the City failed to train and supervise officers in the treatment of mentally ill and emotionally disturbed persons.

The City moves for summary judgment on the failure-to-train and disability discrimination claims. The City also requests, by the same motion, that the Court bifurcate the claims against it from those against the individual officers and limit the trial testimony of an expert witness. For the reasons that follow, the Court grants in part and denies in part the City's motion.

**I.    Background**

The factual circumstances of this case are set out in more detail in the Court's prior orders on the City's motion to dismiss and the detectives' motion for partial summary judgment.

*See Felix v. City of New York (Felix I)*, 344 F. Supp. 3d 644, 649–52 (S.D.N.Y. 2008); *Felix v. City of New York (Felix II)*, 408 F. Supp. 3d 304, 306–07 (S.D.N.Y. 2009).

As relevant here, Detectives Harold Carter and Vincente Matias arrived at the Bridge, a residential facility for individuals suffering from mental illness, on April 25, 2015, to arrest Felix for a robbery and assault. *Felix II*, 408 F. Supp. 3d at 306; Plaintiffs' Responses to Defendants' Rule 56.1 Statement ("Plf. Counter 56.1"), Dkt. No. 142, ¶¶ 1–2. A Bridge employee informed the detectives that Felix suffered from paranoid schizophrenia. *Felix II*, 408 F. Supp. 3d at 306; Plf. Counter 56.1 ¶¶ 3, 6. The employee attempted to buzz Felix, and then led the detectives to his apartment door. *Felix II*, 408 F. Supp. 3d at 306; Plf. Counter 56.1 ¶¶ 7, 9. The employee knocked and heard no answer. *Felix II*, 408 F. Supp. 3d at 306; Plf. Counter 56.1 ¶¶ 10–11. The employee then opened the door with her master key. *Felix II*, 408 F. Supp. 3d at 306; Plf. Counter 56.1 ¶ 16. The detectives entered the apartment. *Felix II*, 408 F. Supp. 3d at 306; Plf. Counter 56.1 ¶¶ 17–20. Matias saw Felix descending down the fire escape outside the window. *Felix II*, 408 F. Supp. 3d at 306; Plf. Counter 56.1 ¶ 22. The detectives ran down the stairs to intercept him. *Felix II*, 408 F. Supp. 3d at 306; Plf. Counter 56.1 ¶¶ 23–25. Detective Carter grabbed Felix by the front door of the building lobby. *Felix II*, 408 F. Supp. 3d at 306; Plf. Counter 56.1 ¶¶ 27–30. After a brief struggle—the circumstances of which the parties dispute—Carter fatally shot Felix. *Felix II*, 408 F. Supp.3d at 306; Plf. Counter 56.1 ¶ 33; Defendants' Counter-Statement Pursuant to Local Rule 56.1 ("Def. Counter 56.1"), Dkt. No. 146, ¶¶ 117–132.

The NYPD receives over 100,000 calls involving emotionally disturbed persons each year. Def. Counter 56.1 ¶ 5. The NYPD has long acknowledged that police encounters with mentally ill or emotionally disturbed persons present heightened risks for police use of force, and

it has required new recruits and some promoted officers undergo training related to emotionally disturbed persons.  *Id.* ¶¶ 1–3; 14–16; Patrol Guide Procedure No. 216-05, Dkt. No. 143, Ex. 28.  However, it did not require detectives, including Carter and Matias, to undergo training upon promotion.  Def. Counter 56.1 ¶¶ 23–26.  Carter last received training related to emotionally disturbed persons in 1994, and Matias last received training related to emotionally disturbed persons in 1992.  *Id.* ¶¶ 132–134.  The NYPD also did not require police officers to undergo Crisis Intervention Training ("CIT"), which teaches de-escalation techniques to avoid violent confrontations with mentally ill and emotionally disturbed persons, until 2015.  *Id.* ¶¶ 41–44.  A 2017 report by the NYPD Office of the Inspector General found what it considered to be significant deficiencies in the NYPD's CIT Program.  *Id.* ¶ 45; *see* New York Police Department Office of the Inspector General, *Putting Training Into Practice: A Review of NYPD's Approach to Handling Interactions with People in Mental Crisis* ("NYPD-OIG Report") (2017).

To bolster claims that the NYPD failed to adequately train officers to deal with mentally ill and emotionally disturbed persons, the Plaintiffs point to an expert report by Dr. Grace Telesco, a retired NYPD Lieutenant and former Chairperson of the Behavior Science Department at the New York Police Academy.  Expert Witness Report of Grace Telesco, Ph.D. ("Telesco Report"), Dkt. No. 143, Ex. 35.  Dr. Telesco opined in her expert report that the training NYPD provided its officers "was inadequate and well below acceptable national standards," both because detectives did not receive retraining following promotion and because the training offered new officers did not include a CIT component.  *Id.* at 5–6.  She further opined that, had Carter and Matias received appropriate training, they would have called for backup and attempted to isolate and contain Felix rather than escalating the situation, and that, were it not for their missteps, Felix likely would have survived the encounter.  *Id.* at 7–12.

## II.     Discussion

### A.     Summary Judgment

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (internal citations omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In applying this standard, [courts] 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (quoting *Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).

#### 1. Failure to Train

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality may not be held liable for constitutional violations by its employees on the basis of *respondeat superior*. *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995). Instead, a plaintiff must establish that a municipal policy or custom caused the constitutional violation. *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

The Second Circuit has held that a plaintiff must satisfy three elements to show that a failure to train constitutes deliberate indifference. "First, the plaintiff must show that a

policymaker knows to a moral certainty that her employees will confront a given situation. Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (internal citations and quotation marks omitted). "In addition, at the summary judgment stage, plaintiffs must identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Id.* (internal quotation marks omitted).

There is at least a genuine dispute of material fact as to each of these elements. Undisputed evidence shows that NYPD officers respond to over 100,000 calls involving emotionally disturbed persons each year, often hundreds each day. Def. Counter 56.1 ¶ 5. NYPD training materials reflect that the City was aware that officers regularly respond to emotionally disturbed person calls and that encounters with mentally ill or emotionally disturbed persons present unique risks. Def. Counter 56.1 ¶¶ 14–15. NYPD officers had shot and killed emotionally disturbed persons on a number of occasions prior to Felix's death. Def. Counter 56.1 ¶¶ 30–37. These incidents prompted the NYPD-OIG to undertake a review of the NYPD's CIT Program, which found a notable "failure to fully integrate and use [CIT] training within the totality of NYPD's everyday policing." NYPD-OIG Report at 1. The NYPD-OIG Report reiterated what was clear from the NYPD's policies and training materials: encounters with emotionally disturbed persons present "the potential for a lethal outcome" if handled improperly. *Id.*; *see also* Def. Counter 56.1 ¶ 15; Patrol Guide Procedure No. 216-05. The record contains

ample evidence from which a reasonable juror could find that the City knew that NYPD officers regularly encountered emotionally disturbed persons; that officers frequently mishandled these encounters; and that doing so often resulted in preventable uses of lethal force.

The City does not dispute its awareness of the need for training or the consequences that frequently flow from an officer's mishandling of an encounter with an emotionally disturbed person. However, the City contends that NYPD's history of responding to calls involving emotionally disturbed persons and prior civil rights suits related to fatal shootings did not suffice to put the City on notice that the training it provided to officers was inadequate. Resolving all factual ambiguities in favor of the Plaintiffs, as the Court must do in this posture, the Court disagrees. As this Court previously held, claims of officer misconduct may put a municipality on notice of training deficiencies even if those claims do not result in a formal finding that misconduct resulted from a failure to train. *Felix I*, 344 F. Supp. 3d at 662; *see also Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) ("Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force."). Moreover, plaintiffs need show only "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult *or* that there is a history of employees mishandling the situation" to satisfy the second prong of the deliberate indifference standard. *Jenkins*, 478 F.3d at 94 (emphasis added); *see, e.g.*, *Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir. 1992) (holding that failure by District Attorney to train Assistant District Attorneys on *Brady* obligations could support *Monell* liability where plaintiffs did not allege a history of disclosure violations). A reasonable juror could find either on this record.

The City also makes several arguments related to causation.  First, the City contends that ensuring Carter and Matias had been recently trained on NYPD's policy on emotionally disturbed persons would not have prevented Felix's death because the detectives complied with that policy.  Second, that additional training would not have helped because the detectives never had an opportunity to attempt to communicate with Felix or deescalate the situation.  Finally, that a lack of training cannot be at fault if, as the Plaintiffs claim, Carter shot Felix when his hands were up as he attempted to surrender.  None of these are persuasive.

There is a genuine dispute as to whether Carter and Matias violated NYPD's policy on emotionally disturbed persons.  As this Court held previously, the relevant Patrol Guide Procedure does not unambiguously state whether the policy would apply based on the detectives' knowledge of Felix's diagnosis and suspected criminal conduct.  *Felix I*, 344 F. Supp. 3d at 657.  The Patrol Guide defines an emotionally disturbed person as "[a] person who appears to be mentally ill or temporarily deranged *and* is conducting himself in a manner which a police officer reasonably believes is likely to result in serious injury to himself or others."  Patrol Guide Procedure No. 216-05 (emphasis added).  However, the stated purpose of the policy is "[t]o safeguard a mentally ill *or* emotionally disturbed person who does not voluntarily seek medical assistance."  *Id.* (emphasis added).  In the City's view, NYPD's policy on emotionally disturbed persons attaches only once an officer personally observes an individual displaying behavior that reflects a risk of harm to themselves or others.  *See* Deposition of Theresa Tobin, Dkt. No. 143, Ex. 26, at 42:17–45:18.

But the record contains significant evidence that the City's view does not comport with how the NYPD has historically understood its policy.  NYPD's training materials suggest that officers may identify an emotionally disturbed person based on reports of mental illness and

7

violent behavior.  *See, e.g.*, Def. Counter 56.1 ¶ 15.  Dr. Telesco opined that the detectives should have recognized Felix as a potential emotionally disturbed person based on his diagnosis of paranoid schizophrenia and the allegations that he had committed a violent assault only days before.  Telesco Report at 8.  The Firearms Discharge Review Board report reached a similar conclusion.  *Id.* at 9.  A reasonable juror could draw different inferences based on how they weighed this evidence and how they assessed the credibility of Dr. Telesco and Chief Tobin.

Nor would a finding that NYPD's policy on emotionally disturbed persons did not apply to these circumstances foreclose a claim against the City for failure to train.  To the contrary, if training provided to officers was silent on how officers should approach a suspect of a violent crime with paranoid schizophrenia until the officers were enmeshed in a physical confrontation, a reasonable juror could readily conclude that the training was inadequate.  *See* Telesco Report at 9 (proper training would have called for the detectives to "back off and call their supervisor for guidance" before gaining access to Felix's apartment).

The City's contention that the detectives never had an opportunity to attempt to communicate with Felix prior to entering his apartment overlooks record evidence as to possible actions the detectives could have taken, with proper training, to avoid escalating the situation. The Telesco Report, quoting the President's Task Force on 21st Century Policing and the 2017 National Consensus Policy on Use of Force, noted that de-escalation techniques may include "command presence, advisements, warnings, verbal persuasion and tactical repositioning." Telesco Report at 9.  Both the NYPD training materials and the Firearms Discharge Review Board report reflect that officers should generally call for a supervisor or an emergency services unit rather than attempting to approach an emotionally disturbed person.  *See id.*; Patrol Guide Procedure No. 216-05; *cf.* Def. Counter 56.1 ¶ 3 (arguing that these techniques are not possible

or necessary in all circumstances). The detectives could have—and a reasonable juror could conclude they should have—called for a supervisor or employed isolation and containment techniques rather than entering Felix's apartment, chasing him through the lobby, and engaging him in a physical altercation. *See* Telesco Report at 12.

Finally, that the Plaintiffs allege intentional wrongdoing by the detectives does not defeat causation. To be sure, a municipality may not be held liable for a failure to train because an officer flouts their training. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130 (2d Cir. 2004). But misconduct—even flagrant misconduct—may trigger liability if the risk of constitutional violations is high without adequate training. *Walker*, 974 F.2d at 297–98. Contrary to the City's position that deficient training cannot be at fault for intentional misconduct like shooting someone who posed no danger to officers, the use of deadly force against a fleeing suspect was the paramount example cited by the Supreme Court in *Canton* as supporting liability for failure to train. *Id.* (citing *Canton*, 489 U.S. at 390 & n.10). A reasonable juror could conclude that, but for the City's failure to provide adequate training, Carter would not have engaged Felix in a physical altercation that dramatically increased the risk of the use of deadly force.

The Court therefore denies the City's motion for summary judgment as to the failure-to-train claim.

### 2. Disability Discrimination

The City also moves for summary judgment on the disability discrimination claims. Title II of the Americans with Disabilities Act ("ADA") forbids the denial of benefits, programs, or services to individuals with disabilities who are otherwise qualified to receive them. 42 U.S.C. § 12132. "To prove a violation of Title II, a party must therefore establish: (1) that he is a

9

qualified individual with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." *Hargrave v. Vermont*, 340 F.3d 27, 34–35 (2d Cir. 2003) (internal quotation marks omitted). A claim under the Rehabilitation Act requires the same showing. *Fulton v. Goord*, 591 F.3d 37, 42 n.1 (2d Cir. 2009).

This Court previously held that the Plaintiffs had stated a claim for violation of the ADA and Rehabilitation Act. *Felix I*, 344 F. Supp. 3d at 664. The parties agree that the ADA requires police departments to make reasonable accommodations for disabled suspects. *See, e.g.*, *Morales v. City of New York*, No. 13-cv-7667 (RJS), 2016 WL 4718189, at *7 (S.D.N.Y. Sept. 7, 2016); *Williams v. City of New York*, 121 F.Supp.3d 354, 368 (S.D.N.Y. 2015); *Wagner v. City of New York*, No. 14-cv-2521 (VEC), 2015 WL 5707326, at *7 (S.D.N.Y. Sept. 28, 2015); *Valanzuolo v. City of New Haven*, 972 F. Supp. 2d 263, 273–74 (D. Conn. 2013); *Anthony v. City of New York*, No. 00-cv-4688 (DLC), 2001 WL 741743, at *11 (S.D.N.Y. July 2, 2001); *Woods v. City of Utica*, 902 F. Supp. 2d 273, 280 (N.D.N.Y. 2012); *Ryan v. Vt. State Police*, 667 F. Supp. 2d 378, 389 (D. Vt. 2009). The ADA's implementing regulations explicitly acknowledge schizophrenia as a disability covered by the ADA. *Felix I*, 344 F. Supp. 3d at 644 (citing 28 C.F.R. § 35.108(d)(2)(iii)(K)). The same evidence that would allow a reasonable juror to conclude that the City was deliberately indifferent to the rights of emotionally disturbed persons supports the inference that the City was deliberately indifferent to the risk of disability discrimination. *See id.*; *Williams*, 121 F. Supp. 3d at 374–75.

The City argues that it is nonetheless entitled to summary judgment on the disability discrimination claims for two reasons. First, it contends that the detectives were not aware of

Felix's current mental state before they saw him fleeing down the fire escape. Second, the City again seeks refuge in its interpretation of the NYPD's policy on emotionally disturbed persons, which the City claims would not require officers to call for backup until they personally observed Felix engaging in behavior that reflected a risk of serious injury to himself or others.

The City's first argument neglects substantial evidence in the record. It is undisputed that the detectives learned of Felix's mental health diagnosis and that he was suspected of a violent crime before going to his apartment to confront him. *Felix II*, 408 F. Supp. 3d at 306; Plf. Counter 56.1 ¶¶ 1–3, 6. Even if they had doubts about Felix's mental state at that time, or were unsure they would find him in his apartment, the City does not articulate any reason why those doubts should have persisted after the detectives saw Felix flee down the fire escape. At either of these junctures, the detectives could have taken the actions suggested by the Patrol Guide, the Telesco Report, or the Firearms Discharge Review Board report. *See* Patrol Guide Procedure No. 216-05; Telesco Report at 9. A reasonable juror could conclude that the detectives had the opportunity to make a reasonable accommodation for Felix's disability and failed to do so.

The City's reliance on its interpretation of the NYPD's definition of an emotionally disturbed person is also misplaced. Conduct may violate the ADA and Rehabilitation Act even if it comports with a city's internal policies and procedures. The disability discrimination statutes apply to individuals with disabilities like schizophrenia—not merely individuals who are also displaying the behavior the City contends would be required to deem them emotionally disturbed persons under its internal policies. *See* 28 C.F.R. § 35.108(d)(2)(iii)(K). Indeed, this Court rejected precisely this argument in its prior order. *See Felix I*, 344 F. Supp. at 644 ("Defendant's suggestion that Mr. Felix was not behaving in an emotionally disturbed manner and that he did not appear to be a threat to himself or others, even if accurate or creditable at this stage, does not

11

contradict Plaintiffs' well-pled allegation that Mr. Felix was entitled to the ADA and Rehabilitation Act's protections."). A reasonable juror could conclude that Felix was a qualified individual with a disability covered by the ADA and Rehabilitation Act.

The Court therefore denies the City's motion for summary judgment as to the disability discrimination claims.

### B. Bifurcation

Federal Rule of Civil Procedure 42(b) affords district courts wide discretion to bifurcate a trial to further convenience, avoid prejudice, or promote judicial efficiency. *Amato v. City of Saratoga Spring*, 170 F.3d 311, 316 (2d Cir. 1999). Courts in this district have taken a range of approaches to the bifurcation of claims against individual officers from claims against municipalities. *See, e.g.*, *Brown v. City of New York*, No. 13-cv-6912 (TPG), 2016 WL 616396, at *2 (S.D.N.Y. Feb. 16, 2016) ("Courts in this Circuit favor bifurcating *Monell* claims." (citation omitted)); *Jeanty v. Cty. of Orange*, 379 F. Supp. 2d 533, 549 (S.D.N.Y. 2005) ("[T]he presumption is that all claims in a case will be resolved in a single trial, and it is only in exceptional circumstances where there are special and persuasive reasons for departing from this practice that distinct causes of action asserted in the same case may be made the subject of separate trials." (internal quotation marks and citations omitted)). Second Circuit precedent makes clear that consideration of the factors in Rule 42(b) "is 'firmly within the discretion of the trial court.'" *Katsaros v. Cody*, 744 F.2d 270, 278 (2d Cir. 1984) (quoting *In re Master Key Antitrust Litigation*, 528 F.2d 5, 14 (2d Cir. 1975)).

The Court finds that the City's arguments in favor of bifurcation do not overcome the presumption that all claims should be resolved in a single trial. In this Court's experience, bifurcation often results in greater burden on court resources and significant delay to the entry of

final judgment. Although a finding that no constitutional violation occurred could obviate the need for testimony regarding the *Monell* claim, those gains in judicial efficiency are likely to be outweighed by the efforts required to schedule and prepare for separate trials. Moreover, even if the detectives prevailed on the § 1983 claims, trial might still be necessary on the disability discrimination and state-law claims against the City. The Court is confident that carefully crafted limiting instructions can eliminate any risk of undue prejudice to the detectives resulting from evidence offered against the City. *See Jeanty*, 379 F. Supp. 2d at 550 (collecting cases). The Court therefore declines to exercise its discretion to order separate trials.

### C. Expert Testimony

The City also seeks to exclude testimony by the Plaintiff's expert witness, Dr. Telesco. "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions, representing a departure from the previously widely followed, and more restrictive, standard of *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923)." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993)). "[B]y loosening the strictures on scientific evidence set by *Frye*, *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence." *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995). In *Daubert*, "the Court expressed its faith in the power of the adversary system to test 'shaky but admissible' evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596). After determining that an expert witness is qualified, this standard requires a district court to assess whether an experts proffered testimony has a "sufficiently 'reliable foundation,'" considering the non-exhaustive factors enumerated in *Daubert* and Rule 702. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 597).

"Courts typically admit police expert testimony, based solely on the expert's professional experience, where it is offered to aid the jury's understanding of an area not within the experience of the average juror." *Cerbelli v. City of New York*, No. 99-cv-6846 (ARR) (RML), 2006 WL 2792755, at *8 (E.D.N.Y. Sept. 27, 2006) (collecting cases). Courts generally consider police practice testimony reliable when it is within the testifying expert's professional experience and the expert has considered the relevant documents. *Id.* However, the Second Circuit has held that expert testimony is not admissible where the expert usurps the jury's role by opining on an issue law or relies on speculative assumptions. *See United States v. Duncan*, 42 F.3d 97, 103 (2d Cir. 1994); *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996).

The City contends that Dr. Telesco's opinions contain a number of impermissible legal conclusions and opinions based on speculation. The Court disagrees that the Telesco Report is, on the whole, based on speculation or improperly premised on the assumption that Felix was an emotionally disturbed person. Dr. Telesco was careful to articulate the bases for her opinions, which included her extensive experience training NYPD instructors on issues related to emotionally disturbed persons, review of the relevant NYPD policies, procedures, and training materials, and study of respected academic sources. Dr. Telesco explained in detail how the detectives could have applied CIT principles to avoid escalating the confrontation with Felix. *Id.* at 8 ("Detective Carter not only failed to ISOLATE and CONTAIN David Felix but escalated the incident . . . ."); *id.* at 9 ("Detective Carter's escalation and the decision to take David Felix into custody demonstrates a lack of recognition that he was potentially encountering a person with a mental illness who had recently been engaged in violent felonious conduct."). In determining that the detectives should have treated Felix as a potential emotionally disturbed person, Dr. Telesco relied on the same common-sense factors that the Firearms Discharge Review Board

14

report concluded should have caused the detectives to call for backup—the detectives knew Felix "resided at the 'Bridge' a residential facility specifically for people with mental illness, had a diagnosis of paranoid schizophrenia, was taking medication for mental illness, and had a history of violence." *Id.* at 8–9.

However, the Court agrees with the City that two of the statements in the Telesco Report cross the line and offer impermissible legal conclusions. First, the Telesco Report stated that "David Felix would have been alive and treated for his schizophrenic symptoms, if the Detectives involved in this case had received the appropriate level of training as should be expected of one of the largest police agencies in the country." Telesco Report at 10. Although Dr. Telesco is qualified to testify as to whether certain police tactics increase the risk of death to mentally ill or emotionally disturbed persons in general, the conclusion that the lack of appropriate training caused Felix's death in this particular case impermissibly substitutes her expert opinion for the factfinding function of the jury. *See Cerbelli*, 2006 WL 2792755, at *11 (citing *Duncan*, 42 F.3d at 101). Second, the Telesco Report stated that "no exigent or emergency circumstances existed that would have justified the detectives to take the action they did." Telesco Report at 8–9. The Second Circuit has held that expert testimony that police action was not "justified under the circumstances" offers an impermissible legal conclusion. *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992). Whether the detectives were justified in entering Felix's apartment at the very least "communicat[es] a legal standard—explicit or implicit—to the jury." *Id.*

The Court therefore grants the City's motion to limit Dr. Telesco's testimony as follows: Dr. Telesco shall not testify as to the ultimate causal relationship between NYPD's training and Felix's death, and Dr. Telesco shall not testify as to whether exigent or emergency circumstances

15

justified the detectives in entering Felix's apartment. The Court denies the City's motion insofar as it seeks to preclude Dr. Telesco's testimony altogether or with respect to the other specific statements the City objects to in its brief.

## Conclusion

The City's motion (Dkt. No. 130) is GRANTED in part and DENIED in part. Specifically, the Court DENIES summary judgment as to both the failure-to-train claim and the disability discrimination claims; DENIES the request for bifurcation; and GRANTS in part the request to limit expert testimony. The Court will schedule a pretrial conference by separate order.

SO ORDERED.

Dated: October 13, 2020
New York, New York

_____
ALISON J. NATHAN
United States District Judge